| | |
|---|---|
| TODD VAN GROLL, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| ESSA PHARMA INC., DAVID R. PARKINSON, and DAVID S. WOOD, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Todd Van Groll ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding ESSA Pharma Inc. ("ESSA" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired ESSA securities between December 12, 2023 and October 31, 2024, both dates inclusive (the "Class Period"), seeking to

recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.    ESSA is a clinical stage pharmaceutical company that focuses on the development of small molecule drugs for the treatment of prostate cancer.  At all relevant times the Company's lead product candidate was masofaniten (EPI-7386), an investigational, oral, small molecule inhibitor of the androgen receptor ("AR"), which plays a pivotal role in the development and progression of prostate cancer, especially castration-resistant prostate cancer ("CRPC").

3.    ESSA was evaluating masofaniten in various clinical trials as a monotherapy and combination therapy for the treatment of prostate cancer.  These trials included, *inter alia*, EPI-7386-CS-010 (the "M-E Combination Study"), a Phase 1/2 study of masofaniten in combination with enzalutamide compared with enzalutamide alone in patients with metastatic CRPC ("mCRPC").

4.    Phase 1 of the M-E Combination Study was a single-arm dose escalation study of masofaniten in combination with a fixed dose of enzalutamide.  Based on results from the Phase 1 portion of the M-E Combination Study, ESSA purportedly identified a recommended Phase 2 combination dose of masofaniten 600 mg twice daily ("BID") combined with enzalutamide 160 mg once daily ("QD").  Phase 2 of the M-E Combination Study compared this recommended combination dose with a 160 mg QD enzalutamide monotherapy—the standard of care for the intended patient population.  The primary endpoint of Phase 2 of the M-E Combination Study was the proportion of patients reaching "PSA90," which refers to deep prostate-specific antigen ("PSA") response with a greater than or equal to 90% decline in PSA.  PSA90 is an important indicator of a patient's response to prostate cancer treatment.

5. Because masofaniten was ESSA's lead and most advanced product candidate, establishing its clinical, regulatory, and commercial viability was of central importance to Defendants and investors alike. Indeed, according to ESSA's website, apart from masofaniten, the Company only has two other product candidates, each of which is still in early development at either the research or preclinical stage[1]

6. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) masofaniten in combination with enzalutamide had no clear efficacy benefit over enzalutamide alone; (ii) accordingly, masofaniten in combination with enzalutamide was less effective in treating prostate cancer than Defendants had led investors to believe; (iii) the M-E Combination Study was unlikely to meet its prespecified Phase 2 primary endpoint; (iv) accordingly, Defendants had overstated masofaniten's clinical, regulatory, and commercial prospects; and (v) as a result, Defendants' public statements were materially false and misleading at all relevant times.

7. On October 31, 2024, during after-market hours, ESSA issued a press release announcing its decision to terminate Phase 2 of the M-E Combination Study, citing "a protocol-specified interim review of the safety, PK [pharmacokinetics] and efficacy data, which showed a much higher rate of PSA90 response in patients treated with enzalutamide monotherapy . . . than were expected based upon historical data" and "no clear efficacy benefit seen with the combination of masofaniten plus enzalutamide compared to enzalutamide single agent." The Company further advised that "a futility analysis determined a low likelihood of meeting the prespecified primary

---

[1] *See Product Candidates: Pipeline*, ESSA, https://essapharma.com/product-candidates/pipeline/ (last visited Jan. 24, 2025).

endpoint of the study" and that, "[a]s part of the effort to focus its resources," it was "planning to terminate the other remaining company-sponsored and investigator-sponsored clinical studies evaluating masofaniten either as a monotherapy or in combination with other agents."

8.      On this news, ESSA's stock price fell $3.80 per share, or ***73.08%***, to close at $1.40 per share on November 1, 2024.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.      Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Plaintiff is a resident of this District, and a substantial part of the property that is the subject of this action is thus situated in this District. Moreover, pursuant to ESSA's most recent annual report on Form 10-K, as of December 16, 2024, there were more than 44 million shares of the Company's common stock outstanding. ESSA's common stock trades on the Nasdaq Capital Market ("NASDAQ"). Accordingly, in addition to Plaintiff, there are presumably hundreds, if not thousands, of investors in ESSA's common stock located in the U.S., some of whom, like Plaintiff, undoubtedly reside in this District.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff, as set forth in the attached Certification, acquired ESSA securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. Plaintiff resides in Manitowoc County, Wisconsin, which is located in this District.

15.     Defendant ESSA is organized under the laws of British Columbia, Canada, with principal executive offices located at Suite 720, 999 West Broadway, Vancouver, British Columbia, Canada V5Z 1K5. The Company's common stock trades in an efficient market on the NASDAQ under the ticker symbol "EPIX."

16.     Defendant David R. Parkinson ("Parkinson") has served as ESSA's Chief Executive Officer at all relevant times.

17.     Defendant David S. Wood ("Wood") has served as ESSA's Chief Financial Officer at all relevant times.

18.     Defendants Parkinson and Wood are collectively referred to herein as the "Individual Defendants."

19.     The Individual Defendants possessed the power and authority to control the contents of ESSA's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of ESSA's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent

their issuance or to cause them to be corrected.  Because of their positions with ESSA, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

20.     ESSA and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21.     ESSA is a clinical stage pharmaceutical company that focuses on the development of small molecule drugs for the treatment of prostate cancer.  At all relevant times the Company's lead product candidate was masofaniten (EPI-7386), an investigational, oral, small molecule inhibitor of AR, which plays a pivotal role in the development and progression of prostate cancer, especially CRPC.

22.     ESSA was evaluating masofaniten in various clinical trials as a monotherapy and combination therapy for the treatment of prostate cancer.  These trials included, *inter alia*, the M-E Combination Study (EPI-7386-CS-010), a Phase 1/2 study of masofaniten in combination with enzalutamide compared with enzalutamide alone in patients with mCRPC.

23.     Phase 1 of the M-E Combination Study was a single-arm dose escalation study of masofaniten in combination with a fixed dose of enzalutamide.  Based on results from the Phase 1 portion of the M-E Combination Study, ESSA purportedly identified a recommended Phase 2 combination dose of masofaniten 600 BID combined with enzalutamide 160 mg QD.  Phase 2 of

6

the M-E Combination Study compared this recommended combination dose with a 160 mg QD enzalutamide monotherapy—the standard of care for the intended patient population. The primary endpoint of Phase 2 of the M-E Combination Study was the proportion of patients reaching PSA90, which is an important indicator of a patient's response to prostate cancer treatment.

24.     Because masofaniten was ESSA's lead and most advanced product candidate, establishing its clinical, regulatory, and commercial viability was of central importance to Defendants and investors alike. Indeed, according to ESSA's website, apart from masofaniten, the Company only has two other product candidates, each of which is still in early development at either the research or preclinical stage.

### Materially False and Misleading Statements Issued During the Class Period

25.     The Class Period begins on December 12, 2023, when ESSA issued a press release during pre-market hours providing a corporate update and its financial results for its fiscal fourth quarter and year ended September 30, 2023 (the "4Q/FY23 Press Release"). The 4Q/FY23 Press Release quoted Defendant Parkinson as stating, in relevant part:

> We are pleased with the progress made in 2023 with masofaniten (EPI-7386), our first-in-class N-terminal domain [AR] inhibitor for the treatment of prostate cancer, which culminated recently in the presentation of Phase 1 dose escalation data at two medical meetings where we showed that ***the combination of masofaniten with enzalutamide . . . demonstrated deep and durable reductions in [PSA] in patients with [mCRPC]*** . . . . Looking ahead, we will be focused on executing the Phase 2 combination study of masofaniten and enzalutamide in mCRPC patients as well as investigating masofaniten in combination with other standard of care antiandrogens to further elucidate its potential as a new treatment for prostate cancer patients at earlier stages of the disease.

(Emphasis added.)

26.     In addition, the 4Q/FY23 Press Release stated, *inter alia*, that results from Phase 1 of the M-E Combination Study "demonstrated that the combination continues to . . . [show] deep

and durable reductions in PSA" with "81% of patients achiev[ing] PSA90" and "69% of patients achiev[ing] PSA90 in less than 90 days[.]"

27.     Also on December 12, 2023, ESSA filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its fiscal fourth quarter and year ended September 30, 2023 (the "2023 10-K").   With respect to the purported efficacy of masofaniten  in combination with enzalutamide observed in the M-E Combination Study, the 2023 10-K stated, in relevant part:

> In the patients evaluable for efficacy (n=16), ***rapid, deep and durable reductions in PSA were observed, regardless of previous chemotherapy status, including in patients who received lower than the full dose of enzalutamide (120 mg)***. In the first three cohorts, ***90% of patients (9 of 10) achieved . . . PSA90[ and] 80% of patients (8 of 10) achieved PSA90 in less than 90 days*** . . . . Across all dose cohorts including patients in the recently enrolled Cohort 4 . . . ***81% of patients (13 of 16) achieved PSA90[ and] 69% of patients (11 of 16) achieved PSA90 in less than 90 days***[.]

(Emphases added.)

28.     Appended as exhibits to the 2023 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that the 2023 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

29.     On February 13, 2024, ESSA issued a press release providing a corporate update and its financial results for its fiscal first quarter ended December 31, 2023 (the "1Q24 Press Release").   The 1Q24 Press Release highlighted that "*[c]ombination of masofaniten plus*

*enzalutamide continues to . . . [show] deep and durable reductions in PSA in Phase 1 dose escalation in patients with mCRPC, including 81% of patients achieving PSA90[ and] 69% of patients achieving PSA90 in less than 90 days*[.]"  (Emphasis in original.)

30.     The 1Q24 Press Release also quoted Defendant Parkinson as stating, in relevant part:

> We are extremely pleased with the data reported to date from the Phase 1 dose escalation study evaluating masofaniten combined with enzalutamide in patients with mCRPC naïve to second generation anti-androgens where ***we continue to observe compelling, deep and durable reductions in [PSA], along with an encouraging 16.6 month median time to PSA progression***. We look forward to reporting updated Phase 1 dose escalation data during 2024.

(Emphasis added.)

31.     Also on February 13, 2024, ESSA filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its fiscal first quarter ended December 31, 2023 (the "1Q24 10-Q").  With respect to the purported efficacy of masofaniten  in combination with enzalutamide observed in the M-E Combination Study, the 1Q24 10-Q stated, in relevant part:

> In the patients evaluable for efficacy (n=16), ***rapid, deep and durable reductions in PSA were observed, regardless of previous chemotherapy status, including in patients who received lower than the full dose of enzalutamide (120 mg)***. Across all dose cohorts . . . ***81% of patients (13 of 16) achieved PSA90[ and] 69% of patients (11 of 16) achieved PSA90 in less than 90 days***[.]

(Emphases added.)

32.     Appended as exhibits to the 1Q24 10-Q were substantively the same SOX certifications as referenced in ¶ 28, *supra*, signed by the Individual Defendants.

33.     On May 14, 2024, ESSA issued a press release providing a corporate update and its financial results for its fiscal second quarter ended March 31, 2024 (the "2Q24 Press Release"). The 2Q24 Press Release highlighted that "*[c]ombination of masofaniten plus enzalutamide*

continues to . . . [show] deep and durable reductions in PSA in Phase 1 dose escalation in patients with mCRPC naïve to second generation antiandrogens, including 81% of patients achieving PSA90[ and] 69% of patients achieving PSA90 in less than 90 days"; and that "*Phase 2 dose expansion [is] underway evaluating masofaniten plus enzalutamide in patients with mCRPC naïve to second generation antiandrogens; ESSA projecting completion of enrollment in 1Q25, with preliminary data expected in mid-2025*[.]"  (Emphases in original.)

34.    The 2Q24 Press Release also quoted Defendant Parkinson as stating, in relevant part:

> The year is off to a strong start with the presentation of updated Phase 1 masofaniten dose escalation data at the 2024 ASCO Genitourinary Cancers Symposium ("ASCO-GU"), **which demonstrated that masofaniten combined with enzalutamide continues to . . . [show] deep and durable reductions in [PSA] in patients with [mCRPC] naïve to second-generation antiandrogens** . . . . Looking ahead, we have multiple critical milestones we are working toward, including reporting more updated data from the Phase 1 dose escalation study evaluating masofaniten combined with enzalutamide in this patient population during the second half of 2024, and completing enrollment in the Phase 2 dose expansion study evaluating masofaniten in combination with enzalutamide during the first quarter of 2025, with preliminary data expected to follow in mid-2025.

(Emphasis added.)

35.    Also on May 14, 2024, ESSA filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its fiscal second quarter ended March 31, 2024 (the "2Q24 10-Q").  The 2Q24 10-Q contained the same statements as referenced in ¶ 31, *supra*, regarding the purported efficacy of masofaniten in combination with enzalutamide observed in the M-E Combination Study.

36.    Appended as exhibits to the 2Q24 10-Q were substantively the same SOX certifications as referenced in ¶ 28, *supra*, signed by the Individual Defendants.

37.     On August 5, 2024, ESSA issued a press release providing a corporate update and its financial results for its fiscal third quarter ended June 30, 2024 (the "3Q24 Press Release"). The 3Q24 Press Release quoted Defendant Parkinson as stating:

> With continued focus on execution, we are progressing towards a stream of significant milestones throughout the next nine to twelve months, with the first being the presentation at ESMO [the European Society for Medical Oncology] of more mature durability data from the Phase 1 dose escalation study evaluating masofaniten combined with enzalutamide in patients with [mCRPC] naïve to second-generation antiandrogens . . . . We are focused on the enrollment of the Phase 2 dose expansion study evaluating masofaniten in combination with enzalutamide, with 25 sites activated in the US, Canada and Australia and an additional 14 sites being activated in Europe. We look forward to reporting key data across these trials throughout the remainder of this year through 2025.

38.     With respect to the purported efficacy of masofaniten in combination with enzalutamide observed in the M-E Combination Study, the 3Q24 Press Release stated, in relevant part:

> Phase 1/2 study is still ongoing evaluating masofaniten in combination with enzalutamide in patients with [mCRPC] naïve to second-generation antiandrogens but may have been treated with chemotherapy in the metastatic castration-sensitive setting . . . . ***Reductions in PSA were observed across evaluable patients for efficacy in all dosing cohorts*** (n=16). Across all dosing cohorts . . . ***81% of patients achieved PSA90[ and] 69% of patients achieved PSA90 in less than 90 days*** . . . . ESSA plans to report updated data from the Phase 1 dose escalation study at the [ESMO] 2024 congress.
>
> Masofaniten continues to be evaluated in combination with enzalutamide compared to enzalutamide monotherapy in a Phase 2 dose randomized study in patients with mCRPC naïve to second-generation antiandrogens but who may have been treated with chemotherapy in the metastatic castration-sensitive setting. Enrollment in the Phase 2 portion of this Phase 1/2 study is expected to be completed during the first quarter of 2025. The study is currently enrolling at approximately 25 sites in the US, Canada, and Australia. Expansion to European clinical sites is in progress with an additional 14 clinical sites planned to be activated by the third quarter of 2024. ESSA is on track to report preliminary data from the Phase 2 dose expansion portion of the study in mid-2025.

(Emphases added.)

39.    Also on August 5, 2024, ESSA filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its fiscal third quarter ended June 30, 2024 (the "3Q24 10-Q"). The 3Q24 10-Q contained the same statements as referenced in ¶ 31, *supra*, regarding the purported efficacy of masofaniten in combination with enzalutamide observed in the M-E Combination Study.

40.    Appended as exhibits to the 3Q24 10-Q were substantively the same SOX certifications as referenced in ¶ 28, *supra*, signed by the Individual Defendants.

41.    The statements referenced in ¶¶ 25-40 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) masofaniten in combination with enzalutamide had no clear efficacy benefit over enzalutamide alone; (ii) accordingly, masofaniten in combination with enzalutamide was less effective in treating prostate cancer than Defendants had led investors to believe; (iii) the M-E Combination Study was unlikely to meet its prespecified Phase 2 primary endpoint; (iv) accordingly, Defendants had overstated masofaniten's clinical, regulatory, and commercial prospects; and (v) as a result, Defendants' public statements were materially false and misleading at all relevant times.

42.    In addition, throughout the Class Period, ESSA's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations. Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"), required ESSA to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered." Defendants' failures

to disclose, *inter alia*, that masofaniten in combination with enzalutamide had no clear efficacy benefit over enzalutamide alone, and that, as a result, the M-E Combination Study was unlikely to meet its prespecified Phase 2 primary endpoint, violated Item 105 because these issues represented material factors that made an investment in the Company speculative or risky.

43.     Defendants also violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required ESSA to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failures to disclose, *inter alia*, that masofaniten in combination with enzalutamide had no clear efficacy benefit over enzalutamide alone, and that, as a result, the M-E Combination Study was unlikely to meet its prespecified Phase 2 primary endpoint, violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

**The Truth Emerges**

44.     On October 31, 2024, during after-market hours, ESSA issued a press release announcing its decision to terminate Phase 2 of the M-E Combination Study, as well as all other studies evaluating masofaniten as a monotherapy or combination therapy, stating, *inter alia*:

> ESSA . . . has made the decision to terminate the Phase 2 clinical trial evaluating in a 2:1 randomization masofaniten combined with enzalutamide versus enzalutamide single agent in patients with [mCRPC] naïve to second-generation antiandrogens. This decision, mutually agreed upon by both senior management and the board of directors, was based on a protocol-specified interim review of the safety, PK and efficacy data, which showed a much higher rate of PSA90 response in patients treated with enzalutamide monotherapy (which is standard of care for this patient population) than were expected based upon historical data. In addition, there was no clear efficacy benefit seen with the combination of masofaniten plus enzalutamide compared to enzalutamide single agent. A futility analysis determined a low likelihood of meeting the prespecified primary endpoint of the study.

13

* * *

As part of the effort to focus its resources, ESSA is also planning to terminate the other remaining company-sponsored and investigator-sponsored clinical studies evaluating masofaniten either as a monotherapy or in combination with other agents.

45.     On this news, ESSA's stock price fell $3.80 per share, or **_73.08%_**, to close at $1.40 per share on November 1, 2024.

46.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

47.     During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. Indeed, masofaniten was ESSA's lead product candidate on which much, if not all, of the Company's future success hinged. In addition, the M-E Combination Study was critical to the overall success of masofaniten as exhibited by the fact that, based on the likely failure of that study to meet its prespecified Phase 2 primary endpoint, Defendants terminated not just the M-E Combination Study, but **_all_** of ESSA's ongoing studies evaluating masofaniten, regardless of whether those studies were evaluating masofaniten as a combination therapy or monotherapy. Accordingly, both masofaniten and the M-E Combination Study were integral to ESS's future success and central to the Company's operations. As exemplified by Defendants' materially false and misleading statements made during the Class Period as alleged herein, Defendants provided a narrative of ongoing success with the M-E Combination Study to investors in an effort to maintain artificially high prices for the Company's stock price. In so doing, Defendants participated in a scheme to

14

defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired ESSA securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

49.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, ESSA securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by ESSA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

50.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of ESSA;

- whether the Individual Defendants caused ESSA to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of ESSA securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

53.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

54.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- ESSA securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold ESSA securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

55. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

56. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

57. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

58. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

59.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of ESSA securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire ESSA securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

60.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for ESSA securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about ESSA's finances and business prospects.

61.     By virtue of their positions at ESSA, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

62. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of ESSA, the Individual Defendants had knowledge of the details of ESSA's internal affairs.

63. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of ESSA. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to ESSA's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of ESSA securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning ESSA's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired ESSA securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

64. During the Class Period, ESSA securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading

statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of ESSA securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of ESSA securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of ESSA securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

65. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

66. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

67. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

68. During the Class Period, the Individual Defendants participated in the operation and management of ESSA, and conducted and participated, directly and indirectly, in the conduct

of ESSA's business affairs. Because of their senior positions, they knew the adverse non-public information about ESSA's misstatement of income and expenses and false financial statements.

69. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to ESSA's financial condition and results of operations, and to correct promptly any public statements issued by ESSA which had become materially false or misleading.

70. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which ESSA disseminated in the marketplace during the Class Period concerning ESSA's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause ESSA to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of ESSA within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of ESSA securities.

71. Each of the Individual Defendants, therefore, acted as a controlling person of ESSA. By reason of their senior management positions and/or being directors of ESSA, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, ESSA to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of ESSA and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

72. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by ESSA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: January 24, 2025                                         Respectfully submitted,

                                                                                    POMERANTZ LLP

                                                                                    */s/ Jeremy A. Lieberman*
                                                                                    Jeremy A. Lieberman
                                                                                    (New York State Bar Number 4161352)
                                                                                    J. Alexander Hood II
                                                                                    (New York State Bar Number 5030838)
                                                                                    600 Third Avenue, 20th Floor
                                                                                    New York, NY 10016
                                                                                    Telephone: (212) 661-1100
                                                                                    Facsimile: (917) 463-1044
                                                                                    jalieberman@pomlaw.com
                                                                                    ahood@pomlaw.com

                                                                                    *Attorneys for Plaintiff*