UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

| | |
|---|---|
| IN RE ESSA PHARMA, INC. SECURITIES LITIGATION | Case No. 1:25-cv-0124-WCG |
| | **CLASS ACTION** |
| THIS DOCUMENT RELATES TO: ALL FILINGS | **AMENDED CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

TABLE OF DEFINITIONS ......................................................................................... iv

NATURE OF THE ACTION ........................................................................................1

JURISDICTION AND VENUE ....................................................................................6

PARTIES .....................................................................................................................7

SUBSTANTIVE ALLEGATIONS ...............................................................................8

    I.       BACKGROUND ...............................................................................................8

          A.  History of Prostate Cancer Treatment and Detection ..............................8

          B.  Prior to the Class Period, the FDA Provides Industry Guidance on Dosing and Requires Strict Label Disclosure of Drug-Drug Interactions ................................13

          C.  Enzalutamide's Label Expressly Warns That Enzalutamide Is a Strong CYP3A4 Inducer ...................................................................................19

    II.     ESSA COVERS UP TRIAL FAILURES .................................................20

          A.  ESSA Tries but Fails to Develop a Monotherapy Treatment ................20

          B.  ESSA Tries to Show Masofaniten Improves Already-Approved Enzalutamide in the M-E Combination Trial ...........................................22

          C.  Masofaniten's Exposure (AUC) Was Reduced Below Clinically Relevant Levels by Enzalutamide ..........................................................28

    III.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD .......................................................................34

    IV.    THE TRUTH EMERGES ..........................................................................43

    V.     ADDITIONAL ALLEGATIONS OF SCIENTER ...................................44

          A.  Defendants Had Access to the Concealed Information .........................44

          B.  Defendants Had Actual Knowledge of the Information They Concealed from Investors .....................................................................................45

          C.  Core Operations ....................................................................................47

Case 1:25-cv-00124-WCG    Filed 08/11/25    Page 2 of 64    Document 20

D.   The Temporal Proximity and Sharp Divergence Between Defendants' Misleading Statements and the Emergence of the Truth Further Bolsters an Inference of Scienter ....................................................................................................................48

E.   Defendants' Failure to Share Data and Evasive Answers to Questions Suggest Scienter ....................................................................................................................48

F.   Suspicious Stock Sales Enhance an Inference of Fraud .......................................50

G.   The Company's Precarious Position Supports and Inference of Fraud .................50

PLAINTIFF'S CLASS ACTION ALLEGATIONS......................................................................51

COUNT I (VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS).....................................53

COUNT II (VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS) ..................................................................................................56

PRAYER FOR RELIEF ..............................................................................................................57

DEMAND FOR TRIAL BY JURY .............................................................................................58

# TABLE OF DEFINITIONS

| Term or Acronym | Definition |
|---|---|
| ADT | Androgen Deprivation Therapy |
| Androgen | A type of hormone that promotes the development and maintenance of male sex characteristics. |
| Aniten | A class of drug candidate developed by ESSA targeting androgen receptors. |
| AR | Androgen receptor |
| Astellas | Astellas Pharma Inc. |
| AUC | Area under the curve |
| BID | Twice daily dosing, or bi-daily dosing |
| CEO | Chief Executive Officer |
| Cesano | Alessandra Cesano |
| Class | All persons or entities who purchased or otherwise acquired ESSA common shares between March 15, 2023 and October 31, 2024, both dates inclusive. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest. |
| Class Period | March 15, 2023 through October 31, 2024, both dates inclusive. |
| Company or ESSA | ESSA Pharma Inc. |
| COO | Chief Operating Officer |
| CRPC | Castration-resistant prostate cancer |
| Clinical Trial Application | A formal request submitted to Health Canada by a drug sponsor, which requests authority to conduct a clinical trial on human subjects that involves a new drug. |
| CW | Confidential Witness |
| CYP3A4 | Refers to the enzyme, Cytochrome P450 3A4, the most common and versatile of the CYP enzymes, metabolizing approximately half of all prescribed drugs, including Masofaniten. |
| Defendants | ESSA Pharma Inc, David R. Parkinson, and Peter Virsik |
| Enzyme Guidance | FDA published guidances titled "In Vitro Drug Interaction Studies — Cytochrome P450 Enzyme — and Transporter-Mediated Drug Interactions" and "Clinical Drug Interaction Studies — Cytochrome P450 Enzyme — and Transporter-Mediated Drug Interactions" |
| Enzalutamide | A standard of care prostate cancer drug treatment. |
| EPI | The prefix ESSA used to identify its developmental Aniten molecule drug candidates. |
| EPI-506 | The Company's first Aniten drug candidate, for which it ran a clinical trial from 2015-2017. |

| Term or Acronym | Definition |
|---|---|
| EPI-7386 | Masofaniten |
| EPIX | The Company's ticker symbol for trading of shares on the NASDAQ. |
| Exchange Act | Securities Exchange Act of 1934 |
| FDA | U.S. Food & Drug Administration |
| Form 10-K | An annual report that gives a comprehensive summary of a public company's performance and is filed with the SEC. |
| Form 10-Q | A quarterly report filed by a public company with the SEC. |
| FY | Fiscal year |
| Inhibitor | A substance (another drug, food, or supplement) that slows down the activity of an enzyme. |
| Investigational New Drug Application | A formal request submitted to the FDA by a drug sponsor to obtain authorization from the FDA to conduct clinical trials of drug candidate on human subjects. |
| Individual Defendants | David R. Parkinson and Peter Virsik |
| Inducer | A substance that increases the activity of an enzyme and the breakdown of the substrate drug, which in turn *reduces* that substrate drug's concentration in the body and reduces the AUC. |
| LBD | Ligand Binding Domain |
| Masofaniten | EPI-7386, the Company's sole drug candidate during the Class Period. |
| mCRPC | Metastatic castration resistant prostate cancer. |
| M-E Combination Trial | ESSA's Phase 1/2 Clinical Trial Combining Masofaniten with Enzalutamide. |
| Monotherapy Trial | The Company's first Masofaniten study evaluating Masofaniten as a single agent. |
| MRI | Magnetic Resonance Imaging |
| NASDAQ | National Association of Securities Dealers Automated Quotations. |
| NTD | N-Terminal Domain |
| Open Label | A type of study in which the drug sponsors, health providers, and the patients are aware of the drug or treatment being given. |
| Parkinson | David R. Parkinson |
| PET Scan | Positron Emission Tomography Scan |
| Pill Burden | The relative difficulty for the patient to swallow the size and number of pills administered. |
| PK | Pharmacokinetic, which means the effect of a drug on a patient's body, specifically its absorption, distribution, metabolism, and excretion. |
| Plaintiff | Todd Van Groll |
| PSA | Prostate-Specific Antigen |
| PSA90 | The percentage of patients who received a 90% reduction in PSA level. |
| PSMA | Prostate-Specific Membrane Antigen |

| Term or Acronym | Definition |
|---|---|
| QD | Once Daily Dosing |
| Responsible Party | The party responsible for submitting information about a clinical study to ClinicalTrials.gov and updating that information. |
| SEC | United States Securities and Exchange Commission |
| Sponsor | The organization or person who initiates the study and who has authority and control over the study. |
| Standard of Care | The treatment that is generally accepted by oncologists as the proper treatment. Also called best practice, standard medical care, and standard therapy. |
| Substrate | Refers to the substance being metabolized by an enzyme. |
| Virsik | Peter Virsik |

Lead Plaintiff Todd Van Groll ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff's and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding ESSA Pharma Inc. ("ESSA" or the "Company"), materials made available by the U.S. Food & Drug Administration ("FDA"), analysts' reports and advisories about the Company, interviews with knowledgeable individuals, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a Class Action on behalf of all persons or entities who purchased or otherwise acquired ESSA common shares between March 15, 2023 and October 31, 2024, both dates inclusive (hereafter the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

2.     At all relevant times, ESSA was a clinical-stage pharmaceutical company focused on developing therapies for the treatment of prostate cancer.

1

3. The Company, under a license agreement with the British Columbia Cancer Agency and the University of British Columbia, retained exclusive rights to develop and commercialize products based on the Aniten molecule, a class of drugs targeting androgen receptors (at times referred to herein as "AR"). ESSA designated these molecule candidates "EPI" followed by a number identifying the specific candidate. From 2015 to 2017, the Company conducted a study on its first candidate, EPI-506, a treatment for metastatic castration-resistant prostate cancer. EPI-506 development was terminated in 2017 due to a lack of efficacy and potency, and excessive pill burden that was required to reach a response.

4. Pill burden is a serious concern for prostate cancer medications, and for several other categories of treatments. The term "pill burden" refers to the burden upon the patient to swallow the size and number of pills administered. Pill burden matters because it impacts a patient's adherence to the drug protocol. In a recent survey of prostate cancer patients, nearly two-thirds (63%) reported difficulty remembering to take pills multiple times per day and 91% said they would choose a one-pill-once-daily option over a multi-pill regimen. Twenty-two percent (22%) of patients had difficulty swallowing pills or were unsure. *See* https://link.springer.com /article/10.1007/s12325-025-03214-7. Here, for example, ESSA has admitted that the pill burden on the highest doses of its EPI-506 drug was as high as "18 capsules/day." *See* https:// clinicaltrials.gov/study/NCT02606123.

5. Left with limited options, the Company initiated a corporate restructuring and pivoted to developing a second Aniten molecule, called Masofaniten (previously known as EPI-7386). Like EPI-506, Masofaniten was intended to treat metastatic castration-resistant prostate cancer. Throughout the Class Period, Masofaniten, was ESSA's sole drug candidate. Pill burden

2

was also a known problem with Masofaniten due to known issues ESSA was having in reaching clinical levels of exposure.

6. ESSA first attempted to develop Masofaniten as a standalone drug, or monotherapy, but Phase 1 testing showed that it lacked clinical effectiveness when administered in that manner.

7. The Company searched for other options to continue developing Masofaniten. In 2021, it announced that it would partner with three manufacturers (Janssen, Astellas, and Bayer) who already had related drugs approved that were considered the "standard of care" therapies (*i.e.*, the treatment that oncologists generally accept as the proper treatment) to test whether Masofaniten combined with those approved drugs performed better than the approved drugs on their own.

8. Only the study combining Masofaniten with Astellas's drug Enzalutamide actually commenced significant dosing. The combination study with the Janssen drug was terminated after just three patients were dosed, and the combination study with the Bayer drug never commenced.

9. The clinical trial involving Masofaniten and Enzalutamide ("M-E Combination Trial") was designated as a Phase 1 / Phase 2 trial, and was the central focus of the Company in the lead-up to and during the Class Period. According to the profile that ESSA submitted to clinicaltrials.gov, ESSA was designated as the "sponsor" of the drug and the "responsible party" for the clinical trial. Critically, the trial was indicated to be "open label," meaning the drug sponsor, health providers, and the patients were aware of the drug being given. In the M-E Combination Trial, there was no masking, meaning that nothing was obscured from the clinicians, participants, or the Company. Phase 1 of the trial sought to determine the optimal dosage for each drug in the combination, and Phase 2 tested the combination of Masofaniten and Enzalutamide against Enzalutamide alone.

10.     Before the Class Period began, the Company admitted to knowing that a potential problem would be getting enough Masofaniten into the patient's body. The study of the amount of a drug reaching the patient's bloodstream is called pharmacokinetics, and the specific measure studied for drugs in this category is called area under the curve ("AUC"). ESSA admitted to understanding that patients needed to reach an exposure level of at least 300,000 AUC for Masofaniten to be clinically significant. Given the limited response of the drug in the Masofaniten monotherapy trial, the Company was well aware that it had to meet this exposure level to have any chance of showing clinical effectiveness.

11.     Defendants also admitted before the Class Period that they knew and understood that the drug with which they sought to combine with Masofaniten, Enzalutamide, would interact with and reduce the presence of Masofaniten in the body. This was because Enzalutamide is a strong inducer of the CYP3A4 enzyme, and Masofaniten is a substrate of that same enzyme. As a result, Enzalutamide made the body metabolize more Masofaniten, leaving less Masofaniten available in the bloodstream to treat the disease. Defendants admitted both before and during the Class Period knowing that Enzalutamide caused a "significant decrease" in exposure to Masofaniten within the body, the very deficiency that they said ultimately sank the drug combination. *See* ¶¶86-91, 99, 102-03, 111.

12.     Defendants also knew exactly how the patients were progressing throughout the trial, because there was no masking. They even admitted to knowing the AUC conditions of individual patients, and confirmed that they received monthly reports. *See* ¶¶88-90, 99, 103, 113. Nevertheless, throughout the Class Period, Defendants repeatedly made false and misleading statements that concealed from investors: (a) that Masofaniten was failing to reach the exposure levels needed for clinical effectiveness when combined with Enzalutamide; (b) that the

4

combination of Enzalutamide and Masofaniten showed no improvement over Enzalutamide alone; (c) that the Enzalutamide-only arm of the trial was performing at a much higher level than they told investors to expect, eliminating any need for a combination therapy; and (d) that comparisons to decade-old trial results were no longer accurate because early detection meant that patients received treatment far earlier and had become more responsive to treatment. Defendants also made affirmatively false and misleading statements asserting that drug-drug interaction concerns had been controlled for by changing the Masofaniten dosing to 600 mg twice daily.

13.     In truth, as Defendants knew, the combination therapy: (a) did not deliver the exposure level of 300,000 AUC of Masofaniten required for anti-tumor activity at a clinical response level; (b) that the combination of Enzalutamide and Masofaniten showed no improvement over Enzalutamide alone; and (c) that the Enzalutamide-only arm of the trial was performing at a much higher level than they told investors to expect, eliminating any need for a combination therapy.

14.     On October 31, 2024, during after-market hours, ESSA issued a press release admitting for the first time that it was terminating the M-E Combination Trial early because interim results showed there was no benefit to combining Masofaniten and Enzalutamide compared to Enzalutamide alone, and that it would not study Masofaniten any further, either as a monotherapy or combination.

15.     On this news, ESSA lost almost three-quarters of its value, ending down the following day by 73.08% on heavy volume.

16.     Shortly thereafter, on December 12, 2024, ESSA disclosed that it had terminated its license with the University of British Columbia for the EPI molecules, and was abandoning

their development altogether. On July 14, 2025, the Company announced it was being acquired by Xeno Therapeutics, at a price far lower than it traded for during the Class Period.

17.     As a result of Defendants' wrongful acts and omissions, the Company lost the majority of its market value and its investors lost tens of millions of dollars. Plaintiff and other Class members have suffered significant losses and damage.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

20.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Plaintiff is a resident of this District, and a substantial part of the property that is the subject of this action is thus situated in this District. Moreover, pursuant to ESSA's most recent annual report on Form 10-K, as of December 16, 2024 there were more than 44 million shares of the Company's common shares outstanding. ESSA's common shares traded on the National Association of Securities Dealers Automated Quotations ("NASDAQ") Capital Market during the Class Period. Accordingly, in addition to Plaintiff, there are presumably hundreds, if not thousands, of investors in ESSA common shares located within the U.S., some of whom, like Plaintiff, undoubtedly reside in this District.

21.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

22.     Lead Plaintiff Todd Van Groll acquired ESSA common shares at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. (ECF No. 13-1). Plaintiff resides in Manitowoc County, Wisconsin, which is located in this District.

23.     Defendant ESSA is organized under the laws of British Columbia, Canada, with principal executive offices located at Suite 720, 999 West Broadway, Vancouver, British Columbia, Canada V5Z 1K5. The Company's common shares trade in an efficient market on the NASDAQ under the ticker symbol "EPIX."

24.     Defendant David R. Parkinson ("Parkinson") has served as ESSA's Chief Executive Officer ("CEO") at all relevant times.

25.     Defendant Peter Virsik ("Virsik") has served as ESSA's Chief Operating Officer ("COO") at all relevant times.

26.     Defendants Parkinson and Virsik are referred to herein collectively as the "Individual Defendants."

27.     The Individual Defendants possessed the power and authority to control, and in the operation of their day-to-day responsibilities did control, the contents of ESSA's SEC filings, press releases, and other market communications. The Individual Defendants held themselves out, as CEO and COO of the Company, as the Company's representatives to investors, speaking expressly about the topics alleged herein. The Individual Defendants were provided with copies of ESSA's SEC filings, press releases, and other market communications alleged herein to be misleading prior

7

to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with ESSA, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

28.     ESSA and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

## I.     BACKGROUND

### A.     History of Prostate Cancer Treatment and Detection

29.     Prostate cancer is the second most diagnosed form of cancer in men. Each year, according to the American Cancer Society, over 300,000 new cases of prostate cancer are diagnosed in the United States alone.[1]

30.     Prostate cancer treatment has evolved since the cancer was first described in the mid-19th Century, with the most profound shift taking place in the 1940s with the discovery of the impact of male sex hormones, or "androgens," on prostate cancer.

31.     In 1941, Charles Huggins published his work demonstrating that prostate tumors regress after testosterone levels are lowered, either via surgical castration or by administering female hormones, estrogen. Huggins' discovery led to the first hormonal therapy for prostate treatment and won him the Nobel Prize in Medicine in 1966.

---

[1] https://www.cancer.org/cancer/types/prostate-cancer/about/key-statistics.html

8

32.     In the early 1980s, the development of more targeted hormonal therapies, such as Luteinizing Hormone-Releasing Hormone agonists, introduced chemical castration and marked a new era of androgen deprivation therapy.

33.     However, while chemical castration was effective in some patients, in others, approximately 10% to 20%, the disease progressed to a more severe form, and it was no longer responsive to treatments that lowered testosterone. In this subset of patients, the disease advanced to what is now referred to as castration-resistant prostate cancer (CRPC), with the modifier "metastatic" being used to define cases of CRPC where the disease has spread to other parts of the body (mCRPC). The median survival rate for men with CRPC or mCRPC ranges between 13.2 months to 23.2 months.

34.     At all relevant times, ESSA focused on developing therapies for the treatment of prostate cancer with a primary focus on patients whose disease is still predominantly driven by an activated androgen receptor (AR). In prostate cancer, androgens bind to androgen receptors inside the cancer cells, which causes the cancer cells to grow. The androgen receptor is composed of three domains: the ligand-binding domain ("LBD"), which binds to androgen hormones, the DNA-binding domain, which binds to DNA in cells, and the N-terminal domain ("NTD"), which is necessary for androgen receptor gene transcription. See the figure below:



**Androgen Receptor**

35.    The standard of care in prostate cancer has been Androgen Deprivation Therapy ("ADT") since most prostate cancer cells require testosterone to grow. ADT stops testosterone from being made or from reaching prostate cancer cells. This causes prostate cancer cells to die or to slow their growth. These antiandrogens interfere either with androgen synthesis (*i.e.*, abiraterone), or with the binding of androgens to the LBD, located at the opposite end of the receptor from the NTD. Most patients initially respond to ADT; however, many experience a recurrence in tumor growth despite the reduction of testosterone to castrate levels, and at that point are considered to have CRPC. Following diagnosis of CRPC, patients have been generally treated with second-generation antiandrogens that more efficiently block the binding of androgens to the AR (such as Enzalutamide), or inhibit synthesis of androgens (abiraterone). All of these treatments bind to the LBD.[2]

36.    Many treatments, including ESSA's, focused on inhibiting the N-terminal domain (NTD) of the androgen receptor. Prostate cancer often grows because of a signal sent by the

---

[2] Chen, Y., Zhou, Q., Hankey, W. *et al.* Second generation androgen receptor antagonists and challenges in prostate cancer treatment. *Cell Death Disease.*, Vol. 13, Art. 632, July 2022, https://doi.org/10.1038/s41419-022-05084-1.

androgen receptor (AR), like an "on" switch for cancer cells. While many drugs block parts of this switch, cancer can sometimes find a way around them. New drugs, called NTD inhibitors (like ESSA's were intended to) aim to disrupt this NTD, and thereby stop the AR "on" switch from ever activating, thwarting prostate cancer growth.



37. In 1986, the FDA approved the use of Prostate-Specific Antigen ("PSA") blood test to monitor prostate cancer. Prostate cancer detection has also advanced significantly, especially in the last ten years. The recent widespread use of PSA testing led to a dramatic increase in the early detection of the disease, often before it would spread or caused other symptoms. A PSA level above a certain threshold (e.g., 4.0 ng/mL) often led to a recommendation for a biopsy.

38. Advanced imaging techniques such as Multiparametric Magnetic Resonance Imaging ("MRI") aided practitioners in providing a highly detailed anatomical and functional map of the prostate before a biopsy. With this method, a urologist uses the MRI images to guide the biopsy needle directly to the suspicious areas. This approach is much more accurate than random

11

biopsies, increasing the detection of clinically significant cancers while reducing the diagnosis of indolent, low-risk tumors that do not require treatment.

39.     The newest and most advanced method for detecting prostate cancer and its spread is the use of specialized Positron Emission Tomography ("PET") scans. These scans use radioactive tracers that bind specifically to the Prostate-Specific Membrane Antigen ("PSMA"), a protein that is overexpressed on the surface of most prostate cancer cells. PSMA PET scans are significantly more sensitive than conventional imaging (CT and bone scans), especially at low PSA levels. They can detect microscopic sites of cancer in lymph nodes or bones that other scans would miss. This capability changed how doctors stage the disease, particularly in cases where the cancer has returned after initial treatment. This method has also led to catching more prostate cancers at earlier stages of the disease.

40.     The first step toward widespread use of next-generation imaging techniques followed FDA approval of Axumin in 2016. This imaging agent, or tracer, specifically targets amino acid transport, which is often elevated in prostate cancer cells. It was a significant improvement for detecting recurrent prostate cancer, particularly in men with rising PSA levels after initial treatment.

41.     In 2020 and 2021, the FDA approved two additional tracers that are significantly more sensitive and can detect tiny metastatic lesions that were previously undetectable. Specifically, in 2021, the FDA approved a fluorine-based tracer that was a commercially available kit that could be used at a much wider range of facilities, rapidly expanding access to this technology across the country.

42.     Importantly, one of the most profound impacts of PSMA PET scans are their ability to detect the presence of lymph node involvement or distant metastases that CT and bone scans

12

completely missed. In some studies, a significant percentage of patients initially thought to have localized disease (that is, confined to the prostate) were found to have metastatic disease on a PSMA PET scan. This finding changes the patient's stage from a localized to a metastatic one, with a dramatic shift in prognosis and treatment strategy.

43.     As a result of these new detection measures, prostate cancer is generally caught much earlier, when the patients are much healthier and responsive to treatment.

**B.      Prior to the Class Period, the FDA Provides Industry Guidance on Dosing and Requires Strict Label Disclosure of Drug-Drug Interactions**

44.     In Spring 2021, the FDA launched Project Optimus, a new initiative to overhaul the way oncology drugs are dosed. Traditionally, oncology drug development relied heavily on the maximum tolerated dose approach, which led to very heavy dosage for newer, targeted therapies.

45.     The core goal of Project Optimus is to identify doses that maximize both efficacy and safety, not just the highest dose tolerated by patients. In that regard, Project Optimus encourages drug sponsors to evaluate multiple doses in early clinical trials to determine the best dose, based on both achieving endpoints and patient tolerability.

46.     Project Optimus also encourages sponsors to explore a broader dose range, including lower doses that might be equally effective but less toxic. Testing broad dose ranges is important because newer, targeted therapies are often given over extended periods, unlike chemotherapies. Therefore, patients must endure any side effects over many months or even years, rather than for the short, concentrated bursts of time typically associated with chemotherapies, and such side effects limit adherence to treatment.

47.     Critically, dose exploration is aimed at extrapolating better pharmacokinetic ("PK") information and AUC details. Pharmacokinetic information shows how a drug moves through a patient's body, specifically its absorption, distribution, metabolism, and excretion. PK information

13

is crucial because it provides data that helps researchers determine optimal dosing, describes how the drug interacts within the body over time, and identifies potential drug-drug or food-drug interactions. AUC is a fundamental pharmacokinetic statistic that directly reflects the total systemic exposure to a drug over a given period of time, or more simply, AUC provides researchers with a numerical value representing the overall amount of exposure to a drug. Once researchers obtain the AUC data from a given dose, they can use it as a benchmark to better assess the efficacy, safety, and tolerability of the drug and compare it to other dose ranges.

48.     FDA drafts Guidances for Industry supporting these goals. Guidances for Industry are written material that describe the FDA's interpretation of a scientific or regulatory issue.

49.     FDA's Good Guidance Practices regulation (21 C.F.R. § 10.115) governs the development and issuance of guidance documents, and it gives interested persons a number of opportunities to provide input into the guidance development process.

50.     Generally, the FDA solicits public input on guidance prior to implementation. The Agency posts draft guidance documents on its website and publicizes them by issuing a Notice of Availability of the draft guidance in the *Federal Register*.

51.     Generally, the public has 60 days to provide comments to the FDA on draft guidance. In some instances, FDA may also hold public meetings or workshops on draft guidance to solicit additional comments or present the draft guidance to an advisory committee for review. Once the comment period has closed, the Agency reviews and considers the comments it has received, as it prepares the final guidance.

52.     In January 2020, the FDA published two guidances titled "In Vitro Drug Interaction Studies — Cytochrome P450 Enzyme — and Transporter-Mediated Drug Interactions" and "Clinical Drug Interaction Studies — Cytochrome P450 Enzyme — and Transporter-Mediated

Drug Interactions" (together, the "Enzyme Guidance").[3] The Enzyme Guidance was "intended to help drug developers plan and evaluate studies to determine the drug-drug interaction (DDI) potential between investigational drugs with cytochrome p450 enzymes."

53. According to the FDA's Enzyme Guidance, Cytochrome P450 enzymes are vital in pharmacokinetics because they are the primary enzymes responsible for metabolizing many drugs. This metabolism can be influenced by other drugs, leading to significant drug-drug interactions that can alter a drug's effectiveness or cause harmful side effects. The Enzyme Guidance directed drug sponsors to evaluate these interactions during drug development to ensure patient safety.

54. More specifically, Cytochrome P450 3A4 ("CYP3A4") enzyme is particularly important because it is the most common and versatile of the CYP enzymes, metabolizing approximately half of all prescribed drugs. Due to its broad substrate specificity, CYP3A4 is a major site for drug-drug interactions. The Enzyme Guidance provides detailed directions for the drug sponsors to test new drugs for their potential to inhibit or induce CYP3A4, as these interactions can significantly alter drug exposure and lead to altered efficacy or serious adverse effects.

55. An inhibitor is a substance (another drug, food, or supplement) that slows down the activity of the CYP3A4 enzyme. This results in the "substrate" drug (the one being metabolized by CYP3A4) being broken down more slowly. Consequently, the concentration of the substrate drug in the body increases relative to what its concentration would be without the inhibitor, which can lead to enhanced therapeutic effects but also a higher risk of adverse side effects and toxicity.

---

[3]The Enzyme Guidance was withdrawn in November 2024 but served as FDA guidance throughout the Class Period.

A classic example is grapefruit juice, which inhibits intestinal CYP3A4 and can significantly increase the exposure of certain drugs.

56.     An inducer is the opposite of an inhibitor. An inducer increases the activity of the CYP3A4 enzyme and the breakdown of the substrate drug, which in turn **reduces** that substrate drug's concentration in the body and reduces the AUC. The result can be a loss of therapeutic efficacy or treatment failure because the drug levels are too low to be effective. The effects of induction are often slower to develop and can last for a period after the inducer is stopped. For example, the antibiotic rifampin is a potent CYP3A4 inducer that can decrease the effectiveness of many other drugs.

57.     The FDA classifies CYP3A4 inducers into three categories based on the degree of induction and the affected reduction of the CYP3A4 substrate: strong, moderate, and weak[4].

## Inducer

| Potency Category | Definitions of inducers for CYP-based metabolism |
|---|---|
| Strong Inducer | Drugs that decrease the AUC of sensitive substrates of a given metabolic pathway by ≥80% |
| Moderate Inducer | Drugs that decrease the AUC of sensitive substrates of a given metabolic pathway by ≥50% to <80% |
| Weak Inducer | Drugs that decrease the AUC of sensitive substrates of a given metabolic pathway by ≥20% to <50% |

58.     Enzalutamide is a known strong inducer of the CYP3A4 enzyme, and it follows that it decreases the exposure, or AUC, of CYP3A4 drug substrates by more than 80%.

59.     The FDA also disseminated a presentation illustrating the important points of the Enzyme Guidance and the drug-drug interaction studies, including the reduction of exposure of the substrate drug:

---

[4] https://www.fda.gov/drugs/drug-interactions-labeling/healthcare-professionals-fdas-examples-drugs-interact-cyp-enzymes-and-transporter-systems



60. Federal Regulations also require precise labeling information regarding drug-drug interactions:

> (i) This section must contain a description of clinically significant interactions, either observed or predicted, with other prescription or over-the-counter drugs, classes of drugs, or foods (e.g., dietary supplements, grapefruit juice), and specific practical instructions for preventing or managing them. The mechanism(s) of the interaction, if known, must be briefly described. Interactions that are described in the "Contraindications" or "Warnings and Precautions" sections must be discussed in more detail under this section. Details of drug interaction pharmacokinetic studies that are included in the "Clinical Pharmacology" section that are pertinent to clinical use of the drug must not be repeated in this section.

> (ii) This section must also contain practical guidance on known interference of the drug with laboratory tests.

21 C.F.R. § 201.57(c)(8).

> (C) 12.3 Pharmacokinetics. This subsection must describe the clinically significant pharmacokinetics of a drug or active metabolites, (i.e., pertinent absorption, distribution, metabolism, and excretion parameters). Information regarding bioavailability, the effect of food, minimum concentration (Cmin), maximum concentration (Cmax), time to maximum concentration (Tmax), area under the curve (AUC), pertinent half-lives (t1/2), time to reach steady state, extent of accumulation, route(s) of elimination, clearance (renal, hepatic, total), mechanisms of clearance (e.g., specific enzyme systems), drug/drug and drug/food (e.g., dietary

17

supplements, grapefruit juice) *pharmacokinetic interactions (including inhibition, induction, and genetic characteristics), and volume of distribution (Vd) must be presented if clinically significant.* Information regarding nonlinearity in pharmacokinetic parameters, changes in pharmacokinetics over time, and binding (plasma protein, erythrocyte) parameters must also be presented if clinically significant. *This section must also include the results of pharmacokinetic studies (e.g., of metabolism or interaction) that establish the absence of an effect, including pertinent human studies and in vitro data.* Dosing recommendations based on clinically significant factors that change the product's pharmacokinetics (e.g., age, gender, race, hepatic or renal dysfunction, concomitant therapy) that appear in other sections (e.g., "Warnings and Precautions," "Dosage and Administration" or "Use in Specific Populations") must not be repeated in this subsection, but the location of such recommendations must be referenced.

21 C.F.R. § 201.57(c)(13)(i)(C).

61.     This regulation, along with various FDA guidance documents, mandates that a drug's labeling must include a "Drug Interactions" section. This section must describe any clinically significant interactions, whether observed or predicted, with other drugs or foods. For a drug that is a CYP3A4 inducer, this means the labeling must:

a.  Describe the mechanism of the interaction (*i.e.*, that the drug induces CYP3A4).

b.  Explain the clinical consequences of this interaction (*e.g.*, that it can lead to decreased effectiveness of other drugs that are CYP3A4 substrates).

c.  Provide practical instructions for healthcare providers on how to manage or prevent the interaction, such as by avoiding concomitant use or adjusting the dosage of the affected drug.

62.     The goal of this regulation is to ensure that healthcare practitioners have clear and accessible information to make safe and effective prescribing decisions, thereby preventing potential therapeutic failures or adverse events, and that drug sponsors have the PK information when designing clinical trials where the approved drug will be given in combination with a drug candidate, *i.e.*, a combination clinical trial.

**C. Enzalutamide's Label Expressly Warns That Enzalutamide Is a Strong CYP3A4 Inducer**

63.     In line with these labeling requirements, Enzalutamide's labeling and prescribing information explicitly warns in the "Drug Interactions" section to:

> *Avoid coadministration with certain CYP3A4, CYP2C9, or CYP2C19 substrates for which a minimal decrease in concentration may lead to therapeutic failure of the substrate. In cases where active metabolites are formed, there may be increased exposure to the active metabolites*."

64.     Furthermore, the Enzalutamide label's prescribing information specifically warns that it is a ***strong CYP3A4*** inducer and should not be combined with CYP3A4 drug substrates, such as Masofaniten:

> *[Enzalutamide] is a strong CYP3A4 inducer* and a moderate CYP2C9 and CYP2C19 inducer. *The coadministration of XTANDI decreases the concentrations of certain CYP3A4*, CYP2C9, or CYP2C19 substrates [see Clinical Pharmacology (12.3)], *which may reduce the efficacy of these substrates. Avoid the coadministration of [Enzalutamide] with certain CYP3A4*, CYP2C9, or CYP2C19 *substrates for which a minimal decrease in concentration may lead to therapeutic failure of the substrate*. If the coadministration cannot be avoided, increase the dosage of these substrates in accordance with their Prescribing Information. In cases where active metabolites are formed, there may be increased exposure to the active metabolites.

65.     The Enzalutamide prescribing information also includes the outcomes of a drug interaction study where Enzalutamide was combined with a CYP3A4 substrate. That study notes that "*[t]he coadministration of [Enzalutamide] 160 mg orally once daily with midazolam (a sensitive CYP3A4 substrate) decreased midazolam AUC by 86%*." Thus, there is no doubt that Defendants were aware that Enzalutamide was a strong CYP3A4 inducer and would impact Masofaniten's AUC by decreasing it by at least 80%, in line with FDA guidance findings and prior Enzalutamide's published PK parameters.

19

## II.     ESSA COVERS UP TRIAL FAILURES

### A.     ESSA Tries but Fails to Develop a Monotherapy Treatment

66.     ESSA was founded in 2009. Since 2010, and through the Class Period, the Company was party to a license agreement with the British Columbia Cancer Agency and the University of British Columbia in which the Company retained exclusive rights to develop and commercialize products based on the EPI molecules.

67.     The Company conducted a proof-of-concept Phase 1 clinical trial of its first Aniten molecule, EPI-506, from 2015 to 2017. That trial enrolled 28 patients across five sites in the United States and Canada.

68.     According to the Company, the initial Phase 1 EPI-506 80 mg dose was woefully inadequate in humans. The Company had to administer doses as high as 3600 mg, but only observed "potential efficacy[] ranging from 4% to 37%" reduction in PSA in five patients who were predominantly administered more than 1280 mg of EPI-506.[5]

69.     The Company terminated the study at the end of the Phase 1 clinical trial because of a lack of effectiveness and because "[e]xcessive high pill burden" was required to reach a clinically relevant response.[6]  In particular, at the highest dose, patients needed to take up to 18 capsules per day. The Company explained that "the pharmacokinetic and metabolic studies revealed the limitations of the first-generation agent EPI-506."

70.     CW1 worked at ESSA as a technical consultant from February 2018 to January 2020, where CW1 focused specifically on increasing the potency levels of the Company's EPI molecules. During CW1's consultancy, CW1 was also employed as a research technician at the

---

[5] *See* ESSA Pharma Annual Report for Fiscal Year 2023 on Form 10-K ("2023 10-K").
[6] https://clinicaltrials.gov/study/NCT02606123

20

University of British Columbia, where CW1 worked on the research and development of ESSA's EPI molecules. CW1 confirmed that EPI-506 was cancelled due to pill burden. According to CW1, because patients needed to take too much of the drug to sustain levels of exposure in the body, the drug was too cumbersome for cancer patients to take.

71.     Because EPI-506 failed to show efficacy, the Company abandoned the drug candidate and announced on September 11, 2017 that it would initiate a corporate restructuring plan. According to the Company, the restructuring plan would "focus research and development resources on its next-generation [EPI molecules] targeting the AR-NTD. This next generation [EPI] compound includes significantly more potent drugs designed to exhibit increased resistance to metabolism and therefore a longer predicted circulating half-life."

72.      After abandoning EPI-506, ESSA focused on Masofaniten (EPI-7386), which it claimed "demonstrated 20 times higher potency than EPI-506" and exhibited "increased resistance to metabolism." On March 28, 2019, the Company announced Masofaniten was its lead clinical candidate for the treatment of metastatic castration resistant prostate cancer (mCRPC).

73.     On March 30, 2020, the Company submitted an Investigational New Drug Application to the FDA, and a Clinical Trial Application with Health Canada in April 2020. The Company began clinical testing on human patients in July 2020.

74.     On March 31, 2020, the Company issued a press release where Parkinson touted Masofaniten's (EPI-7386) prospects:

> "We believe that [Masofaniten] EPI-7386 has the potential to be an important new therapy for men with prostate cancer. All of the preclinical data accumulated to date leads us to believe that it will be an active agent with a good PK profile."

75.     The first Masofaniten study was to be conducted to evaluate Masofaniten as a single agent (the "Monotherapy Trial").

76. The Monotherapy Trial was a non-randomized, open-label dose-escalation trial designed to primarily "assess the safety (side effects) of [Masofaniten] EPI-7386 and to find a dose that can be given without unacceptable side effects." The Monotherapy Trial was also undertaken to evaluate: (a) the changes in the amount of Masofaniten in the blood over time; (b) the effect of Masofaniten on prostate cancer; (c) the effect of Masofaniten on certain substances in the body; and (d) the possibility that Masofaniten can interact with other drugs.

77. The Monotherapy Trial initially evaluated Masofaniten doses ranging from 200 mg to 1000 mg taken once daily, and a 600 mg dose taken twice daily.

78. At the Cowen 41st Annual Health Care Conference on March 4, 2021, Virsik explained that ESSA thought it needed Masofaniten exposures of over 300,000 AUC, which it "project[ed]" it could accomplish with a single 600 or 800 mg daily dose. However, this failed. In September 2021, the Company amended its protocol to allow for twice-daily dosing of Masofaniten 800 mg due to saturation issues.

79. Even with the higher dose, the Monotherapy Trial failed to demonstrate clinical effectiveness. As Parkinson later admitted at the Oppenheimer 33rd Annual Healthcare Conference on March 15, 2023, that the PSA reduction was not "deep" or "long" and "we didn't see dramatic clinical activity."

**B.      ESSA Tries to Show Masofaniten Improves Already-Approved Enzalutamide in the M-E Combination Trial**

80. Confronted with a drug it could never commercialize as a monotherapy, the Company sought to prove the drug's worth when combined with approved LBD-targeting drugs that had become the standard of care.

81. On January 13, 2021, the Company announced a collaboration with Janssen to test Masofaniten in combination with Janssen's two approved therapies. However, this trial was

22

terminated early, after just three patients were enrolled. The Company also announced a collaboration and supply agreement with Bayer Consumer Care AG to evaluate Masofaniten in combination with Bayer's androgen receptor inhibitor, darolutamide, but that trial never commenced.

82.     On February 24, 2021, the Company announced the M-E Combination Trial, a collaboration and supply agreement with Astellas Pharma Inc. ("Astellas") to evaluate Masofaniten in combination with Astellas's AR inhibitor, Enzalutamide, in patients with mCRPC. ESSA paid for and sponsored the M-E Combination Trial, and was the designated responsible party for the trial. The M-E Combination Trial was designed to have two phases, both of which were open-label with no masking. That study design ensured that ESSA, as the sponsor and responsible party, had full access to interim trial data. Defendants admitted before and during the Class Period that they did in fact receive actual interim trial data, including patient-by-patient interim data on crucial statistics like PSA reduction and AUC. *See, e.g.,* ¶¶86-91, 99, 102-03, 111, 113.

83.     Phase 1 of the M-E Combination Trial was a single-arm dose escalation study of Masofaniten in combination with Enzalutamide to primarily evaluate the safety and tolerability of the drug combination and estimate the optimal dose, which would be called the Recommended Phase 2 Combination Dose and administered to cohorts in Phase 2 of the study. In addition, blood sampling was to be conducted to assess the potential interaction between Masofaniten and Enzalutamide, and to assess PSA levels.

84.     Phase 2 contained two study arms: the experimental arm that received the Masofaniten-Enzalutamide combination therapy, and the control arm that received only the approved Enzalutamide, which was considered standard of care. Patients assigned to receive a

23

combination therapy were divided into four cohorts. Each cohort received a different dose of Masofaniten in combination with either 120 mg or 160 mg of Enzalutamide:

| Cohort | Doses |
|---|---|
| 1 | 600 mg once daily Masofaniten in combination w/ Enzalutamide 120 mg |
| 2 | 800 mg once daily Masofaniten in combination w/ Enzalutamide 120 mg |
| 3 | 1000 mg once daily Masofaniten in combination w/ Enzalutamide 160 mg |
| 4 | Recommended Phase 2 Combination Dose, as determined in Phase 1 |

85.    The Company later amended the trial design of the M-E Combination Trial to switch dosing for Cohort 3 from 1000 mg once daily to 1200 mg, administered as 600 mg twice daily.[7] ESSA's Chief Medical Officer Alessandra Cesano ("Cesano") explained earlier on June 27, 2022 at the Monotherapy Study Clinical Development Call, that the Company would need to make the change because "exposures achieve[d] at 800 and 1,000 milligram levels administered QD [(once daily)] were not linearly increased, suggesting a possible limitation in drug absorption." Virsik also conceded on November 17, 2021 at the Jefferies London Healthcare Virtual Conference that the move was made because "there was a possibility that some of the drug was being saturated for absorption. Meaning, you'll get your larger amount and they weren't necessarily absorbing" the full amount. Optimal dosing continued to be a problem with Masofaniten as it had been with EPI-506, especially given the known issues with pill burden and potency.

86.    Defendants unquestionably knew before the Class Period that potency and pill burden would be substantially more difficult with Masofaniten as a combination therapy than it

---

[7] This was announced on April 12, 2023.

had been with EPI-506 or Masofaniten as a monotherapy, because Enzalutamide was widely

understood to induce metabolization, and thereby reduce the presence, of CYP3A4 substrate drugs

like Masofaniten. Besides the direct warning provided by Enzalutamide's prescribing information,

even before the Class Period began, Defendants admitted to understanding that this drug-drug

interaction would impact Masofaniten as a combination therapy. On March 9, 2021, at the H.C.

Wainwright Annual Global Life Sciences Virtual Conference, Parkinson acknowledged that:

> "The importance of this is that we don't want to see a drug that is a huge inducer
> of CYP3A that would complicate -- if possible, that would complicate interactions
> with other drugs."

87. On June 27, 2022, at the EPI-7386 Clinical Development Update Call, ESSA's

Chief Medical Officer, Cesano, recognized that "EPI-7386 [Masofaniten] exposure was impacted

by Enzalutamide with decreased exposure level of EPI-7386 [Masofaniten]." And in response to

a pointed analyst question regarding the drug-drug interaction between Masofaniten,

Enzalutamide, and a third drug a patient was prescribed, Cesano admitted to understanding that

the CYP3A4 inducer decreased the exposure of Masofaniten, a substrate:

**Q - Maury Raycroft**
Got it. It's really helpful. And maybe last quick question for me, just for the Combo
study, for the third patient in there with the drug-drug interaction, can you say what
the concomitant drug is that cause the exposure decrease?

**A - Alessandra Cesano**
Yeah. It was primidone. It's a drug that was given to the patient for essential tremor.
***It's actually a very strong inducer of the CYP3A4. And so, as you can see, and
probably from -- in the slides, that's what's affecting on just EPI-7386
[Masofaniten], that we had some suspicion that it was substrate, metabolic
substrate for that*** but also enzalutamide, since the level of exposure to
enzalutamide were definitely below what you would expect.

***

***The third patient was discontinued from the study at the end of cycle two, when
it became clear from the PK data that there was a drug-drug interaction between
a concomitant medication, it was taking with both enzalutamide and EPI-7386***

*[Masofaniten], resulting in a significant decrease in the exposure of both of these drugs.*

88. Cesano also pointed to the presentation that Defendants had prepared for the call and specifically the "third patient" that was discontinued from the study due to "significant decreases" in the exposure (AUC) of Masofaniten, which were only 33,000, or about one-tenth the exposure needed to be clinically significant:



89. Defendants also understood the impact of induction reducing exposure of Masofaniten from another patient, Patient #02. That patient's AUC measured 62,000 after being dosed with 600 mg Masofaniten, even ESSA's dosing projections indicated it should have been greater than 400,000 without the induction:



**Projection of human PK parameters at steady state based on preclinical data**

| Dose (mg) | $C_{max}$ (ng/mL) | $AUC_{0-24}$ (ng*hr/mL) |
|---|---|---|
| 200 | 6,915 | 137,278 |
| 400 | 13,830 | 274,556 |
| 600 | 20,748 | 411,834 |
| 800 | 27,659 | 549,113 |
| 1000 | 34,580 | 686,390 |

Patient #02
600 mg EPI-7386 / 120 mg Enza
Serum PSA evolution

EPI-7386 AUCss ~ 62k
Enz AUCss ~ 286k
M2 AUCss ~ 139k

90.     On November 17, 2022, at the Jefferies London Healthcare Conference, in response to a pointed analyst question regarding the drug-drug interaction of Enzalutamide and Masofaniten, Parkinson admitted that Enzalutamide was a "notorious" CYP3A4 inducer that was impacting the metabolism rate (AUC/exposure) of Masofaniten:

> But with respect to the drug-drug interaction, ***enzalutamide is a notorious, what's called CYP3A inducer***, okay. ***And so we anticipated at the beginning we needed to pick a molecule that would be minimally or moderately impacted by enzalutamide because it's a tough drug to combine with***. And at the same time, we wanted to make sure we wouldn't pick a drug that would significantly impact enzalutamide or the other drugs.

27

*On the flip side, enzalutamide is impacting our metabolism. It's reducing it by 50% to 60%.* And so in response to that, what we're doing is we're doubling our exposure and our dose in the current combination studies. And so the current cohort has 600 milligrams of 7386 BID. *And we believe that should get us to the right level of exposure in combination with enzalutamide*.

*We'd anticipate something probably like this with apalutamide as well, because apalutamide has a very similar CYP induction profile as enzalutamide*.

91.    In reality, as Defendants admitted at the end of the Class Period, the reduction observed was so significant that Masofaniten would not meet "prespecified primary endpoint of the study." *See* ¶129.

### C.    Masofaniten's Exposure (AUC) Was Reduced Below Clinically Relevant Levels by Enzalutamide

92.    AUC is a key measurement in drug studies that represents the total exposure of a person to a drug over a specific period. It is particularly useful for connecting a drug's long-term effects to the drug's overall daily exposure, especially after multiple doses have been administered.[8]

93.    AUC is a versatile measurement of drug exposure that can be calculated over different time frames. The AUC from time zero to the last measured point (AUC0−t) captures drug exposure over the observed study period, while the AUC0−∞ estimates total exposure until the drug is fully eliminated from the body. In multi-dose studies, the AUC0−τ is used to measure drug exposure within a single dosing interval once the drug has reached a stable concentration.[9]

---

[8]   FDA Guidance - Exposure-Response Relationships — Study Design, Data Analysis, and Regulatory Applications April 2003, available at https://www.fda.gov/media/71277/download

[9] Dion R Brocks, Elisabeth A Minthorn, Brian E Davies, Exploring various measures of the area under the curve for the assessment of dose-proportionality and estimation of bioavailability, *Journal of Pharmacy and Pharmacology*, Volume 76, Issue 3, March 2024, Pages 245–256, https://doi.org/10.1093/jpp/rgae004

94.     Prior to the Monotherapy Trial, Defendants estimated the AUC of Masofaniten. From the preclinical animal studies, the Defendants estimated the AUC of Masofaniten, as a single agent, in humans at various doses:[10]



95.     As early as February 2021, from their own calculations, Defendants knew that they needed to achieve an AUC greater than 300,000 ng*hr/mL of Masofaniten to stimulate anti-tumor activity to a level that was clinically relevant.

- **Drug accumulation observed with repeat QD dosing; steady state reached after day 8**
  - Confirmed EPI-7386 long half life (~24 hrs) in humans, supporting QD dosing
- **Average Day 28 AUC ~ 147K is similar to preclinical projections for the AUC (137K) in patients at the 200mg dose**
- **Doses ≥ 600 mg of EPI-7386 are projected to achieve the AUC goal of >300K, corresponding to drug exposures in mouse xenograft studies showing antitumor activity**

96.     On March 4, 2021, at the Cowen 41st Annual Health Care Conference, Virsik confirmed the 300,000 AUC threshold for "anti-tumor activity":

---

[10] Material presented by Defendants at the 2021 Genitourinary Cancers Symposium that took place from February 11-13, 2021. Presentation available at https://essapharma.com/wp-content/uploads/ASCO-GU-slides_Final-V21-Read-Only-1.pdf

Our target here though is to be able to get to exposures of over 300,000 AUC and we're projecting that would be roughly at the 600 or 800 milligram doses. And the reason we're project -- we're targeting 300,000 is because that is the exposure where we saw good consistent anti-tumor activity across all of our Xenograft models with the molecule.

97. Virsik reiterated the same on March 18, 2021 at the Oppenheimer 31st Annual Healthcare Conference and then again on April 20, 2021 Bloom Burton & Co. Healthcare Investor Conference:

"So our ultimate goal, though, is to get to exposures in patients of roughly 300,000 AUC, that's area under the curve, that's nanogram hour per mill, that's a total daily exposure of drug. And the reason we're targeting that is because that's the exposure in animal studies where we saw very good anti-tumor effect across all the models. And our current projections estimate that, that exposure would be achieved roughly at the 600 or 800 milligram level."

\*\*\*

"And we are targeting in patients, an exposure of over 300,000 [AUC] because that is the exposure where we saw good consistent activity across all of our xenograft models."

98. On June 27, 2022, on an EPI-7386 Clinical Development Update Call, Chief Medical Officer Cesano also confirmed ESSA's "target threshold of 300,000 nanogram per hour per milliliter developed from extensive preclinical experience."

99. On October 27 to 29, 2022, Defendants took part in the 2022 Prostate Cancer Foundation Retreat. They presented findings regarding the drug-drug interaction between Enzalutamide 120 mg (a reduced strength), and Masofaniten 600mg and 800 mg (each administered once daily) cohorts that featured a total of seven patients:

## Enz Caused a Significant Decrease in EPI-7386 Exposure, While EPI-7386 Did Not Significantly Impact Enz PK Parameters

- To assess possible drug-drug interactions and establish PK parameters at steady state, a 7-day run-in phase with EPI-7386 alone was initiated at the beginning of Cycle 1 for each dose level. Enz was then introduced at C1D1, and EPI-7386 PK parameters were again measured at cycle 1 day 7 and cycle 1 day 28.
- Enz PK parameters were captured at the end of Cycle 1 and compared with published data



| Analyte | Dose | Enz dose | Day | $T_{max}$ (hr) | $C_{max}$ (ng/mL) | $AUC_{0-24}$ (hr·ng/mL) | $C_{min}$ (ng/mL) |
|---------|------|----------|-----|------|--------|---------|--------|
| EPI-7386 | 600 mg EPI-7386 | 120 mg QD | -1 | 6.7 | 18,300 | 340,000 | 8,460 |
| | | | 7 | 5.7 | 7,390 | 117,000 | 2,710 |
| | | | 28 | 6 | 6,550 | 111,000 | 2,190 |
| EPI-7386 | 800 mg EPI-7386 | 120 mg QD | -1 | 4.5 | 25,700 | 406,000 | 11,800 |
| | | | 7 | 4.1 | 11,300 | 218,000 | 6,420 |
| | | | 28 | 4.8 | 9,430 | 151,000 | 3,670 |



**Impact of Enz on EPI-7386**
- Significant decrease (~ 60%) in the AUC of EPI-7386 caused by Enz, likely by Enz CYP3A4 induction
- Yet the exposure of EPI-7386 is still within the efficacy exposure range observed in mouse xenograft studies (~ 10uM total fraction drug)

100.    The Defendants described the pharmacokinetic (PK) setup to "assess possible interaction and establish PK parameters at steady state, a 7-day run-in phase with EPI-7386 [Masofaniten] alone was initiated at the beginning of Cycle 1 for each does level. Enz[alutamide] was then introduced at C1D1, and EPI-7386 [Masofaniten] PK parameters were again measured at cycle 1 day 7 and cycle 1 day 28."

101.    The AUC numbers presented were arrived at by taking the average between the patients in each dosing cohort – three patients in the 600 mg cohort and four patients in the 800 mg cohort.

102.    Although Defendants noted that there was a "significant decrease" in the AUC of Masofaniten when administered with Enzalutamide, they manipulated the measurement to minimize the severity of the decrease by measuring AUC only through the end of the first cycle of

dosing, an incomplete time frame since patients would be required to undergo many cycles of dosing.

103. In the same presentation, Defendants included Masofaniten AUC data for the three patients in the 600 mg Masofaniten cohort, and the four patients in the 800 mg cohort. Notably, even though Enzalutamide was at a reduced strength, every patient was below the 300,000 AUC goal for Masofaniten (EPI-7386):





104. Defendants assuaged investor concerns by falsely claiming that, despite the drop in AUC below the threshold they previously claimed was needed to show "anti-tumor activity" that Phase 1 data showed "exposure of EPI-7386 [Masofaniten] is still within the efficacy exposure

range." This was not true, and subsequent to the Class Period, Defendants admitted that Masofaniten exposure when administered with Enzalutamide was not sufficient to be efficacious and showed no benefit over Masofaniten alone. *See* ¶129.

105. Throughout the Class Period, Defendants also touted the M-E Combination Trial early Phase 1 results by comparing the PSA90 rates (meaning the percent of patients who received a 90% reduction in PSA level) to patients in earlier studies. But Defendants knew that the M-E Combination Trial patients entered the study with extremely low baseline PSAs relative to previous studies, meaning they were far healthier than patients in decade-old studies. Defendants knew that the M-E Combination Trial patients' baseline PSA numbers were low, because: (a) Defendants' own Phase 1 data showed median baseline PSA was only 3 ng/ml, only approximately 1/18[th] the baseline PSA observed in Astellas's 2014 PREVAIL trial for Enzalutamide; (b) Defendants consistently received reports measuring PSA levels in the trial, *see* ¶113; and (c) because published data on trials for Enzalutamide and other similar drugs showed a large reduction in baseline PSA since 2014:

| Study | Month/Year Data Published | Years Data Tested | Baseline PSA ng/mL | PSA90 Response Rate |
|---|---|---|---|---|
| AFFIRM[11] (Enzalutamide) | September, 2012 | 2009-2011 | 107.7 | 24.8% |
| PREVAIL[12] (Enzalutamide) | July, 2014 | 2010-2013 | 54.1 | 46.7% |
| Real World Data (Enzalutamide)[13] | February, 2023 | 2017-2022 | 19 | 62.5% |
| Real World Data (Apalutamide)[14] | February, 2023 | 2017-2022 | 18.9 | 70.4% |
| PROSPER (Enzalutamide)[15] | March, 2023 | 2017-2019 | 11.1 | 65.0% |

## III. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

106. The Class Period begins on March 15, 2023, when Virsik spoke at an Oppenheimer investor conference. In scripted remarks, Virsik misleadingly downplayed the impact of Enzalutamide on metabolizing Masofaniten:

> From a Pharmacokinetic standpoint, we've seen that we've had actually no real impact on the PK of Enzalutamide, and that's allowed us to be able to in the fourth cohort go to the full dose of 160 milligrams. **On the flip side, we have seen a increase in the metabolism of EPI-7386 [Masofaniten] as we were anticipating in conjunction with Enzalutamide, but we've actually designed that into the study and we're increasing the dose and we're able to get to significant clinical exposures already with the current doses QD and the BID dose gets us again even**

[11] Scher H., Fizazi K., Saad F., Taplin M., Sternberg C., Miller K., *et al*. (2012) Increased survival with enzalutamide in prostate cancer after chemotherapy. *N Engl J Med* 367: 1187–1197, https://doi.org/10.1056/NEJMoa1207506

[12] Beer T., Armstrong A., Rathkopf D., Loriot Y., Sternberg C., Higano C., *et al*. (2014) Enzalutamide in metastatic prostate cancer before chemotherapy. *N Engl J Med* 371: 424–433, https://doi.org/10.1056/NEJMoa1405095

[13] Benjamin H. Lowentritt *et al*. Real-world prostate-specific antigen (PSA) response and disease progression among patients with non-metastatic castration-resistant prostate cancer (nmCRPC) initiated on apalutamide (APA). *Journal of Clinical Oncology,* vol. 41, no. 6, February 2023, https://doi.org/10.1200/JCO.2023.41.6_suppl.69.

[14] *Id*.

[15] Hussain, Maha, *et al*. "Nadir Prostate-Specific Antigen as an Independent Predictor of Survival Outcomes: A Post Hoc Analysis of the PROSPER Randomized Clinical Trial." 2023. *Journal of Urology*, vol. 209, no. 3, Mar. 2023, pp. 532–539, https://doi.org/10.1097/JU.0000000000003084.

*higher dosing. So we've been able to address the higher metabolism induced by Enzalutamide.*

107.     The statements identified in Paragraph 106 were materially false and misleading when made because they omitted to disclose that: (a) the Masofaniten exposure levels were not clinically significant, and well below the necessary threshold for anti-tumor activity of 300,000 AUC; (b) Enzalutamide, as a strong CYP3A4 inducer, was then significantly reducing Masofaniten exposure; and (c) patients were then having issues with pill burden at the dose combinations involving higher doses of Masofaniten, just as was observed with EPI-506 and in the Monotherapy Trial.

108.     On April 25, 2023, Parkinson spoke at the Bloom Burton & Co. Healthcare Investor Conference and explained that Defendants needed to move to giving patients Masofaniten twice per day instead of once per day because single doses higher than 600 mg were beginning to be saturated, meaning that maximum AUC was reached due to the body's ability to process Masofaniten had reached its limit:

> We did that because as we were getting past 600 milligrams into 800 milligrams, we started to see a tailing off the kind of exposure from the same dose. And that's what you see with small molecules. ***They reach a limit of absorption and the trick is to split the dose over the day. We did that very successful[ly] in getting reproducibly high exposures***.

109.     The statements identified in Paragraph 108 were materially false and misleading when made because they omitted to disclose that: (a) the exposure levels were still well below the necessary threshold for anti-tumor activity of 300,000 AUC; (b) Enzalutamide, as a strong CYP3A4 inducer, was then significantly reducing Masofaniten exposure; (c) this "trick" of bi-daily dosing was not successful in producing clinical exposures; and (d) patients were then having issues with pill burden at the dose combinations involving higher doses of Masofaniten, just as was observed with EPI-506 and in the Monotherapy Trial.

35

110.    On October 20-24, 2023, Defendants presented certain findings on drug-drug interactions in the Masofaniten 600 mg twice-daily cohorts to the European Society of Medical Oncology. One cohort included four patients who were given Enzalutamide 120 mg once daily, while the other cohort of 5 patients was given Enzalutamide 160 mg once daily.



### DDI with Full Dose Enz is Similar to 120 mg - Masofaniten 600 mg BID Dosing Mitigates Drop in Exposure

- To assess possible DDIs and establish PK parameters at steady state, a 7-day run-in phase with masofaniten alone was initiated at the beginning of Cycle 1 for each dose level. Enz was then introduced at C1D1. Masofaniten, enzalutamide and its N-desmethyl metabolite (M2) were measured.

**PK questions assessed during dose finding**

| Agent | DDI issue | Hypothesis tested |
|---|---|---|
| Masofaniten | CYP2C8 inhibitor | Increased enzalutamide exposure Can we use full dose Enz (160 mg)? |
| Enzalutamide | CYP inducer | Decreased masofaniten exposure Can we dose masofaniten BID? |

**Masofaniten is a "victim" of Enz**

| Analyte | Dose / Regimen | Enza dose | Number of patients | Day | Tmax (hr) | Cmax (ng/mL) | AUC24 (hr·ng/mL) | Clast (ng/mL) |
|---|---|---|---|---|---|---|---|---|
| Masofaniten | 600 mg QD | 120 mg QD | 3 | -1 | 6.7 | 18,300 | 340,000 | 8,860 |
| | | | | 7 | 5.7 | 7,390 | 117,000 | 2,880 |
| | | | | 28 | 6 | 6,550 | 111,000 | 2,300 |
| Masofaniten | 800 mg QD | 120 mg QD | 4 | -1 | 4.5 | 25,700 | 406,000 | 12,700 |
| | | | | 7 | 4.1 | 11,300 | 218,000 | 7,840 |
| | | | | 28 | 4.8 | 9,430 | 151,000 | 3,670 |
| Masofaniten | 600 mg BID | 120 mg QD | 4 | -1 | 3.3 | 28,900 | 508,250 | 20,250 |
| | | | | 7 | 2.0 | 17,150 | 292,250 | 13,550 |
| | | | | 28 | 4.3 | 11,913 | 233,000 | 9,685 |
| Masofaniten | 600 mg BID | 160 mg QD | 5-6 | -1 | 8.0 | 22,833 | 435,833 | 16,817 |
| | | | | 7 | 6.2 | 13,483 | 273,833 | 11,948 |
| | | | | 28 | 2.8 | 11,018 | 189,600 | 8,248 |

**Masofaniten is not a "perpetrator" of Enz**

| Analyte | Dose | EPI-7386 dose | Number of patients | Day | Tmax (hr) | Cmax (ng/mL) | AUC24 (hr·ng/mL) | Clast (ng/mL) |
|---|---|---|---|---|---|---|---|---|
| Enzalutamide | 120 mg | 600 mg QD | 3 | 28 | 2 | 13,100 | 280,000 | 11,500 |
| Enzalutamide | 120 mg | 800 mg QD | 4 | 28 | 2.5 | 12,200 | 257,000 | 10,600 |
| Enzalutamide | 120 mg | 600 mg BID | 4 | 28 | 2.25 | 15,050 | 304,750 | 12,523 |
| Enzalutamide | 160 mg | 600 mg BID | 5 | 28 | 2.1 | 13,958 | 300,600 | 12,186 |
| Enzalutamide projection[1] | 120 mg | NA | NA | steady state | 1.1 | 11,000 | 230,000 | ND |
| Enzalutamide reference[2] | 160 mg | NA | NA | steady state | 2.5 | 16,590 | 321,500 | 12,000 |
| N-desmethyl enzalutamide | 120 mg | 600 mg QD | 3 | 28 | 18.7 | 7,640 | 171,000 | 7,580 |
| N-desmethyl enzalutamide | 120 mg | 800 mg QD | 4 | 28 | 12.3 | 6,690 | 150,000 | 6,580 |
| N-desmethyl enzalutamide | 120 mg | 600 mg BID | 4 | 28 | 2 | 7,318 | 161,750 | 7,228 |
| N-desmethyl enzalutamide | 160 mg | 600 mg BID | 5 | 28 | 2.6 | 8,424 | 191,800 | 8,110 |
| N-desmethyl enzalutamide projection[1] | 120 mg | NA | NA | steady state | ND | 9,510 | 208,725 | 7,928 |
| N-desmethyl enzalutamide reference[2] | 160 mg | NA | NA | steady state | ND | 12,680 | 278,300 | 10,570 |

[1] Gibbons et al, Clin Pharmacokinet, 2015 ; [2] Enzalutamide NDA, Clin Pharm section

111.    By Day 7, Masofaniten's AUC dropped to below the Company's clinical target, and by Day 28, it was more than 110,000 AUC below the 300,000 target. Thus, even after switching to bi-daily dosing, Defendants knew that Masofaniten in combination with Enzalutamide failed to achieve the 300,000 AUC of Masofaniten they believed was required to exhibit anti-tumor activity.

36

112.    The statements identified in Paragraph 110 were materially false and misleading when made because "Masofaniten 600 mg BID [bi-daily] dosing" did not mitigate the drop in exposure, and because the statements omitted to disclose that the exposure levels were still well below the necessary threshold for anti-tumor activity of 300,000 AUC.

113.    On September 18, 2023, Defendants began the Phase 2 portion of the trial, in which 80 patients received the Masofaniten-Enzalutamide combo, and 40 were in a control arm, which tested only Enzalutamide. The trial was scheduled for "primary completion" in August 2025 and full "study completion" in January 2026, according to information that ESSA submitted to clinicaltrials.gov. As the unmasked sponsor and responsible party, ESSA continued to receive regular reports of trial data including AUC and PSA levels throughout Phase 2. For example, Parkinson later admitted at a June 6, 2024 Jefferies Global Healthcare Conference that he and ESSA had followed the trial data and received monthly measurements of PSA levels for each patient: "[W]e actually measure PSA monthly." He also indicated that although Phase 2 was scheduled to be completed primarily by August 2025, "the trial is being monitored and if things emerged earlier, we would certainly respond to that."

114.    On November 30, 2023, Parkinson spoke at a Piper Sandler 35th Annual Healthcare Conference. There, he made more misstatements about the dosing levels:

**Q - Joseph Catanzaro**
My last question, I guess, as we look towards now the ongoing randomized study is maybe first on your level of comfort of the exposures you're achieving. You've moved forward with the full dose of Enza and then I think the 600mg bid for masofaniten. Just your overall level of comfort there and whether there's any additional kind of dosing work you're doing outside of the Phase[.]

**A - David R. Parkinson**
Well, first of all, we've shown we can give full dose enzalutamide because our drug does not affect the pharmacokinetics of enzalutamide. Secondly, we confirmed our predictions, which were no surprises, that enzalutamide does accelerate the metabolism of our drug. ***Hence, we worked on giving higher and higher doses and***

*gave 600 milligrams twice a day of our drug together with enzalutamide. We get excellent exposures, totally consistent with active levels of exposure from our preclinical data.*

But we also did treat on the way up in the dose escalation. We treated 120 milligrams, so not full dose of enzalutamide with 800 milligrams of our drug. And we got pretty good exposures in those relatively few patients.

Now we've made the decision to go into the Phase 2 with the dose and schedule I described. Probably on the side, we'll take a look at additional patients because ultimately project optimists from the FDA would want you to. We believe it's important. We believe you should try to get the exposures that are necessary for efficacy without any safety or tolerability price. We don't have that with our drug.

So we will explore some additional dose and schedules of our drug with dose enzalutamide. But we don't need that for the randomized Phase 2, which is proof of concept for the hypothesis with a higher level of evidence.

115.    The statements identified in Paragraph 114 were materially false and misleading when made because trial participants receiving the combination therapy were not "get[ting] excellent exposures" of Masofaniten, and because the statements omitted to disclose that: (a) the exposure levels were still well below the necessary threshold for anti-tumor activity of 300,000 AUC; (b) Enzalutamide, as a strong CYP3A4 inducer, was then significantly reducing Masofaniten exposure; and (c) patients were then having issues with pill burden at the dose combinations involving higher doses of Masofaniten, just as was observed with EPI-506 and in the Monotherapy Trial.

116.    At that same Piper Sandler Conference, Virsik was asked about PSA90 results. There, he touted their PSA90 in 90 days results, comparing it to the PREVAIL study:

**Q - Joseph Catanzaro**
Yeah. So I think one thing you guys have emphasized is not just the rate of PSA90 responses, but the kinetics of those responses. Maybe you could speak to that, how we should think about that in comparison to enzalutamide on its own, and ultimately maybe what those kinetics imply about how masofaniten is contributing to the efficacy within the combination.

**A - Peter Virsik**

38

Sure. So there's historical data here where the investigators have looked retrospectively at two studies, the PREVAIL study and the PROSPER study. And those were both in the castrate-resistant setting. One was metastatic versus non-metastatic. What they showed was that the deeper you can suppress PSAs and more quickly, the better the overall survival in those patients. So that's actually that concept of a rapid deep decline is what we're using our Phase 2 for our primary endpoint. ***And what we're seeing in our Phase 1 data set so far is that 69% of patients achieve that PSA90 within 90 days. So very rapid. We would expect it, based upon the Prevail data, to had roughly 37% of patients. So a good delta. So it's encouraging so far.***

117. The statements identified in Paragraph 116 were materially false and misleading when made because they omitted to disclose that: (a) the PSA90 rates from the PREVAIL study were not comparable, because the M-E Combination Trial involved far healthier patients, including those with much lower baseline PSAs and that were more responsive to treatment; (b) the PSA90 rates observed in Phase 1 were consistent with those observed in contemporary practice from Enzalutamide alone, indicating that the observed reduction in PSA90 was attributable to Enzalutamide itself, not Masofaniten or the combination; and (c) as a result of (a)-(b), the "delta" observed between the combination therapy and reported data from Enzalutamide alone was nonexistent, not "good."

118. Plaintiff is informed and believes that Phase 2 patients began dosing no later than January 2024. Plaintiff bases this allegation on the fact that in a January 25, 2024 press release, Parkinson stated that the "Phase 2 dose expansion head-to-head portion of the study is underway."

119. On April 16, 2024, Parkinson appeared at a Bloom Burton & Co. Healthcare Investor Conference. During the scripted portion of the presentation, he made the following representation about getting "good exposures" in both Masofaniten and Enzalutamide in the M-E Combination Trial.

And the dose that we've chosen for the second part, which I'll discuss in the second is 600 milligrams, twice a day of our drug together with full dose Enzalutamide.

And so, it's in patients who have often a long history of prostate cancer treatment but have not yet received latest generation antiandrogens.

What we showed and exactly what we had predicted, we did not affect the pharmacokinetics of Enzalutamide. *So we can give full dose Enzalutamide. Second thing we showed, which is exactly what we had predicted is that Enzalutamide chews up. It's incredible drug to try to combine with. It's a nasty drug from that perspective, but we can still get good exposures with the 600 milligrams twice a day. So we can give our drug together with Enzalutamide and get good concentrations of both drugs.*

120. The statements identified in Paragraph 119 were materially false and misleading when made because: (a) exposure of Masofaniten in patients administered the combination therapy was poor not "good"; and (b) the Company was not able to "get good concentrations of both drugs" when administering Masofaniten and Enzalutamide together.

121. On July 15, 2024, Parkinson spoke at the Jones Trading Healthcare Seaside Summit. There, he again falsely assured investors that ESSA had successfully controlled for the known problem that Enzalutamide was a "potent inducer" of drugs like Masofaniten:

Now, the rationale for the study design is that the potential existed for masofaniten to increase circulating levels of enzalutamide. That turned out not to be the case, which is why we can use full-dose enzalutamide in the combination studies. *We also knew that enzalutamide was a potent inducer of CYP3A4. And of course, our drug is partly metabolized by CYP3A4. So the question was, could we give adequate doses that would reach therapeutic efficacy, as projected from the clinical studies -- from the preclinical studies. And the answer to all of that is yes, we can give doses of masofaniten which are therapeutic, together with full-dose enzalutamide. And that is the setting in which we go into the Phase 2 randomized trial.*

122. The statements identified in Paragraph 121 were materially false and misleading when made because: (a) the Company could not "give doses of masofaniten which are therapeutic, together with full-dose enzalutamide," as evidenced by the fact that the Company observed no clinical benefit from the combination over recent real world data from Enzalutamide alone; and

40

(b) the monthly PSA measurements reported to the sponsor in Phase 2 showed no clinical benefit in the combination therapy arm over the control arm.

123.    On August 5, 2024, the Company posted a press release that was filed on Form 8-K announcing its third quarter earnings for fiscal year 2024. In that press release, Parkinson said the following regarding the commercial prospects of the M-E Combination Trial:

> **With continued focus on execution, we are progressing towards a stream of significant milestones throughout the next nine to twelve months, with the first being the presentation at ESMO of more mature durability data from the Phase 1 dose escalation study evaluating masofaniten combined with enzalutamide in patients with metastatic castration-resistant prostate cancer naïve to second-generation antiandrogens…** "We are focused on the enrollment of the Phase 2 dose expansion study evaluating masofaniten in combination with enzalutamide, with 25 sites activated in the US, Canada, and Australia, and an additional 14 sites being activated in Europe.

124.    The statements identified in Paragraph 123 were materially false and misleading when made because they omitted to disclose that: (a) the internal reports he claimed to receive monthly already showed that the combination therapy had no clinical benefit over Enzalutamide alone; and (b) the Masofaniten exposure levels were too low to be effective.

125.    On September 18, 2024, Virsik spoke at the Cantor Fitzgerald Global Healthcare Conference. There, he made the following misstatement concerning optimal dosing:

**Q - Josh Schimmer**
What's the dose that you're exploring? And how did you hone in on the optimal dose?

**A - Peter Virsik**
**Well, what we saw is that with enzalutamide combination treatment, we have a reduction in our pharmacokinetic, our overall AUC, as it's called, or exposure. We anticipated that may occur and which is why in our Phase 1 monotherapy we went to a 600 BID dose, because we found by going twice a day in our TACC studies, we could actually get to higher exposures. And so that worked in the monotherapy and we tested that in our combination study with enza and that worked very well. So when you double the dose to 600 BID, you get back up to those kind of exposures. And so that's the one we picked. So it's 600 BID masofaniten combined with the standard approved dose of 160 milligrams enzalutamide. And that was well tolerated as well.**

41

126.    The statements identified in Paragraph 125 were materially false and misleading when made because they omitted to disclose that: (a) even "doubl[ing] the dose to 600 [mg] BID" did not "get back up to" the Masofaniten exposures ESSA had known was necessary to show anti-tumor effects; and (b) the PSA measurements observed in Phase 2 already showed that the combination of Masofaniten and Enzalutamide had no clinical benefit over Enzalutamide alone.

127.    At that same September 18, 2024 Conference, Virsik and Parkinson also touted the Phase 1 trial PSA90 results, comparing them to older studies:

**Q - Josh Schimmer**
Maybe you can help contextualize that PSA90 and what one might have expected for enzalutamide alone. And I think what we tend to see is that there's always a range of...

**A - David R. Parkinson**
Yeah.

**Q - Josh Schimmer**
...outcomes and experiences. So if you can try to quantify that or capture that range for enzalutamide monotherapy?

**A - David R. Parkinson**
And it's a smaller end [ph], but...

**A - Peter Virsik**
Yup. It's a small end. So we have to always keep...

**A - David R. Parkinson**
Yeah.

**A - Peter Virsik**
...caveat that only 16 patients that are valuable for the 88% PSA90 rate. But if you look at the historical studies done with enzalutamide, you look probably at the PREVAIL study. ***The PREVAIL study was done for registration in the same patient population and there was a PSA90 rate there of 47%.*** I think there have been a few other studies, the ALLIANCE study as well, that trended to something similar in that kind of 50% range. And I think the highest PSA90 range that's been published that I found after doing an exhaustive literature search...

**A - David R. Parkinson**
Yeah.

**A - Peter Virsik**
...through everything, is roughly around 60%, 62% in patients who are a little bit milder, if you will. And in our poster, we provided background baseline information

42

so people can understand the patients we've enrolled. There's nothing about them that stands out as being particularly less or harder to be able to treat than those patients we're talking about for PREVAIL. But that is a 10- year difference, but -- since that study versus our study. ***But that is probably the best metric of that is PREVAIL at 47%.***

128. The statements identified in Paragraph 127 were materially false and misleading when made because the PREVAIL trial was not "the best metric" to consider and because the statements omitted to disclose that: (a) the PSA90 rates from the PREVAIL study had no bearing on the M-E Combination Trial, as the patients in the PREVAIL study were sicker when the trial began, as indicated in part that they had a baseline PSA approximately 18 times higher than the baseline PSA in the M-E Combination Trial; (b) PSA90 rates already observed in the monthly PSA measurements Parkinson previously admitted Defendants were monitoring already showed that the combination of Masofaniten and Enzalutamide had no clinical benefit over Enzalutamide alone; and (c) the data for Phase 2 that Defendants had already claimed to have been monitoring for several months and checking PSA levels monthly (*see* Paragraph 113), showed that the PREVAIL study was no longer the "best metric" because Enzalutamide was then outperforming the M-E Combination Trial.

## IV.   THE TRUTH EMERGES

129. On October 31, 2024, after the market closed, ESSA issued a press release announcing its decision to terminate Phase 2 of the M-E Combination Trial and abandon Masofaniten development because interim results showed no clinical benefit and further study would be futile:

> [ESSA] has made the decision to terminate the Phase 2 clinical trial evaluating in a 2:1 randomization masofaniten combined with enzalutamide versus enzalutamide single agent in patients with [mCRPC] naïve to second-generation antiandrogens. This decision, mutually agreed upon by both senior management and the board of directors, was based on a protocol-specified interim review of the safety, PK and efficacy data, which showed a much higher rate of PSA90 response in patients treated with enzalutamide monotherapy (which is standard of care for this patient

43

population) than were expected based upon historical data. In addition, there was no clear efficacy benefit seen with the combination of masofaniten plus enzalutamide compared to enzalutamide single agent. A futility analysis determined a low likelihood of meeting the prespecified primary endpoint of the study.

***

As part of the effort to focus its resources, ESSA is also planning to terminate the other remaining company-sponsored and investigator-sponsored clinical studies evaluating masofaniten either as a monotherapy or in combination with other agents.

130. The disclosure of the failures concealed by Defendants' Class Period misrepresentations eviscerated ESSA's stock price. When trading resumed the following day, ESSA's stock price fell $3.80 per share, or 73.08%, to close at $1.40 per share on November 1, 2024. As a result, investors suffered tens of millions of dollars in losses. ESSA share prices never recovered. On July 14, 2025, the Company announced Xeno Therapeutics was acquiring it.

## V.     ADDITIONAL ALLEGATIONS OF SCIENTER

131. Several facts demonstrate that Defendants knowingly made false statements or, at a minimum, acted with reckless disregard for the truth or falsity of their Class Period representations to investors.

### A.     Defendants Had Access to the Concealed Information

132. Critically, the M-E Combination Trial was open-label, meaning the Defendants had access to: (a) participant data, (b) safety and efficacy data, and (c) trial progress data. For example, on November 15, 2023 at the Jefferies 2023 London Healthcare Conference, Parkinson admitted that Defendants "got the final data from the combination, when the safety review committee met, when they recommended the particular dose" and then on June 6, 2024, Parkinson admitted that Defendants were monitoring the patients and the changes in their respective PSA levels every month, and that "*if things emerge[] earlier, we would certainly respond to that*."

133. Defendants had access to each cohort patient's AUC and PSA90 data, and Defendants included this data in their presentations and spoke at length about the data at various trade shows and other speaking engagements. *See* ¶¶86-91, 102-03, 110-11, 113. For example, at the European Society of Medical Oncology gathering taking place October 20-24, 2023, Defendants presented a poster that included the Recommended Phase 2 Combination Dose AUC data, and the neutralizing effect Enzalutamide had on Masofaniten exposure. ¶110.

**B. Defendants Had Actual Knowledge of the Information They Concealed from Investors**

134. Similarly, Defendants made statements demonstrating actual knowledge of the underlying facts that rendered their representations misleading, including the threshold Masofaniten AUC required for "consistent anti-tumor activity" and the detrimental impact Enzalutamide had on Masofaniten exposure.

135. For example, Virsik and Parkinson each repeatedly spoke about the clinical effectiveness target of 300,000 AUC before the Class Period began. On March 4, 2021, at the Cowen 41st Annual Health Care Conference, Virsik stated, "Our target here though is to be able to get to exposures of over 300,000 AUC…And the reason [ ] we're targeting 300,000 is because that is the exposure where we saw good consistent anti-tumor activity." Virsik reiterated the same line on March 18, 2021 at the Oppenheimer 31st Annual Healthcare Conference: "So our ultimate goal, though, is to get to exposures in patients of roughly 300,000 AUC … And the reason we're targeting that is because that's the exposure in animal studies where we saw very good anti-tumor effect across all the models." At the April 20, 2021 Bloom Burton & Co Healthcare Investor Conference, David Wood, Chief Financial Officer of ESSA, agreed with Virsik, stating that "doses above 600 milligrams per day, if the modeling continued to be correct. Would give us exposures above that 300,000 you see that [Virsik] referred to."

45

136. The Company's Chief Medical Officer Alessandra Cesano also confirmed at a conference on June 27, 2022 that ESSA's "target threshold of 300,000 nanogram per hour per milliliter developed from extensive preclinical experience."

137. As early as March 9, 2021, Parkinson admitted that CYP3A4 induction would be a huge issue and that Defendants "don't want to see a drug that is a huge inducer of CYP3[A4] that would complicate … interactions with other drugs." Similarly, on November 17, 2022, Parkinson further expounded on, but misrepresented the full impact of, the drug-drug interaction data between Masofaniten and Enzalutamide that Defendants had reviewed:

> But with respect to the drug-drug interaction, enzalutamide is a notorious, what's called CYP3A inducer, okay. And so we anticipated at the beginning we needed to pick a molecule that would be minimally or moderately impacted by enzalutamide because it's a tough drug to combine with. And at the same time, we wanted to make sure we wouldn't pick a drug that would significantly impact enzalutamide or the other drugs.
>
> ***
>
> On the flip side, enzalutamide is impacting our metabolism. It's reducing it by 50% to 60%. And so in response to that, what we're doing is we're doubling our exposure and our dose in the current combination studies. And so the current cohort has 600 milligrams of 7386 BID. And we believe that should get us to the right level of exposure in combination with enzalutamide.

138. Yet again, on February 13, 2024, Parkinson admitted that "enzalutamide does increase the metabolism of our drug. That was totally anticipated. Enzalutamide is notorious as a CYP3A4 inducer at inducing the more rapid metabolism of other drugs." Defendants anticipated the reduction in exposure in Masofaniten before the M-E Combination Trial, and then the data confirmed their suspicions.

139. Then on July 15, 2024, at the Jones Trading Healthcare Seaside Summit, Parkinson admitted that Defendants "*knew* that enzalutamide was a potent inducer of CYP3A4. And of course our drug [Masofaniten] is partly metabolized by CYP3A4." Defendants admitted to

46

knowing that Enzalutamide was a strong inducer of CYP3A4, and Masofaniten was a CYP3A4 substrate whose exposure would be massively reduced in combination with Enzalutamide at all relevant times.

140. Importantly, Defendants' presentations confirm that they knew that the Enzalutamide reduced the exposure of Masofaniten below the "target threshold of 300,000 AUC" required for "consistent anti-tumor activity" to demonstrate the clinical effectiveness of Masofaniten. *See* ¶¶96, 135.

141. Further, Virsik and Parkinson each spoke at length about FDA guidelines as well as earlier studies concerning prostate cancer, and associated PSA90 responses. *See* ¶¶116, 127.

142. Defendants' decision to speak at length about the Masofaniten exposure levels and comparison with earlier studies, but selectively disclose some information concerning the topic while concealing adverse facts, enhances a strong inference of scienter. Defendants either knew the facts they were misrepresenting and concealing, or were reckless in holding themselves out as knowledgeable if they had chosen to speak authoritatively about these subjects without bothering to learn the facts.

### C.    Core Operations

143. Defendants' scienter is also supported by the fact that the alleged misstatements and omissions concerned core operations of ESSA. The clinical testing of Masofaniten was a core operation of ESSA during the Class Period, as it was a small company without any other candidates. In addition, the M-E Combination Trial was the only active study that had reached Phase 2.

144. Additionally, Defendants were active in all aspects of the business. For these reasons, it would be absurd to assume that Defendants were unaware of the enormous actual

problems with exposure level and that the combination drug was faring no better than Enzalutamide alone.

### D. The Temporal Proximity and Sharp Divergence Between Defendants' Misleading Statements and the Emergence of the Truth Further Bolsters an Inference of Scienter

145. The temporal proximity and sharp divergence between Defendants' misleading statements and subsequent disclosures further support an inference of scienter.

146. For example, on August 5, 2024, Parkinson said "we are progressing towards a stream of significant milestones throughout the next nine to twelve months"—just two months before the Company abandoned all drug prospects. On September 18, 2024, Virsik stated that the exposures were "very well," when the data from the open-label M-E Combination Trial that they had been actively monitoring showed the exact opposite.

147. That less than 6 weeks later, the Company had already completed a futility analysis, concluded that Enzalutamide alone performed better than the M-E Combination Trial, *and* concluded that it would abandon all clinical projects entirely, supports an inference of scienter.

### E. Defendants' Failure to Share Data and Evasive Answers to Questions Suggest Scienter

148. The FDA requires clinical trial results to be posted on the FDA website. 42 C.F.R. §11.42(b). Despite ESSA's being required to submit its clinical trial results to the FDA, it has not done so for any of its failed studies. Also, Defendants stopped reporting Masofaniten patient level AUC data after October 2022, which suggests Defendants were hiding the data after it became clear the drug was metabolizing. In addition, despite Phase 2 beginning more than a year prior to the announcement of the results of the futility study, the Company never shared any of its data, or gave any indication that it was not performing well. For example, when asked about Phase 2 results

48

at the September 18, 2024 Cowen Conference, Defendants immediately diverted attention back to

Phase 1:

> **Q - Josh Schimmer**
> And maybe we can review some of the Phase 1 and 2 findings thus far? And what is giving you the confidence that masofaniten is adding benefit to? And (Multiple Speakers)
>
> **A - David R. Parkinson**
> Do you want to comment on the ***combination Phase 1***?
>
> **A - Peter Virsik**
> Sure. So we were just coming back from ESMO where we were presenting a Phase 1 poster updating the combination enzalutamide combination dose escalation portion of the study. And this was again 18 patients enrolled into the study across four different dose cohorts. These are patients who are first line metastatic CRPC. What that means is they've not yet had a ARSI or a second generation antiandrogen before, but they could have had chemotherapy in the metastatic castrate sensitive setting. And so what we updated at the conference versus what we had at ASCOGU was we had a PSA90 rate of 88%. So that was up from 81%. And then we were looking at kind of the time based measures, the durability measures, because that's our real question we're trying to answer now, which is, okay, so these are – that's a very good PSA response. So we're quite pleased with that. But will it translate to a long term benefit for these patients? And so we were looking at time to PSA progression and that looked very good. We hadn't yet reached a median point. We had earlier in the year at ASCOGU we had 16.6 months, but we were no longer on the curve, so we don't yet have an estimate. And we also started to talk about radiographic progression free survival, because that ultimately is the next measure to look at. And that's a clinical measure for approval purposes. And on that measure we also were trending very well. So the real point was to say, okay, how did the PSAs end up? They looked quite good. Was the safety maintained? Maintained. It was in fact maintained. ***And then the durability does fit what one would expect with a strong deep PSA reduction. In that, we don't yet have a good estimate for the durability, but it looks good so far.***

149.    Defendants' evasive shift to dated Phase 1 data to avoid discussing unfavorable

Phase 2 data bolsters an inference of scienter.

### F. Suspicious Stock Sales Enhance an Inference of Fraud

150. During the Class Period, Virsik took advantage of ESSA's artificially inflated stock price to reap over $819,000 in insider sales:

| Defendant | Trade Date | Shares Sold | Price per Share | Proceeds |
|---|---|---|---|---|
| Virsik | 10/7/2024 | 694 | $6.03 | $4,184.82 |
| Virsik | 9/9/2024 | 694 | $6.00 | $4,164.00 |
| Virsik | 9/3/2024 | 2082 | $6.03 | $12,554.46 |
| Virsik | 5/6/2024 | 694 | $6.95 | $4,823.30 |
| Virsik | 4/5/2024 | 694 | $7.94 | $5,510.36 |
| Virsik | 3/5/2024 | 694 | $8.98 | $6,232.12 |
| Virsik | 2/6/2024 | 72,782 | $10.29 | $748,926.78 |
| Virsik | 2/5/2024 | 694 | $9.25 | $6,419.50 |
| Virsik | 2/5/2024 | 500 | $10.04 | $5,020.00 |
| Virsik | 1/16/2024 | 1,718 | $10.01 | $17,197.18 |
| Virsik | 1/5/2024 | 699 | $6.11 | $4,270.89 |
| **Total** | | **81,945** | | **$819,303.41** |

In the 18 months before the Class Period, Virsik had not sold any shares. These windfalls exceeded Virsik's salary of approximately $493,000 in Fiscal Year 2024. In violation of his duty to disclose all material information or refrain from trading during the Class Period when false and misleading representations were made, Virsik profited from stock sales in a manner that was out of line with his prior trading history over a comparable period in the past. Notably, these sales were pursuant to trading plans entered into nearly six months after the Class Period when Defendants began misleading investors.[16] The disproportionate trading he engaged in enhances an inference of fraud.

### G. The Company's Precarious Position Supports an Inference of Fraud

151. Founded in 2009, the Company had never developed a successful product. Its previous candidate, EPI-506, failed to show efficacy, as did Masofaniten when used as a

---

[16] The trades were made pursuant to a Rule 10b5-1 trading plan, which was entered into on August 31, 2023, nearly six months into the Class Period.

monotherapy. Janssen had terminated its collaboration with ESSA early. Faced with repeated failures, Defendants confronted an existential crisis. They had two choices: admit the M-E Combination Trial was failing and risk shutting down, or delay disclosing the truth in hopes of a miracle. After nearly a year of Phase 2 dosing yielded no miracle, the defendants were forced to wind down the Company.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

152.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons and entities who purchased or otherwise acquired ESSA common shares on the NASDAQ or another United States trading venue between March 15, 2023 and October 31, 2024, both dates inclusive, and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

153.    The members of the Class are so numerous that joinder of all members is impracticable. ESSA had over 44 million common shares outstanding and 346 holders of record as of end of fiscal year 2024, representing a far higher number of beneficial owners whose brokers hold their shares in "street name." Throughout the Class Period, ESSA's common shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ESSA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

51

154. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

155. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

156. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the clinical prospects of ESSA's drug candidates;
- whether the Individual Defendants were control persons of ESSA during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the prices of ESSA's common shares during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

157. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

158. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- ESSA's common shares traded in an efficient market;
- the Company's shares were liquid and traded with heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common shares; and
- Plaintiff and members of the Class purchased, acquired, and/or sold ESSA common shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts materialized or began to emerge, without knowledge of the omitted or misrepresented facts.

159. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

160. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as the claims asserted herein sound primarily in omission rather than affirmative misrepresentation.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

161. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

162. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

163. During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material fact and omitted to state material

53

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of ESSA common shares. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of ESSA common shares; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire ESSA common shares at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

164. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the materially misleading statements described above that were designed to influence the market for ESSA common shares. The statements described above were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about ESSA's lead product candidate's clinical efficacy and exposure levels of the drug.

165. Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

54

166.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior executives of ESSA, the Individual Defendants had knowledge of the details of ESSA's internal affairs and operations throughout the Class Period.

167.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of ESSA's public statements. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to ESSA's viability as a company. As a result of the dissemination of the aforementioned false and misleading statements, the market price of ESSA common shares was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning ESSA's leading drug candidate, which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired ESSA common shares at artificially inflated prices and relied upon the price of the common shares, the integrity of the market for the common shares and/or upon statements disseminated by Defendants, and were damaged thereby.

168.     Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common shares, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of ESSA common shares was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of ESSA common shares declined upon public disclosure or materialization of the concealed risks alleged herein to the injury of Plaintiff and all other Class members.

169. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

170. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's common shares during the Class Period, upon the disclosure or materialization of the concealed risks on the dates identified in this Amended Complaint.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

171. Plaintiff repeats and realleges each and every allegation contained in the foregoing Paragraphs as if fully set forth herein.

172. During the Class Period, the Individual Defendants not only participated in but dominated the operation and management of ESSA, and participated, directly and indirectly, in the conduct of ESSA's business affairs. Because of their roles and responsibilities as ESSA's most senior executives, they knew the adverse non-public information that rendered ESSA's public statements false and misleading.

173. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to ESSA's business and results of operations, and to correct promptly any public statements issued by ESSA which had become materially false or misleading.

174. Because of their positions of control and authority as senior officers, and the fact that they exercised such control in the day-to-day conduct of ESSA's affairs, the Individual

Defendants were able to, and did, control the Company's statements which ESSA disseminated in the marketplace during the Class Period concerning ESSA's business, financial results and operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause ESSA to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of ESSA within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of ESSA common shares.

175.    Each Individual Defendant also culpably participated in the misrepresentations to investors as alleged in Count I. Each of the Individual Defendants, therefore, acted as a controlling person of ESSA. By reason of their senior management positions of ESSA, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, ESSA to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of ESSA and possessed the power to control the specific activities, which comprise the primary violations about which Plaintiff, and the other members of the Class complain.

176.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by ESSA.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: August 11, 2025

Respectfully submitted,

*/s/ Brian P. O'Connell*

**POMERANTZ LLP**
Brian P. O'Connell
(WIED Bar Number 6313628)
Joshua B. Silverman
(WIED Bar Number 6238108)
Genc Arifi
(WIED Bar Number 6323579)
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: boconnell@pomlaw.com
        jbsilverman@pomlaw.com
        garifi@pomlaw.com

*Counsel for Lead Plaintiff Todd Van Groll and the Proposed Class*