**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION**

| | |
|---|---|
| IN RE ESSA PHARMA INC., SECURITIES LITIGATION | Case No.: 1:25-cv-00124-WCG |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | <u>CLASS ACTION</u><br><br>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND .................................................................................................................3

     A.    ESSA's Work to Develop of Potential Prostate Cancer Treatments ......................3

     B.    Monotherapy Trial ...............................................................................................4

     C.    M-E Combination Trial.........................................................................................4

     D.    AUC Target..........................................................................................................5

     E.    Interaction Between Masofaniten and Enzalutamide, a CYP3A4 Inducer ..............6

     F.    Evaluation of PSA Baseline Levels and Reduction Rates ......................................6

     G.    ESSA Consistently Disclosed Risks Associated With Drug Development in Its Public Filings ...........................................................................................7

     H.    Termination of M-E Combination Trial ...............................................................8

ARGUMENT.....................................................................................................................9

I.     THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 10(B) OF THE EXCHANGE ACT.................................................................................................10

     A.    Plaintiff Fails To Allege Any Actionable Misstatements ......................................10

          1.    Plaintiff Fails to Plead Facts to Support that Statements Regarding Patients' Exposure to Masofaniten Were Materially False or Misleading....................................................................................................12

          2.    Plaintiff Fails to Plead Any Facts from Which to Infer that Any of the Challenged Statements Regarding the PREVAIL Study Were Materially False or Misleading When Made ..............................................17

          3.    Plaintiff Fails to Adequately Plead That Statements Regarding M-E Combination Trial Results Were False or Misleading ...........................19

          4.    The challenged statements are not otherwise actionable pursuant to the PSLRA Safe Harbor and Bespeaks Caution Doctrine ........................20

     B.    Plaintiff Fails To Plead Facts Giving Rise To A Strong Inference Of Scienter .............................................................................................................21

          1.    Plaintiff Fails to Allege that Any Defendant Knew or Was Reckless in Not Knowing that Any Statement Would Mislead.................22

2. Allegations of Insider Stock Sales Are Insufficient ................................. 25

3. The "Core Operations" Does Not Support An Inference Of Scienter ....................................................................................... 26

4. Generalized Allegations Do Not Support An Inference Of Scienter ......... 27

5. Plaintiff Cannot Overcome More Plausible, Nonculpable Competing Inferences ................................................................... 28

C. Plaintiff Fails to Adequately Allege Loss Causation ............................................. 28

II. THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20(A) OF THE EXCHANGE ACT .................................................................................................... 30

CONCLUSION ..................................................................................................................... 30

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 3 of 37    Document 28

# TABLE OF AUTHORITIES

**CASES**

*Alizadeh v. Tellabs, Inc.*,
  No. 13 C 537, 2015 WL 557249 (N.D. Ill. Feb. 9, 2015)...................................................13

*In re Amarin Corporation PLC Securities Litigation*,
  Civ. Action No.: 13–6663 (FLW)(TJB), 2016 WL 1644623 (D.N.J. Apr. 26,
  2016), *aff'd*, 689 F. App'x 124 (3d Cir. 2017) ................................................18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..............................................................................................9

*In re Baxter International Inc. Securities Litigation*,
  No. 19 C 7786, 2021 WL 100457 (N.D. Ill. Jan. 12, 2021) ....................................3, 24, 27

*Borsellino v. Goldman Sachs Group, Inc.*,
  477 F.3d 502 (7th Cir. 2007) .......................................................................11

*City of Edinburgh Council v. Pfizer, Inc.*,
  754 F.3d 159 (3d Cir. 2014)..............................................................................16, 20

*City of Livonia Employees' Retirement System & Local 295/Local 851 v. Boeing Co.*,
  711 F.3d 754 (7th Cir. 2013) ...............................................................22, 24, 28

*City of Taylor Police & Fire Retirement System v. Zebra Technologies Corp.*,
  8 F.4th 592 (7th Cir. 2021) ...............................................................19, 22, 28

*City Pension Fund for Firefighters & Police Officers in City of Tampa Bay v. Generac
  Holdings Inc.*,
  765 F. Supp. 3d 775 (E.D. Wis. 2025)...............................................................30

*Cornielsen v. Infinium Capital Management, LLC*,
  916 F.3d 589 (7th Cir. 2019) .................................................................22

*Davis v. SPSS, Inc.*,
  385 F. Supp. 2d 697 (N.D. Ill. 2005) ................................................................21

*Employees' Retirement System of the City of Baton Rouge & Parish of East Baton Rouge
  v. MacroGenics, Inc.*,
  61 F.4th 369 (4th Cir. 2023) ....................................................................1, 16

*In re Fifth Third Bancorp Derivative Litigation*,
  No. 20 C 4115, 2023 WL 2429009 (N.D. Ill. Mar. 8, 2023) ...........................................27

*Fryman v. Atlas Financial Holdings, Inc.*,
  462 F. Supp. 3d 888 (N.D. Ill. 2020)................................................................25

*Fulton County Employees' Retirement System v. MGIC Investment Corp.*,
   No. 08-C-0458, 2010 WL 601364 (E.D. Wis. Feb. 18, 2010)............................................11

*Gaines v. Guidant Corp.*,
   No. 1:03CV00892–SEB–WTL, 2004 WL 2538374
   (S.D. Ind. Nov. 8, 2004)............................................................................................23, 27

*Garden City Employees' Retirement System v. Anixter International, Inc.*,
   No. 09-CV-5641, 2012 WL 1068761 (N.D. Ill. Mar. 29, 2012)........................................26

*Glickenhaus & Co. v. Household International, Inc.*,
   787 F.3d 408 (7th Cir. 2015) ..........................................................................................29

*Goucher v. Iterum Therapeutics plc*,
   648 F. Supp. 3d 962 (N.D. Ill. 2022) ..........................................................................13, 20

*Gregory v. ProNAi Therapeutics Inc.*,
   297 F. Supp. 3d 372 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)..................20

*In re Guidant Corp. Securities Litigation*,
   536 F. Supp. 2d 913 (S.D. Ind. 2008) .............................................................................26

*Harden v. Raffensperger, Hughes & Co.*,
   65 F.3d 1392 (7th Cir. 1995) ...........................................................................................21

*In re Harley-Davidson, Inc. Securities Litigation*,
   660 F. Supp. 2d 969 (E.D. Wis. 2009)..........................................................................22, 25

*Higginbotham v. Baxter International, Inc.*,
   495 F.3d 753 (7th Cir. 2007) ...........................................................11, 15, 22, 23, 26

*In re Human Genome Sciences Inc. Securities Litigation*,
   933 F. Supp. 2d 751 (D. Md. 2013) .................................................................................28

*Lewakowski v. Aquestive Therapeutics, Inc.*,
   No. CV213751ZNQDEA, 2023 WL 2496504 (D.N.J. Mar. 14, 2023)..............................16

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024)....................................................................................................11, 15

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)...........................................................................................................19

*In re Nektar Therapeutics Securities Litigation*,
   34 F.4th 828 (9th Cir. 2022) ............................................................................................29

*Orgone Capital III, LLC v. Daubenspeck*,
   912 F.3d 1039 (7th Cir. 2019) ...........................................................................................3

*Pension Trust Fund for Operating Engineers v. Kohl's Corp.*,
   895 F.3d 933 (7th Cir. 2018) ................................................................22, 25, 27

*Pension Trust Fund for Operating Engineers v. Kohl's Corp.*,
   266 F. Supp. 3d 1154 (E.D. Wis. 2017), *aff'd*, 895 F.3d 933 (7th Cir. 2018) ...................25

*In Re Philip Morris International Inc. Securities Litigation*,
   89 F.4th 408 (2d Cir. 2023) ................................................................16

*Pizzuto v. Homology Medicines, Inc.*,
   No. 1:23-CV-10858-AK, 2024 WL 1436025 (D. Mass. Mar. 31, 2024) ..........................29

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
   11 F.4th 90 (2d Cir. 2021) ................................................................11

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
   679 F.3d 952 (7th Cir. 2012) ................................................................28

*Pommer v. Medtest Corp.*,
   961 F.2d 620 (7th Cir. 1992) ................................................................11

*Premier Capital Management, L.L.C. v. Cohen*,
   No. 02 C 5368, 2003 WL 21960357 (N.D. Ill. Aug. 15, 2003)........................................14

*Pugh v. Tribune Co.*,
   521 F.3d 686 (7th Cir. 2008) ................................................................9, 25, 28, 30

*In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
   697 F.3d 869 (9th Cir. 2012) ................................................................17

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)................................................................11

*Rubinstein v. Gonzalez*,
   No. 14-cv-9465, 2016 WL 1213931 (N.D. Ill. Mar. 29, 2016) ......................................23

*Shapiro v. TG Therapeutics, Inc.*,
   652 F. Supp. 3d 416 (S.D.N.Y. 2023)................................................................14

*Silverman v. Motorola, Inc.*,
   772 F. Supp. 2d 923 (N.D. Ill. 2011) ................................................................26

*Teamsters Affiliates Pension Plan v. Walgreen Co.*,
   No. 08 C 2162, 2010 WL 3894149 (N.D. Ill. Sept. 29, 2010)........................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................10, 22

Case 1:25-cv-00124-WCG   Filed 10/10/25   Page 6 of 37   Document 28

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)..........................................................................................16

*Tricontinental Industries, Ltd. v. PricewaterhouseCoopers, LLP*,
475 F.3d 824 (7th Cir. 2007) ........................................................................................29

*Vallabhaneni v. Endocyte, Inc.*,
No. 114CV01048TWPMJD, 2016 WL 51260 (S.D. Ind. Jan. 4, 2016).......................15, 17

*West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
495 F. Supp. 3d 622 (N.D. Ill. 2020), *aff'd sub nom. National Elevator Industry
Pension Fund v. Conagra Brands, Inc.*, No. 21-1155, 2022 WL 1449184 (7th Cir.
May 9, 2022).........................................................................................................16, 25, 27

*Washtenaw County Employees' Retirement System v. Walgreen Co.*,
No. 15-CV-3187, 2021 WL 5083756 (N.D. Ill. Nov. 2, 2021), *on reconsideration
in part,* No. 15-CV-3187, 2022 WL 614925 (N.D. Ill. Mar. 2, 2022)................................29

**STATUTES**

15 U.S.C. § 78u-4(b)(1) .......................................................................................................10

15 U.S.C. § 78u-4(b)(2)(A)...................................................................................................10

15 U.S.C. § 78u-5(c)(1)(A)...................................................................................................20

17 C.F.R. § 240.10b-5(b) ......................................................................................................11

42 C.F.R. § 11.44 ..................................................................................................................24

Defendants ESSA Pharma Inc. ("ESSA"), David R. Parkinson, and Peter Virsik (together, the "Individual Defendants," and together with ESSA, "Defendants") respectfully submit this Memorandum of Law in support of their motion to dismiss the Amended Class Action Complaint, Docket No. 20 ("CAC" or the "Complaint").

## PRELIMINARY STATEMENT

The Complaint is emblematic of an all-too-common and unfortunate scenario: (i) a pharmaceutical company embarks on a series of clinical trials to evaluate a novel drug, (ii) the drug does not perform as hoped, (iii) the company's stock price declines following the publication of the results, and (iv) a plaintiff reflexively claims "securities fraud" based on nothing more than speculation and hindsight. But the Private Securities Litigation Reform Act ("PSLRA") was designed to protect against such meritless claims, as "[i]t would be a great disservice to stifle biopharmaceutical companies' pursuit of medical advancements by failing to safeguard against an inundation of lawsuits alleging securities-law violations." *Emps.' Ret. Sys. v. MacroGenics, Inc.*, 61 F.4th 369, 388 (4th Cir. 2023).

Here, ESSA spent years developing novel therapies for patients with prostate cancer, including drugs that would inhibit the N-terminal domain ("NTD") of the androgen receptor ("AR"), a nuclear receptor that drives prostate cancer growth. (CAC ¶¶ 34, 36.) After years of research and preclinical development, ESSA selected Masofaniten (EPI-7386) as its lead candidate in 2019. (*Id.* ¶ 72.) In addition to conducting clinical trials evaluating Masofaniten as a monotherapy, ESSA also initiated a Phase 1/2 clinical study to assess the potential benefits of combining Masofaniten with Enzalutamide in patients with advanced prostate cancer ("M-E Combination Trial"). (*Id.* ¶¶ 75, 82.)

Phase 1 of the M-E Combination Trial commenced in January 2022, focusing on assessing the safety, tolerability, and optimal dosing of the Masofaniten-Enzalutamide

combination. (CAC ¶ 83.) Throughout Phase 1, ESSA transparently reported results, including at major medical conferences and in its public filings. (*See* Ex. 1 at 14-19 (ESSA 2023 10-K).) In September 2023, ESSA initiated Phase 2 of the M-E Combination Trial, which was a randomized study comparing combination therapy to Enzalutamide monotherapy. (*See* CAC ¶ 83.) Following a protocol-specified interim review and a futility analysis, in October 2024, ESSA determined that the combination did not demonstrate a clear efficacy benefit over Enzalutamide alone and that the likelihood of meeting the study's primary endpoint was low. (*Id.* ¶ 129.) ESSA promptly disclosed these results along with its decision to terminate the trial, thus providing investors with candid and timely information. (*Id.*) Unsurprisingly, ESSA's stock price declined in response to the news. (*Id.* ¶ 130.)

Seizing on the trial's disappointing results and resulting drop in stock price, Plaintiff reflexively filed this action, asserting that Defendants committed securities fraud by making several false and misleading statements about the trial. Plaintiff fails, however, to plead any of the required elements of a claim for securities fraud. Among other things, he pleads no facts to support that any statement made by Defendants was false and misleading when made, no facts to support that any statement was made with an intent to deceive, and no facts to support that ESSA's stock price dropped as a result of any corrective disclosure. Instead, Plaintiff's claims are based on speculation, mischaracterization of public disclosures, and impermissible fraud-by-hindsight. The results of the trial may have been disappointing, but the PSLRA and controlling case law do not permit disappointed investors to manufacture securities fraud claims from adverse clinical outcomes alone. For these reasons, and as set forth below, the Complaint should be dismissed with prejudice.

2

A.      **ESSA's Work to Develop of Potential Prostate Cancer Treatments**

Prostate cancer is the second most diagnosed cancer among men, with over 300,000 new cases diagnosed each year in the United States. (CAC ¶ 29.) As a clinical-stage pharmaceutical company, ESSA focused on developing novel therapies for the treatment of prostate cancer with an initial focus on patients whose disease is progressing despite treatment with existing therapies. (Ex. 1 at 6.) Specifically, ESSA sought to develop compounds with the "potential to significantly expand the interval of time in which patients with castration-resistant prostate cancer ('CRPC') can benefit from anti-hormone-based therapies." (*Id.* at 74.) These products were based on the Aniten molecule, a new class of drugs targeting the NTD AR. (*See* CAC ¶ 3.)

From 2015 to 2017, ESSA conducted a study of its first-generation agent, ralaniten acetate ("EPI-506") administered to metastatic CRPC ("mCRPC") patients. (*Id.* ¶ 3; Ex. 1 at 6.) EPI-506 demonstrated prostate-specific antigen ("PSA") declines, but the inhibition was not deep or sustained enough to confer clinical benefit. ESSA decided to discontinue its work on EPI-506 in favor of developing a new, more potent drug that would also have a longer half-life. (*See* CAC ¶ 71; Ex. 1 at 6.) After considering a series of next-generation compounds, ESSA selected Masofaniten (EPI-7386) as the lead candidate for the initial clinical development to treat mCRPC. (*See* CAC ¶ 71-72; Ex. 1 at 6.)

In March 2020, ESSA submitted an Investigational New Drug Application to the FDA.

---

[1]     In ruling on a motion to dismiss, the Court may "take judicial notice of matters of public record and consider documents incorporated by reference in the pleadings." *Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1044 (7th Cir. 2019). Each of the exhibits attached to the concurrently filed Lape Declaration fit these criteria. *See In re Baxter Int'l Inc. Sec. Litig.,* No. 19 C 7786, 2021 WL 100457, at *1 (N.D. Ill. Jan. 12, 2021) (taking judicial notice of SEC filings).

(CAC ¶ 73.) The following month, it submitted a Clinical Trial Application to Health Canada. (*Id.*) In July 2020, the Company began clinical testing on human patients. (*Id.*)

**B.      Monotherapy Trial**

ESSA's first clinical trial of Masofaniten evaluated the drug as a single agent (the "Monotherapy Trial"). (CAC ¶ 75.) The open-label, dose-escalation Phase 1 Monotherapy Trial was designed to determine the safety, tolerability, pharmacokinetics, maximum tolerated dose and/or a recommended Phase 2 range of doses, and to assess preliminary anti-tumor activity of the drug. (*Id.* ¶ 76; Ex. 1 at 12.) The Monotherapy Trial initially tested doses ranging from 200 to 800 milligrams a day, and was subsequently expanded to test 600 mg taken twice daily. (CAC ¶ 77; Ex. 1 at 12.) As Virsik stated in March 2021, "[o]ur *target* here . . . is to be able to get to exposures of over 300,000 AUC[2], and we're *projecting* that, that would be roughly at the 600 or 800 milligram doses." (CAC ¶ 96; Ex. 2 at 6 (Tr. Cowen 41st Annual Health Care Conference, Mar. 4, 2021) (emphasis added).)

**C.      M-E Combination Trial**

In December 2020, ESSA announced that—in parallel to the Company's clinical development of Masofaniten as a single agent—it had also been conducting preclinical studies and planning clinical studies to evaluate Masofaniten in combination with other agents. (Ex. 3 at 10 (ESSA 2020 10-K).) ESSA disclosed that "preclinical and clinical studies . . . suggest the potential to increase therapeutic activity by combining [the Company's Aniten compounds] with anti-androgens at an earlier stage of treatment." (*Id.*) On February 24, 2021, ESSA announced a collaboration with Astellas Pharma Inc. to evaluate Masofaniten in combination with Astellas's AR inhibitor, Enzalutamide, in patients with mCRPC. (CAC ¶ 82; Ex. 1 at 13.)

---

[2]    "AUC" or "area under the curve" measures the amount of a drug reaching the patient's bloodstream. (CAC ¶ 10).

ESSA paid for and operationalized the trial, which was to be conducted as an open label study with no masking. (CAC ¶ 82.) An "open label study" means that ESSA, the health provider, and the patients all have full knowledge of the drug and dosage each patient would receive. (*Id.* ¶ 9.) Phase 1 of the M-E Combination Trial was a dose escalation study aimed to evaluate the safety and tolerability of the drug combination and estimate the optimal dose of Masofaniten in combination with Enzalutamide. (*See id.* ¶ 83; Ex. 1 at 13.) In Phase 2, one group of patients would receive the Masofaniten-Enzalutamide combination therapy and a control group would receive only Enzalutamide. (CAC ¶ 83.) The first patient was dosed in Phase 1 of the M-E Combination Trial in January 2022. (Ex. 1 at 13.) On September 18, 2023, ESSA announced the initiation of Phase 2. (*Id.*)

**D. AUC Target**

One of the measurements that ESSA examined in its clinical trials is called area under the curve ("AUC"), which is used to calculate a patient's exposure to a drug over a period of time. (CAC ¶¶ 10, 93.) Prior to the purported class period, ESSA stated its "AUC goal of >300K, corresponding to drug exposures in mouse xenograft studies showing antitumor activity." (*Id.* ¶ 95; Ex. 4 at 4 (Presentation Materials, 2021 Genitourinary Cancers Symposium, Feb. 11-13, 2021).) Defendants consistently explained that 300,000 AUC was a "goal" or "target" of the Monotherapy Trial, not a minimum threshold for clinical relevance. For example:

- "Our *target* here . . . is to be able to get to exposures of over 300,000 AUC and we're *projecting* that would be roughly at the 600 or 800 milligram doses. And the reason we're . . . *targeting* 300,000 is because that is the exposure where we saw good consistent anti-tumor activity across all of our Xenograft models with the molecule." (CAC ¶ 96; Ex. 2 at 6) (emphasis added).)

- "So our ultimate *goal*, though, is to get to exposures in patients of roughly 300,000 AUC. . . . And the reason we're *targeting* that is because that's the exposure in animal studies where we saw very good anti-tumor effect across all the models." (CAC ¶ 97; Ex. 5 at 6-7 (Oppenheimer 31st Annual Healthcare Conference, Mar. 18, 2021) (emphasis added).)

5

**E.      Interaction Between Masofaniten and Enzalutamide, a CYP3A4 Inducer**

In connection with the M-E Combination Trial, Defendants disclosed—both prior to and during the purported class period—the risk that Enzalutamide would reduce Masofaniten exposure in patients. (CAC ¶ 11.)[3] Defendants informed investors that:

- "EPI-7386 [Masofaniten] exposure was impacted by Enzalutamide with decreased exposure level of EPI-7386 [Masofaniten]." (*Id.* ¶ 87; Ex. 6 at 9 (Tr. ESSA Special Call, June 27, 2022).)

- "[E]nzalutamide is a notorious, what's called CYP3A inducer, okay. . . . [E]nzalutamide is impacting our metabolism. It's reducing it by 50% to 60%." (CAC ¶ 90; Ex. 7 at 7 (Tr. Jefferies London Healthcare Conference, Nov. 17, 2022).)

- "Pharmacokinetic results from these first two cohorts demonstrated that enzalutamide exposure was minimally impacted by EPI-7386 while exposures of EPI-7386 were reduced by coadministration with enzalutamide, but remained in the clinically relevant range as suggested by preclinical xenograft studies." (Ex. 8.1 at 1 (Oct. 26, 2022 Press Release).)

- "Pharmacokinetic results from cohorts 1 and 2 had demonstrated that enzalutamide exposure was minimally impacted by masofaniten (EPI-7386), while, as expected, masofaniten (EPI-7386) exposure was reduced by approximately 60% by enzalutamide (a well established CYP3A4 inducer)." (Ex. 1 at 15.)

ESSA also disclosed that, despite the reduction of Masofaniten exposure caused by Enzalutamide, the observed exposures "remained in the clinically relevant range suggested by pre-clinical xenograph studies." (Ex. 1 at 15.)

**F.      Evaluation of PSA Baseline Levels and Reduction Rates**

ESSA also measured PSA baseline levels and reduction rates as part of its clinical trials. (*See, e.g.*, CAC ¶¶ 68, 105.) PSA is a protein produced by cells of the prostate gland, and its levels in the blood are commonly used as a biomarker to detect and monitor prostate cancer. (*Id.* ¶ 37.) The measurement of PSA is used to evaluate the efficacy of prostate cancer treatments, as

---

[3]   This is because Enzalutamide is an inducer of the CYP3A4 metabolic enzyme, which can increase the metabolism of CYP3A4-metabolized drugs like Masofaniten. (CAC ¶¶ 11, 63-64.)

a reduction in PSA levels often correlates with a positive therapeutic response. In clinical trials, companies evaluate "PSA90" or the percentage of patients who achieve a 90% reduction in PSA levels from baseline. (*Id.* at v., ¶¶ 105, 116). ESSA first reported PSA data from Phase 1 of the M-E Combination Trial during the European Society of Medical Oncology (ESMO) Congress on October 21, 2023. (*See Id.* ¶ 110; Ex. 9 (Oct. 21, 2023 Press Release). At this conference, ESSA presented the Median Baseline PSA in absolute terms for each cohort in the study. (Ex. 10 (Poster, ESMO, Oct. 21, 2023) ("Median Baseline PSA (range)**,** ng/mL [Cohort 1]: 24.9 (2.6-26.4), [Cohort 2]: 2.54 (1.84-1209); [Cohort 3]: 2.13 (1.35- 20.6); [Cohort 4]: 13.5 (1.18-565)").)

In analyzing Phase 1 data, ESSA contextualized its PSA90 rates by comparing them to those reported in historical studies of Enzalutamide monotherapy, including the PREVAIL and PROSPER trials. (CAC ¶¶ 116, 127.) As the Complaint acknowledges, when discussing their data, Defendants emphasized the "caveat that only 16 patients [were] valuable for the 88% PSA90 rate" in Phase 1 (*Id.* ¶ 127.) ESSA also directly addressed the differences in the patient baseline PSA levels from the comparable trials, disclosing, for example, that participants in the M-E Combination Trial "have a low PSA," while patients in the PREVAIL study entered with a median PSA of 54 ng/mL. (Ex. 11 at 6 (Tr. Piper Sandler 35th Annual Healthcare Conference, Nov. 30, 2023).)

### G. ESSA Consistently Disclosed Risks Associated With Drug Development in Its Public Filings

ESSA also repeatedly disclosed that clinical drug development is inherently risky, lengthy, and expensive, with highly uncertain outcomes. ESSA's Annual Reports expressly stated that the risk of failure is high and exists through every stage of drug development:

> Clinical testing is expensive and can take many years to complete, and **its outcome is inherently uncertain**. **Failure can occur at any time during the clinical trial process.** ESSA's planned clinical trials may produce negative or inconclusive results, and ESSA or any of its current and future collaborators may decide, or

7

regulators may require ESSA, to conduct additional clinical or preclinical testing. **The results of preclinical studies and early clinical trials may not be predictive of the results of later-stage clinical trials.** Preclinical tests and **Phase 1 and Phase 2 clinical trials are primarily designed to test safety, to study pharmacokinetics and pharmacodynamics and to understand the side effects of product candidates at various doses and schedules**. Success in preclinical or animal studies and early clinical trials does not ensure that later large-scale efficacy trials will be successful nor does it predict final results. Favorable results in early trials may not be repeated in later trials.

(Ex. 12 at 25 (ESSA 2021 10-K); Ex. 13 at 28 (ESSA 2022 10-K); Ex. 1 at 28-29 (emphasis added).) ESSA also made several additional specific risk disclosures, including: (1) "risks related to clinical trial development and our ability to conduct the clinical trial of our product candidate and the predictive value of our current or planned clinical trials"; (2) "risks related to our future success being dependent primarily on identification through preclinical studies, clinical studies, regulatory approval for commercialization of a single product candidate"; (3) "risks related to the possibility that our product candidate and potential future product candidates, if any, may have undesirable side effects when used alone or in combination with other drugs"; (4) "the risk of increased costs associated with prolonged, delayed or terminated clinical trials"; (5) "risks related to our limited operating history"; and (6) "risks related to our reliance on proprietary technology." (Ex. 1 at 4.[4])

## H.     Termination of M-E Combination Trial

Just over a year after ESSA began Phase 2 of the M-E Combination Trial, on October 31, 2024, ESSA announced its decision to terminate the M-E Combination Trial and all other ongoing clinical studies evaluating Masofaniten. (CAC ¶ 129; Ex. 14 (Oct. 31, 2024 Press Release).) This decision was based on an interim review of data that showed "no clear efficacy benefit [] with the combination of masofaniten plus enzalutamide compared to enzalutamide

---

[4]    ESSA's 2021 and 2022 Annual Reports contain substantially similar risk disclosures. (*See* Ex. 12 at 3-5; Ex. 13 at 3-5.)

single agent." (CAC ¶ 129; Ex. 14 at 1.) The review also "showed a much higher rate of PSA90 response in patients treated with enzalutamide monotherapy" than "expected based upon historical data." (CAC ¶ 129; Ex. 14 at 1.) ESSA further disclosed that it had conducted a futility analysis that "determined a low likelihood of meeting the prespecified primary endpoint of the study." (CAC ¶ 129; Ex. 14 at 1.)

The next day, November 1, 2024, ESSA's stock price dropped $3.80 per share to $1.40. Plaintiff subsequently filed this Complaint on behalf of a putative class of shareholders who purchased or otherwise acquired ESSA common shares between March 15, 2023 and October 31, 2024 alleging that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder by making a number of false and misleading statements regarding the clinical development and prospects for Masofaniten. The Complaint also alleges that the Individual Defendants as "control persons" violated Section 20(a) of the Exchange Act.

## ARGUMENT

The Complaint falls far short of satisfying the requirements to plead a claim for securities fraud under Section 10(b) or 20(a). To state a claim under Section 10(b), a plaintiff must allege, among other things: (1) a material misrepresentation or omission; (2) scienter; and (3) loss causation. *Pugh v. Trib. Co.*, 521 F.3d 686, 693 (7th Cir. 2008). To state a claim under Section 20(a), a plaintiff must first adequately plead a primary violation of the securities laws and must also allege facts to show that the individual defendants qualified as "control persons." *Id*.

In pleading the elements of a securities fraud claim, a plaintiff must not only set forth sufficient factual matter that, if accepted as true, states a claim to relief that is "plausible on its face," *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted), but must also meet the heightened pleading standards imposed by the PSLRA. The PSLRA requires a plaintiff to

9

"specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed[.]" 15 U.S.C. § 78u–4(b)(1). A plaintiff must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind[.]" § 78u–4(b)(2)(A). For an inference to be strong, it must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).

The Complaint here fails to adequately plead the elements of a Section 10(b) or 20(a) claim and must be dismissed for at least four reasons. *First*, Plaintiff fails to plead with particularity any statement that was false or misleading at the time it was made, instead raising alleged omissions contradicted by the very record Plaintiff cites and impermissibly relying on fraud by hindsight. *Second*, Plaintiff fails to allege facts giving rise to a strong inference of scienter. He instead attempts to rely on mere access to information, routine stock sales, and other generic allegations that are insufficient to show any knowledge of falsity or intent to deceive. *Third*, Plaintiff does not adequately plead loss causation, as the Complaint fails to connect any alleged misstatement or omission to the subsequent decline in ESSA's stock price. And *fourth*, Plaintiff cannot state a claim for "control person" liability under Section 20(a) because that claim is predicated entirely upon Plaintiff's deficient claims under Section 10(b). As such, the Complaint fails as a matter of law and should be dismissed in its entirety.

## I.     THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 10(B) OF THE EXCHANGE ACT

### A.     Plaintiff Fails To Allege Any Actionable Misstatements

The Complaint fails at the outset because Plaintiff does not identify any actionable

misrepresentation or omission. Plaintiff must plead that Defendants made an "untrue statement of a material fact" or omitted "a material fact necessary in order to make [other] statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Pure omissions—where a defendant simply remains silent—are not actionable. *Macquarie Infrastructure Corp. v. Moab Partners, LP*, 601 U.S. 257, 266 (2024).

What is more, the falsity of a statement is judged at the time it was made. As the Seventh Circuit has explained, there is no "fraud by hindsight." *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 759-60 (7th Cir. 2007) (quoting *Tellabs, Inc. v. Makor Issues & Rts.*, Ltd., 551 U.S. 308, 320 (2007)). "[A] statement true when made does not become fraudulent because things unexpectedly go wrong" afterwards. *Pommer v. Medtest Corp.*, 961 F.2d 620, 623 (7th Cir. 1992). Thus, Plaintiff must do more than claim statements were false and misleading; he must plead contemporaneous facts that "demonstrate with specificity why and how" the Defendants' statements were false or misleading *at the time*. *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *see also Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (requiring plaintiffs to allege "the who, what, when, where, and how" of the alleged fraud). Importantly, context matters: a statement that appears misleading in isolation may be entirely proper when read alongside other contemporaneous disclosures. *See, e.g.*, *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 102 (2d Cir. 2021) (granting motion to dismiss because "[r]ead in context, nothing in that statement is false"); *Fulton Cnty. Emps.' Ret. Sys. v. MGIC Inv. Corp.*, No. 08-C-0458, 2010 WL 601364, at *9 (E.D. Wis. Feb. 18, 2010) (granting motion to dismiss where "given the context in which [the] statement was made, it was not false or misleading").

Here, Plaintiff generally alleges that ESSA made material misstatements or omissions

regarding (i) patients' exposure to Masofaniten, (ii) comparisons to past clinical trials of Enzalutamide, and (iii) the clinical benefits and prospects of the M-E combination therapy. But Plaintiff does not—and cannot—plead facts to support that any of the statements the Complaint points to were false or misleading when made. This is fatal.

### 1. Plaintiff Fails to Plead Facts to Support that Statements Regarding Patients' Exposure to Masofaniten Were Materially False or Misleading

Plaintiff first challenges several of ESSA's statements regarding Masofaniten exposure levels during the clinical trials—including that they were clinically significant (CAC ¶ 106), "therapeutic" (*id.* ¶ 121), "high" (*id.* ¶ 108), "excellent" (*id.* ¶ 114), or "good" (*id.* ¶ 114), and that bi-daily dosing addressed exposure concerns (*id.* ¶¶ 106, 108, 110, 125). Plaintiff asserts that such statements were false and misleading because ESSA failed to disclose that: (i) Masofaniten exposure levels were "below the necessary threshold for anti-tumor activity of 300,000 AUC" (*id.* ¶ 107; *see also id.* ¶¶ 109, 112, 115, 120, 122, 124); (ii) Enzalutamide significantly reduced Masofaniten exposure (*id.* ¶¶ 107, 109, 115); (iii) bi-daily dosing was not successful in producing clinical exposures (*id.* ¶¶ 109, 112, 126); and (iv) pill burden remained a significant problem (*id.* ¶¶ 107, 109, 115). Plaintiff fails, however, to allege facts to support that any of the statements were in fact false or misleading when made.

The first attack on ESSA's exposure statements rests on the premise that Masofaniten must reach an exposure level of 300,000 AUC in order to produce clinical results. (*See, e.g.*, *id.* ¶ 107.) But the very materials the Complaint cites fatally undermine this theory: ESSA described 300,000 AUC as an exposure "target" or "goal," not as a threshold for clinical significance. (*Id.* ¶¶ 95-99.) Indeed, ESSA repeatedly stated that exposures in the range of 130,000 to 140,000 AUC indicated a "biologically active" or "biologically relevant" dose. *See, e.g.*, Ex. 2 at 6 (stating that an exposure of 130,000 to 140,000 AUC "would indicate a biologically active

dose")); Ex. 5 at 6 ("[A]n exposure in patients of roughly 130,000, 140,000 . . . may be in a range where we could start to see some biological activity in patients."); Ex. 15 at 3 (Tr. Bloom Burton & Co. Healthcare Investor Conference, Apr. 20, 2021) (characterizing an AUC of 137,278 as "biologically relevant").) Plaintiff cannot manufacture a rigid 300,000 AUC requirement while disregarding ESSA's statements that lower exposure levels were considered both biologically active and effective. *See Alizadeh v. Tellabs, Inc.*, No. 13 C 537, 2015 WL 557249, at *10 (N.D. Ill. Feb. 9, 2015) (rejecting plaintiffs' attempt to mischaracterize defendant's statement by ignoring the full context in which it was made).

Plaintiff next claims that ESSA's statements regarding Masofaniten exposure were materially misleading because ESSA failed to disclose that Enzalutamide was a strong CYP3A4 inducer that significantly reduced Masofaniten exposure. (CAC ¶¶ 107, 109, 115) But this too is flatly contradicted by the Complaint's own allegations and public statements, as ESSA repeatedly acknowledged an increase in the metabolism of Masofaniten when administered in conjunction with Enzalutamide. *See Goucher v. Iterum Therapeutics plc*, 648 F. Supp. 3d 962, 972 (N.D. Ill. 2022) ("Plaintiff's position fails because the information alleged to have rendered Defendants' statements false and misleading was . . . disclosed by Defendants.").

For example, ESSA stated that "we have seen an increase in the metabolism of EPI-7386 [Masofaniten] as we were anticipating in conjunction with Enzalutamide," and that the company was "increasing the dose" to address this effect. (CAC ¶ 106.) ESSA also disclosed that: Masofaniten exposure was "was impacted by Enzalutamide with decreased exposure level of EPI-7386 [Masofaniten]" (*id.* ¶ 87); "Masofaniten is a 'victim' of [Enzalutamide]" (*id.* ¶ 110); "Enzalutamide does accelerate the metabolism of [Masofaniten]" (*id.* ¶ 114); Enzalutamide "chews up [Masofaniten]" and is "a nasty drug from that perspective" (*id.* ¶ 119); "Enzalutamide

13

[is] a potent inducer of CYP3A4" which metabolizes Masofaniten (*id.* ¶ 121); and "Enzalutamide combination treatment [causes] a reduction in [Masofaniten's] overall AUC, as it's called, or exposure" (*id.* ¶ 125). These disclosures put investors on notice of the very risk that Plaintiff asserts was wrongly concealed. See *Shapiro v. TG Therapeutics, Inc.*, 652 F. Supp. 3d 416, 422 (S.D.N.Y. 2023) (dismissing claim that defendants' press releases omitted information about adverse events that arose during a clinical trial because the adverse events had already been disclosed elsewhere).

Plaintiff further asserts that statements made regarding the impact of bi-daily dosing on Masofaniten exposure were materially false and misleading because bi-daily dosing "was not successful in producing clinical exposures" and "did not mitigate the drop in exposure." (*See, e.g.*, CAC ¶¶ 109, 112.) But Plaintiff alleges no facts to support that ESSA's statements regarding bi-daily dosing, including that it helped to prevent saturation, were false or misleading. See *Premier Cap. Mgmt., L.L.C. v. Cohen*, No. 02 C 5368, 2003 WL 21960357, at *3 (N.D. Ill. Aug. 15, 2003) (dismissing Section 10(b) claims where plaintiffs "repeatedly fail to provide 'the reason or reasons why [each] statement is misleading'" (quoting 15 U.S.C. § 78u–4(b)(1)(B)). Moreover, ESSA frequently made statements in the context of presentations that included detailed AUC data and charts, allowing investors to assess actual exposure levels for themselves. See *Teamsters Affiliates Pension Plan v. Walgreen Co.*, No. 08 C 2162, 2010 WL 3894149, at *5 (N.D. Ill. Sept. 29, 2010) ("Plaintiffs would like the court to view the statement in a vacuum, but the court must consider the statement in the context of the report."). In a chart included in ESSA's presentation at ESMO 2023, for example, ESSA provided clinical results showing that increasing dosing from QD dosing (once daily) to BID dosing (twice daily) resulted in material increases in the AUC of Masofaniten. (CAC ¶ 110; Ex. 10).

14

The Complaint also alleges that ESSA's statements regarding exposure were materially misleading because they failed to disclose that "patients struggled with pill burden." (CAC ¶ 107.) But this allegation is nothing more than a pure omission, inactionable under *Macquarie*. *See Macquarie*, 601 U.S. at 264 ("Rule 10b–5(b) does not proscribe pure omissions."). Moreover, even if it were actionable, Plaintiff provides no evidence to support his claim of pill burden beyond a vague statement from a confidential witness indicating that pill burden posed problems during the clinical trial of a *different* EPI molecule that took place *before* the class period.[5] (CAC ¶ 70.) Such allegations, even if they were relevant, would be entitled to little to no weight. *See Higginbotham*, 495 F.3d at 757 ("It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist."); *Vallabhaneni v. Endocyte, Inc.*, No. 1:14-CV-01048-TWP-MJD, 2016 WL 51260, at *8 (S.D. Ind. Jan. 4, 2016) ("The Seventh Circuit has reacted strongly against reliance on confidential witnesses in securities fraud cases, noting that allegations from such witnesses are to be steeply discounted."). Even if credited, however, Plaintiff still fails to plead any facts to demonstrate that ESSA's challenged statements—none of which discussed pill burden—were somehow rendered false or misleading by the alleged omission.

---

[5]  Plaintiff's sole confidential witness (CW1) was a technical consultant from February 2018 until January 2020—more than three years before the class period. (CAC ¶ 70.) Tellingly, Plaintiff does not allege that CW1 had any involvement in the development or testing of Masofaniten. Instead, CW1 claims that the clinical trial for EPI-506—an entirely different molecule—was canceled due to pill burden. *Id.* The Complaint provides no basis from which to infer that issues experienced by EPI-506 patients transferred to Masofaniten patients. Furthermore, the EPI-506 trial was conducted from 2015 to 2017 (*Id.* ¶ 3), meaning that it was discontinued before CW1 did any work for ESSA. In short, the singular confidential witness can only muster allegations relating to a clinical trial of a different drug that predated both the class period and witness's tenure. These non-credible allegations cannot save the Complaint.

Finally, to the extent that Plaintiff challenges Defendants' representation of what is a significant clinical, therapeutic, or high exposure as false and misleading, courts have repeatedly held that such statements are opinions. *See City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) ("Interpretations of clinical trial data are considered opinions."); *MacroGenics*, 61 F.4th at 387 (same); *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 423 (2d Cir. 2023) (referring to an interpretation of scientific data as an "opinion statement"). And statements of opinion are actionable only if the speaker does not hold the professed belief, supplies facts in support of the opinion that are untrue, or omits information that makes the stated opinion misleading to a reasonable investor. *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86, 190-91 (2015)); *see also W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 650 (N.D. Ill. 2020), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, No. 21-1155, 2022 WL 1449184 (7th Cir. May 9, 2022).

Here, the Complaint does not allege that Defendants disbelieved their statements or that Defendants provided untrue facts in support of any their statements. *See Lewakowski v. Aquestive Therapeutics, Inc.*, No. 21-3751 (ZNQ) (DEA), 2023 WL 2496504, at *7 (D.N.J. Mar. 14, 2023) (granting dismissal where plaintiffs failed to "challenge Defendants' basis for their opinion that 70 ng/mL plasma concentration is enough to be therapeutic or their honest belief in that opinion"). To the contrary, Defendants supported their statements with the actual clinical results. The fact that an investor may disagree with Defendants' opinion of what is an "excellent" or clinically significant exposure does not render Defendants' statements actionable under Section 10(b). *See MacroGenics*, 61 F.4th at 388 ("We cannot instruct the district court to proceed with this case due to a difference of opinion because '[s]ecurities law is simply not a

vehicle through which courts will police disagreements in the cancer research community or the parameters of clinical trials.'" (quoting *Zagami v. Cellceutix Corp.*, No. 15 Civ. 7194 (KPF), 2016 WL 3199531, at *13 (S.D.N.Y. June 8, 2016)).

> **2.      Plaintiff Fails to Plead Any Facts from Which to Infer that Any of the Challenged Statements Regarding the PREVAIL Study Were Materially False or Misleading When Made**

Plaintiff similarly fails to adequately plead that Defendants made materially false and misleading statements when it compared the results of the M-E Combination Trial to the results of the PREVAIL study, a 2014 clinical trial evaluating Enzalutamide as a monotherapy. (CAC ¶ 105.) Plaintiff asserts that such statements were false and misleading because patients in the PREVAIL study were sicker with higher baseline PSAs than those in the M-E Combination Trial. (*Id.* ¶¶ 117, 128.) Defendants did not, however, conceal the differences between the PREVAIL and M-E Combination Trial populations or otherwise mislead investors. To the contrary, they directly addressed the differences in patient populations during the November 30, 2023 Piper Sandler 35th Annual Healthcare Conference, explaining, among other things, that "we have a low PSA coming into our study" and that patients in the PREVAIL study entered with a median PSA of 54 ng/mL. (Ex. 11 at 6.) Moreover, ESSA's choice of which comparable studies to use in analyzing its results is a matter of study design and statistical methodology, and courts routinely reject securities fraud claims that are premised on the allegation that defendants should have employed a different design or statistical approach. *See, e.g.*, *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 878-79 (9th Cir. 2012); *Vallabhaneni*, 2016 WL 51260, at *14 ("[W]here a study's methods are reasonable and the defendant has accurately described those methods . . . a defendant pharmaceutical company does not have to adhere to the highest research standards, disclose all potentially relevant information or findings, or reveal potential flaws to study design.").

17

*In re Amarin Corporation PLC Securities Litigation* is instructive. No. CV 13-6663 (FLW) (TJB), 2016 WL 1644623 (D.N.J. Apr. 26, 2016), *aff'd*, 689 F. App'x 124 (3d Cir. 2017). There, the plaintiffs alleged that Amarin and its executives misled investors by referencing the results of an earlier Japanese cardiovascular outcomes study (JELIS) to support the efficacy of their drug for a U.S. patient population, despite significant differences in study design and patient characteristics. *Id.* at *12-13. The court held, however, that "as a matter of law, Defendants' statements regarding the positive implications of the JELIS study results were not materially false or misleading" because the plaintiffs "failed to sufficiently allege that the JELIS study was not indicative, at least in some manner, of the potential efficacy" of Amarin's drug. *Id.* at *14.

Here too, Plaintiff fails to allege that the PREVAIL study was not, in any manner, indicative of Masofaniten's potential efficacy when administered in combination with Enzalutamide. The Complaint also does not—and cannot—allege that ESSA made any guarantees that, based on comparisons to the PREVAIL study, the M-E Combination Trial would produce superior PSA reductions. For good reason. Any such allegation would be directly contradicted by ESSA's repeated assertions that the results of the clinical trial were uncertain. (*See, e.g.*, Ex. 16 at 7 (Tr. Oppenheimer 33rd Annual Healthcare Conference, Mar. 15, 2023) ("[Y]ou never know for sure, of course, and clinical research is challenging . . . .")); Ex. 17 at 4-5 (Tr. Bloom Burton & Co. Healthcare Investor Conference, Apr. 25, 2023) ("So that's not definitive because enzalutamide alone does have a history and is active drug and can decrease PSAs. . . . So, so far, so good, but not definitive.")); Ex. 18 at 4 (Tr. Bloom Burton & Co. Healthcare Investor Conference Transcript, Apr. 16, 2024) ("The next 6 to 12 months will tell the tale. . . . Again, we'll give guidance when we feel we can give beyond speculation.")).)

To the extent that Plaintiff disagrees with ESSA's reasoning described above, his challenge is directed at a statement of opinion not an affirmative statement of fact. And because Plaintiff does not claim that Defendants either disbelieved or provided untrue facts in support of his opinion regarding comparability, Plaintiff fails to adequately allege that ESSA's comparisons to the PREVAIL study constitute actionable misstatements under Section 10(b).

### 3. Plaintiff Fails to Adequately Plead That Statements Regarding M-E Combination Trial Results Were False or Misleading

Plaintiff also fails to adequately allege that Defendants misled investors regarding the outlook of the M-E Combination Trial. Plaintiff asserts that several statements that Defendants made beginning in November 2023 related to data results, proceeding into the Phase 2 randomized trial, and progressing forward were false and misleading because Defendants fraudulently omitted that reports already showed that the combination of Masofaniten and Enzalutamide afforded patients no clinical benefit over Enzalutamide alone. (CAC ¶¶ 117, 122, 124, 126, 128.) Many of these statements are no more that immaterial "puffery"—vague expressions of optimism or general statements of confidence. *See City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021) (dismissing a statement as mere puffery because it "did not make any concrete assertion; it expressed only vague optimism").

But even any of the statements contained more than vague optimism, the Complaint fails to explain how the existence of interim clinical reports would render any of the alleged misstatements false or misleading. There are no allegations that Defendants disclosed false clinical results or that, when they made statements regarding the trial's next steps, ESSA did not in fact intend to move forward.

Moreover, because Section 10(b) "do[es] not create an affirmative duty to disclose any and all material information," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011),

19

ESSA had no duty to disclose data from its ongoing clinical trial on a rolling basis. *City of Edinburgh*, 754 F.3d at 174-75 (holding that a pharmaceutical company had no duty to provide ongoing or interim disclosures of clinical trial data absent an affirmative statement or misleading prior disclosure); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 410 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018) ("There is, of course, no general duty to update investors on the progress of a clinical trial."); *Goucher*, 648 F. Supp. 3d at 977-78 (collecting cases that reject material omission claims where pharmaceutical companies do not reveal FDA commentary or interim status reports). Defendants would only have such a duty if they made affirmative statements that required correction or additional context so as not to mislead investors. *See City of Edinburgh*, 754 F.3d at 174. Here, however, Plaintiff does not—and cannot—allege that Defendants made any affirmative guarantees about Masofaniten's clinical effectiveness. To the contrary, Defendants repeatedly warned investors that the results of the M-E Combination Trial were uncertain. Although they disclosed a factual account of the results of the Phase 1 study, they appropriately withheld Phase 2 data until they completed an interim review and protocol-specified futility analysis, the results of which they then promptly disclosed. (CAC ¶ 147.) Defendants' actions do not support a claim of material omission or misrepresentation.

### 4. The challenged statements are not otherwise actionable pursuant to the PSLRA Safe Harbor and Bespeaks Caution Doctrine

Plaintiff's claims also fail because many of Defendants' statements are protected by the PSLRA safe harbor and bespeaks caution doctrine, which protects forward-looking statements that are identified and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ material from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A). Here, all of the materials accompanying the

20

presentations cited in the Complaint expressly warned that they included forward-looking statements. *See Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 711 (N.D. Ill. 2005) (holding that, because the defendant's press release contained a clause warning that some of statements were forward-looking and certain variables could cause actual company results to differ from predictions, the safe harbor applied). Forward-looking statements made during those conferences—including statements communicating projections about Masofaniten's therapeutic efficacy and noting that ESSA is "progressing towards a stream of significant milestones"—are therefore inactionable. (CAC ¶¶ 121, 123.)

Similarly, the "bespeaks caution doctrine provides that when forecasts, opinions, or projections in a disclosure statement are accompanied by meaningful warnings and cautionary language, the forward-looking statements may not be misleading." *Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1404 (7th Cir. 1995) (internal quotation marks and citation omitted). As discussed, the conference materials cited in the Complaint and ESSA's Annual Reports were littered with warnings and cautionary statements about predictions. (*See, e.g.*, Ex. 16 at 7 (warning that clinical research is challenging and unpredictable); Ex. 17 at 4-5 (cautioning that positive preliminary results are not definitive); Ex. 18 at 4 (informing investors that ESSA will share guidance when it can do so beyond speculation); Ex. 12 at 25 (warning that the risk of failure is high and exists through every stage of drug development); Ex. 13 at 28 (same); Ex. 1 at 4, 28-29 (same). Accordingly, predictions about the clinical study are also inactionable under the bespeaks caution doctrine.

**B.     Plaintiff Fails To Plead Facts Giving Rise To A Strong Inference Of Scienter**

The Complaint fails for the additional and independent reason that Plaintiff does not sufficiently plead a strong inference of scienter on the part of any Defendant. The PSLRA demands that a plaintiff "state *with particularity* facts giving rise to a *strong inference* that the

21

defendant acted with the required state of mind." *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018) (quoting 15 U.S.C. § 78u-4(b)(2)(A)). "Th[e] 'required state of mind' is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham*, 495 F.3d at 756. Only facts evidencing "*an extreme departure* from the standards of ordinary care" can suffice to establish recklessness. *City of Livonia Emps.' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*, 711 F.3d 754, 756 (7th Cir. 2013) (emphasis added). To meet this standard, the inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314; *see also City of Taylor*, 8 F.4th at 595-96. Here, Plaintiff fails to plead any inference of scienter, let alone the strong inference that the PSLRA demands.

### 1. Plaintiff Fails to Allege that Any Defendant Knew or Was Reckless in Not Knowing that Any Statement Would Mislead

Plaintiff first seeks to draw an inference of scienter on the basis of Defendants' access to data from the M-E Combination Trial. (CAC ¶¶ 132-42.) But mere access to information alone cannot support an inference of scienter. *Cornielsen*, 916 F.3d at 602; *see also Kohl's*, 895 F.3d at 940 (allegations in complaint "advanced without any sense of how the dots connect" were insufficient to show cogent and compelling inference of scienter); *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 999 (E.D. Wis. 2009) ("[N]ot only is mere receipt of reports insufficient to establish scienter, the inferential leap required to tie these alleged facts to the conclusion that defendants acted knowingly or recklessly when presenting relevant information to the market is untenable given the heightened pleading standards."). "The question is not merely whether the [defendant] had knowledge of the undisclosed facts; rather, it is the 'danger of misleading buyers [that] must be actually known or so obvious that any reasonable man would

be legally bound as knowing.'" *Rubinstein v. Gonzalez*, No. 14-cv-9465, 2016 WL 1213931, at *10 (N.D. Ill. Mar. 29, 2016) (quoting *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989)).

Here, the Complaint improperly conflates Defendants' knowledge of clinical trial data with knowledge that Defendants' statements were false. *See Higginbotham*, 495 F.3d at 758 ("[T]here is a big difference between knowing about the reports from Brazil and knowing that the reports are false. The complaint documents the former but not the latter."). Plaintiff contends that Defendants' "knowledge of the underlying facts . . . rendered their representations misleading, including the threshold Masofaniten AUC required for 'consistent anti-tumor activity' and the detrimental impact Enzalutamide had on Masofaniten exposure." (CAC ¶¶ 134-42.) But Plaintiff fails to connect the dots between Defendants' access to clinical trial data and any alleged false statement and thus cannot support a compelling inference of scienter. As discussed in Section I.A., Defendants made no false or misleading statements with respect to the AUC target or the impact of Enzalutamide on Masofaniten.

Instead, and confusingly, the Complaint points to Defendants' repeated public statements calling 300,000 AUC a "target" and regarding the impact of Enzalutamide on Masofaniten exposure as supporting an inference of scienter—rather than any statement that the target was achieved or downplaying the drug interaction. (*Id.* ¶¶ 135-39.) Making statements about the trials accompanied by disclosures of the relevant data and potential risks cannot support an inference of scienter. *See Gaines v. Guidant Corp.*, No.1:03CV00892-SEB-WIL, 2004 WL 2538374, at *16 (S.D. Ind. Nov. 8, 2004) ("[R]epeated, voluntary disclosures of negative information regarding [medical device] . . . preclude a strong inference of scienter.").

Moreover, Plaintiff fails to plead facts to support Defendants knew the statements were

false at the time they were made or otherwise acted with reckless disregard. *In re Baxter*, 2021 WL 100457, at \*12 ("Plaintiffs must allege facts showing that Defendants 'had the requisite scienter at the time that they made each allegedly fraudulent statement.'" (quoting *In re NeoPharm, Inc. Sec. Litig.*, No. 02 C 2976, 2007 WL 625533, at \*6 (N.D. Ill. Feb. 23, 2007)). Instead, Plaintiff impermissibly appears to reason that because the M-E Combination Trial ultimately failed, any statements made about interim results during its course must have been knowingly or recklessly fraudulent. That is not the law. *See Boeing*, 711 F.3d at 758 ("There is no securities fraud by hindsight. The law does not require public disclosure of mere *risks* of failure." (internal quotations and citations omitted)).

Perhaps recognizing this failure, the Complaint misleadingly suggests that ESSA failed to comply with a requirement under 42 C.F.R. § 11.42(b) to submit clinical trial *results* to the FDA. (*See* CAC ¶ 148.) But that the deadline to submit clinical trial results to the FDA is "no later than 1 year after the primary completion date of the applicable clinical trial." 42 C.F.R. § 11.44. Accordingly, ESSA was under no obligation to submit its results for the Monotherapy Study or the M-E Combination Trial at the time it ended the trials. Contrary to Plaintiff's assertion, failing to comply with a nonexistent requirement does not suggest "Defendants were hiding the data." (CAC ¶ 148.) Likewise, Plaintiff mischaracterizes a Q&A during the Cantor Fitzgerald Global Healthcare Conference to allege an "evasive shift to dated Phase 1 data to avoid discussing unfavorable Phase 2 data."[6] (*See Id.* ¶¶ 148-49.) Reading the statements in context, it is clear that (1) the moderator asked a multi-part question about findings from both Phase 1 and 2; (2) Parkinson asked Virsik to first comment on Phase 1; (3) Virsik gave a detailed answer regarding Phase 1; and (4) the moderator then asked a follow up question before Parkinson or Virsik could

---

[6]   The Complaint misidentifies this Q&A as the Cowen Conference. (CAC ¶ 148.)

address Phase 2. (*See* Ex. 19 at 7 (Tr. Cantor Fitzgerald Global Healthcare, Sept. 18, 2024).) The transcript does not suggest any attempt to conceal the results of Phase 2.

In sum, Plaintiff has failed to allege contemporaneous facts establishing "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Kohl's*, 895 F.3d at 936; *Conagra Brands*, 495 F. Supp. 3d at 659.

### 2. Allegations of Insider Stock Sales Are Insufficient

With no contemporaneous facts, Plaintiff instead attempts to allege that an inference of scienter is supported by certain stock sales by Virsik. (CAC ¶ 150.) But merely alleging a number of shares sold and resulting proceeds, as Plaintiff does here, is insufficient to support a finding of scienter.[7] *See Pugh v. Trib. Co.*, 521 F.3d 686, 695 (7th Cir. 2008). Indeed, "[b]ecause executives sell stock all the time, stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." *Kohl's*, 895 F.3d at 940. Unusual or suspicious means "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 903-04 (N.D. Ill. 2020) (internal quotation marks and citation omitted).

Tellingly, Plaintiff alleges no facts to support that Virsik's trades were "dramatically out of line." *Id*. Instead, as Plaintiff concedes, all of Virsik's trades identified in the Complaint were

---

[7] Plaintiff fails to allege any facts to suggest that that Virsik's stock sales are unusual or suspicious. Plaintiff alleges that Virsik sold 81,945 shares during the class period for total proceeds of $819,303.41. (CAC ¶ 150.) While Plaintiff compares the proceeds to Virsik's annual salary, Plaintiff fails to "specify the percentage of stock sold by the defendants in relation to their total holdings or reference any offsetting stock purchases during the class period." *See In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d at 1001. Plaintiff's allegations are thus "insufficient to demonstrate scienter because they include no context in which the Court could consider the import of the trades." *Pension Tr. Fund for Operating Eng'rs v Kohl's*, 266 F. Supp. 3d 1154, 1169 (E.D. Wis. 2017), *aff'd*, 895 F.3d 933 (7th Cir. 2018).

sold pursuant to a 10b5-1 trading plan entered into on August 31, 2023—before the start of Phase 2 and more than a year before ESSA terminated the M-E Combination Trial. (CAC ¶¶ 14, 150.) And importantly, stock sales made pursuant to a 10b5-1 trading plan "negate[] an inference of scienter." *Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641, 2012 WL 1068761, at \*13 (N.D. Ill. Mar. 29, 2012); *see also In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 931 (S.D. Ind. 2008) ("[A]utomatic, nondiscretionary sales made pursuant to 10b5–1 plans . . . do not give rise to a strong inference of scienter.").

The Complaint also attempts to obscure the fact that 91% of the proceeds are from a single transaction on February 6, 2024. The applicable Form 4 shows that the purported "windfall" is attributable to Virsik's exercise of an option to purchase 72,782 shares at $3.23 and to sell of those same shares on the same day at a time when ESSA common shares were trading at $10.29. (*See* Ex. 20 (Form 4, Feb. 7, 2024).) This too counsels against a finding of scienter. *See Silverman v. Motorola, Inc.*, 772 F. Supp. 2d 923, 936 (N.D. Ill. 2011) (holding that an executives "exercise of . . . stock options and related sale of stock . . . does not in itself constitute sufficient evidence of scienter").

Finally, that Plaintiff fails to allege stock sales by any other executive likewise undermines a strong inference of scienter. As the Seventh Circuit held, "the *absence* of sales by other managers who would have been in the know (had news of the fraud reached HQ) implies that nothing was thought to be out of the ordinary." *Higginbotham*, 495 F.3d at 759 ("Because *Tellabs* instructs us to consider all potential inferences, and not just those that favor plaintiffs, the absence of any demonstration that April 2004 was an unusual period for managerial sales means that the complaint lacks the required 'strong' demonstration of scienter.").

### 3. The "Core Operations" Does Not Support An Inference Of Scienter

The Complaint's allegation that scienter is supported because "the alleged misstatements

and omissions concerned core operations of ESSA" is similarly inadequate. (*See* CAC ¶ 143.) The "core operations" theory can apply "when executives make statements about core or critical aspects of their own companies." *Conagra Brands, Inc.*, 495 F. Supp. 3d 622, at 661. But even if the "core operations" inference can support an inference of scienter in conjunction with other factors supporting scienter, it is insufficient standing alone. *See In re Baxter*, 2021 WL 100457, at *13 ("[T]he 'core operations' inference generally will not establish a strong inference of scienter by itself."). Moreover, the fact that Plaintiff's allegations concern ESSA's core operations is immaterial, because Plaintiff has failed to allege any actionable misstatements. *In re Fifth Third Bancorp Derivative Litig.*, No. 20 C 4115, 2023 WL 2429009, at *19 (N.D. Ill. Mar. 8, 2023) ("[T]he core operations theory does not support a strong inference of scienter here because it does not necessarily follow that the Director Defendants disbelieved their statements or sought to deceive shareholders with their statements." (internal punctuation omitted)).

### 4. Generalized Allegations Do Not Support An Inference Of Scienter

Plaintiff makes additional cursory allegations that the "temporal proximity" between ESSA's disclosures regarding the trial's progress and its decision to abandon the trial as well as ESSA's "precarious [financial] position" also support an inference of scienter. (CAC ¶¶ 145-47, 151.) But these allegations likewise fail to establish a strong inference of scienter alone or in combination with Plaintiff's other allegations. As the Seventh Circuit has instructed, it is wholly insufficient to "simply note the 'temporal proximity between positive statements stressing a firm's strengths and announcements of poor economic performance.'" *Guidant Corp.*, 2004 WL 2538374, at *6 (quoting *Arazie v. Mullane*, 2 F.3d 1456, 1467–68 (7th Cir. 1993)). Nor can Defendants' generalized desire for ESSA to succeed in the face of challenges (*see* CAC ¶ 151) support a strong inference of scienter. *See Kohl's Corp.*, 895 F.3d at 939-40 ("[A] generalized motive common to all corporate executives is not enough to establish scienter."); *see also*

*Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012) (executives' motives to "keep their jobs, improve their bonuses, and increase the value of their stock options" were "too generic to satisfy *Tellabs*").

### 5. Plaintiff Cannot Overcome More Plausible, Nonculpable Competing Inferences

Even if the Court were persuaded that some of Plaintiff's allegations could support an inference of scienter, it "must weigh the strength of the plaintiffs' inferences in comparison to plausible nonculpable explanations for the defendants' conduct." *Pugh*, 521 F.3d at 693. Here, the fact that the Phase 2 trial was ultimately unsuccessful does not mean that ESSA deceived investors during the course of its efforts to evaluate the efficacy of Masofaniten. *See City of Taylor*, 8 F.4th at 595-96 (finding the inference that company learned of difficulties over time more compelling than the fraud alleged); *Boeing*, 711 F.3d at 758 (finding more plausible inference that defendants, "unsure whether they could fix the problem," were reluctant to prematurely announce a delay); *In re Hum. Genome Scis. Inc. Sec. Litig.*, 933 F. Supp. 2d 751, 761 (D. Md. 2013) (finding that "[w]hile it is possible to infer that . . . executives deliberately omitted facts . . . in order to hoodwink investors, it is just as plausible, indeed more so, to infer that they only offered vague details about the study because it was ongoing"). Instead, the more compelling inference is that ESSA's efforts were sincere and its optimism genuine. When it received information suggesting that the treatment would not be effective, ESSA did the right thing and conducted a futility analysis and promptly disclosed its decision to end the trial. The Complaint offers no similarly compelling inference of fraud.

### C. Plaintiff Fails to Adequately Allege Loss Causation

The Complaint fails for the additional, independent reason that Plaintiff fails to plead facts connecting the purported inflation of or subsequent drop in ESSA's stock price to

28

Defendants' alleged misstatements. A securities fraud plaintiff must plead "a causal connection between the material misrepresentation and the loss." *Tricontinental Indus. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843 (7th Cir. 2007) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)). "[I]n order to prove loss causation, plaintiffs in securities-fraud cases need to isolate the extent to which a decline in stock price is due to fraud-related corrective disclosures and not other factors." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 421 (7th Cir. 2015). "A 'corrective disclosure' is a public admission, such as a company's formal announcement, that discloses the truth to the market about prior material misrepresentations or omissions." *Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, No. 15-CV-3187, 2021 WL 5083756, at *5 (N.D. Ill. Nov. 2, 2021), *on reconsideration in part,* No. 15-CV-3187, 2022 WL 614925 (N.D. Ill. Mar. 2, 2022).

Here, ESSA's stock price dropped on November 1, 2024, following the announcement in the October 31, 2024 press release that ESSA was terminating the M-E Combination Trial and ending its evaluation of Masofaniten. (CAC ¶¶ 14-15.) But Plaintiff fails to allege any misstatement that was *corrected* by this announcement, nor can he. Defendants never promised or predicted a particular outcome of the M-E Combination Trial. To the contrary, ESSA repeatedly disclosed the risks of failure in its Annual Reports. (*See* Ex. 13 at 3-4; Ex. 1 at 3-4). Moreover, ESSA's press release did not correct any previously published data. *See In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir. 2022) (no loss causation where disclosure "did not correct or revise previous patient data"); *Pizzuto v. Homology Meds., Inc.*, No. 1:23-CV-10858-AK, 2024 WL 1436025, at *19 (D. Mass. Mar. 31, 2024) (no loss causation where "[n]either disclosure corrected, contradicted, or revised previous data"). Thus, to the extent the stock price dropped, it was caused by new information—the decision to stop the clinical trial—

29

not because of the corrective disclosure of a prior misstatement.

## II.     THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20(A) OF THE EXCHANGE ACT

Because Plaintiff fails to state a primary securities fraud claim, his Section 20(a) claim alleging control liability must be dismissed as well. *See Pugh*, 521 F.3d at 693 ("[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws."); *see also City Pension Fund for Firefighters & Police Officers v. Generac Holdings Inc.*, 765 F. Supp. 3d 775, 789 n. 3 (E.D. Wis. 2025).

## CONCLUSION

For the reasons set forth above, the Court should dismiss the Complaint with prejudice.

Dated: October 10, 2025

Respectfully submitted,

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

 *s/ Marcella L. Lape*
Marcella L. Lape
(WIED Bar No. 77803)
320 South Canal Street
Chicago, Illinois 60606
Telephone: (312) 407-0954
Fax: (312) 827-9327
marcie.lape@skadden.com

Lara A. Flath
(WIED Bar No. 5723481)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3737
Fax: (917) 777-3717
lara.flath@skadden.com

*Counsel for Defendants ESSA Pharma Inc., David R. Parkinson, and Peter Virsik*

30