# EXHIBIT 1

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended September 30, 2023**
**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from  to**
**Commission file number: 001-37410**

# ESSA Pharma Inc.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **British Columbia, Canada** | **98-1250703** |
| **(State or other jurisdiction of** | **(I.R.S. Employer** |
| **incorporation or organization)** | **Identification Number)** |

**Suite 720, 999 West Broadway**
**Vancouver, BC V5Z 1K5**
**(Address of principal executive offices, including zip code)**
**Registrant's telephone number, including area code: (778) 331-0962**
**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Shares | EPIX | Nasdaq Capital Market |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Securities Exchange Act of 1934). Yes ☐ No ☒

The aggregate market value of the voting and non-voting Common Shares held by non-affiliates of the registrant, based on the closing sale price of the registrant's Common Shares on the last business day of its most recently completed second fiscal quarter, as reported on the Nasdaq was approximately $78.8 million.

The number of outstanding Common Shares of the registrant, no par value per share, as of December 11, 2023, was 44,142,088.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive proxy statement in connection with the registrant's 2024 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission (the "SEC") subsequent to the date hereof, are incorporated by reference into Part III of this Form 10-K. Such proxy statement will be filed with the SEC not later than 120 days following the end of the registrant's fiscal year ended September 30, 2023.

**ESSA PHARMA INC.**

**FORM 10-K**

**For the Fiscal Year Ended September 30, 2023**

**Table of Contents**

| | PART I | 6 |
|---|---|---|
| Item 1. | Business | 6 |
| Item 1A. | Risk Factors | 27 |
| Item 1B. | Unresolved Staff Comments | 67 |
| Item 1C | Cybersecurity | 67 |
| Item 2. | Properties | 67 |
| Item 3. | Legal Proceedings | 67 |
| Item 4. | Mine Safety Disclosures | 68 |
| | PART II | 68 |
| Item 5. | Market for Registrant's Common Equity, Related Shareholder Matters and Issuer Purchases of Equity Securities | 68 |
| Item 6. | [Reserved] | 73 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 74 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 80 |
| Item 8. | Financial Statements and Supplementary Data | 81 |
| | Report of Independent Registered Public Accounting Firm (PCAOB ID: 731) | 82 |
| | Consolidated Balance Sheets | 84 |
| | Consolidated Statements of Operations and Comprehensive Loss | 85 |
| | Consolidated Statements of Cash Flows | 86 |
| | Consolidated Statement of Changes In Shareholders' Equity | 87 |
| | Notes to Consolidated Financial Statements | 88 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 103 |
| Item 9A. | Controls and Procedures | 103 |
| Item 9B. | Other Information | 103 |
| Item 9C | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 103 |
| | PART III | 104 |
| Item 10. | Directors, Executive Officers and Corporate Governance | 104 |
| Item 11. | Executive Compensation | 104 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Shareholder Matters | 104 |
| Item 13. | Certain Relationships and Related Transactions and Director Independence | 104 |
| Item 14. | Principal Accountant Fees and Services | 104 |
| | PART IV | 104 |
| Item 15. | Exhibits, Financial Statement Schedules | 104 |
| Item 16. | Form 10-K Summary | 106 |
| | SIGNATURES | 107 |

# CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K includes "forward-looking statements" within the meaning of the U.S. Private Securities Litigation Reform Act of 1995 and "forward-looking information" within the meaning of Canadian securities laws, or collectively, forward-looking statements. Forward-looking statements include statements that may relate to our plans, objectives, goals, strategies, future events, future revenue or performance, capital expenditures, financing needs and other information that is not historical information. Many of these statements appear, in particular, under the headings "Business," "Risk Factors," and "Management's Discussion and Analysis of Financial Condition and Results of Operations." Forward-looking statements can often be identified by the use of terminology such as "subject to", "believe," "anticipate," "plan," "expect," "intend," "estimate," "project," "may," "will," "should," "would," "could," "hope," "can," the negatives thereof, variations thereon and similar expressions, or by discussions of strategy. Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the Company's actual results, performance or achievements to be materially different from any future results, performance or achievements that may be expressed or implied by such forward-looking statements. Examples of such forward looking statements include, but are not limited to statements related to:

- our ability to advance our product candidate and potential future product candidates through, and successfully complete, clinical trials;
- our ability to recruit sufficient numbers of patients for future clinical trials, and the benefits expected therefrom;
- our ability to establish and maintain relationships with collaborators with acceptable development, regulatory and commercialization expertise and the benefits to be derived from such collaborative efforts;
- our ability to obtain funding for operations, including research funding, and the timing and potential sources of such funding;
- the initiation, timing, cost, location, progress and success of, strategy and plans with respect to our research and development programs (including research programs and related milestones with regards to next-generation drug candidates and compounds), preclinical studies and clinical trials;
- the therapeutic benefits, properties, effectiveness, pharmacokinetic profile and safety of our product candidate and potential future product candidates, if any, including the expected benefits, properties, effectiveness, pharmacokinetic profile and safety of our next-generation Aniten compounds;
- our ability to protect our intellectual property and operate our business without infringing upon the intellectual property rights of others;
- developments relating to our competitors and our industry, including the success of competing therapies that are or may become available;
- our ability to achieve profitability;
- the grant ("CPRIT Grant") under the Cancer Prevention and Research Institute of Texas ("CPRIT") and payments thereunder, including any residual obligations;
- sales of our Common Shares, no par value (the "Common Shares") under the Open Market Sale Agreement$^{SM}$ between the Company and Jefferies LLC, effective November 3, 2023 (the "ATM Sales Agreement");
- our intended use of proceeds from past and future offerings of our securities;
- the implementation of our business model and strategic plans, including strategic plans with respect to patent applications and strategic collaborations and partnerships;
- our ability to identify, develop and commercialize product candidates;
- our commercialization, marketing and manufacturing capabilities and strategy;
- our expectations regarding federal, state, provincial and foreign regulatory requirements, including our plans with respect to anticipated regulatory filings;
- whether we will receive, and the timing and costs of obtaining, regulatory approvals in the United States, Canada and other jurisdictions;
- the accuracy of our estimates of the size and characteristics of the markets that may be addressed by our product candidate and potential future product candidates, if any;
- our ability to maintain operations, development programs, preclinical studies, clinical trials and raise capital as a result of global macroeconomic factors including inflation, supply chain issues and any current or future impact related to widespread health concerns, pandemics, or epidemic, and other outbreaks of illness;

- the rate and degree of market acceptance and clinical utility of our potential future product candidates, if any;
- the timing of, and our ability and our collaborators' ability, if any, to obtain and maintain regulatory approvals for our product candidate and potential future product candidates, if any;
- our expectations regarding market risk, including inflation, interest rate changes and foreign currency fluctuations;
- our ability to engage and retain the employees required to grow our business;
- the compensation that is expected to be paid to our employees;
- our future financial performance and projected expenditures; and
- estimates of our financial condition, expenses, future revenue, capital requirements and our need for additional financing and potential sources of capital and funding.

Such statements reflect our current views with respect to future events, are subject to risks and uncertainties and are necessarily based upon a number of estimates and assumptions that are inherently subject to significant medical, scientific, business, economic, competitive, political and social uncertainties and contingencies. Many factors could cause our actual results, performance or achievements to be materially different from any future results, performance, or achievements that may be expressed or implied by such forward-looking statements, including those described under "Risk Factors". All forward-looking statements included in this Annual Report on Form 10-K, are based upon our current expectations and various assumptions. Certain assumptions made in preparing the forward-looking statements include, but are not limited to:

- our ability to conduct clinical studies involving our product candidate and to identify any future product candidates;
- our ability to obtain regulatory and other approvals to commence clinical trials involving any future product candidates;
- our ability to obtain positive results from research and development activities, including clinical trials;
- the availability of sufficient financing on reasonable terms;
- our ability to obtain required regulatory approvals;
- our ability to protect patents and proprietary rights;
- our ability to successfully out-license or sell future products, if any, and in-license and develop new products;
- the absence of material adverse changes in our industry or the global economy;
- our ability to attract and retain key personnel;
- our continued compliance with third-party license terms and non-infringement of third-party intellectual property rights;
- our ability to maintain good business relationships with our strategic partners; and
- our ability to understand and predict market competition.

We believe there is a reasonable basis for our current expectations, views and assumptions, but they are inherently uncertain. We may not realize our expectations, and our views and assumptions may not prove correct. Actual results could differ materially from those described or implied by such forward-looking statements.  In evaluating forward-looking statements, investors should specifically consider the following uncertainties and factors, among others (including those set forth under the heading "Risk Factors" within this document), that could affect future performance and cause actual results to differ materially from those matters expressed in or implied by forward-looking statements.

## RISK FACTOR SUMMARY

Below is a summary of material factors that make an investment in our Common Shares speculative or risky. Importantly, this summary does not address all of the risks and uncertainties that we face. Additional discussion of the risks and uncertainties summarized in this risk factor summary, as well as other risks and uncertainties that we face, can be found under "Cautionary Note Regarding Forward-Looking Statements" and Part I, Item 1A. "Risk Factors" in this Annual Report. The below summary is qualified in its entirety by those more complete discussions of such risks and uncertainties. You should consider carefully the risks and uncertainties described under Part I, Item 1A. "Risk Factors" in this Annual Report as part of your evaluation of an investment in our Common Shares. Important factors that could cause such differences include, among other things, the following:

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 6 of 110    Document 29-1

- risks related to clinical trial development and our ability to conduct the clinical trial of our product candidate and the predictive value of our current or planned clinical trials;
- risks related to our future success being dependent primarily on identification through preclinical studies, clinical studies, regulatory approval for commercialization of a single product candidate;
- risks related to our license agreement with third parties;
- uncertainty related to our ability to obtain required regulatory approvals for our proposed products;
- risks related to the Company's ability to conduct a clinical trial or submit a future NDA/NDS or IND/CTA (each, as defined herein);
- risks related to our ability to successfully commercialize future product candidates;
- risks related to the possibility that our product candidate and potential future product candidates, if any, may have undesirable side effects when used alone or in combination with other drugs;
- risks related to our ability to enroll subjects in clinical trials;
- risks that the FDA may not accept data from trials conducted in locations outside the United States;
- risks related to our ongoing obligations and continued regulatory review;
- risks related to potential administrative or judicial sanctions;
- the risk of increased costs associated with prolonged, delayed or terminated clinical trials;
- risks related to clinical trials being conducted by third parties under collaboration and clinical supply agreements, including combination studies, using the Company's product candidate, studies which the Company may not control, and ensuing reputational risk related to clinical trial results;
- the risk that third parties may not carry out their contractual duties or terminate the relationship;
- risks related to our lack of experience manufacturing product candidates on a large clinical or commercial scale and our lack of manufacturing facility;
- risks inherent in foreign operations, including related to foreign sourced raw materials, manufacturing or clinical trials;
- risks related to disruptions in domestic and foreign supply chains that the Company relies on for the production and shipment of raw materials and clinical trial materials;
- risks related to our failure to obtain regulatory approval in international jurisdictions;
- risks related to recently enacted and future legislation in the United States and internationally that may increase the difficulty and cost for us to obtain marketing approval of, and commercialize, our product candidate and potential future products, if any, and affect the prices we may obtain;
- risks related to new legislation, new regulatory requirements, and the continuing efforts of governmental and third-party payors to contain or reduce the costs of healthcare;
- uncertainty as to our ability to raise additional funding;
- risks related to our ability to raise additional capital on favorable terms and the impact of dilution from incremental financing;
- risks of a deemed default on any residual obligations of the agreement providing for the CPRIT Grant and having to reimburse all of the CPRIT Grant, if such deemed default is not waived by CPRIT;
- risks related to our incurrence of significant losses in every quarter since inception and our anticipation that it will continue to incur significant losses in the future;
- risks related to our limited operating history;
- risks related to our reliance on proprietary technology;
- risks related to our ability to protect our intellectual property rights throughout the world;
- risks related to claims by third parties asserting that we, or our employees, contractors or consultants have misappropriated their intellectual property, or claiming ownership of what we regard as our intellectual property;
- risks related to our ability to comply with governmental patent agency requirements in order to maintain patent protection;
- risks related to computer system failures or security breaches and increasing cyber threats;
- risks related to business disruptions that could seriously harm our future revenues and financial condition and increase our costs and expenses;
- risks related to our ability to attract and maintain highly qualified personnel;

4

- risks relating to the possibility that third-party coverage and reimbursement and health care cost containment initiatives and treatment guidelines may constrain our future revenues;
- risks related to potential conflicts of interest between us and our directors and officers;
- risks related to competition from other biotechnology and pharmaceutical companies;
- risks related to movements in foreign currency exchange rates, interest rates and rate of inflation;
- risks related to our ability to convince public payors and hospitals to include our product candidate and potential future products, if any, on their approved formulary lists;
- risks related to our ability to establish an effective sales force and marketing infrastructure, or enter into acceptable third-party sales and marketing or licensing arrangements;
- risks related to our ability to manage growth;
- risks related to our ability to achieve or maintain expected levels of market acceptance for our products;
- risks related to our ability to realize benefits from acquired businesses or products or form strategic alliances in the future;
- risks related to collaborations with third parties;
- risks that employees may engage in misconduct or other improper activities, including noncompliance with regulatory standards and requirements, which could cause significant liability for us and harm our reputation;
- risks related to product liability lawsuits;
- risks related to compulsory licensing and/or generic competition;
- risks related to the costs of and management time devoted to operating as a public company;
- risks related to being a smaller reporting company;
- risks related to the possibility that laws and regulations governing international operations may preclude us from developing, manufacturing and selling certain product candidates outside of the United States and Canada and require us to develop and implement costly compliance programs;
- risks related to laws that govern fraud and abuse and patients' rights;
- risks related to our ability to comply with environmental, health and safety laws and regulations;
- risks related to us being a "passive foreign investment company";
- risks related to United States investors' ability to effect service of process or enforcement of actions against us;
- risks related to market price and trading volume volatility;
- risks related to our dividend policy;
- risks associated with future sales of our securities;
- risks related to our ability to maintain an active trading market for the Company's Common Shares;
- risks related to widespread health concerns, pandemics, or epidemics and other outbreaks of illness;
- risks related to our ability to implement and maintain effective internal controls;
- risks related to provisions in our charter documents and Canadian law affecting corporate governance; and
- risks related to analyst coverage.

If one or more of these risks or uncertainties or a risk that is not currently known to us, materialize, or if our underlying assumptions prove to be incorrect, actual results may vary materially from those expressed or implied by forward-looking statements. The forward-looking statements represent our expectations, plans, estimates and views as of the date of this document. We do not undertake and specifically decline any obligation to update, republish or revise forward-looking statements to reflect future events or circumstances or to reflect the occurrences of unanticipated events, except as required by law. Investors are cautioned that we cannot guarantee future results, events, levels of activity, performance or achievements and that forward-looking statements are inherently uncertain. Accordingly, investors are cautioned not to put undue reliance on forward-looking statements. We advise you that these cautionary remarks expressly qualify in their entirely all forward-looking statements attributable to us or persons acting on our behalf.

We express all amounts in this Annual Report on Form 10-K in U.S. dollars, except where otherwise indicated. References to "$" and "US$" are to U.S. dollars and references to "C$" are to Canadian dollars. Except as otherwise indicated, references in this Annual Report on Form 10-K to "ESSA," "the Company," "we," "us" and "our" refer to ESSA Pharma Inc. and its subsidiary.

**PART I**

**Item 1.      Business**

**Overview**

ESSA is a clinical stage pharmaceutical company, focused on developing novel therapies for the treatment of prostate cancer with a primary focus on patients whose disease is still predominantly driven by the androgen axis. ESSA's development of proprietary small molecule inhibitors of the N-terminal domain ("NTD") of the androgen receptor ("AR") is focused on the treatment of these patients in combination with second-generation antiandrogen drugs such as abiraterone, enzalutamide, apalutamide, and darolutamide. The Company believes its latest series of investigational compounds, including its product candidate masofaniten (formerly known as EPI-7386), have the potential to significantly expand the interval of time in which patients with earlier stage prostate cancer can benefit from anti-hormone-based therapies. Specifically, the compounds are designed to disrupt the androgen receptor AR signaling pathway, the primary pathway that drives prostate cancer growth and prevent AR activation through selective binding to the NTD of the AR. In this respect, the Company's compounds differ mechanistically from classical non-steroid antiandrogens. These classic antiandrogens interfere either with androgen synthesis (i.e., abiraterone), or with the binding of androgens to the ligand-binding domain ("LBD"), located at the opposite end of the receptor from the NTD (i.e., "lutamides"). A functional NTD is essential for the functionality of the AR; blocking the NTD inhibits AR-driven transcription and therefore androgen-driven biology.

The Company believes that the transcription inhibition mechanism of its preclinical compounds is unique and has the potential advantage of bypassing several of the identified mechanisms of resistance to the antiandrogens currently used in the treatment of castration-resistant prostate cancer ("CRPC"). The Company has been granted by the United States Adopted Names ("USAN") Council a unique USAN stem "-Aniten" to recognize this new first-in-class mechanistic class. The Company refers to this series of proprietary investigational compounds as the "Aniten" series. In preclinical studies, blocking the NTD has demonstrated the capability to prevent AR-driven gene expression. A previously completed Phase 1 clinical trial of ESSA's first-generation agent, ralaniten acetate ("EPI-506") administered to patients with metastatic CRPC ("mCRPC") refractory to current standard of care therapies demonstrated prostate-specific antigen ("PSA") declines, a sign of inhibition of AR-driven biology. This inhibition, however, was neither deep nor sustained enough to confer clinical benefit and the Company made the decision to develop a more potent next generation drug which would also have a longer half-life.  The Company has done so and is now in clinical trial with this next generation Aniten, masofaniten (EPI-7386), focusing on the treatment of earlier stage, more homogeneously androgen-driven tumors, in combination with one or another of the current latest generation classic antiandrogens.

According to the American Cancer Society, in the United States, prostate cancer is the second most frequently diagnosed cancer among men, behind skin cancer. Approximately one-third of all prostate cancer patients who have been treated for local disease with curative intent will subsequently have rising serum levels of PSA, which is an indication of recurrent disease with or without development of distant metastasis. Patients with recurrent disease as indicated by rising PSA or nodal or bone metastasis usually undergo initial androgen ablation therapy using analogues of luteinizing hormone releasing hormone or surgical castration; this approach is termed "androgen deprivation therapy" ("ADT"). Most of these patients initially respond to ADT; however, many experience a recurrence in tumor growth despite the reduction of testosterone to castrate levels, and at that point are considered to have CRPC. Following diagnosis of CRPC, patients have been generally treated with antiandrogens that block the binding of androgens (enzalutamide) to the AR, or inhibit synthesis of androgens (abiraterone). More recently, significant improvements in progression free survival and overall survival have been achieved by utilizing this latest generation of antiandrogens in combination with ADT earlier in the disease natural history (i.e., metastatic hormone-sensitive prostate cancer ("mHSPC") and non-metastatic castration-resistant prostate cancer ("nmCRPC")).

Since the mid-20th century, it has been recognized that the growth of prostate tumors is in large part mediated by an activated AR. Generally, there are three means of activating the AR. First, androgens, such as dihydrotestosterone can activate AR by binding to its LBD. Second, CRPC can be driven by variants of AR that lack an LBD, are constitutively activated, and consequently do not require androgen for activation. A third mechanism, of less certain clinical significance, may involve certain signaling pathways that activate AR independent of androgen activity. Generally, current drugs for the treatment of prostate cancer are directed against the first mechanism by either (i) interfering with the production of androgen, or (ii) preventing androgen from binding to the LBD. Over time, these approaches eventually fail due to mechanisms of resistance which involve the LBD end of the receptor, whether at the DNA (AR amplification or LBD mutations) or RNA level (emergence of AR splice variants). With respect to the development of alternative pathway mechanisms of AR activation, tumors may also become insensitive to antiandrogen activity. Finally, in patients who have been treated for years with various antiandrogen therapies, genomic changes may lead to additional, non-AR-related oncogenic drivers, also insensitive to inhibition of AR biology.

The Company believes that through their potential to block androgen-driven gene transcription by using a unique mechanism involving the NTD and thereby bypassing these known mechanisms of resistance to current antiandrogens, the Aniten series of compounds hold the potential to be effective in cases where LBD-based mechanisms of resistance to second generation antiandrogens in otherwise AR-driven disease are operating. The results from both extensive preclinical studies and the initial clinical experience support the Company's belief. In preclinical studies, the Aniten series of compounds has been observed to shrink AR-dependent prostate cancer xenografts, including tumors both sensitive and resistant to the second-generation antiandrogens, such as enzalutamide. Plasma PSA level declines and increases in PSA doubling time as well as declines in circulating tumor DNA and decreases in radiographic tumor measurements were observed in a subset of patients enrolled in the Phase 1 study of masofaniten (EPI-7386) as described below. Importantly with respect to the potential clinical application of NTD inhibition during the natural history of the disease, recent studies by the Company and its collaborators have also suggested the potential advantage for combinations of the Company's Aniten compounds with currently approved antiandrogens to inhibit AR-driven biology more completely than AR inhibition from either end of the receptor alone. This hypothesis is supported by the clinical trial results obtained in recent years of the superior overall survival obtained in the hormone-sensitive prostate cancer ("HSPC") setting by combining ADT and latest generation antiandrogens earlier in the course of the disease versus the administration of these two therapies sequentially.

While the potential importance of the NTD as a drug target has been appreciated for more than two decades, for technical reasons this has been a difficult target for therapeutic agent development. The NTD of the AR is flexible with a high degree of intrinsic disorder making it difficult for use in classic crystal structure-based drug design. The Company is not currently aware of any clinical-stage NTD AR inhibitors that are in development by other drug development companies. The nature of the highly specific binding of the Aniten compounds to the NTD, and the biological consequences of that binding, have been defined in scientific studies. The selectivity of the binding, based on *in vivo* imaging as well as *in vitro* studies, has been consistent with the favorable toxicological results observed in preclinical studies of the first-generation EPI-506 and the subsequent safety results observed in the Phase 1 trial of EPI-506. Subsequent to this trial and following the decision to pursue masofaniten (EPI-7386) as the Company's lead product candidate, the Company completed a series of biophysical and biological studies revealing the interaction and binding of masofaniten (EPI-7386) to the NTD of the AR and presented these findings at several medical conferences in 2021. See "Completed Phase 1 Clinical Study of EPI-506" and "Next generation Aniten molecules" below.

The incidence of both metastatic and non-metastatic CRPC continues to rise. Using a dynamic progression model, Scher et al.[1] projected a 2020 incidence of 546,955 and prevalence of 3,072,480. The Company believes that the Aniten series of compounds could ultimately hold potential benefit for many of those patients. In its early clinical development, the Company focused on patients who have failed second-generation antiandrogen therapies (i.e. abiraterone and/or lutamides) for the following reasons:

- CRPC treatment remains a prostate cancer market segment with an apparent and significant unmet therapeutic need and is a potentially large market;
- the Company believes that the unique mechanism of action of its Aniten compounds is well suited to treat those patients who have failed AR LBD focused therapies and whose biological characterization reveals that their tumors are still largely driven by AR biology; and
- the Company expects that the relatively large number of patients with an apparent unmet therapeutic need in this area will facilitate timely enrollment in its clinical trials.

The Company believes that the demonstration of favorable safety and tolerability in the initial Aniten Phase 1 clinical trial, together with the compelling preclinical rationale, enabled and emphasized the importance of the study of the combination of masofaniten (EPI-7386) with second-generation antiandrogens. Furthermore, the Company believes that this application of two independent, complementary mechanisms of AR transcription inhibition may result in greater suppression of androgen activity and the delay or prevention of drug resistance. Recent progress in the clinical treatment of prostate cancer has resulted from the earlier utilization of antiandrogens in combination with classic ADT, consistent with the premise that more effective androgen suppression may yield clinical benefit. The Company believes that the introduction of NTD inhibitors, such as masofaniten (EPI-7386), therefore has the potential to improve androgen suppression, delay the emergence of resistance, and result in improved clinical benefit.

*Completed Phase 1 Clinical Study of EPI-506*

The Company conducted an initial proof-of-concept Phase 1 clinical study utilizing the first-generation Aniten compound, EPI-506 from 2015 to 2017. The objective of the EPI-506 Phase 1 clinical trial was to explore the safety, tolerability, maximum tolerated dose and pharmacokinetics of EPI-506, in addition to anti-tumor activity in asymptomatic or minimally symptomatic patients with mCRPC who were no longer responding to either abiraterone or enzalutamide treatments, or both. Efficacy endpoints, such as PSA reduction, and other disease progression criteria were evaluated. Details relating to the design of the Phase 1/2 clinical trial of EPI-506 are available on the U.S. National Institutes of Health clinical trials website (see https://clinicaltrials.gov under identifier NCT02606123).

The Investigational New Drug (" IND") application to the FDA for EPI-506, to begin a Phase 1 clinical trial was allowed in September 2015, with the first clinical patient enrolled in November 2015. The Company's Clinical Trial Application ("CTA") submission to Health Canada was subsequently also cleared. Based on allometric scaling, an initial dose level of EPI-506 of 80 mg was determined. However, following the enrollment of the initial cohorts, it became apparent that EPI-506 exposure was much lower in humans than projected. EPI-506 dosing was escalated aggressively to allow patients in the clinical study greater exposure to the drug. The highest dose patients ultimately received was 3600 mg of EPI-506, administered in a single dose or split into two doses daily. The initial data from the Phase 1 clinical trial was presented at the European Society of Medical Oncology meeting in September 2017.

---

[1]    Scher HI, Solo K, Valant J, Todd MB, Mehra M (2015) Prevalence of Prostate Cancer Clinical States and Mortality in the United States: Estimates Using a Dynamic Progression Model. PLoS ONE 10(10): e0139440. doi:10.1371/journal.pone.013944

Conducted at five sites in the United States and Canada, the open-label, single-arm, dose-escalation study evaluated the safety, pharmacokinetics, maximum-tolerated dose and anti-tumor activity of EPI-506 in men with end-stage mCRPC who had progressed after prior enzalutamide and/or abiraterone treatment and who may have received one prior line of chemotherapy. Twenty-eight patients were available for analysis, with each patient having received four or more prior therapies for prostate cancer at the time of study entry. Patients self-administered oral doses of EPI-506 ranging from 80 mg to 3600 mg, with a mean drug exposure of 85 days (range of eight to 535 days). Four patients underwent prolonged treatment (with a median of 318 days, and a range of 219 to 535 days at data cut-off), following intra-patient dose escalation. PSA declines, a measure of potential efficacy, ranging from 4% to 37% were observed in five patients, which occurred predominantly in the higher dose cohorts (≥1280 mg).

EPI-506 was generally well-tolerated with favorable safety results observed across all doses up to 2400 mg. At a dose of 3600 mg, gastrointestinal adverse events (nausea, vomiting and abdominal pain) were observed in two patients: one patient in the once-daily ("QD") dosing cohort and one patient in the 1800 mg twice-daily dosing cohort, leading to study discontinuation and a dose-limiting toxicity ("DLT") due to more than 25% of doses being missed in the 28-day safety reporting period. A separate patient in the 3600 mg QD cohort experienced a transient Grade 3 increase in liver enzymes (AST/ALT), which also constituted a DLT, and enrollment was consequently concluded in this cohort.

Although the Company believes that the safety results and possible signs of anti-tumor activity observed at higher dose levels support the concept that inhibiting the AR-NTD may provide a clinical benefit to mCRPC patients, the pharmacokinetic and metabolic studies revealed the limitations of the first generation agent EPI-506. Through its discovery research, the Company had concluded that it should be feasible to develop a next generation of NTD inhibitor which would demonstrate greater potency, reduced metabolism and other improved pharmaceutical properties. As a result, the Company announced on September 11, 2017, its decision to discontinue the further clinical development of EPI-506 and to implement a corporate restructuring plan to focus research and development resources on its next-generation Anitens targeting the AR-NTD. This next generation aniten compound includes significantly more potent drugs designed to exhibit increased resistance to metabolism and therefore a longer predicted circulating half-life. The Company's lead product candidate masofaniten (EPI-7386) has demonstrated these and other favorable characteristics in extensive preclinical characterization and clinical studies which the Company has presented in a series of poster presentations at scientific meetings.

*Next generation Aniten molecules*

The Company's family of next-generation investigational Aniten compounds incorporate multiple chemical scaffold changes to the first-generation drugs which in preclinical studies retain NTD inhibition of the AR. In addition, they have shown improvement in a range of attributes when compared to the first-generation compound, EPI-506, in preclinical studies. In *in vitro* assays measuring inhibition of AR transcriptional activity, these product candidates demonstrated 20 times higher potency than EPI-506 or its active metabolite, EPI-002. In addition, the compounds have demonstrated increased metabolic stability in preclinical studies, suggesting the potential for longer half-lives in humans. Lastly, the compounds have demonstrated more favorable pharmaceutical properties relative to EPI-506. The Company believes that these product candidates, if successfully developed and approved, may offer advancements in ease and cost of large-scale manufacture, drug product stability, and suitability for commercialization globally. Of these next-generation anitens, masofaniten (EPI-7386) was selected for IND filing and a Phase 1 clinical trial.

**Our Strategy**

In developing possible therapeutics that involve binding to the NTD, the Company's strategic approach involves:

- combining aniten compounds with second generation antiandrogens in earlier lines of therapy. The Company, with industry partners, has been conducting clinical trials of combinations of masofaniten (EPI-7386) and second-generation antiandrogens in patients with nmCRPC, mCRPC, mHSPC and neo-adjuvant prostate cancer surgical therapy in earlier lines of treatment;

- completing the initial Phase 1 clinical development of masofaniten (EPI-7386) as a monotherapy treatment for patients with mCRPC, who are resistant to the current standard of care, to demonstrate the drug's characteristics

as a single agent as completely as possible, with regards to safety, tolerability, and efficacy together with detailed pharmacological and biological studies. The Company's assessment of this clinical data will determine the Company's clinical development of masofaniten (EPI-7386) as a single agent therapy and also as a combination therapy, whilst considering the impact of such treatment against the size of the patient population whose tumors have progressed and are prevalently driven by the AR pathway despite heavy pre-treatment of the latest generation antiandrogens; and

- continuing preclinical studies, including work on other Aniten molecules, NTD degraders and other potential applications for AR NTD inhibitors.

*The identification and characteristics of masofaniten (EPI-7386)*

The purpose of the next-generation program has been to identify drug candidates with increased potency, reduced metabolic susceptibility and superior pharmaceutical properties compared to ESSA's first-generation compounds. Structure-activity relation studies conducted on the chemical scaffold of ESSA's first-generation compounds have resulted in the generation of a new series of compounds that have demonstrated higher potency and predicted longer half-lives. Multiple changes in the chemical scaffold have also been incorporated with the goal of improving ADME (absorption, distribution, metabolism, and excretion) and pharmaceutical properties of the chemical class.

Several next-generation Aniten molecules met prespecified preclinical target product profile goals regarding potency, stability, selectivity and pharmaceutical properties. On March 26, 2019, the Company announced the nomination of masofaniten (EPI-7386) as its lead clinical candidate for the treatment of mCRPC through inhibition of the NTD of the androgen receptor. In preclinical studies, masofaniten (EPI-7386) has displayed activity *in vitro* in numerous AR-dependent prostate cancer models including models where second-generation antiandrogens are inactive. In addition, masofaniten (EPI-7386) is significantly more potent, metabolically stable and more effective in preclinical studies compared to ESSA's first-generation compound, EPI-506. Lastly, masofaniten (EPI-7386) has demonstrated a favorable tolerability profile in all animal studies of the compound conducted to date.

From this series of next-generation compounds, masofaniten (EPI-7386) was selected as the lead candidate for the initial clinical development in mCRPC. An IND was submitted to the FDA on March 30, 2020, and was allowed by the FDA on April 30, 2020. A CTA was filed with Health Canada in April 2020 and clearance was subsequently received. Clinical testing of masofaniten (EPI-7386) commenced in July 2020, allowing for accommodations to the planned timeline as a result of the impact of COVID-19 at clinical trial sites (see "Risk Factors – Widespread health concerns, pandemics or epidemics, and other outbreaks of illness may negatively affect the Company's ability to maintain operations and execute its business plan" in this Annual report on Form 10-K).

*Advancing masofaniten (EPI-7386) through clinical development*

The Company is advancing masofaniten (EPI-7386) through two clinical trials: EPI-7386-CS-001 and EPI-7386-CS-010. The clinical trial of EPI-7386-CS-001 has two arms that each represent a monotherapy and combination component of the study schema, as outlined below:



Notes: "mCRPC" means metastatic castration-resistant prostate cancer; "AAP" means abiraterone acetate/prednisone; "mHSPC" means metastatic hormone-sensitive prostate; "nmCRPC" means non-metastatic castration-resistant prostate cancer

The clinical trial of EPI-7386-CS-010 is a combination trial with enzalutamide with a Phase 1 dose equilibration component and Phase 2 head-to-head comparison component, as outlined in the study schema below:



Notes: "ENZ" means enzalutamide

*Phase 1 Clinical Trial - EPI-7386-CS-001- Monotherapy Treatment*

The Phase 1 clinical trial of masofaniten (EPI-7386) "Oral EPI-7386 in Patients With Castration-Resistant Prostate Cancer (EPI-7386)" is currently actively enrolling nmCRPC patients naïve to second generation antiandrogens and mCRPC patients who are refractory to standard of care treatments at clinical sites in the U.S. and Canada (www.clinicaltrials.gov under identifier NCT04421222). In September 2021, the Company amended the protocol to allow testing in the Phase 1a for a 800 mg/day and 1200 mg/day dosages, administered as either 400 mg or 600 mg dosed twice daily ("BID"), respectively. In addition, the protocol amendment focused further monotherapy development in less heavily pretreated

11

patients with mCRPC, i.e., patients who have received a maximum of three prior approved systemic therapies for mCRPC, including at least one second-generation antiandrogen and excluded patients with visceral metastasis.

*Part A Monotherapy - Phase 1a – Dose Escalation*

The open-label, dose-escalation Phase 1a clinical trial was designed to determine the safety, tolerability, pharmacokinetics, maximum tolerated dose and/or a recommended Phase 2 range of doses in line with the FDA's Project Optimus, and to access preliminary anti-tumor activity of the drug.

The design of the Phase 1 clinical trial included the standard 3+3 design per dose cohort for the Part 1a dose escalation phase, with subjects receiving a daily oral dose of masofaniten (EPI-7386) once a day QD until there is objective evidence of clinical disease progression, and or occurrence of an unacceptable toxicity.

The dose escalation Part 1a of the study has completed enrollment. Patients enrolled in the Part 1a of the study were selected clinically, on the basis of having progressive mCRPC as exemplified by rising PSA values and/or radiological disease progression despite latest generation antiandrogen treatment. However, all patients were also retrospectively biologically characterized for underlying tumor genomic characteristics, for evidence of AR pathway activation as well as non-AR oncogenic pathways and during the conduct of the trial, for dose-related biological, pharmacological and pharmacodynamic effects.

The protocol amendments filed with the FDA in September 2021 and July 2022 allow for monotherapy development in less heavily pretreated patients (as described above) in whom the androgen receptor pathway is more likely to be the primary driver of tumor growth. The Company's goal has been to establish, one or more doses/schedules to be tested in the expansion Phase 1b study in alignment with the FDA Project Optimus guidance, based on multiple inputs, including pharmacokinetic and biological observations, in addition to clinical experience. Two dose levels have been advanced to Phase 1b dose expansion testing: 600 mg QD and 600 mg BID.

*Part A Monotherapy – Phase 1b – Dose Expansion*

The primary objective of Phase 1b is to further evaluate the safety, tolerability, pharmacokinetics, and preliminary anti-tumor activity (as measured by changes in tumor burden measured by imaging and changes in PSA levels over time) of masofaniten (EPI-7386) at 600 mg BID and 600 mg QD in a patient population enrolled under eligibility criteria similar to the one adopted for the Phase 1a with a focus on chemo-naïve mCRPC patients whose diseases have progressed after two lines of treatment including at least one line of second-generation antiandrogens. The 600 mg BID cohort of 12 patients has been fully enrolled and the 600 mg QD cohort of 12 patients is enrolling.

Demonstration of the favorable safety and tolerability profile of masofaniten (EPI-7386) in the Phase 1a, together with clinical evidence for its mechanism of action and efficacy, were necessary to enable the study of patient populations with less advanced and less heavily pre-treated prostate cancer. The experience in the initial Phase 1a trial provided evidence for both an antiandrogen biological effect as well as some level of clinically relevant anti-tumor activity. The biological characterization of these patients also demonstrated favorable safety profiles.

The Company's preclinical data and other evidence suggest earlier patient populations are more homogeneously AR-driven, and the favorable safety profile demonstrated in the Phase 1a dose escalation trial justified the study of the combination of masofaniten (EPI-7386) with classic antiandrogens. As a result the Company, together with its collaborators, are conducting a series of clinical trials in this regard. The first Phase 1/2 study involves masofaniten (EPI-7386) evaluated in combination with enzalutamide in patients with mCRPC naïve to second generation antiandrogens. Additional clinical trials involving the combination of masofaniten (EPI-7386) with apalutamide, abiraterone acetate, or darolutamide are in various stages of implementation.

*Combination studies – developing a new standard of care for the treatment of prostate cancer*

An activated AR is required for the growth and survival of most prostate cancer. Unlike current antiandrogen therapies which can only inhibit full-length AR, NTD inhibition of AR-directed biology occurs both in full length AR and splice

variant ARs. Therefore, the Company believes that the AR-NTD is an ideal target for next-generation antiandrogen hormone therapy. If masofaniten (EPI-7386) is successful in treating CRPC patients, it is reasonable to expect that such clinical candidate may be effective in treating earlier stage patients. Preclinical studies suggest particular value to the use of Anitens in combination with the currently widely used second-generation antiandrogens. The Company is conducting clinical trials in line with this strategy.

*Clinical Trial – EPI-7386-CS-010 – Combination Treatment*

The Company has been running a Phase 1/2 study of masofaniten (EPI-7386) in combination with enzalutamide compared with enzalutamide alone in patients with mCRPC. Phase 1 of the study is a single-arm dose escalation study of masofaniten (EPI-7386) in combination with a fixed dose of enzalutamide.

A collaboration and supply agreement with Astellas Pharma Inc. ("Astellas") to evaluate masofaniten (EPI-7386) in combination with Astellas and Pfizer Inc.'s ("Pfizer") AR inhibitor, enzalutamide, in patients with mCRPC was announced on February 24, 2021. ESSA is paying for and is operationally conducting this trial, with an initial Phase 1 dose equilibration followed by a randomized Phase 2 trial involving a planned 120 patients. The enzalutamide for this trial is supplied by Astellas. The first patient in this Phase 1/2 study was dosed in January 2022 and the safety, tolerability, pharmacokinetics, and initial PSA responses were originally reported in the June 2022 clinical update in poster presentations at the Prostate Cancer Foundation Retreat in October 2022 and the American Society of Clinical Oncology Genitourinary Cancers Symposium in February 2023. The clinical trial is a two part study: a Phase 1 dose equilibration stage followed by a Phase 2 open label randomized study. Masofaniten (EPI-7386) is being evaluated at escalating dose levels including 600 mg QD, 800 mg QD and 600 mg BID in combination with 120 mg and 160 mg enzalutamide in patients with mCRPC naïve to second generation antiandrogens. The Phase 1 part of the study has completed enrollment and the recommended Phase 2 combination doses for the Phase 2 randomized phase is 600 mg BID masofaniten (EPI-7386) with 160 mg enzalutamide (the highest dose levels tested).

*Clinical Trial – EPI-7386-CS-001 – Combination Treatment*

The first collaboration, with Janssen Research & Development, LLC ("Janssen"), to study in clinical trials the safety and potential benefit of the combination of masofaniten (EPI-7386) with abiraterone acetate with prednisone as well as the combination of masofaniten (EPI-7386) with apalutamide in patients with mCRPC, was announced on January 13, 2021. Under the collaboration agreement with Janssen, Janssen would pay for and conduct a clinical trial with masofaniten (EPI-7386) and in separate cohorts each of their antiandrogens, apalutamide and abiraterone acetate. This combination trial was initiated in March 2022. Enrollment was suspended by Janssen in October 2022 due to operational recruitment challenges. On April 12, 2023, ESSA announced that it had entered into a clinical trial support agreement with Janssen, with ESSA paying for and conducting a study of the combinations, in an earlier patient population, and with Janssen supplying apalutamide and abiraterone acetate.

The Company's most recent protocol amendment in June 2023, modifies the protocol design of this study by adding combination treatment with second-generation antiandrogens. Specifically, the amended protocol consists of two parts: a Part A Monotherapy study and a Part B Combination study. Part A has two phases: a Phase 1a Dose Escalation and a Phase 1b Dose Expansion, as discussed above, with Part B conducted in two cohorts, Cohort 1 evaluating masofaniten (EPI-7386) in combination with abiraterone acetate/prednisone for patients with mHSPC or mCRPC who receive abiraterone acetate/prednisone as part of their standard of care treatment and Cohort 2, previously the "window of opportunity cohort", evaluating single agent masofaniten (EPI-7386) for 12 weeks in patients with nmCRPC before apalutamide is added.

13

*Part B Combination – Cohort 1 – Combination with abiraterone acetate/prednisone*

The Company will evaluate the combination of masofaniten (EPI-7386) with abiraterone acetate/prednisone (AAP) in patients with mHSPC or mCRPC. AAP will be provided by Janssen under a clinical trial support agreement as described above.

*Part B Combination - Cohort 2 – Window of opportunity with clinical endpoints followed by combination with apalutamide*

The primary objective of Cohort 2 is to assess the anti-tumor activity (as measured by changes of PSA over time) of masofaniten (EPI-7386) administered at 600 mg BID for a limited window of time (up to 12 weeks before patients start standard of care therapy) in nmCRPC patients whose disease is unperturbed by previous second-generation antiandrogen therapies or chemotherapy. Following the dosage of masofaniten (EPI-7386) as a single agent after the 12-week window, the Company will evaluate the combination of masofaniten (EPI-7386) with apalutamide. Apalutamide will be provided by Janssen under the same clinical trial support agreement.

In addition to the agreements announced with Pfizer, and Janssen, a third collaboration has been announced with Bayer. Bayer will pay for and conduct a Phase 1/2 clinical trial with masofaniten (EPI-7386) to evaluate masofaniten (EPI-7386) in combination with darolutamide in earlier line mCRPC patients. ESSA will provide masofaniten (EPI-7386) for the combination trial. This clinical trial has not yet been initiated. The Company continues to evaluate potential collaborations that could enhance the value of its prostate cancer program and allow it to leverage the expertise of such strategic collaborators such as those with Janssen, Astellas, and Bayer.

*Preclinical Development of Anitens, Degraders, and other indications*

As part of the continued preclinical work on Aniten compounds, the Company has also studied NTD degraders and presented data for its first generation of AR ANITAC NTD degraders at the AACR annual meeting on April 10, 2022, in a poster titled "Androgen receptor (AR) N-Terminal Domain degraders can degrade AR full length and AR splice variants in CRPC preclinical models". The Company continues preclinical work on other emerging potential clinical applications for NTD inhibitors.

**Recent Developments**

The Company has presented preclinical and clinical scientific data relative to masofaniten (EPI-7386) in a number of presentations at scientific meetings and other forums.

*2023*

On October 26-28, 2023, the Company presented updated dose escalation data from its Phase 1/2 study evaluating masofaniten (EPI-7386) in combination with enzalutamide at the 30th Annual Prostate Cancer Foundation Scientific Retreat.

The data presented were from the four cohorts of patients in the Phase 1 dose escalation portion of the study. The data indicated that masofaniten (EPI-7386) had no effect on enzalutamide exposure, thus allowing the use of full dose per label (160mg) of enzalutamide in combination. It also indicated that enzalutamide reduces masofaniten (EPI-7386) exposure but twice daily dosing of masofaniten (EPI-7386) appears to mitigate the reduction and maintains clinically relevant drug exposures.

In patients evaluable for safety (n=18), masofaniten (EPI-7386) combined with enzalutamide, was well-tolerated at the doses tested through 21 cycles of dosing in some patients. The most frequent adverse events were Grade 1 and 2, related to either AR inhibition or gastrointestinal tract irritation. In Cohort 4, one patient experienced a Grade 3 rash, which was observed immediately following administration of masofaniten (EPI-7386) combined with enzalutamide and deemed probably related.

14

In the patients evaluable for efficacy (n=16), rapid, deep and durable reductions in PSA were observed, regardless of previous chemotherapy status, including in patients who received lower than the full dose of enzalutamide (120 mg). In the first three cohorts, 90% of patients (9 of 10) achieved PSA50 and PSA90, 80% of patients (8 of 10) achieved PSA90 in less than 90 days, and 70% of patients (7 of 10) achieved PSA <0.2ng/mL. Across all dose cohorts including patients in the recently enrolled Cohort 4, 88% of patients (14 of 16) achieved PSA50, 81% of patients (13 of 16) achieved PSA90, 69% of patients (11 of 16) achieved PSA90 in less than 90 days, and 56% of patients (9 of 16) achieved PSA <0.2ng/mL. The randomized Phase 2 dose expansion portion of the study was reported to be enrolling.

On October 20-24, 2023, the Company presented the same updated dose escalation data from its Phase 1/2 study evaluating masofaniten (EPI-7386) in combination with enzalutamide at the European Society of Medical Oncology (ESMO) 2023 Congress.

On October 3, 2023, the Company filed a prospectus supplement to its registration statement on Form S-3, including a base prospectus, with the SEC. Further to this, on November 6, 2023, the Company announced that it had entered into the ATM Sales Agreement with Jefferies LLC, effective as of November 3, 2023. Under the ATM Sales Agreement, ESSA may, within the period that the ATM Sales Agreement is in effect, sell its Common Shares from time to time for up to US$50.0 million in aggregate sales proceeds. No offers or sales of Common Shares will be made in Canada, to anyone known by Jefferies LLC to be a resident of Canada or on or through the facilities of any stock exchange or trading markets in Canada.

On September 18, 2023, the Company announced the initiation of the Phase 2 portion of its Phase 1/2 study evaluating its lead candidate, masofaniten (EPI-7386), in combination with Astellas and Pfizer's enzalutamide in patients with mCRPC naïve to second-generation antiandrogens.

On August 31, 2023, the Company announced the establishment of Automatic Securities Disposition Plans for its President and Chief Executive Officer, David R. Parkinson and its Executive Vice President and Chief Operating Officer, Peter Virsik.

On June 6, 2023, the Company appointed Lauren Merendino to its Board of Directors (the "Board").

On April 12, 2023, the Company announced it had entered into a clinical trial support agreement with Janssen. ESSA will sponsor and conduct a Phase 1 clinical trial evaluating the safety, pharmacokinetics, drug-drug interactions, and preliminary anti-tumor activity of masofaniten (EPI-7386) when administered in combination with either apalutamide or abiraterone acetate plus prednisone. Janssen will supply apalutamide and abiraterone acetate.

On February 16-19, 2023, the Company presented analyses of initial clinical data from two Phase 1 studies of masofaniten (EPI-7386) in patients with mCRPC at the American Society of Clinical Oncology Genitourinary Cancers Symposium. The Company presented an update to the Phase 1 monotherapy study demonstrating that masofaniten (EPI-7386) single agent showed a favorable safety profile and was well tolerated up to a daily dose of 1200 mg (600 mg BID), achieved target clinical exposures and showed preliminary signals of anti-tumor activity in heavily pretreated mCRPC patients. The second poster presented preliminary results to the Phase 1/2 trial of masofaniten (EPI-7386) in combination with Astellas and Pfizer's AR inhibitor, enzalutamide. Ten patients had been enrolled in the first three cohorts: three in cohort 1 (600 mg QD masofaniten (EPI-7386) and 120 mg QD enzalutamide), four in cohort 2 (800 mg QD masofaniten (EPI-7386) and 120 mg QD enzalutamide) and three in cohort 3 (600 mg BID masofaniten (EPI-7386) and 120 mg QD enzalutamide). At that time, the DLT period had not cleared for cohort 3. For the first 2 cohorts that cleared the DLT period, no DLTs were observed, and the safety profile was consistent with second-generation antiandrogens (e.g., Grade 1 or 2 AEs of fatigue and hot flushes). Pharmacokinetic results from cohorts 1 and 2 had demonstrated that enzalutamide exposure was minimally impacted by masofaniten (EPI-7386), while, as expected, masofaniten (EPI-7386) exposure was reduced by approximately 60% by enzalutamide (a well established CYP3A4 inducer). The observed masofaniten (EPI-7386) exposures remained in the clinically relevant range suggested by pre-clinical xenograph studies. Five out of six evaluable patients enrolled in the first two cohorts showed a PSA decrease >90% regardless of the patients previous chemotherapy status, and four out of six evaluable patients PSA levels reached < 0.2 ng/mL. All five patients that experienced biochemical responses showed stable disease by imaging.

On October 31, 2022, the Company announced that Janssen Research and Development is suspending enrollment into the Phase 1 clinical study of masofaniten (EPI-7386) with apalutamide and masofaniten (EPI-7386) with abiraterone acetate plus prednisone in mCRPC patients as a result of operational recruitment challenges. Initial clinical activity was observed in some patients, with two of the three patients achieving a PSA reduction of 90% ("PSA90") within 12 weeks. The Company is in discussions with Janssen to supply abiraterone acetate and apalutamide for an ESSA-sponsored combination study.

On October 26, 2022, the Company announced the presentation of preclinical data for its lead first generation AR ANITen bAsed Chimera ("ANITAC"™) NTD degrader in a poster session at the 34th EORTC-NCI-AACR Annual Symposium on Molecular Targets and Cancer Therapeutics.

On October 26, 2022, the Company announced the presentation of updated clinical data from the first two cohorts of the Phase 1/2 study of ESSA's lead candidate masofaniten (EPI-7386) in combination with enzalutamide at the 2022 Prostate Cancer Foundation Scientific Retreat. In the multicenter, open-label Phase 1/2 dose escalation study, seven mCRPC patients naïve to second generation antiandrogens were enrolled in the first two cohorts, with escalating doses of masofaniten (EPI-7386) and a fixed 120 mg once a day QD dose of enzalutamide. The study permitted one prior line of chemotherapy. Pharmacokinetic results from these first two cohorts demonstrated that enzalutamide exposure was minimally impacted by masofaniten (EPI-7386) while exposures of masofaniten (EPI-7386) were reduced by coadministration with enzalutamide, but remained in the clinically relevant range as suggested by preclinical xenograft studies. The safety of the combination was favorable with a safety profile consistent with second-generation antiandrogens and no dose limiting toxicities were observed. One of the patients in the first cohort discontinued after one cycle of dosing due to a strong CYP3A inducer concomitant medication which lowered exposures to both masofaniten (EPI-7386) and enzalutamide and was therefore not evaluable for efficacy. Anti-tumor activity in the remaining six patients enrolled demonstrated that four of six of these patients achieved a PSA90 by 12 weeks of dosing and five of six patients to date have achieved a PSA90.

On September 13, 2022, the Company appointed Philip Kantoff to its Board.

On June 30, 2022, the Company announced the establishment of Automatic Securities Disposition Plans for its President and Chief Executive Officer, David R. Parkinson and its Executive Vice President and Chief Operating Officer, Peter Virsik.

On June 27, 2022, the Company presented, by conference call and webcast, a clinical update on masofaniten (EPI-7386) monotherapy and combination therapy clinical development. The update on the Phase 1a dose escalation study showed initial data from 36 patients that demonstrated that masofaniten (EPI-7386) was well-tolerated, exhibited a favorable pharmacokinetic profile, and demonstrated initial anti-tumor activity in a heavily pretreated group of patients. The Company believes the favorable safety and tolerability profile, good pharmaceutical characteristics together with both antiandrogen biological and anti-tumor activity support the Company's decision to move into earlier lines of therapy and study masofaniten (EPI-7386) in combination with second-generation antiandrogens. The update also noted that ctDNA molecular analysis in the heavily pretreated population has provided a detailed profile of genetic alterations, which reveals the biological complexity of late-stage mCRPC patients and also allows for the continued refinement of the population of prostate cancer patients whose tumors are still primarily driven by the androgen receptor, and therefore most likely to respond to an androgen receptor inhibitor.

The update detailed that in the multi-center, open-label Phase 1a dose escalation study, 31 patients received masofaniten (EPI-7386) as oral tablets once a day QD in cohorts with 200 milligram increments from 200 milligrams up to 1000 milligrams. Patients in this QD group were heavily pretreated, with a median of seven lines of prior therapy for prostate cancer and four lines of therapy for mCRPC. Almost 60% of patients had been treated with prior chemotherapy. Patients entered the trial with rapidly progressive disease, as evidenced by a median PSA doubling time of only 2.1 months and a median ctDNA percent of 29%. Almost a third of the patients had lung, liver, or brain metastases, and an overlapping third of patients had overt neuroendocrine differentiation. The ctDNA analysis revealed that tumors in these patients had extensive non-AR associated genomic changes denoting the presence of multiple non-AR oncogenic drivers associated with late-stage prostate cancer. Subsequent to a protocol amendment, the experience was also presented for the five initial patients enrolled in a twice daily dose regimen in 400 mg and 600 mg BID cohorts. The amendment excluded patients who had been treated with more than three prior lines of therapy, excluded patients with visceral metastases, and permitted only one prior line of chemotherapy.

The key safety results from both QD and BID patients, as of June 1, 2022, showed that masofaniten (EPI-7386) was safe and well-tolerated at all dose levels and schedules tested, with no dose-limiting toxicities, treatment related adverse events were limited to Grade 1 or Grade 2, with one Grade 3 occurrence of anemia ultimately deemed unlikely to be treatment related, and that there was no apparent dose dependency in any of the side effects.

Antiandrogen response was assessed by changes in circulating PSA levels, changes in ctDNA levels, and radiographic changes in disease burden measured by both traditional RECIST criteria as well as by total lesion volumetric quantification using the AIQ Solutions platform.

The key response findings in both QD and BID patients, as of June 1, 2022, demonstrated that tumor volume decreased in five patients out of 10 patients who had measurable disease and were on therapy for more than 12 weeks. PSA decrease or PSA stabilization was observed in a clinical subset of patients with no visceral disease, fewer DNA genomic aberrations in non-AR oncogenic pathways, and fewer than 3 lines of therapy. This provides further information to support refining the monotherapy development program patient population. In 17 patients with measurable ctDNA levels at baseline, ctDNA declines were observed in patients harboring AR point mutations, AR gain/amplification and AR truncations, suggesting masofaniten's (EPI-7386) potential activity against these tumors.

The update also described the planned Phase 1b study, the planned window of opportunity cohort and the status of the combination study of masofaniten (EPI-7386) with enzalutamide. The Phase 1b study will evaluate a patient population of mCRPC similar to the one treated under the Phase 1a BID cohort but with the additional exclusion of prior chemotherapy. Up to 12 patients per each dose/schedule (600 mg QD and either 400 mg or 600 mg BID) will be evaluated to gain additional information about safety, tolerability, exposure and anti-tumor activity of masofaniten (EPI-7386) in a less heavily pretreated patient population.

The update also described the planned window of opportunity cohort as part of the Phase 1b expansion in which a separate group of non-metastatic CRPC will be enrolled into a 12-week study with a clinical endpoint (i.e., PSA changes) to assess the anti-tumor activity of masofaniten (EPI-7386) in a patient population in which the disease is mainly AR-driven and the tumor biology has not been affected by second-generation antiandrogen therapy.

The clinical update also provided the status of the combination studies evaluating masofaniten (EPI-7386) in earlier lines of therapy in Phase 1/2 trials which combine masofaniten (EPI-7386) with approved second-generation antiandrogens. In the Phase 1/2 study being conducted by the Company of masofaniten (EPI-7386) in combination with Astellas Pharma Inc.'s and Pfizer Inc.'s AR inhibitor, enzalutamide, in patients with mCRPC who have not been treated with second-generation antiandrogens, the first cohort had cleared the 28-day DLT period with no safety issues and when reported the trial was currently enrolling the second cohort of patients. The preliminary data from the first cohort in the Phase 1/2 combination trial with enzalutamide suggests that the drugs can be combined safely and based upon clinical and preclinical data predicted to be active. The early data, in addition to preclinical studies, support masofaniten's (EPI-7386) potential in combination with second-generation antiandrogens to suppress androgen receptor biology and induce a potent anti-tumor response.

The Company also described the anticipated initiation later in 2022 of a Phase 2 investigator-sponsored neoadjuvant study which will evaluate darolutamide compared to masofaniten (EPI-7386) + darolutamide in patients undergoing prostatectomy for high-risk localized prostate cancer.

At the AACR annual meeting on April 10, 2022, in a poster titled "Androgen receptor (AR) N-Terminal Domain degraders can degrade AR full length and AR splice variants in CRPC preclinical models," the Company presented preclinical data for its first generation of androgen receptor (AR) ANITen bAsed Chimera (ANITAC™) N-terminal domain (NTD) degraders. The preclinical data demonstrated the potential of ESSA's ANITAC degraders as a new approach to AR pathway inhibition. The intrinsically disordered nature of the NTD region of the AR has meant it has generally been considered undruggable. The preclinical studies have shown that through their unique ability to bind to the NTD of AR, ANITACs have the ability to inhibit NTD-mediated AR transcription while also degrading AR protein including resistant forms of AR which are commonly associated with CRPC. The preclinical results demonstrate that ANITAC degraders utilize the ubiquitin proteasome system and can degrade many forms of AR including full length, mutant, and splice variants which are often expressed in CRPC patients. Specifically, the ANITAC degraders show robust potency in inhibiting AR transcriptional activity driven by AR-FL, AR-V7, or AR-V567es. In addition, the orally bioavailable ANITAC degraders exhibit high potency in inhibiting AR-dependent transcription and reducing viability of AR-dependent prostate cancer cells. The Company continues to design and test ANITAC degraders with a focus on improving selectivity.

On January 19, 2022, the Company announced the first patient dosed in the Company-sponsored Phase 1/2 study to evaluate the safety, tolerability and preliminary efficacy of ESSA's lead product candidate, masofaniten (EPI-7386), a first-in-class N-terminal domain androgen receptor inhibitor, in combination with Astellas and Pfizer Inc.'s ligand-binding domain androgen receptor inhibitor, enzalutamide, in patients with mCRPC. This combination trial investigates the potential clinical benefit of inhibiting the androgen receptor through two independent pathways in the treatment of patients with mCRPC who have not yet received treatment with a second-generation antiandrogen drug. In preclinical models, the combination of masofaniten (EPI-7386) with lutamides by simultaneously targeting both ends of the AR resulted in deeper and broader inhibition of androgen biology.

The Phase 1/2 clinical trial (NCT05075577) is a two part study. Phase 1 evaluates the safety and tolerability of the drug combination to establish the recommended Phase 2 range of doses for masofaniten (EPI-7386) and enzalutamide when dosed in combination. This Phase of the study is expected to enroll up to 30 mCRPC patients who have not yet been treated with second-generation antiandrogen therapies. As described below on June 27, 2022, the results of the initial experience with the first cohort were presented, demonstrating the safety and tolerability of the combination in this first cohort, along with the accompanying pharmacokinetic and PSA reduction information. In Phase 2, single agent enzalutamide is compared to the combination of enzalutamide and masofaniten (EPI-7386) in the same patient population. The goal of Phase 2 is to evaluate the safety, tolerability and anti-tumor activity of masofaniten (EPI-7386) in combination with a fixed dose of enzalutamide compared with enzalutamide as a single agent. This part of the study is expected to enroll 120 mCRPC patients who have not yet been treated with second-generation antiandrogen therapies.

*2021*

In October 2021, the company disclosed the development of a collaboration with Caris Life Sciences, involving the incorporation of Caris' newly developed cNAS ("circulating nucleic acid sequencing") assay in the characterization of patients receiving masofaniten (EPI-7386). The Company believes that the characterization of real time individual patient biology will contribute significantly to understanding the extent to which individual patient's tumors are still AR driven and what mechanisms of resistance exist.

At the October AACR, National Cancer Institute, and European Organisation for Research and Treatment of Cancer Virtual International Conference on Molecular Targets and Cancer Therapeutics, the Company presented preclinical data characterizing the mechanism of action of masofaniten (EPI-7386), including the results of NMR studies which confirm the binding of the compound to the NTD of the AR, a region not currently targeted by other antiandrogen therapies. The data also demonstrated that the combination of masofaniten (EPI-7386) with enzalutamide results in complete inhibition of genome-wide androgen-induced AR binding, supporting the rationale for Phase 1 / 2 combination trials of masofaniten (EPI-7386) with approved antiandrogens in patients with mCRPC.

On February 11, 2021, the Company presented preclinical and clinical pharmacology data from ESSA's Phase 1 clinical trial of masofaniten (EPI-7386) for the treatment of patients with mCRPC at the 2021 American Society of Clinical Oncology Genitourinary Cancers Symposium in an oral poster presentation titled, "Preclinical and clinical pharmacology of EPI-7386, an androgen receptor N-terminal domain inhibitor for castration-resistant prostate cancer." The poster is available on the Company website.

Data on the poster included a comparison of preclinical projections of masofaniten (EPI-7386) clinical pharmacokinetic parameters to the pharmacokinetic, safety and preliminary clinical data from the initial 200 mg cohort of patients enrolled in ESSA's multi-center, open-label, ascending multiple-dose Phase 1 study of masofaniten (EPI-7386) to treat patients with mCRPC who have become resistant to standard of care treatments. Patients participating in this trial have progressed on two or more approved systemic therapies for mCRPC, including at least one second generation antiandrogen therapy not necessarily in the metastatic disease setting. In this initial cohort of patients receiving the 200 mg once-daily dose, masofaniten (EPI-7386) was well-tolerated with no significant adverse effects observed. The results from this cohort support ESSA's preclinical projections regarding the pharmacologic properties of masofaniten (EPI-7386) in humans. masofaniten (EPI-7386) was well-absorbed, demonstrated high exposure levels and was confirmed to have a long half-life of at least 24 hours. The predicted exposures of masofaniten (EPI-7386) in patients at that 200 mg dose level were similar to the Company's modeled projections and were still below optimal target exposures of masofaniten (EPI-7386) associated with anti-tumor activity in animal models. Although the 200 mg dose exposure was suboptimal, one out of three patients who completed 12 weeks of therapy experienced a PSA decline of more than 50 percent after three cycles of masofaniten (EPI-7386) therapy (12 weeks) with ongoing continued PSA declines continuing through seventeen cycles of therapy, despite previously having failed enzalutamide and abiraterone acetate.

At the 2021 American Association of Cancer Research ("AACR") Annual Meeting, which took place virtually April 10-15, 2021, ESSA presented an e-poster presentation titled, "Comprehensive *in vitro* characterization of the mechanism of action of EPI-7386, an androgen receptor N-terminal inhibitor." The content of this poster added to previously presented data that masofaniten (EPI-7386) binds to the full-length androgen receptor, inhibits the transcription of AR-regulated genes, and physically interacts with the splice variant form AR-V7, by demonstrating that masofaniten (EPI-7386) can prevent the androgen receptor from binding to genomic DNA and is active against additional androgen receptor splice variants, including AR-v567es. These preclinical data suggest masofaniten (EPI-7386) can potentially inhibit AR related transcription, a key driver of prostate cancer, and further supports the ongoing Phase 1 dose escalation study.

The data also showed that masofaniten (EPI-7386), in combination with enzalutamide, may result in broader and deeper inhibition of the AR pathway, underscoring the potential clinical benefit of combining masofaniten (EPI-7386) with current standard of care antiandrogen therapies for prostate cancer patients at earlier stages of the disease.

**Future Clinical Development Program**

*Phase 2/3 Clinical Trial Design for treating CRPC patients*

*Combination Therapy Development*

The wealth of preclinical data developed by the Company, as well as the continued emergence of evidence that while earlier stages of prostate cancer are more homogeneously AR pathway driven, the later stages of the disease are much more biologically complex. The Company is conducting the combination of masofaniten (EPI-7386) with current antiandrogens in earlier patients. This is the current priority for the Company's clinical development, reflected in the several clinical trial collaborations established with leading pharmaceutical companies. Following demonstration of the practical ability to combine masofaniten (EPI-7386) with each of these antiandrogens, further clinical development will require conduct of randomized clinical trials in earlier patient populations (potentially ranging from newly-diagnosed through non-metastatic and metastatic hormone-sensitive or pre-latest generation antiandrogen CRPC populations).

*Single Agent Development*

Depending on the results of the Phase 1 study, a Phase 2 single arm clinical trial evaluating the activity of masofaniten (EPI-7386) single agent in a larger group of biologically-characterized mCRPC patients might be conducted. While the

decision as to whether or not to conduct such a trial has not been formally reached, embarking on the conduct of such a trial will depend on several considerations. The considerations related to the decision to conduct such a trial relate to the company's ability to identify those patients who, having progressed on one or another late generation antiandrogen, have tumors which are still predominantly AR-driven, as well as the size of that patient population. Our experience during the conduct of the Phase 1 dose escalation trial has revealed that many such patients will have tumors driven predominantly by other oncogenic drivers. Those patients whose tumors remain predominantly AR-driven are the population most likely to benefit clinically from Aniten therapy, and the size of this population will weigh in the decision as to whether or not to pursue a single agent registration strategy.

In order to ultimately obtain full single agent regulatory approval, the Company expects that at least one Phase 3 clinical trial would be required, most likely in patients similar to the population of mCRPC patients who will have been enrolled in the planned Phase 1/2 clinical trial. However, the results of the Phase 1/2 clinical trial may also suggest modification of the initial patient population based on anti-tumor response and biomarker assessment. In a Phase 3 clinical trial, the key end-point is expected to be progression-free survival or overall survival relative to patients receiving the standard of care. It is expected that such a Phase 3 clinical trial would be conducted at numerous sites around the world.

**Competition**

The competition in the prostate cancer market is very high, many of the companies against which we compete or against which we may compete in the future have significantly greater financial resources and expertise in research and development, manufacturing, preclinical testing, conducting clinical trials, obtaining regulatory approvals and marketing approved products than we do. Mergers and acquisitions in the pharmaceutical and biotechnology industries may result in even more resources being concentrated among a smaller number of our competitors. Several pharmaceutical therapies already have approved and many new molecules are being tested for their effect in this patient population. In addition, generic forms of Zytiga (abiraterone acetate) are now approved and commercially available in the U.S.

Currently approved therapies include:

| GENERIC/PROGRAM NAME | BRAND NAME | COMPANY NAME(S) | STAGE |
|---|---|---|---|
| Enzalutamide | Xtandi | Astellas and Pfizer | Marketed |
| Abiraterone acetate | Zytiga | Johnson & Johnson | Marketed |
| Sipuleucel-T | Provenge | Valeant | Marketed |
| Docetaxel | n/a | Sanofi and various | Marketed |
| Cabazitaxel | Jevtana | Sanofi | Marketed |
| Radium-233 | Xofigo | Bayer | Marketed |
| Apalutamide (ARN-509) | Erleada | Johnson & Johnson | Marketed |
| Darolutamide | Nubeqa | Bayer | Marketed |
| Pembrolizumab | Keytruda | Merck | Marketed |
| Olaparib | Lynparza | AstraZeneca | Marketed |
| Rucaparib | Rubraca | Clovis Oncology | Marketed |
| Vipivotide tetraxetan | Pluvicto | Novartis | Marketed |

In this market, ESSA believes that its competitive position is strong because its product candidate, if successful, involves a mechanistically unique, differentiated approach to prostate cancer treatment involving the therapeutic modality that has been shown to make the biggest difference to the survival of recurrent prostate cancer patients: blocking AR activation. Since Anitens have been shown to directly bind to AR-NTD and prevent AR-mediated transcription, they have the potential to bypass the AR-dependent resistance pathways (discussed above) that may develop as a result of treatment with current hormone-related therapies that target the AR LBD. If successful, ESSA believes this could represent a significant step forward in the treatment of prostate cancer. To ESSA's knowledge, no other antagonist to the AR-NTD is currently undergoing clinical trials for prostate cancer or any other indication. Other approaches to interfering with AR signaling include potentially complementary strategies to degrade the AR such as that being pursued by Arvinas, Inc.

**Patents and Proprietary Rights**

*License Agreement with UBC and the BCCA*

ESSA has in-licensed intellectual property embodied in issued patents, pending patents applications and know-how relating to compounds that modulate AR activity. ESSA refers to these intellectual property rights as the "Licensed IP."

The Company is party to a license agreement with the British Columbia Cancer Agency and the University of British Columbia (the "Licensors") dated December 22, 2010, as amended on February 10, 2011, May 27, 2014, and May 25, 2021 (the "License Agreement"), which provides the Company with exclusive world-wide rights to develop and commercialize products based on the Licensed IP.

ESSA paid a minimum annual royalty of C$85,000 in 2017, 2018, and 2019 and must continue to pay a minimum of C$85,000 for each year thereafter. For a First Compound entering clinical development, an additional C$50,000 and C$900,000 must be paid upon enrollment of a patient in a Phase 2 and Phase 3 clinical trial, respectively.

The Licensors may terminate the License Agreement upon ESSA's insolvency, or the License Agreement may be terminated by either party for certain material breaches by the other party. ESSA has already spent more than C$5,000,000 in connection with the commercialization of products relating directly to the Licensed IP, as required under the License Agreement. ESSA is required to allocate reasonable time to the development and commercialization of the Licensed IP and to use reasonable efforts to promote, market and sell products covered by the Licensed IP. The terms of the License Agreement required ESSA to issue to the Licensors, 1,000,034 pre-Consolidation Common Shares, in lieu of payment of an initial license fee. If ESSA develops products covered by the Licensed IP in the future, it will be required to pay certain development and regulatory milestone payments up to an aggregate of C$2.4 million for the first drug product developed under the license and up to an aggregate of C$510,000 for each subsequent product. ESSA must also pay the Licensors low single-digit royalties based on aggregate worldwide net sales of products covered by the Licensed IP and a percentage of sublicensing revenue in the low teens. The License Agreement will expire on the later of 20 years after the date of the License Agreement or the expiry of the last issued patent included in the Licensed IP.

*ESSA's Intellectual Property Strategy*

The Company currently retains all commercial rights for its Aniten series drug portfolio and believes it has developed a strong and defensive intellectual property position for the Aniten structural classes. ESSA has licensed certain patent rights, with respect to some of its compounds that modulate AR activity, from the Licensors. ESSA has the right to acquire ownership of the licensed patents and patent applications upon specified payment to the Licensors, and providing that payments required under the License Agreement continue to be made.

As of December 2023, ESSA owns rights to a patent portfolio that includes 71 issued patents, including 19 issued U.S. patents, that are in force and cover multiple EPI- and Aniten structural classes of compounds with different structural motifs/analogues. Patent applications are also pending in the United States and in contracting states to the Patent Cooperation Treaty for Aniten next-generation NTD inhibitors, with expected expiration dates between 2036 to 2043.

The patent portfolio includes issued patents that are in force and pending patent applications that cover the masofaniten (EPI-7386) compound, pharmaceutical compositions comprising the masofaniten (EPI-7386) compound, or its methods of use, and are expected to provide protection until the expiration dates, ranging from 2036 to 2043.

21

Both ESSA and the broader pharmaceutical industry attach significant importance to patents for the protection of new technologies, products and processes. Accordingly, ESSA's success depends, in part, on its ability to obtain patents or rights thereto, to protect commercial secrets and carry on activities without infringing the rights of third parties. Disputes may arise as to the inventorship of and/or ownership interest in the Company's or the Licensors' patents, including for example, former or current employees of the Company or the Licensors pursuing ownership rights of patents owned by or licensed to the Company. The Company may have limited ability to impact any internal disputes between the Licensors and their employees or former employees. See "Risk Factors" in this Annual Report on Form 10-K. Where appropriate, and consistent with management's objectives, ESSA will continue to seek patents in relation to components or concepts of its technology that it perceives to be important.

**Regulatory Environment**

The production and manufacture of ESSA's product candidate and potential future product candidates and its R&D activities are subject to regulation for safety, efficacy, quality and ethics by various governmental authorities around the world. In the United States, drugs and biological products are subject to regulation by the FDA. In Canada, these activities are regulated by the Food and Drugs Act and the rules and regulations thereunder, which are enforced by the TPD. Drug approval laws require registration of manufacturing facilities, carefully controlled research and testing of product candidates, government review and approval of experimental results prior to giving approval to sell drug products. Regulators also require that rigorous and specific standards such as cGMP, good laboratory practices ("GLP") and current good clinical practices ("GCP") are followed in the manufacture, testing and clinical development respectively of any drug product. See "Risk Factors" in this Annual Report on Form 10-K.

The process of obtaining regulatory approvals and the corresponding compliance with appropriate federal, state, local and foreign statutes and regulations requires the expenditure of substantial time and financial resources. Failure to comply with the applicable U.S. requirements at any time during the product development process, approval process or after approval may subject an applicant or sponsor to a variety of administrative or judicial sanctions, including refusal by the FDA to approve pending applications, withdrawal of an approval, imposition of a clinical hold, issuance of warning letters and other types of enforcement letters, product recalls, product seizures, total or partial suspension of production or distribution, injunctions, fines, refusals of government contracts, restitution, disgorgement of profits, or civil or criminal investigations and penalties brought by the FDA and the Department of Justice or other governmental entities.

**Drug Products Development Process**

An applicant seeking approval to market and distribute a new drug product in the United States must typically undertake the following:

- completion of extensive nonclinical, sometimes referred to as preclinical laboratory tests, and preclinical animal trials in compliance with applicable requirements for the humane use of laboratory animals and formulation studies, including GLPs;
- submission to the FDA of an IND, which must take effect before human clinical trials may begin;
- approval by an institutional review board ("IRB"), representing each clinical site before each clinical trial may be initiated;
- performance of adequate and well-controlled human clinical trials according to the FDA's regulations commonly referred to as GCP regulations and any additional requirements for the protection of human research subjects and their health information, to establish the safety and efficacy of the proposed drug product for its intended use;
- preparation and submission to the FDA of a New Drug Application ("NDA");
- review of the product by an FDA advisory committee, where appropriate or if applicable;
- satisfactory completion of one or more FDA inspections of the manufacturing facility or facilities at which the product, or components thereof, are produced to assess compliance with cGMP requirements and to assure that the facilities, methods and controls are adequate to preserve the product's identity, strength, quality and purity;
- payment of user fees and securing FDA approval of the NDA; and

- compliance with any post-approval requirements, including Risk Evaluation and Mitigation Strategies ("REMS") and post-approval studies required by the FDA.

*Preclinical Studies*

Preclinical studies are conducted *in vitro* and in animals to evaluate pharmacokinetics, metabolism and possible toxic effects to provide evidence of the safety of the product candidate prior to its administration to humans in clinical studies and throughout development. The conduct of preclinical studies is subject to federal regulations and requirements, including GLP regulations. The results of the preclinical tests, together with manufacturing information, analytical data, any available clinical data or literature and plans for clinical studies, among other things, are submitted to the FDA as part of an IND. Some long-term preclinical testing, such as animal tests of reproductive adverse events and carcinogenicity, may continue after the IND is submitted.

*Initiation of Human Testing*

Clinical trials involve the administration of the investigational product to human subjects under the supervision of qualified investigators in accordance with GCP requirements, which include, among other things, the requirement that all research subjects provide their informed consent in writing before their participation in any clinical trial. Clinical trials are conducted under written trial protocols detailing, among other things, the objectives of the trial, the parameters to be used in monitoring safety and the effectiveness criteria to be evaluated. A protocol for each clinical trial and any subsequent protocol amendments must be submitted to the FDA as part of the IND. An IND automatically becomes effective 30 days after receipt by the FDA, unless before that time the FDA raises concerns or questions related to a proposed clinical trial and places the trial on clinical hold. In such a case, the IND sponsor and the FDA must resolve any outstanding concerns before the clinical trial can begin. In Canada, this application is called a CTA. An IND/CTA application must be filed and accepted by the FDA or TPD, as applicable, before human clinical trials may begin. In addition, an IRB representing each institution participating in the clinical trial must review and approve the plan for any clinical trial before it commences at that institution, and the IRB must conduct continuing review and reapprove the trial at least annually. The IRB must review and approve, among other things, the trial protocol and informed consent information to be provided to trial subjects. An IRB must operate in compliance with FDA regulations.

Two key factors influencing the rate of progression of clinical trials are the rate at which patients can be enrolled to participate in the research program and whether effective treatments are currently available for the disease that the drug is intended to treat. Patient enrollment is largely dependent upon the incidence and severity of the disease, the treatments available and the potential side effects of the drug to be tested and any restrictions for enrollment that may be imposed by regulatory agencies.

*Phase 1 Clinical Trials*

Phase 1 clinical trials for cancer therapeutics are typically conducted on a small number of patients to evaluate safety, dose limiting toxicities, tolerability, pharmacokinetics and to determine the dose for Phase 2 clinical trials in humans.

*Phase 2 Clinical Trials*

Phase 2 clinical trials typically involve a larger patient population than Phase 1 clinical trials and are conducted to identify possible adverse effects and safety risks, to preliminarily evaluate the efficacy of a product candidate for specific targeted diseases and to determine dosage tolerance, optimal dosage and dosing schedule.

*Phase 3 Clinical Trials*

Phase 3 clinical trials typically involve testing an experimental drug on a much larger population of patients suffering from the targeted condition or disease – in ESSA's case, CRPC. These studies involve testing the experimental drug in an expanded patient population at geographically dispersed test sites (multi-center trials) to establish clinical safety and effectiveness. These trials also generate information from which the overall risk-benefit relationship relating to the drug can be determined.

23

In most cases FDA requires two adequate and well controlled Phase 3 clinical trials to demonstrate the efficacy of the drug. A single Phase 3 trial with other confirmatory evidence may be sufficient in rare instances where the trial is a large multicenter trial demonstrating internal consistency and a statistically very persuasive finding of a clinically meaningful effect on mortality, irreversible morbidity or prevention of a disease with a potentially serious outcome and confirmation of the result in a second trial would be practically or ethically impossible.

*New Drug Application*

Assuming successful completion of required clinical testing and other requirements, the results of the preclinical and clinical studies, together with detailed information relating to the product's chemistry, manufacture, controls and proposed labeling, among other things, are submitted to the FDA as part of an NDA, or the TPD as part of a New Drug Submission ("NDS"), requesting approval to market the drug product for one or more indications. The NDS or NDA is then reviewed by the applicable regulatory body for approval to market the drug.

The FDA conducts a preliminary review of an NDA within 60 days of its receipt and informs the sponsor by the 74th day after the FDA's receipt of the submission to determine whether the application is sufficiently complete to permit substantive review. The FDA may request additional information rather than accept an NDA for filing. In this event, the application must be resubmitted with the additional information. The resubmitted application is also subject to review before the FDA accepts it for filing. Once the submission is accepted for filing, the FDA begins an in-depth substantive review. The FDA has agreed to specified performance goals in the review process of NDAs. Most such applications are meant to be reviewed within ten months from the date of filing, and most applications for "priority review" products are meant to be reviewed within nine months of filing. The review process may be extended by the FDA for three additional months to consider new information or clarification provided by the applicant to address an outstanding deficiency identified by the FDA following the original submission.

Before approving an NDA, the FDA typically will inspect the facility or facilities where the product is or will be manufactured. These pre-approval inspections cover all facilities associated with an NDA submission, including drug component manufacturing (such as Active Pharmaceutical Ingredients), finished drug product manufacturing, and control testing laboratories. The FDA will not approve an application unless it determines that the manufacturing processes and facilities are in compliance with cGMP requirements and adequate to assure consistent production of the product within required specifications. Additionally, before approving an NDA, the FDA will typically inspect one or more clinical sites to assure compliance with GCP.

The cost of preparing and submitting an NDA is substantial. The submission of most NDAs is additionally subject to a substantial application user fee, currently exceeding $2,500,000 and the manufacturer or sponsor under an approved new drug application are also subject to significant annual program and establishment user fees. These fees are typically increased annually.

On the basis of the FDA's evaluation of the NDA and accompanying information, including the results of the inspection of the manufacturing facilities, the FDA may issue an approval letter or a complete response letter. An approval letter authorizes commercial marketing of the product with specific prescribing information for specific indications. A complete response letter generally outlines the deficiencies in the submission and may require substantial additional testing or information in order for the FDA to reconsider the application. If and when those deficiencies have been addressed to the FDA's satisfaction in a resubmission of the NDA, the FDA will issue an approval letter. The FDA has committed to reviewing such resubmissions in two or nine months depending on the type of information included. Even with submission of this additional information, the FDA ultimately may decide that the application does not satisfy the regulatory criteria for approval.

If the FDA approves a product, it may limit the approved indications for use for the product, require that contraindications, warnings or precautions be included in the product labeling, require that post-approval studies, including Phase 4 clinical trials, be conducted to further assess the drug's safety after approval, require testing and surveillance programs to monitor the product after commercialization, or impose other conditions, including distribution restrictions or other risk management mechanisms which can materially affect the potential market and profitability of the product. The FDA may prevent or limit further marketing of a product based on the results of post-market studies or surveillance programs. After approval, many types of changes to the approved product, such as adding new indications, manufacturing changes and additional labeling claims, are subject to further testing requirements and FDA review and approval.

*Post-Approval Requirements*

Drugs manufactured or distributed pursuant to FDA approvals are subject to pervasive and continuing regulation by the FDA, including, among other things, requirements relating to recordkeeping, periodic reporting, product sampling and distribution, advertising and promotion and reporting of adverse experiences with the product. After approval, significant changes to the approved product, such as adding new indications or other labeling claims, are subject to prior FDA review and approval. There also are continuing, annual user fee requirements for any marketed products and the establishments at which such products are manufactured, as well as new application fees for supplemental applications with clinical data.

In addition, drug manufacturers and other entities involved in the manufacture and distribution of approved drugs are required to register their establishments with the FDA and state agencies, and are subject to periodic unannounced inspections by the FDA and these state agencies for compliance with cGMP requirements. Changes to the manufacturing process are strictly regulated and often require prior FDA approval before being implemented. FDA regulations also require investigation and correction of any deviations from cGMP and impose reporting and documentation requirements upon the sponsor and any third-party manufacturers that the sponsor may decide to use. Accordingly, manufacturers must continue to expend time, money, and effort in the area of production and quality control to maintain cGMP compliance.

Once an approval is granted, the FDA may withdraw the approval if compliance with regulatory requirements and standards is not maintained or if problems occur after the product reaches the market. Later discovery of previously unknown problems with a product, including adverse events of unanticipated severity or frequency, or with manufacturing processes, or failure to comply with regulatory requirements, may result in revisions to the approved labeling to add new safety information; imposition of post-market studies or clinical trials to assess new safety risks; or imposition of distribution or other restrictions under a REMS program. Other potential consequences include, among other things:

- restrictions on the marketing or manufacturing of the product, complete withdrawal of the product from the market or product recalls;
- fines, warning letters or holds on post-approval clinical trials;
- refusal of the FDA to approve pending NDAs or supplements to approved NDAs, or suspension or revocation of product license approvals;
- product seizure or detention, or refusal to permit the import or export of products; or
- injunctions or the imposition of civil or criminal penalties.

The FDA strictly regulates marketing, labeling, advertising and promotion of products that are placed on the market. Drugs may be promoted only for the approved indications and in accordance with the provisions of the approved label. The FDA and other agencies actively enforce the laws and regulations prohibiting the promotion of off-label uses, and a company that is found to have improperly promoted off-label uses may be subject to significant liability.

In addition, the distribution of prescription pharmaceutical products is subject to the Prescription Drug Marketing Act, or PDMA, which regulates the distribution of drugs and drug samples at the federal level, and sets minimum standards for the registration and regulation of drug distributors by the states. Both the PDMA and state laws limit the distribution of prescription pharmaceutical product samples and impose requirements to ensure accountability in distribution.

25

*Orphan Designation and Exclusivity*

ESSA may, in the future, seek orphan drug designation for its product candidates. Under the Orphan Drug Act, the FDA may designate a drug product as an "orphan drug" if it is intended to treat a rare disease or condition (generally meaning that it affects fewer than 200,000 individuals in the United States, or more in cases in which there is no reasonable expectation that the cost of developing and making a drug product available in the United States for treatment of the disease or condition will be recovered from sales of the product). A company must request orphan product designation before submitting an NDA. If the request is granted, the FDA will disclose the identity of the therapeutic agent and its potential use. Orphan product designation does not convey any advantage in or shorten the duration of the regulatory review and approval process.

If a product with orphan status receives the first FDA approval for the disease or condition for which it has such designation, the product generally will receive orphan product exclusivity. Orphan product exclusivity means that the FDA may not approve any other applications for the same product for the same indication for seven years, except in certain limited circumstances. Competitors may receive approval of different products for the indication for which the orphan product has exclusivity and may obtain approval for the same product but for a different indication. If a drug or drug product designated as an orphan product ultimately receives marketing approval for an indication broader than what was designated in its orphan product application, it may not be entitled to exclusivity.

**Government Regulation Outside of the United States and Canada**

In addition to regulations in the United States and Canada, we will be subject to a variety of regulations in other jurisdictions governing, among other things, clinical studies and any commercial sales and distribution of our products.

Whether or not we obtain FDA approval for a product, we must obtain the requisite approvals from regulatory authorities in foreign countries prior to the commencement of clinical studies or marketing of the product in those countries. Certain countries outside of the United States have a similar process that requires the submission of a clinical study application much like the IND prior to the commencement of human clinical studies. In the European Union, for example, a CTA must be submitted to each country's national health authority and an independent ethics committee, much like the FDA and IRB, respectively. Once the CTA is approved in accordance with a country's requirements, clinical study development may proceed.

The requirements and process governing the conduct of clinical studies, product licensing, coverage, pricing and reimbursement vary from country to country. In all cases, the clinical studies are conducted in accordance with GCP and the applicable regulatory requirements and the ethical principles that have their origin in the Declaration of Helsinki.

**Human Capital Resources**

As of the date of this Annual Report, ESSA has a total of approximately 50 employees and consultants on a full-time or part-time basis. ESSA has in the past, and may in the future, retain additional expert consultants on an ad-hoc basis if required in connection with the Company's development program.

We believe that our future success will depend, in part, on our ability to continue to attract, hire, and retain qualified personnel. We continue to seek additions to our science and technical staff. Through our experience with technological innovation, we appreciate the importance of retention, growth and development of our employees. We believe we offer competitive compensation (including salary, incentive bonus, and equity) and benefits packages. None of our employees is represented by a labor union, and we have never experienced a work stoppage.

**Corporate Structure**

The Company was incorporated under the name "ESSA Pharma Inc." pursuant to the Business Corporations Act (British Columbia) on January 6, 2009. The Company's registered and records office is located at Suite 3500, The Stack, 1133 Melville Street, Vancouver, British Columbia, Canada V6E 4E5. The Company's head office is located at Suite 720, 999 West Broadway, Vancouver, British Columbia, Canada V5Z 1K5.

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 29 of 110    Document 29-1

Since July 9, 2015, the Company's Common Shares have traded on the Nasdaq under the symbol "EPIX." The Company's Common Shares traded under the symbol "EPI" on the Toronto Stock Exchange (the "TSX") from July 28, 2015, until November 24, 2017. On November 27, 2017, the Company delisted its Common Shares from the TSX and began trading on the TSX-V under the same symbol, "EPI." On October 26, 2020, the Company announced its decision to voluntarily delist its Common Shares from the TSX-V.

The Company has one wholly owned subsidiary:

- ESSA Pharmaceuticals Corp. ("ESSA Texas"), existing under the laws of the State of Texas. The head office of ESSA Texas is located at Suite 1300, 700 Milam Street, Houston, Texas, USA 77002.

**Available Information**

This Annual Report on Form 10-K, our quarterly reports on Form 10-Q or Form 6-K, our current reports on Form 8-K or Form 6-K, and any amendments to these reports are filed, or will be filed, as appropriate, with the SEC and the Canadian Securities Administrators ("CSA"). These reports are available free of charge on our website, www.essapharma.com, as soon as reasonably practicable after we electronically file such reports with or furnish such reports to the SEC and the Canadian regulatory authorities. Information contained on, or accessible through, our website or any other website referenced herein is not a part of this Annual Report on Form 10-K, and the inclusion of our website address or any other website address in this document is an inactive textual reference.

Additionally, our filings with the SEC may be accessed through the SEC's website at www.sec.gov and our filings with the CSA may be accessed through SEDAR+ at www.sedarplus.com. Our annual report on Form 10-K from the year ended September 30, 2022, which includes a full discussion of the general development of our business, can be found at https://www.sec.gov/Archives/edgar/data/1633932/000155837022018570/tmb-20220930x10k.htm.

**Item 1A.       Risk Factors**

**Risk Factor Summary**

We are providing the following summary of the risk factors contained in this Annual Report on Form 10-K to enhance the readability and accessibility of our risk factor disclosures. This summary does not address all the risks  that we face. We encourage you to carefully review the full risk factors contained in this Annual Report on Form 10-K in their entirety, together with our other filings with the SEC, for additional information regarding the material factors that make an investment in our securities speculative or risky, and before making an investment decision regarding our Common Shares. These risks and uncertainties include, but are not limited to, the following:

- Clinical drug development involves a lengthy and expensive process with an uncertain outcome;
- Our future success is dependent primarily on the regulatory approval for commercialization of a single product candidate, which is in the clinical development stage;
- We may not be able to obtain required regulatory approvals for our proposed products;
- We may not be able to successfully commercialize our Aniten series of compounds;
- Our product candidate and potential future product candidates may have undesirable side effects when used alone or in combination with other drugs, that may delay or prevent marketing approval or, if approval is received, require them to be taken off the market, require them to include safety warnings or otherwise limit their sales;
- Even if we obtain marketing approval for any product candidate and potential future products, we will be subject to ongoing obligations and continued regulatory review, which may result in significant additional expense;
- We may fail to comply with applicable legal and regulatory requirements, which may result in administrative or judicial sanctions;
- We rely on third parties to conduct our preclinical studies and clinical trials. If these third parties do not successfully carry out their contractual duties, meet expected deadlines, or terminate the relationship, this could substantially harm our business because we may not be able to obtain regulatory approval for or commercialize product candidates in a timely manner or at all;

- We have limited experience manufacturing product candidates on a large clinical or commercial scale and have no manufacturing facility;
- Our business may be materially adversely affected by new legislation, new regulatory requirements and the continuing efforts of governmental and third-party payors to contain or reduce the costs of healthcare through various means;
- We will have significant additional future capital needs for future clinical trials and there are uncertainties as to the Company's ability to raise additional funding;
- We may not be able to raise additional capital on favorable terms, which may result in dilution to our existing shareholders, restrictions on our operations or the requirement for us to relinquish rights to technologies or any future product candidates;
- We have incurred significant losses in every quarter since our inception and anticipate that we will continue to incur significant losses in the future and may never generate profits from operations or maintain profitability;
- We have a limited operating history, which may make it difficult for you to evaluate the success of our business to date and to assess our future viability;
- We rely on proprietary technology, the protection of which can be unpredictable and costly;
- We may not be able to protect our intellectual property rights throughout the world;
- We may be subject to claims by third parties asserting that we, or our employees, contractors or consultants have misappropriated their intellectual property, or claiming ownership of what we regard as our own intellectual property;
- Our business and operations would suffer in the event of computer system failures or security breaches;
- We face intense competition from other biotechnology and pharmaceutical companies and our operating results will suffer if we fail to compete effectively;
- We have never marketed a drug before, and if we are unable to establish an effective sales force and marketing infrastructure, or enter into acceptable third-party sales and marketing or licensing arrangements, we may be unable to generate any revenue;
- Our product candidate and potential future products may, if approved for sale, not achieve or maintain expected levels of market acceptance, which could have a material adverse effect on our business, financial condition and results of operations and could cause the market value of our securities to decline;
- Laws and regulations governing international operations may preclude us from developing, manufacturing and selling certain product candidates outside of the United States and Canada and require us to develop and implement costly compliance programs;
- We are a smaller reporting company and a non-accelerated filer and the reduced disclosure requirements available to us may make our Common Shares less attractive to investors;
- We are and there is a risk that we may continue to be a "passive foreign investment company," which would likely result in materially adverse U.S. federal income tax consequences for U.S. investors;
- The market price and trading volume of our Common Shares may be volatile, which could result in rapid and substantial losses for our shareholders or securities litigation; and
- Widespread health concerns, pandemics or epidemics, and other outbreaks of illness may negatively affect our ability to maintain operations and execute our business plan.

## ESSA's Product Candidate and Regulatory Matters

*Clinical drug development involves a lengthy and expensive process with an uncertain outcome, results of earlier studies and trials may not be predictive of future trial results and ESSA's product candidate and potential future product candidates may not have favorable results in later trials or in the commercial setting or satisfy the requirements of the FDA or non-US regulatory authorities.*

Clinical testing is expensive and can take many years to complete, and its outcome is inherently uncertain. Failure can occur at any time during the clinical trial process. ESSA's planned clinical trials may produce negative or inconclusive results, and ESSA or any of its current and future collaborators may decide, or regulators may require ESSA, to conduct additional clinical or preclinical testing. The results of preclinical studies and early clinical trials may not be predictive of the results of later-stage clinical trials. Preclinical tests and Phase 1 and Phase 2 clinical trials are primarily designed to test safety, to study pharmacokinetics and pharmacodynamics and to understand the side effects of product candidates at various doses and schedules. Success in preclinical or animal studies and early clinical trials does not ensure that later

28

large-scale efficacy trials will be successful nor does it predict final results. Favorable results in early trials may not be repeated in later trials. The Company cannot assure you that the FDA, TPD or EMA or other similar government bodies will view the results as the Company does, or that any future trials of ESSA's proposed products for other indications will achieve positive results. Product candidates in later stages of clinical trials may fail to show the desired safety and efficacy traits despite having progressed through preclinical studies and initial clinical trials.

A number of companies in the pharmaceutical industry have suffered significant setbacks in advanced clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier trials. Any current or future clinical trial results for ESSA's proposed products may not be successful. Similarly, preclinical interim results of a clinical trial do not necessarily predict final results. A number of factors could contribute to a lack of favorable safety and efficacy results for ESSA's proposed products for other indications. For example, such trials could result in increased variability due to varying site characteristics, such as local standards of care, differences in evaluation period and due to varying patient characteristics including demographic factors and health status. There can be no assurance that the Company's clinical trials will demonstrate sufficient safety and efficacy for the FDA, TPD or EMA or other similar government bodies to approve ESSA's potential products for the treatment of CRPC, or any other indication that the Company may consider in any additional NDA or NDS submissions for ESSA's potential products.

The Company will be required to demonstrate through large scale clinical trials that any product candidate and potential future product candidate is safe and effective for use in a diverse population before ESSA can seek regulatory approvals for its commercial sale. There is typically an extremely high rate of attrition from the failure of product candidates proceeding through clinical and post-approval trials. If ESSA's potential products fail to demonstrate sufficient safety and efficacy in ongoing or future clinical trials, the Company could experience potentially significant delays in, or be required to abandon development of a product candidate.

In addition, clinical trials and nonclinical studies performed by research organizations and other independent third parties may yield negative or inconclusive results regarding the effect of ESSA's potential products on CRPC, either in absolute terms or relative to other products.

***ESSA's future success is dependent primarily on the regulatory approval for commercialization of a single product candidate, which is in the clinical development stage.***

The Company does not have any products that have obtained regulatory approval for commercialization. Currently, ESSA is engaged in the clinical testing of a product candidate, masofaniten (EPI-7386), to take forward from its Aniten series of compounds through clinical development to determine the safety, tolerability, maximum tolerated dose, pharmacokinetics and potential therapeutic benefits of such candidate in patients with CRPC, and to ultimately receive regulatory approval. As a result, the Company's near-term prospects, including its ability to finance its operations and generate revenue, are substantially dependent on its ability to develop, obtain regulatory approval for, and, if approved, to successfully commercialize a product candidate in a timely manner. ESSA cannot commercialize its product candidates in the United States without first conducting multiple preclinical and clinical trials to establish the product's safety and efficacy and obtaining regulatory approval for the product from the FDA; similarly, ESSA cannot commercialize its product candidates outside of the United States without obtaining regulatory approval from comparable foreign regulatory authorities. The FDA development and review process typically varies in time and may take years to complete and approval is not guaranteed. Developing, obtaining regulatory approval for and successfully commercializing ESSA's product candidates will depend on many factors, including, but not limited to, the following:

- successfully completing formulation and process development activities;
- completing multiple clinical trials that demonstrate the efficacy and safety of ESSA's product candidates;
- receiving marketing approval from applicable regulatory authorities;
- establishing commercial manufacturing capabilities;
- launching commercial sales, marketing and distribution operations;
- acceptance of ESSA's product candidates by patients, the medical community and third-party payors;
- a continued acceptable safety profile following approval; and
- competing effectively with other therapies, including with respect to the sales and marketing of ESSA's product candidates, if approved.

Many of these factors are wholly or partially beyond ESSA's control, including clinical development, the regulatory submission process and changes in the competitive landscape. If ESSA does not achieve one or more of these factors in a timely manner, it could experience significant delays or an inability to develop ESSA's product candidates at all.

Further, disruptions at the FDA and other government agencies caused by funding shortages or global health concerns could also hinder their ability to hire, retain or deploy key leadership and other personnel, or otherwise prevent new or modified product candidates from being developed, or approved or commercialized in a timely manner or at all, which could negatively impact the Company's business.

***If the Company breaches any of the agreements under which the Company licenses rights to its technology from third parties, the Company could lose license rights that are important to ESSA's business. ESSA's current license agreement may not provide an adequate remedy for its breach by the licensor.***

ESSA entered into a License Agreement with UBC and the BC Cancer Agency that covers certain Aniten compound candidates. The Company is subject to a number of risks associated with the Company's collaboration with UBC and the BC Cancer Agency, including the risk that UBC or the BC Cancer Agency may terminate the License Agreement upon the occurrence of certain specified events. ESSA's License Agreement requires, among other things, that the Company make certain payments and use reasonable commercial efforts to meet certain clinical and regulatory milestones. See "Patents and Proprietary Rights" in Item 4 of this Annual Report. If ESSA fails to comply with any of these obligations or otherwise breaches this or similar agreements, UBC, the BC Cancer Agency or any future licensors may have the right to terminate the license. ESSA could also suffer the consequences of non-compliance or breaches by licensors in connection with ESSA's license agreements. Such non-compliance or breaches by such third parties could in turn result in ESSA's breaches or defaults under the Company's agreements with the Company's other collaboration partners, and the Company could be found liable for damages or lose certain rights, including rights to develop and/or commercialize a product or product candidate. Loss of ESSA's rights to the Licensed IP or any similar license granted to ESSA in the future, or the exclusivity rights provided therein, could harm ESSA's financial condition and operating results.

***The Company may not be able to obtain required regulatory approvals for the Company's proposed products.***

The research, testing, manufacturing, labeling, packaging, storage, approval, sale, marketing, advertising and promotion, pricing, export, import and distribution of drug products developed by ESSA or ESSA's future collaborative partners, if any, is subject to extensive regulation by federal, provincial, state and local governmental authorities and those regulations differ from country to country. ESSA's product candidate and potential future product candidates will be principally regulated in the United States by the FDA, in the European Union by the EMA and the regulators in the individual European Union member countries, in Canada by the TPD, and by other similar regulatory authorities in Japan and other jurisdictions. Government regulation substantially increases the cost and risk of researching, developing, manufacturing and selling products. Following several widely publicized issues in recent years, the FDA and similar regulatory authorities in other jurisdictions have become increasingly focused on product safety. This development has led to requests for more clinical trial data, for the inclusion of a significantly higher number of patients in clinical trials and for more detailed analysis of trial results. Consequently, the process of obtaining regulatory approvals, particularly from the FDA, is time-consuming and has become more costly than in the past. Any product developed by ESSA or ESSA's future collaborative partners, if any, must receive all relevant regulatory approvals or clearances from the applicable regulatory authorities before it may be marketed and sold in a particular country.

ESSA will not be permitted to market any potential products in the United States, Europe, Japan, Canada or in other countries where ESSA intends to market its product candidate and potential future product candidates until such product candidate receives approval of a NDA from the FDA or similar approval in other countries as restrictions apply. In the United States, the FDA generally requires the completion of preclinical testing and clinical trials of each drug to establish its safety and efficacy and extensive pharmaceutical development to ensure its quality before an NDA is approved. This process takes many years and requires the expenditure of substantial resources and may include post-marketing studies and surveillance. Regulatory authorities in other jurisdictions impose similar requirements. Of the large number of drugs in development, only a small percentage result in the submission of an NDA to the FDA and even fewer are approved for commercialization. Other than the INDs submitted for EPI-506 and EPI-7386, the Company has not submitted an IND or an NDA to date for any of the Company's potential products to the FDA or comparable applications to other regulatory

authorities. If the Company's development efforts for potential products are not successful for the treatment of CRPC and regulatory approval is not obtained in a timely fashion or at all, the Company's business will be adversely affected.

The receipt of required regulatory approvals for the Company's product candidate and potential future product candidate(s) is uncertain and subject to a number of risks, including the following:

- the FDA, IRBs or comparable foreign regulatory authorities may disagree with the design or implementation of the Company's clinical trials;
- the Company may not be able to provide acceptable evidence of the safety, efficacy or quality of its potential products;
- the results of the Company's clinical trials may not meet the level of statistical or clinical significance required by the FDA or comparable foreign regulatory authorities for marketing approval;
- the dosing of the Company's potential products in a particular clinical trial may not be at an optimal level;
- patients in the Company's clinical trials may suffer adverse effects for reasons that may or may not be related to the Company's potential products;
- the data collected from the Company's clinical trials may not be sufficient to support the submission of an NDA for the Company's potential products or to obtain regulatory approval in the United States, Europe, Japan, Canada, or elsewhere;
- the FDA or comparable foreign regulatory authorities may find deficiencies in the manufacturing processes or facilities of third-party manufacturers with which the Company contracts for clinical and commercial supplies; and
- the approval policies or regulations of the FDA or comparable foreign regulatory authorities may significantly change in a manner rendering the Company's clinical data insufficient for approval.

The FDA and other comparable foreign regulatory authorities have substantial discretion in the approval process and may refuse to accept any application or may decide that the Company's data is insufficient for approval and require additional clinical trials, or other studies. In addition, varying interpretations of the data obtained from preclinical studies and clinical trials could delay, limit or prevent regulatory approval of the Company's potential products. ESSA, or ESSA's future collaborative partner, if any, must obtain and maintain regulatory authorization to conduct clinical trials. ESSA's preclinical research is subject to good laboratory practice, or GLP and other requirements and ESSA's clinical research is subject to good clinical practice, or GCP and other requirements. Failure to adhere to these requirements could invalidate ESSA's data. In addition, the relevant regulatory authority or independent review board may modify, suspend or terminate a clinical trial at any time for various reasons, including a belief that the risks to study subjects outweigh the benefits. Further, the process of obtaining regulatory approvals is expensive, often takes many years, if approval is obtained at all, and can vary substantially based upon, among other things, the type, complexity and novelty of the prescription product candidates involved, the jurisdiction in which regulatory approval is sought and the substantial discretion of the regulatory authorities. If regulatory approval is obtained in one jurisdiction, it does not necessarily mean that ESSA's potential products will receive regulatory approval in all jurisdictions in which the Company may seek approval, or any regulatory approval obtained may not be as broad as what was obtained in other jurisdictions. However, the failure to obtain approval for ESSA's potential products in one or more jurisdictions may negatively impact the Company's ability to obtain approval in a different jurisdiction. Accordingly, despite ESSA's expenditures and investment of time and effort, it may be unable to receive required regulatory approvals for product candidates developed by it. If a significant portion of these development efforts are not successfully completed, required regulatory approvals are not obtained, or any approved products are not commercially successful, ESSA's business, financial condition and results of operations may be materially harmed.

The Company will also need to obtain FDA approval for any proposed product candidate names, and any failure or delay associated with such approval may adversely affect the business. The FDA typically conducts a review of proposed product candidate names, including an evaluation of the potential for confusion with other product names. The FDA may also object to a product name if it believes the name inappropriately implies certain medical claims or contributes to an overstatement of efficacy. If the FDA objects to any product candidate names, ESSA may be required to adopt an alternative name for product candidates.

*As an organization, ESSA has never submitted an NDA/NDS and may be unable to do so for any future products ESSA develops.*

ESSA is currently undergoing a Phase 1 clinical trial for masofaniten (EPI-7386). ESSA will need to conduct Phase 2 and Phase 3 clinical trials, which it has not previously undertaken. The conduct of Phase 3 clinical trials and the submission of a successful IND or CTA and NDA or NDS is a complicated process. As an organization, ESSA has limited experience in preparing, submitting and prosecuting regulatory filings and has not submitted an NDA or NDS. ESSA's interactions with the FDA to date have been limited to the completed EPI-506 clinical trial and the initiation of the Phase 1 clinical trial for masofaniten (EPI-7386). Consequently, even if ESSA's initial clinical trials are successful, the Company may be unable to successfully and efficiently execute and complete necessary clinical trials in a way that leads to NDA or NDS submission and approval of ESSA's proposed products or any other future product candidate ESSA may develop. The Company may require more time and incur greater costs than competitors and may not succeed in obtaining regulatory approvals of products that the Company develops. Failure to commence or complete, or delays in, ESSA's planned clinical trials, would prevent ESSA from or delay ESSA in commercializing proposed products or any other future product candidate ESSA develops.

*ESSA may not be able to successfully commercialize its Aniten series of compounds.*

Even if a candidate from ESSA's Aniten series were to be successfully developed and obtain approval from the FDA and comparable foreign regulatory authorities, any approval might contain significant limitations related to use restrictions for specified age groups, warnings, precautions or contraindications, may be subject to burdensome post-approval study or risk management requirements, or may be limited to a subset of CRPC patients with limited commercial value. If ESSA is unable to obtain regulatory approval in one or more jurisdictions, or any approval contains significant limitations, ESSA may not be able to obtain sufficient funding or generate sufficient revenue to continue the development of any other future product candidates that ESSA may discover, in-license, develop or acquire in the future. Also, any regulatory approval of any future product candidates, once obtained, may be withdrawn. Furthermore, even if ESSA obtains regulatory approval for a product candidate, the commercial success of such product candidate will depend on a number of factors, including the following:

- development of a commercial organization or establishment of a commercial collaboration with a commercial infrastructure;
- establishment of commercially viable pricing and approval for adequate reimbursement from third-party and government payors;
- the ability of ESSA's third-party manufacturers to manufacture quantities of the compound using commercially efficient processes and at a scale sufficient to meet anticipated demand and enable ESSA to reduce its cost of manufacturing;
- ESSA's success in educating physicians and patients about the benefits, administration and use of the compound;
- the availability, perceived advantages, relative cost, relative safety and relative efficacy of alternative and competing treatments;
- the effectiveness of ESSA's own or its potential strategic collaborators' marketing, sales and distribution strategy and operations;
- acceptance of the product candidate as safe and effective by patients and the medical community; and
- a continued acceptable safety profile of a product candidate following approval.

Many of these factors are beyond ESSA's control. If ESSA, or its potential commercialization collaborators, are unable to successfully commercialize a product candidate, ESSA may not be able to earn sufficient revenues to continue the Company's business.

***The Company's product candidate and potential future product candidates may have undesirable side effects when used alone or in combination with other approved products or investigational new drugs that may delay or prevent marketing approval or, if approval is received, require them to be taken off the market, require them to include safety warnings or otherwise limit their sales.***

Although any future product candidates will undergo safety testing, not all adverse effects of drugs can be predicted or anticipated. Unforeseen side effects from any of ESSA's product candidate and potential future product candidates when used alone or in combination with other approved products or investigational new drugs could arise either during clinical development or, if approved by regulatory authorities, after the approved product has been marketed. The results of any future clinical trials may show a product candidate causes undesirable or unacceptable side effects, which could interrupt, delay or halt clinical trials, and result in delay of, or failure to obtain, marketing approval from the FDA and other regulatory authorities, or result in marketing approval from the FDA and other regulatory authorities with restrictive label warnings, limited patient populations or potential product liability claims.

Patients in ESSA's planned clinical trials may in the future suffer significant adverse events or other side effects not observed in ESSA's nonclinical studies or previous clinical trials. If significant adverse events or other side effects are observed in any of ESSA's current or future clinical trials, ESSA may have difficulty recruiting patients to the clinical trials, patients may drop out of ESSA's trials, or ESSA may be required to abandon the trials or the Company's development efforts of that product candidate altogether or limit development to more narrow uses or subpopulations in which the undesirable side effects or other characteristics are less prevalent, less severe or more acceptable from a risk-benefit perspective. In addition, if masofaniten (EPI-7386) or any future product candidates ESSA may develop, are used in combination with other approved products, masofaniten (EPI-7386) or any future product candidates ESSA may develop may exacerbate adverse events associated with the approved product and it may not be possible to determine whether it was caused by ESSA's product or the one with which it was combined. Patients treated with masofaniten (EPI-7386) or any future candidates ESSA may develop, may also be undergoing surgical, radiation and chemotherapy treatments, which can cause side effects or adverse events that are unrelated to masofaniten (EPI-7386) or any future product candidates ESSA may develop, but may still impact the success of ESSA's clinical trials. The inclusion of critically ill patients in ESSA's clinical trials may result in deaths or other adverse medical events due to other therapies or medications that such patients may be using or due to the gravity of such patients' illnesses.

If any of ESSA's product candidate and potential future product candidates receive marketing approval and it or others later identify undesirable or unacceptable side effects caused by such products:

- regulatory authorities may require us to take ESSA's approved product off the market;
- regulatory authorities may require the addition of labeling statements, specific warnings, a contraindication or field alerts to physicians and pharmacies;
- it may be required to change the way the product is administered, conduct additional clinical trials or change the labeling of the product;
- it may be subject to limitations on how it may promote or distribute the product;
- sales of the product may decrease significantly;
- it may be subject to litigation or product liability claims; and
- ESSA's reputation may suffer.

Any of these events could prevent ESSA or its future collaborative partners from achieving or maintaining market acceptance of the affected product or could substantially increase commercialization costs and expenses, which in turn could delay or prevent ESSA from generating significant revenue from the sale of ESSA's products.

***If ESSA, or any of ESSA's partners are unable to enroll and/or maintain subjects in clinical trials, ESSA will be unable to complete its clinical development activities on a timely basis or at all.***

Patient enrollment is a significant factor in the timing of clinical trials, and the timing of ESSA's or ESSA's partners clinical trials depends, in part, on the speed at which ESSA or ESSA's partners can recruit patients to participate in its trials, as well as completion of required follow-up periods. The Company or its partners may not be able to initiate or continue clinical trials for masofaniten (EPI-7386), or any future product candidate it may develop, if the Company or its partners are unable to locate and enroll a sufficient number of eligible patients to participate in these trials to such trial's conclusion as required by the FDA, or other comparable foreign regulatory authorities. Additionally, certain clinical trials for future product candidates may be focused on indications with relatively small patient populations, which may further limit enrollment of eligible patients or may result in slower enrollment than the Company or the Company's partners anticipate. The eligibility criteria of ESSA or ESSA's partners clinical trials, once established, may further limit the pool of available trial participants.

Enrollment of patients in ESSA or ESSA's partners clinical trials and maintaining patients in its ongoing clinical trials may be delayed or limited in the future if the Company or the Company's partners clinical trial sites have to limit their onsite staff or temporarily close as a result of the widespread health concerns, pandemics or epidemics, or other outbreaks of illness. In addition, patients may not be able to visit clinical trial sites for dosing or data collection purposes due to limitations on travel and physical distancing imposed or recommended by federal or state governments or patients' reluctance to visit the clinical trial sites during any such event. These factors could delay the anticipated readouts from the Company's or the Company's partners clinical trials and ultimately delay future regulatory submissions.

Patient enrollment may also be affected if ESSA's or ESSA's partners or competitors have ongoing clinical trials for product candidates that are under development for the same indications as masofaniten (EPI-7386), or any future product candidate the Company or the Company's partners or competitors may develop, and patients who would otherwise be eligible for ESSA's or ESSA's partners clinical trials instead enroll in clinical trials of a competitors' product candidates. Patient enrollment for any of the Company's or the Company's partners clinical trials may be affected by other factors, including:

- the size and nature of the patient population;
- severity of the disease under investigation;
- availability and efficacy of approved drugs for the disease under investigation;
- patient eligibility criteria for the trial in question as defined in the protocol;
- perceived risks and benefits of the product candidate under study;
- clinicians' and patients' perceptions as to the potential advantages of the product candidate being studied in relation to other available therapies, including any new products that may be approved for the indications ESSA is investigating;
- the efforts to facilitate timely enrollment in clinical trials;
- patient referral practices of physicians;
- the ability to monitor patients adequately during and after treatment;
- proximity and availability of clinical trial sites for prospective patients;
- continued enrollment of prospective patients by clinical trial sites; and
- the risk that patients enrolled in clinical trials will drop out of the trials before completion or, because they may be late-stage cancer patients, will not survive the full terms of the clinical trials.

Furthermore, ESSA's or ESSA's partners' plans to rely on clinical research organizations ("CROs") and clinical trial sites to ensure the proper and timely conduct of the Company's or the Company's partners clinical trials, and while the Company has agreements governing their committed activities, the Company has limited influence over their actual performance.

If ESSA experiences delays in the completion or termination of any clinical trial of any future product candidates, the commercial prospects of product candidates will be harmed, and ESSA's or ESSA's partners ability to generate product revenues from any of these product candidates will be delayed. In addition, any delays in completing ESSA's or ESSA's partners' clinical trials will increase costs, slow down product candidate development and approval process and could shorten any periods during which ESSA or ESSA's partners may have the exclusive right to commercialize product candidates or allow competitors to bring products to market before ESSA or ESSA's partners does, and jeopardize ESSA's or ESSA's partners ability to commence product sales, which would impair ESSA's or ESSA's partners ability to generate revenues and may harm ESSA's or ESSA's partners business, results of operations, financial condition and cash flows and future prospects. In addition, a delay in the commencement or completion of clinical trials may also ultimately lead to the denial of regulatory approval of ESSA's or ESSA's partners proposed products or future product candidates.

***ESSA may conduct trials for future product candidates at sites outside the United States and the FDA may not accept data from trials conducted in such locations.***

ESSA may in the future choose to conduct more clinical trials outside the United States. Although the FDA may accept data from clinical trials conducted outside the United States, acceptance of this data is subject to certain conditions imposed by the FDA. For example, the clinical trial must be well designed and conducted and performed by qualified investigators of recognized competence and pursuant to GCP requirements. The trial population must also adequately represent the U.S. population, and the data must be applicable to the U.S. population and U.S. medical practice in ways that the FDA deems clinically meaningful. The FDA must be able to validate the data through an on-site inspection or other appropriate means. In addition, while these clinical trials are subject to the applicable local laws, FDA acceptance of the data will be dependent upon its determination that the studies also complied with all applicable U.S. laws and regulations. There can be no assurance the FDA will accept data from trials conducted outside of the United States. If the FDA chooses to not accept data collected outside the United States, it would likely result in the need for additional trials, which would be costly and time-consuming and delay or permanently halt the development of the Company's proposed products or any future product candidates.

***Even if the Company obtains marketing approval for any product candidate and potential future products, the Company will be subject to ongoing obligations and continued regulatory review, which may result in significant additional expense.***

Even if the Company obtains U.S., Canadian or European regulatory approval for a future product candidate, which would not occur until the Company successfully completes multiple clinical trials, including Phase 3 clinical trials, the FDA, TPD or EMA may still impose significant restrictions on its indicated uses or marketing or the conditions of approval, or impose ongoing requirements for potentially costly and time-consuming post-approval studies, including Phase 4 clinical trials or clinical outcome studies and post-market surveillance to monitor the safety and efficacy of ESSA's potential products. Even if the Company secures U.S., Canadian or European regulatory approval, the Company would continue to be subject to ongoing regulatory requirements governing manufacturing, labeling, packaging, storage, quality assurance, distribution, import, export, safety surveillance, advertising, promotion, recordkeeping and reporting of adverse events and other post-market information. These requirements include registration with the FDA, as well as continued compliance with GCP obligations, for any clinical trials that the Company conducts post approval. In addition, manufacturers of drug products and their facilities are subject to continual review and periodic inspections by the FDA and other regulatory authorities for compliance with current cGMP requirements relating to quality control, quality assurance and corresponding maintenance of records and documents.

With respect to any product candidates for which ESSA obtains regulatory approval, ESSA will be subject to post-marketing regulatory obligations, including the requirements by the FDA, EMA and similar agencies in other jurisdictions to maintain records regarding product safety and to report to regulatory authorities serious or unexpected adverse events. Compliance with extensive post-marketing record keeping and reporting requirements requires a significant commitment of time and funds, which may limit ESSA's ability to successfully commercialize approved products.

In addition, manufacturing of approved drug products must comply with extensive regulations governing cGMP. Manufacturers and their facilities are subject to continual review and periodic inspections. As ESSA will be dependent on third parties for manufacturing, ESSA will have limited ability to ensure that any entity manufacturing products on its behalf is doing so in compliance with applicable cGMP requirements. Failure or delay by any manufacturer of ESSA's

products to comply with cGMP regulations or to satisfy regulatory inspections could have a material adverse effect on ESSA, including potentially preventing ESSA from being able to supply products for clinical trials or commercial sales. In addition, manufacturers may need to obtain approval from regulatory authorities for product, manufacturing, or labeling changes, which requires time and money to obtain and can cause delays in product availability. ESSA is also required to comply with good distribution practices such as maintenance of storage and shipping conditions, as well as security of products, in order to ensure product quality determined by cGMP is maintained throughout the distribution network. In addition, ESSA is subject to regulations governing the import and export of its products.

Sales and marketing of pharmaceutical products are subject to extensive federal and state or other laws governing on-label and off-label advertising, scientific/educational grants, gifts, consulting and pricing and are also subject to consumer protection and unfair competition laws. Compliance with these extensive regulatory requirements will require training and monitoring of any future sales force, which will impose a substantial cost on ESSA and ESSA's collaborators. To the extent any future ESSA products are marketed by collaborators, ESSA's ability to ensure their compliance with applicable regulations will be limited.

***Failure to comply with applicable legal and regulatory requirements may result in administrative or judicial sanctions.***

If the Company or a regulatory agency discovers previously unknown problems with a product, such as adverse events of unanticipated severity or frequency, lack of efficacy, problems with the facility where the product is manufactured, or the Company or its manufacturers fail to comply with applicable regulatory requirements, the Company may be subject to the following administrative or judicial sanctions:

- restrictions on the marketing or manufacturing of the product, withdrawal of the product from the market, or voluntary or mandatory product recalls;
- issuance of warning letters or untitled letters;
- clinical holds;
- injunctions or the imposition of civil or criminal penalties or monetary fines;
- suspension or withdrawal of regulatory approval;
- suspension of any ongoing clinical trials;
- refusal to approve pending applications or supplements to approved applications filed by the Company, or suspension or revocation of product license approvals;
- suspension or imposition of restrictions on operations, including costly new manufacturing requirements;
- withdrawal of the product from the market and product recalls; or
- product seizure or detention or refusal to permit the import or export of product.

The occurrence of any event or penalty described above may inhibit the Company's ability to commercialize potential products and generate revenue. Adverse regulatory action, whether pre- or post-approval, can also potentially lead to product liability claims and increase the Company's product liability exposure.

In the future, the regulatory climate might change due to changes in the FDA and other regulatory authorities' staffing, policies or regulations and such changes could impose additional post-marketing obligations or restrictions and related costs. While it is impossible to predict future legislative or administrative action, if the Company is not able to maintain regulatory compliance, the Company will not be able to market its drugs and its business could suffer.

***If clinical trials for ESSA's product candidate and potential future product candidates are prolonged, delayed or stopped, ESSA may be unable to obtain regulatory approval and commercialize such product candidates on a timely basis, or at all, which would require ESSA to incur additional costs and delay receipt of any product revenue.***

ESSA may experience delays in any future preclinical studies or clinical trials, and ESSA does not know whether future preclinical studies or clinical trials will begin on time, need to be redesigned, enroll an adequate number of patients on time or be completed on schedule, if at all. The commencement of these planned clinical trials could be substantially delayed or prevented by several factors, including:

- discussions with the FDA or other regulatory agencies regarding the scope or design of ESSA's clinical trials;

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 39 of 110    Document 29-1

- the limited number of, and competition for, suitable sites to conduct ESSA's clinical trials, many of which may already be engaged in other clinical trial programs, including some that may be for the same indication as ESSA's product candidates;
- any delay or failure to obtain regulatory approval or agreement to commence a clinical trial in any of the countries where enrollment is planned;
- subjects choosing an alternative treatment for the indication for which ESSA is developing masofaniten (EPI-7386), or participating in competing clinical trials;
- inability to obtain sufficient funds required for a clinical trial;
- clinical holds on, or other regulatory objections to, a new or ongoing clinical trial;
- delay or failure to manufacture sufficient supplies of the product candidate or obtaining sufficient quantities of combination therapies for ESSA's clinical trials;
- delay or failure to reach agreement on acceptable clinical trial agreement terms or clinical trial protocols with prospective sites or CROs, the terms of which can be subject to extensive negotiation and may vary significantly among different sites or CROs;
- delay or failure to obtain IRB approval to conduct a clinical trial at a prospective site, precluding enrollment of additional subjects, or withdrawing their approval of the trial;

The completion of ESSA's clinical trials, once started, could also be substantially delayed or prevented by several factors, including:

- slower than expected rates of patient recruitment and enrollment;
- failure of patients to complete the clinical trial or to return for post-treatment follow-up;
- the inability to enroll a sufficient number of patients in studies to ensure adequate statistical power to detect statistically significant treatment effects;
- unforeseen safety issues, including severe or unexpected drug-related adverse effects experienced by patients, including possible deaths;
- lack of efficacy during clinical trials;
- termination of ESSA's clinical trials by one or more clinical trial sites;
- inability or unwillingness of patients or clinical investigators to follow ESSA's anticipated schedule or ESSA's clinical trial protocol, good clinical practices, or GCP, or other regulatory requirements;
- inability to monitor patients adequately during or after treatment by ESSA and/or ESSA's CROs;
- ESSA's CROs or clinical study sites failing to comply with regulatory requirements or meet their contractual obligations to ESSA in a timely manner, or at all, deviating from the protocol or dropping out of a study;
- the inability to produce or obtain sufficient quantities of the product candidate to complete clinical studies;
- the inability to scale up manufacture of the product candidate into a commercially acceptable formulation at reasonable cost;
- the inability to address any noncompliance with regulatory requirements or safety concerns that arise during the course of a clinical trial; and
- the need to repeat or terminate clinical trials as a result of inconclusive or negative results or unforeseen complications in testing.

Changes in regulatory requirements, policies and guidelines may also occur and ESSA may need to significantly amend clinical trial protocols to reflect these changes with appropriate regulatory authorities. Such changes may require ESSA to renegotiate terms with CROs or resubmit clinical trial protocols to IRBs for re-examination, which may impact the costs, timing or successful completion of a clinical trial. ESSA's clinical trials may be suspended or terminated at any time by the FDA, other regulatory authorities, the IRB overseeing the clinical trial at issue, any of ESSA's clinical trial sites with respect to that site, or ESSA, due to a number of factors, including:

- failure to conduct the clinical trial in accordance with regulatory requirements or ESSA's clinical protocols;
- unforeseen safety issues or any determination that a clinical trial presents unacceptable health risks;
- lack of adequate funding to continue the clinical trial due to unforeseen costs or other business decisions; and
- upon a breach or pursuant to the terms of any agreement with, or for any other reason by, current or future collaborators that have responsibility for the clinical development of any of ESSA's product candidates.

37

Product development costs for any of ESSA's potential products will increase if it has delays in testing or approval or if the Company needs to perform more or larger clinical studies than planned. Any delays in completing the Company's future clinical trials will increase its costs, slow down its development and approval process and jeopardize its ability to generate revenues. Any of these occurrences may have a material adverse effect on the Company's business, financial condition and prospects.

***ESSA relies on third parties to conduct its preclinical studies and clinical trials, and has entered into collaboration agreements with companies related to combination studies, in addition to the combination study the Company controls. If these third parties do not successfully carry out their contractual duties, fail to meet expected deadlines, or if unfavorable results related to combination studies are announced, this could have a negative impact on ESSA's reputation and substantially harm ESSA's business because it may not be able to obtain regulatory approval for or commercialize product candidates in a timely manner or at all.***

ESSA has extensively relied upon and plans to continue to extensively rely upon entities outside of its control, including independent clinical investigators, CROs and academic institutions, to monitor and manage data for its ongoing preclinical and clinical programs. ESSA relies on these parties for execution of its preclinical studies and clinical trials, and it controls only some aspects of their activities. Nevertheless, ESSA is responsible for ensuring that each of its studies and clinical trials is conducted in accordance with the applicable protocol and legal, regulatory and scientific standards, and ESSA's reliance on CROs and academic institutions does not relieve it of these responsibilities. ESSA also relies on third parties to assist in conducting its preclinical studies in accordance with GLP and the Animal Welfare Act requirements. ESSA and the third parties that it relies on are required to comply with federal regulations and current GCP, which are international standards meant to protect the rights and health of patients that are enforced by the FDA and comparable foreign regulatory authorities for all of ESSA's products in clinical development. Regulatory authorities enforce GCP through periodic inspections of trial sponsors, principal investigators and trial sites. If ESSA or any of the third parties it relies on fail to comply with applicable GCP, the clinical data generated in ESSA's clinical trials may be deemed unreliable and the FDA or comparable foreign regulatory authorities may require ESSA to perform additional clinical trials before approving ESSA's marketing applications. ESSA cannot assure you that upon inspection by a given regulatory authority, such regulatory authority will determine that any of its clinical trials comply with GCP requirements. In addition, ESSA's clinical trials must be conducted with product produced under cGMP requirements. Failure to comply with these regulations may require ESSA to repeat preclinical studies and clinical trials, which would delay the regulatory approval process.

ESSA has ongoing combination studies with Astellas and Pfizer, Janssen, and Bayer, not all of which are under ESSA's control. These combination studies involve additional risks due to their reliance on circumstances outside of ESSA's control, such as those relating to the availability and marketability of the third-party product in the study. In addition, because we have established collaborations with leading biotechnology and pharmaceutical companies, we may be subject to greater reputational risk depending on the outcomes of the combination studies conducted through these collaborations.

The third parties that ESSA relies upon are not its employees, and except for remedies available to the Company under its agreements with such third parties, ESSA cannot control whether or not they devote sufficient time and resources to the Company's ongoing clinical, nonclinical and preclinical programs. Academic institutions may not operate under the same commercial standards as other third-party CROs that undertake such work and may not be able to devote adequate time and resources to preclinical studies. These third parties may also have relationships with other commercial entities, including ESSA's competitors, for whom they may also be conducting clinical trials or other product development activities, which could affect their performance on ESSA's behalf. Switching or adding additional CROs or academic institutions would involve additional cost and would require management time and focus. The CROs and academic institutions that ESSA relies on have the right to terminate their agreements with the Company in the event of an uncured material breach. If any of ESSA's relationships with CROs and academic institutions terminate, the Company could experience a significant delay in identifying, qualifying and managing performance of a comparable third-party service provider, which could adversely affect its development programs. In addition, there is a natural transition period when a new CRO or academic institution commences work and the new CRO or academic institution may not provide the same type or level of services as the original provider. ESSA may not be able to enter into arrangements with alternative CROs or academic institutions or be able to do so on commercially reasonable terms.

If independent clinical investigators, CROs or academic institutions do not successfully carry out their contractual duties or obligations or meet expected deadlines, or if the quality or accuracy of the preclinical or clinical data they obtain is compromised due to the failure to adhere to our protocols, regulatory requirements or for other reasons, ESSA's preclinical or clinical trials may be extended, delayed or terminated and we may not be able to obtain regulatory approval for or successfully commercialize future product candidates. As a result, ESSA's results of operations and the commercial prospects for its future product candidates would be harmed, its costs could increase and its ability to generate revenues could be delayed.

Because ESSA has relied on third parties, its internal capacity to perform these functions is limited. Outsourcing these functions involves risk that third parties may not perform to ESSA's standards, may not produce results in a timely manner or may fail to perform at all. In addition, the use of third-party service providers requires ESSA to disclose our proprietary information to these parties, which could increase the risk that this information will be misappropriated. ESSA currently has a small number of employees, which limits the internal resources we have available to identify and monitor third-party providers. To the extent ESSA is unable to identify and successfully manage the performance of third-party service providers in the future, its business may be adversely affected. Though ESSA carefully manages its relationships with CROs and academic institutions, there can be no assurance that it will not encounter challenges or delays in the future or that these delays or challenges will not have a material adverse impact on ESSA's business, results of operations, financial condition and cash flows and future prospects.

***ESSA has limited experience manufacturing product candidates on a large clinical or commercial scale and has no manufacturing facility. As a result, ESSA may in the future be dependent on third-party manufacturers for the manufacture of product candidates as well as on third parties for ESSA's supply chain, and if ESSA experiences problems with any future third parties, the manufacturing of ESSA's product candidates or products could be delayed.***

ESSA does not own or operate facilities for the manufacture of future potential product candidates. ESSA currently has no plans to build internal clinical or commercial scale manufacturing capabilities. ESSA relies on collaborators either directly or through third-party contract manufacturing organizations, or CMOs, for the manufacture of active pharmaceutical ingredients for ESSA's product candidates for preclinical testing and clinical trials and intends to do so for the future commercial manufacturing of its products. Also, ESSA may potentially rely on other CMOs for the production of the final product formulation. To meet ESSA's projected potential needs for clinical supplies to support its activities through regulatory approval and commercial manufacturing, the CMOs with whom ESSA works and may potentially work will need to increase the scale of production. ESSA may need to identify additional CMOs for continued production of supply for product candidates in the event the current potential CMOs ESSA chooses to utilize are unable to scale production, or if ESSA otherwise experiences any problems with them. Although alternative third-party suppliers with the necessary manufacturing and regulatory expertise and facilities exist, it could be expensive and take a significant amount of time to arrange for alternative suppliers. ESSA may encounter technical difficulties or delays in the transfer of any future potential product manufacturing on a commercial scale to additional third-party manufacturers. ESSA may be unable to enter into agreements for commercial supply with third-party manufacturers, or may be unable to do so on acceptable terms. If ESSA is unable to arrange for alternative third-party manufacturing sources or to do so on commercially reasonable terms or in a timely manner, ESSA may not be able to complete development of its potential product candidates, market or distribute them.

Reliance on third-party manufacturers entails risks to which ESSA would not be subject if ESSA manufactured product candidates or products ourselves, including reliance on the third-party for regulatory compliance and quality assurance, the possibility of breach of the manufacturing agreement by the third-party because of factors beyond ESSA's control, including a failure to synthesize and manufacture product candidates or any products ESSA may eventually commercialize in accordance with ESSA's specifications and the possibility of termination or nonrenewal of the agreement by the third party, based on its own business priorities, at a time that is costly or damaging to ESSA. In addition, the FDA and other regulatory authorities require that ESSA's product candidates and any products that ESSA may eventually commercialize be manufactured according to cGMP and similar foreign standards. Any failure by ESSA's third-party manufacturers to comply with cGMP or failure to scale up manufacturing processes, including any failure to deliver sufficient quantities of product candidates in a timely manner, could lead to a delay in, or failure to obtain, regulatory approval of any of ESSA's potential product candidates and could cause ESSA to incur higher costs and prevent ESSA from commercializing product candidates successfully. In addition, such failure could be the basis for the FDA to issue a warning letter, withdraw approvals for product candidates previously granted to ESSA, or take other regulatory or legal action, including recall or

seizure of outside supplies of the product candidate, total or partial suspension of production, suspension of ongoing clinical trials, refusal to approve pending applications or supplemental applications, detention or product, refusal to permit the import or export of products, injunction, or imposing civil and criminal penalties.

Any significant disruption in ESSA's supplier relationships could harm the Company's business. Any significant delay in the supply of a product candidate or its key materials for a potential ongoing clinical study could considerably delay completion of ESSA's potential clinical trials, product testing and regulatory approval of ESSA's potential product candidates. If ESSA's manufacturers or ESSA is unable to purchase these key materials after regulatory approval has been obtained for ESSA's product candidates, the commercial launch of ESSA's product candidates would be delayed or there would be a shortage in supply, which would impair ESSA's ability to generate revenues from the sale of its product candidates. It may take several years to establish an alternative source of supply for ESSA's product candidates and to have any such new source approved by the FDA.

***Failure to obtain regulatory approval in international jurisdictions would prevent any product candidates from being marketed outside the United States.***

In order to market and sell ESSA's products in the European Union and many other jurisdictions, it must obtain separate marketing approvals and comply with numerous and varying regulatory requirements. The approval procedure varies among countries and can involve additional testing. The time required to obtain approval may differ substantially from that required to obtain FDA approval. The regulatory approval process outside of the United States generally includes all of the risks associated with obtaining FDA approval. In addition, in many countries outside the United States, it is required that the product be approved for reimbursement before the product can be approved for sale in that country. Obtaining foreign regulatory approvals and compliance with foreign regulatory requirements could result in significant delays, difficulties and costs for ESSA and could delay or prevent the introduction of its potential products in certain countries. ESSA may not obtain approvals from regulatory authorities outside the United States on a timely basis, if at all. A failure or delay in obtaining regulatory approval in one country may have a negative effect on the regulatory approval process in others. ESSA may not be able to file for marketing approvals and may not receive necessary approvals to commercialize its potential products in any market. If ESSA is unable to obtain approval of any of its future product candidates by regulatory authorities in the European Union or another jurisdiction, the commercial prospects of that product candidate may be significantly diminished and its business prospects could decline.

***Recently enacted and future legislation may increase the difficulty and cost for the Company to obtain marketing approval of, and commercialize, its products and affect the prices the Company may obtain.***

In the United States and internationally there have been a number of legislative and regulatory changes and proposed changes regarding the healthcare system that could prevent or delay marketing approval for ESSA's products, restrict or regulate post-approval activities and affect the Company's ability to profitably sell products. Legislative and regulatory proposals have been made to expand post-approval requirements and restrict sales and promotional activities for pharmaceutical products. The Company does not know whether additional legislative changes will be enacted, or whether the FDA regulations, guidance or interpretations will be changed, or what the impact of such changes on the marketing approvals of ESSA's products, if any, may be. In addition, increased scrutiny by the U.S. Congress of the FDA's approval process may significantly delay or prevent marketing approval, as well as subject the Company to more stringent product labeling and post-marketing testing and other requirements.

In recent years, the U.S. Congress has considered reductions in Medicare reimbursement levels for drugs administered by physicians. CMS also has authority to revise Medicare reimbursement rates and to implement Medicare coverage restrictions for some drugs. Cost reduction initiatives and changes in coverage implemented through legislation or regulation could decrease utilization of and reimbursement for any approved products, which in turn would affect the price ESSA can receive for those products, if approved. While Medicare regulations apply only to drug benefits for Medicare beneficiaries, private payors often follow Medicare coverage policy and payment limitations in setting their own reimbursement rates. Therefore, any reduction in reimbursement that results from federal legislation or regulation may result in a similar reduction in payments from private payors.

In March 2010, the Patient Protection and Affordable Care Act (the "ACA") was signed into law. This law, which was intended to broaden access to health insurance, significantly impacted the pharmaceutical industry. Among other things,

the ACA imposed an annual fee on manufacturers of branded prescription drugs, increased the statutory minimum rebates a manufacturer must pay under the Medicaid Drug Rebate Program; expanded the healthcare fraud and abuse laws, implemented a Medicare Part D coverage gap discount program, in which manufacturers must agree to offer discounts off negotiated prices; expanded the eligibility criteria for Medicaid programs; expanded the entities eligible for discounts under the Public Health Service Act pharmaceutical pricing program; and imposed a number of substantial new compliance provisions related to pharmaceutical companies' interactions with healthcare practitioners.

Since its enactment, there have been judicial and Congressional challenges to certain aspects of the ACA. For example, the Tax Cuts and Jobs Act, signed into law by President Trump in 2017, effectively repealed the individual health insurance mandate, which is considered a key component of the ACA. In November 2020, the United States Supreme Court heard oral argument in a case regarding the constitutionality of the ACA and the individual mandate. The ongoing challenges to the ACA and new legislative proposals have resulted in uncertainty regarding the ACA's future viability and destabilization of the health care market. These reforms could have an adverse effect on anticipated revenue from product candidates that ESSA may successfully develop and for which ESSA may obtain marketing approval and may affect ESSA's overall financial condition and ability to develop or commercialize product candidates. For example, it is possible that efforts to repeal the ACA, if enacted into law, could ultimately result in fewer individuals having health insurance coverage or in individuals having insurance coverage with less generous benefits. The scope of potential future legislation to repeal and replace the ACA provisions is highly uncertain in many respects, as is the effect of such future legislation on ESSA's business and prospects.

In addition, other legislative changes have been proposed and adopted since the ACA was enacted. Beginning April 1, 2013, Medicare payments for all items and services, including drugs and biologics, were reduced by 2% under the sequestration (i.e., automatic spending reductions) required by the Budget Control Act of 2011. Although Medicare sequestration will remain in effect through 2027 unless additional Congressional action is taken, the Coronavirus Aid, Relief, and Economic Security (CARES) Act passed in March 2020 temporarily suspended Medicare sequestration from May 1, 2020, through December 31, 2020. Separately, in January 2013, the American Taxpayer Relief Act of 2012, among other things, further reduced Medicare payments to certain providers, and increased the statute of limitations period for the government to recover overpayments to providers from three to five years. New laws may result in additional reductions in Medicare and other healthcare funding, which may materially adversely affect future customer demand and affordability for any future our products, if approved and, accordingly, the results of our financial operations.

Further, the FDA's policies may change and additional government regulations may be enacted that could prevent, limit or delay regulatory approval of our product candidates. In response to the global COVID-19 pandemic, in March 2020 the FDA announced its intention to postpone most domestic and foreign inspections of manufacturing facilities, and regulatory authorities outside the United States adopted similar restrictions or other policy measures in response to the COVID-19 pandemic. Although the FDA resumed domestic on-site inspections in July 2021, inspections are being scheduled based upon each state's phase of reopening and the current intensity and risk of COVID-19 infections in a geographic region, and foreign inspections have not resumed. This or other decreases in FDA inspection or regulatory activity could delay regulatory approval of our product candidates. Changes to the FDA's policies and regulations may also impact our product candidates. For example, in December 2016, the 21st Century Cures Act ("Cures Act") was signed into law. The Cures Act, among other things, is intended to modernize the regulation of drugs and biologics and spur innovation, but its ultimate implementation is unclear. If we are slow or unable to adapt to changes in existing requirements or the adoption of new requirements or policies, or if we are not able to maintain regulatory compliance, we may lose any marketing approval that we may have obtained, which would adversely affect our business, prospects and ability to achieve or sustain profitability. In addition, on May 30, 2018, the Trickett Wendler, Frank Mongiello, Jordan McLinn, and Matthew Bellina Right to Try Act of 2017 ("Right to Try Act") was signed into law. The law, among other things, provides a federal framework for certain patients to access certain investigational new drug products that have completed a Phase 1 clinical trial and that are undergoing investigation for FDA approval. Under certain circumstances, eligible patients can seek treatment without enrolling in clinical trials and without obtaining FDA permission under the FDA expanded access program. There is no obligation for a drug manufacturer to make its drug products available to eligible patients as a result of the Right to Try Act. ESSA cannot be sure whether additional legislative changes will be enacted, or whether FDA regulations, guidance or interpretations will be changed, or what the impact of such changes on its product candidates, if any, may be.

The Company also cannot predict the likelihood, nature or extent of government regulation that may arise from future legislation or administrative or executive action in the United States. For example, there has been heightened governmental scrutiny recently over the manner in which pharmaceutical companies set and advertise prices for their marketed products, which have resulted in several Congressional inquiries and proposed federal legislation, as well as state efforts, designed to, among other things, bring more transparency to product pricing, reduce the cost of prescription drugs under Medicare, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drug products.

Individual states in the United States have also become increasingly active in passing legislation and implementing regulations designed to control pharmaceutical product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries, and bulk purchasing.

Further, on September 9, 2021, the Biden Administration published a wide-ranging list of policy proposals, most of which would need to be carried out by Congress, to reduce drug prices and drug payment. The United States Department of Health and Human Services ( "HHS") plan includes, among other reform measures, proposals to lower prescription drug prices, including by allowing Medicare to negotiate prices and disincentivizing price increases, and to support market changes that strengthen supply chains, promote biosimilars and generic drugs, and increase price transparency. These initiatives recently culminated in the enactment of the Inflation Reduction Act (the "IRA") in August 2022, which will, among other things, allow the HHS to negotiate the selling price of certain drugs and biologics that the Centers for Medicare & Medicaid Services ("CMS") reimburses under Medicare Part B and Part D, although only high-expenditure single-source drugs that have been approved for at least 7 years (11 years for biologics) can be selected by CMS for negotiation, with the negotiated price taking effect two years after the selection year. The negotiated prices, which will first become effective in 2026, will be capped at a statutory ceiling price beginning in October 2023, penalize drug manufacturers that increase prices of Medicare Part B and Part D drugs at a rate greater than the rate of inflation. The IRA permits the Secretary of HHS to implement many of these provisions through guidance, as opposed to regulation, for the initial years. Manufacturers that fail to comply with the IRA may be subject to various penalties, including civil monetary penalties. The IRA also extends enhanced subsidies for individuals purchasing health insurance coverage in ACA marketplaces through plan year 2025. These provisions will take effect progressively starting in 2023, although they may be subject to legal challenges.

We expect that additional state and federal healthcare reform measures will be adopted in the future, any of which could limit the amounts that federal and state governments will pay for healthcare products and services, which could result in reduced demand for any product candidates we successfully develop or additional pricing pressures. These and other potential reforms could have a significant impact on the pharmaceutical industry and on the development and potential future pricing of ESSA's product candidates.

Further, governments and regulatory authorities in Europe and other markets in which ESSA intends to sell its products may propose and adopt new legislation and regulatory requirements relating to pharmaceutical approval criteria and manufacturing requirements. Such legislation or regulatory requirements, or the failure to comply with such, could adversely impact ESSA's operations and could have a material adverse effect on ESSA's business, financial condition and results of operations.

In recent years, national, federal, provincial, state, and local officials and legislators have proposed, or are reportedly considering proposing, a variety of price-based reforms to the healthcare systems in the European Union, the United States and other countries. Some proposals include measures that would limit or eliminate payments for certain medical procedures and treatments or subject the pricing of pharmaceuticals to government control. Furthermore, in certain foreign markets, the pricing or profitability of healthcare products is subject to government controls and other measures that have been prepared by legislators and government officials. While ESSA cannot predict whether any such legislative or regulatory proposals or reforms will be adopted, the adoption of any such proposals or reforms could adversely affect the commercial viability of the Company's existing and potential products. Significant changes in the healthcare system in the European Union and other countries may have a substantial impact on the manner in which ESSA conducts its business. Such changes could also have a material adverse effect on ESSA's business, financial condition and results of operations.

**Risks Related to ESSA's Financial Position and Need for Additional Capital**

***ESSA will have significant additional future capital needs for future clinical trials and there are uncertainties as to the Company's ability to raise additional funding.***

Management has forecasted that ESSA's working capital will be sufficient to execute its planned operating expenses and capital expenditures for the coming fiscal year. On current plans, ESSA believes it has sufficient capital resources to fund its current and planned operations through 2025. The Company recognizes that despite a decreased cash outflow that may occur as a result of delays to clinical trials, general and administrative and other expenses will continue to be incurred which may impact the Company's cash runway. ESSA has based this estimate on assumptions that may prove to be wrong, and ESSA could use its capital resources sooner than it currently expects. Advancing ESSA's novel and proprietary therapies, or the acquisition and the development of any new products or product candidates will require considerable resources and additional access to capital. In addition, ESSA's future cash requirements may vary materially from those now expected. For example, ESSA's future capital requirements may increase if:

- the Company experiences setbacks in its progress with non-clinical studies or if ongoing or future clinical trials are delayed;
- the Company is required to perform additional non-clinical studies and clinical trials;
- the Company elects to develop, acquire or license new technologies, products or businesses;
- the Company experiences competition from other life sciences companies or in more markets than anticipated;
- the Company experiences delays or unexpected increases in connection with obtaining regulatory approvals in the various markets where ESSA hopes to sell its products;
- the Company experiences unexpected or increased costs relating to preparing, filing, prosecuting, maintaining, defending and enforcing patent claims, or other lawsuits, brought by either ESSA or ESSA's competition; or
- the Company experiences scientific progress sooner than expected in its discovery and R&D projects, if ESSA expands the magnitude and scope of these activities, or if ESSA changes its focus as a result of ESSA's discoveries.

ESSA could potentially seek additional funding through strategic collaborations, alliances and licensing arrangements, through public or private equity or debt financing, or through other transactions. However, if future sales are slow to increase or if capital market conditions in general, or with respect to life sciences companies such as ESSA's, are unfavorable, ESSA's ability to obtain significant additional funding on acceptable terms, if at all, will be negatively affected. There is no certainty that any such financing will be provided or provided on favorable terms.

If sufficient capital is not available, ESSA may be required to delay or abandon its business expansion or R&D projects, either of which could have a material adverse effect on ESSA's business, financial condition, prospects or results of operations.

***ESSA may not be able to raise additional capital on favorable terms, which may result in dilution to ESSA's existing shareholders, restrictions on ESSA's operations or the requirement for ESSA to relinquish rights to technologies or any future product candidates.***

Until the Company can generate substantial revenue from product sales, if ever, the Company expects to finance future cash needs through a combination of private and public equity offerings, debt financings, strategic collaborations and alliances and licensing arrangements. Additional financing that the Company may pursue may involve the sale of its Common Shares or financial instruments that are exchangeable for, or convertible into, its Common Shares, which could result in significant dilution to ESSA's shareholders and the terms may include liquidation or other preferences that adversely affect the rights of existing shareholders. Additional capital may not be available on reasonable terms, if at all. Furthermore, these securities may have rights senior to those of ESSA's Common Shares and could contain covenants that include restrictive covenants limiting ESSA's ability to take important actions and potentially impair ESSA's competitiveness, such as limitations on ESSA's ability to incur additional debt, make capital expenditures, acquire, sell or license intellectual property rights or declare dividends. If ESSA raises additional funds through strategic collaborations and alliances or licensing arrangements with third parties, ESSA may have to relinquish valuable rights to technologies or future product candidates, or grant licenses on terms that are not favorable to ESSA. If the Company is unable to raise additional funds when needed, the Company may be required to delay, limit, reduce or terminate its product development

43

or commercialization efforts or grant rights to develop and market product candidates that ESSA would otherwise prefer to develop and market ourselves.

***The Company was subject to the restrictions and conditions of the CPRIT Agreement for a period of time after receipt of the last grant payment. Failure to have complied with the CPRIT Agreement may materially and adversely affect ESSA's financial condition.***

ESSA relied on the CPRIT Grant to fund a portion of its preclinical and Phase 1 clinical development costs of clinical candidate EPI-506, which ceased development in September 2017. The total of the CPRIT Grant was US$12 million. The CPRIT Grant was subject to various requirements, including ESSA's compliance with the scope of work outlined in the CPRIT Agreement. If ESSA was found not to have complied with the terms of the CPRIT Agreement, or found to have used any grant proceeds for purposes other than intended, or found to have failed to maintain the required level of operations in the State of Texas for three years following the final payment of grant funds, CPRIT could determine that ESSA was in default of its obligations under the CPRIT Agreement and could, among other things, seek reimbursement of all proceeds of the CPRIT Grant received by ESSA. ESSA received and responded to a request in October 2018 for information from CPRIT regarding the nature and extent of the Company's operations in Texas. Although the Company believes it has at all times acted in compliance with the CPRIT Agreement and believes its response to CPRIT's request for information was satisfactory, there can be no assurance that CPRIT will agree with ESSA's determination. If ESSA is found to be in default under the CPRIT Agreement and such default is not waived by CPRIT, the Company could be required to reimburse a portion or all of the CPRIT Grant. Being required to reimburse a portion or all of the CPRIT Grant would impact ESSA's ongoing operations, which could materially and adversely affect its financial condition and results of operations.

***The Company has incurred significant losses in every quarter since its inception and anticipates that it will continue to incur significant losses in the future and may never generate profits from operations or maintain profitability.***

ESSA is a clinical stage pharmaceutical company with a limited operating history. Investment in pharmaceutical product development is highly speculative because it entails substantial upfront capital expenditures and significant risk that any potential product candidate will fail to demonstrate adequate effect or an acceptable safety profile, gain regulatory approval or become commercially viable. ESSA does not have any products approved by regulatory authorities for marketing or commercial sale and has not generated any revenue from product sales, or otherwise, to date. Furthermore, ESSA continues to incur significant research, development and other expenses related to its ongoing operations. As a result, ESSA is not profitable and has incurred losses in every reporting period since inception in 2009. For the years ended September 30, 2023 and September 30, 2022, ESSA reported net losses of $26,567,596 and $35,161,917, respectively. As of September 30, 2023, ESSA had an accumulated deficit since inception of $179,461,359.

The Company expects to continue to incur significant expenses and operating losses for the foreseeable future. ESSA anticipates these losses will increase as it continues the research and development of, and seeks regulatory approvals for, its product candidate and any of its potential future product candidates and potentially begins to commercialize any products that may achieve regulatory approval. ESSA may encounter unforeseen expenses, difficulties, complications, delays and other unknown factors that may adversely affect its financial condition. ESSA expects its financial condition and operating results to continue to fluctuate significantly from quarter to quarter and year to year due to a variety of factors, many of which are beyond ESSA's control. The size of ESSA's future net losses will depend, in part, on the rate of future growth of ESSA's expenses and ESSA's ability to generate revenues. The Company's prior losses and expected future losses have had and will continue to have an adverse effect on the Company's financial condition.

Even if the Company is able to commercialize any product candidate, there can be no assurance that the Company will generate significant revenues or ever achieve profitability.

The Company expects to continue to incur substantial losses for the foreseeable future, and these losses may be increasing. The Company is uncertain about when or if it will be able to achieve or sustain profitability. If the Company achieves profitability in the future, it may not be able to sustain profitability in subsequent periods. Failure to become and remain profitable would impair the Company's ability to sustain operations and adversely affect the price of the Common Shares and its ability to raise capital.

***ESSA has a limited operating history, which may make it difficult for you to evaluate the success of ESSA's business to date and to assess ESSA's future viability.***

The Company commenced operations in 2009, and its operations have been primarily limited to organizing and staffing ESSA, business planning, raising capital, establishing relationships with consultants and contract vendors with relevant expertise, acquiring the in-licensing of intellectual property, filing patent applications, discovering and developing novel small molecule product candidates, conducting preliminary preclinical research, preparing for and conducting early-stage clinical trials. ESSA is a development stage company with limited operating history and no revenue. As a development stage company ESSA may encounter unforeseen expenses, difficulties, complications, delays and other known or unknown factors. If the Company's trials are successful, ESSA will need to transition at some point from a company with a research and development focus to a company capable of supporting commercial activities. ESSA may not be successful in such a transition. ESSA has identified a product candidate, masofaniten (EPI-7386), to advance through clinical development but does not have any products ready for commercialization. Consequently, evaluating ESSA's performance, viability or future success will be more difficult than if ESSA had a longer operating history or approved products on the market.

**Risks Related to ESSA's Intellectual Property**

***ESSA relies on proprietary technology, the protection of which can be unpredictable and costly.***

The Company's activities depend, in part, on its ability to (i) obtain and maintain patents, trade secret protection and operate without infringing the intellectual proprietary rights of third parties, (ii) successfully defend these patents (including patents owned by or licensed to the Company) against third-party challenges and (iii) successfully enforce these patents against third-party competitors. There is no assurance that the Company will be granted such patents or proprietary technology or that such granted patents or proprietary technology will not be circumvented through the adoption of a competitive, though non-infringing, process or product. Failure to protect the Company's existing and future intellectual property rights could seriously harm its business and prospects and may result in the loss of its ability to exclude others from using the Company's technology or its own right to use the technologies. If the Company does not adequately ensure the right to use certain technologies, it may have to pay others for the right to use their intellectual property, pay damages for infringement or misappropriation or be enjoined from using such intellectual property. The Company's patents do not guarantee the right to use the technologies if other parties own intellectual property rights that are necessary in order to use such technologies. The Company's patent position is subject to complex factual and legal issues that may give rise to uncertainty as to the validity, scope and enforceability of a particular patent. The Company's and the Company's licensors' patents and patent applications, if issued, may be challenged, invalidated or circumvented by third parties. U.S. patents and patent applications may also be subject to interference proceedings, re-examination proceedings, derivation proceedings, post-grant review or inter partes review in the United States Patent and Trademark Office ("USPTO"), challenging the Company's or the Company's licensors' patent rights. Foreign patents may be subject also to opposition or comparable proceedings in the corresponding foreign patent office.

For example, in patent litigation in the United States and in some other jurisdictions, defendant counterclaims alleging invalidity and/or unenforceability are commonplace. Grounds for a validity challenge could be an alleged failure to meet any of several statutory requirements, for example, lack of novelty, obviousness, written description, indefiniteness, or non-enablement. Grounds for an unenforceability assertion could be an allegation that someone connected with prosecution of the patent withheld material information from the USPTO or the applicable foreign counterpart, or made a misleading statement, during prosecution. A litigant or third party could challenge the Company's patents on this basis even if the Company believes that it conducted its patent prosecution in accordance with the duty of candor and in good faith. The outcome following such a challenge is unpredictable.

In addition, it is possible that the Company or its licensors do not perfect ownership of all patents, patent applications or other intellectual property. This possibility includes the risk that the Company or its licensors does not identify all inventors, or identifies incorrect inventors, or that third parties pursue an ownership interest in the Company's patents, which may lead to claims disputing inventorship or ownership of ESSA's patents, patent applications or other intellectual property by former employees or other third parties. If ESSA fails in prosecuting or defending any such claims, in addition to paying monetary damages, ESSA may lose valuable intellectual property rights or personnel or sustain damages. ESSA may lose exclusive rights to their intellectual property rights and ESSA could be required to obtain a license from such third-party to commercialize ESSA's technology or products. Such a license may not be available on commercially

45

reasonable terms or at all. Even if ESSA is successful in defending against such claims, litigation could result in substantial costs and be a distraction to management.

If a defendant were to prevail on a legal assertion of invalidity, sole or joint ownership, and/or unenforceability, the Company would lose at least part, or perhaps all, of the patent protection on a product candidate. Even if a defendant does not prevail on a legal assertion of invalidity and/or unenforceability, the Company's patent claims may be construed in a manner that would limit its ability to enforce such claims against the defendant and others. The cost of defending such a challenge, and any resulting loss of patent protection, could have a material adverse impact on one or more of the Company's product candidates and its business.

Certain of ESSA's current or former employees, contractors or consultants, including senior management, were previously employed, or continue to be employed, at universities or other public institutions, or at other biotechnology or pharmaceutical companies, including ESSA's competitors or potential competitors. Some of these employees may have executed proprietary rights, nondisclosure and noncompetition agreements, in connection with such previous employment. ESSA may be subject to claims that ESSA, or these employees, have used or disclosed confidential information or intellectual property, including trade secrets or other proprietary information, of any such employee's former employer.

In addition, there is a risk that improved versions of ESSA's own product developed by third parties will be granted patent protection and compete with ESSA's products. For example, any patents ESSA obtains may not be sufficiently broad to prevent others from utilizing its technologies or from developing competing products and technologies. Third parties may attempt to circumvent ESSA's patents by means of alternative designs and processes or may independently develop similar products, duplicate any of ESSA's products not under patent protection, or design around the inventions ESSA claims in any of its existing patents, existing patent applications or future patents or patent applications. The actual protection afforded by a patent varies on a product-by-product basis, from country to country and depends upon many factors, including the type of patent, the scope of ESSA's coverage, the availability of regulatory related extensions, the availability of legal remedies in a particular country and the validity and enforceability of the patents. It is impossible to anticipate the breadth or degree of protection that patents will afford products developed by ESSA or their underlying technology.

In any case, there can be no assurance that:

- any rights under U.S., Canadian, or foreign patents owned by the Company or other patents that third parties license to the Company will not be curtailed;
- the Company was the first inventor of inventions covered by its issued patents or pending applications or that the Company was the first to file patent applications for such inventions;
- the Company's pending or future patent applications will be issued with the breadth of claim coverage sought by the Company, or be issued at all;
- the Company's competitors will not independently develop or patent technologies that are substantially equivalent or superior to the Company's technologies;
- third parties will not attempt to circumvent ESSA's patents by means of alternative designs and processes or that third parties will not also independently develop similar products, duplicate any of ESSA's products not under patent protection, or design around the inventions ESSA claims in any of the Company's existing patents, existing patent applications or future patents or patent applications;
- any of the Company's trade secrets will not be learned independently by its competitors; or
- the steps the Company takes to protect its intellectual property will be adequate.

In addition, effective patent, trademark, copyright and trade secret protection may be unavailable, limited or not sought in certain foreign countries. Further, countries ESSA may sell to may not protect its intellectual property to the same extent as the laws of the United States, Canada or Europe, and may lack rules and procedures required for defending ESSA's patents.

There is a risk that any patents issued relating to ESSA's products or any patents licensed to ESSA may be successfully challenged or that the practice of its products might infringe the patents of third parties. If the practice of ESSA's products infringes the patents of third parties, the Company may be required to design around such patents, potentially causing increased costs and delays in product development and introduction or precluding ESSA from developing, manufacturing or selling its planned products. In addition, disputes may arise as to the rights to know-how and inventions among ESSA's

employees and consultants who use intellectual property owned by others for the work performed for the Company. The scope and validity of patents which may be obtained by third parties, the extent to which ESSA may wish or need to obtain patent licenses and the cost and availability of such licenses are currently unknown. If such licenses are obtained, it is likely they would be royalty bearing, which could reduce ESSA's income. If licenses cannot be obtained on an economical basis, delays in market introduction of its planned products could occur or introduction could be prevented, in some cases causing the expenditure of substantial funds.

In certain instances, ESSA may elect not to seek patent protection but instead rely on the protection of the Company's technology through confidentiality agreements or trade secrets. There can be no assurance that these agreements will not be breached, that the Company will have adequate remedies for any breach or that such persons or institutions will not assert rights to intellectual property arising out of these relationships. The value of ESSA's assets could also be reduced to the extent that third parties are able to obtain patent protection with respect to aspects of ESSA's technology or products or that confidential measures ESSA has in place to protect the Company's proprietary technology are breached or become unenforceable. However, third parties may independently develop or obtain similar technology and such third parties may be able to market competing products and obtain regulatory approval through a showing of equivalency to one of ESSA's products which has obtained regulatory approval, without being required to undertake the same lengthy and expensive clinical studies that ESSA would have already completed. The cost of enforcing the Company's patent rights or defending rights against infringement charges by other patent holders may be significant and could limit operations.

Litigation may also be necessary to enforce patents issued or licensed to ESSA or to determine the scope and validity of a third party's proprietary rights. ESSA could incur substantial costs if the Company is required to defend itself in patent suits brought by third parties, if ESSA participates in patent suits brought against or initiated by ESSA's corporate collaborators or if ESSA initiates such suits. The Company may not have the necessary resources to participate in or defend any such activities or litigation. Even if ESSA did have the resources to vigorously pursue its interests in litigation, because of the complexity of the subject matter, it is impossible to predict whether ESSA would prevail in any such action. Any claims of patent infringement asserted by third parties may:

- divert the time and attention of the Company's technical personnel and management;
- cause product development or commercialization delays;
- require the Company to cease or modify its use of the technology and/or develop non-infringing technology; or
- require the Company to enter into royalty or licensing agreements.

If third parties successfully assert their intellectual property rights against ESSA, ESSA might be barred from using certain aspects of its intellectual property portfolio or barred from developing and commercializing certain products. Prohibitions against using certain technologies or prohibitions against commercializing certain products could be imposed by a court or by a settlement agreement between the Company and a plaintiff. In addition, if ESSA is unsuccessful in defending against allegations that it has infringed, misappropriated or otherwise violated patent or other intellectual property rights of others, the Company may be forced to pay substantial damage awards to a plaintiff. If litigation leads to an outcome unfavorable to the Company or in order to avoid or settle potential claims, the Company may choose or be required to seek a license from a third-party and be required to pay license fees or royalties or both, which could be substantial, in order to continue the Company's development or to commercialize any resulting product. It is possible that the necessary license will not be available to the Company on commercially acceptable terms, or at all. These licenses may not be available on acceptable terms, or at all. Even if the Company or any future collaborators were able to obtain a license, the rights may be nonexclusive, which could result in the Company's competitors gaining access to the same intellectual property. Ultimately, the Company could be prevented from commercializing a product, or be forced, by court order or otherwise, to cease some or all aspects of its business operations, if, as a result of actual or threatened patent or other intellectual property claims, we are unable to enter into licenses on acceptable terms. Alternatively, the Company may be required to modify or redesign its current or future products, if any, in order to avoid infringing or otherwise violating third-party intellectual property rights. This may not be technically or commercially feasible, may render those products less competitive, or may delay or prevent the entry of those products to the market. Further, the Company could be found liable for significant monetary damages as a result of claims of intellectual property infringement.

An adverse outcome in litigation, or interference or derivation proceeding to determine priority or other proceeding in a court or patent or selling office could subject ESSA to significant liabilities, require disputed rights to be licensed from

47

third parties or require ESSA to cease using certain technology or products, any of which may have a material adverse effect on the Company's business, financial condition and results of operations.

***ESSA may not be able to protect its intellectual property rights throughout the world.***

Filing, prosecuting and defending patents on ESSA's product candidate and potential future product candidates throughout the world would be prohibitively expensive. In addition, the laws of some foreign countries do not protect intellectual property rights to the same extent as federal and state laws in the United States or federal and provincial laws in Canada. Consequently, ESSA may not be able to prevent third parties from practicing its inventions in all countries outside the United States or Canada, or from selling or importing products made using its inventions in and into the United States, Canada or other jurisdictions. Competitors may use ESSA's technologies in jurisdictions where it has not obtained patent protection to develop their own products and may export otherwise infringing products to territories where ESSA has patent protection, but where enforcement is not as strong as that in the United States or Canada. These products may compete with ESSA's products in jurisdictions where it does not have any issued patents and its patent claims or other intellectual property rights may not be effective or sufficient to prevent them from so competing.

Many companies have encountered significant problems in protecting and defending intellectual property rights in foreign jurisdictions. The legal systems of certain countries, particularly certain developing countries, do not favor the enforcement of patents and other intellectual property protection, particularly those relating to biopharmaceuticals, which could make it difficult for ESSA to stop the infringement, misappropriation or violation of its patents or ESSA's licensors patents, or marketing of competing products in violation of its proprietary rights generally. Proceedings to enforce ESSA's patent rights in foreign jurisdictions could result in substantial cost and divert its efforts and attention from other aspects of its business, could put ESSA's patents or the patents of ESSA's licensors at risk of being invalidated or interpreted narrowly, could put ESSA's patent applications or the patent applications of ESSA's licensors at risk of not issuing and could provoke third parties to assert claims against ESSA. ESSA may not prevail in any lawsuits that it initiates and the damages or other remedies awarded, if any, may not be commercially meaningful.

The requirements for patentability may differ in certain countries, particularly developing countries. For example, unlike other countries, China has a heightened requirement for patentability, and specifically requires a detailed description of medical uses of a claimed drug. In India, unlike the United States, there is no link between regulatory approval of a drug and its patent status. Furthermore, generic or biosimilar drug manufacturers or other competitors may challenge the scope, validity or enforceability of ESSA's patents, requiring it to engage in complex, lengthy and costly litigation or other proceedings. Generic or biosimilar drug manufacturers may develop, seek approval for, and launch biosimilar versions of ESSA's products. In addition to India, certain countries in Europe and developing countries, including China, have compulsory licensing laws under which a patent owner may be compelled to grant licenses to third parties. In those countries, ESSA may have limited remedies if patents are infringed or if it is compelled to grant a license to a third-party, which could materially diminish the value of those patents. This could limit ESSA's potential revenue opportunities. Accordingly, ESSA's efforts to enforce intellectual property rights around the world may be inadequate to obtain a significant commercial advantage from the intellectual property that it owns or licenses.

***Obtaining and maintaining ESSA's patent protection depends on compliance with various procedural, documentary, fee payment and other requirements imposed by regulations and governmental patent agencies, and ESSA's patent protection could be reduced or eliminated for non-compliance with these requirements.***

Periodic maintenance fees, renewal fees, annuity fees and various other governmental fees on patents and/or applications will be due to the USPTO and other foreign patent agencies in several stages over the lifetime of ESSA's patents and/or applications. ESSA has systems in place to remind the Company to pay these fees. The USPTO and various foreign governmental patent agencies require compliance with a number of procedural, documentary, fee payment and other similar provisions during the patent application process. ESSA employs reputable law firms to help the Company comply, and in many cases, an inadvertent lapse can in many cases be cured by payment of a late fee or by other means in accordance with the applicable rules to the relevant jurisdiction. However, there are situations in which noncompliance can result in abandonment or lapse of the patent or patent application, resulting in partial or complete loss of patent rights in the relevant jurisdiction. Non-compliance events that could result in abandonment or lapse of a patent or patent application include, but are not limited to, failure to respond to official actions within prescribed time limits, non-payment of fees and failure to properly legalize and submit formal documents. If ESSA or its future potential licensors fail to

maintain the patents and patent applications covering product candidates, ESSA's competitive position would be adversely affected.

Depending upon the timing, duration and conditions of FDA marketing approval of ESSA's product candidates, one or more of our U.S. patents may be eligible for limited patent term extension under the Drug Price Competition and Patent Term Restoration Act of 1984, referred to as the Hatch-Waxman Amendments. The Hatch-Waxman Amendments permit a patent term extension of up to five years for a patent covering an approved product as compensation for effective patent term lost during product development and the FDA regulatory review process. However, the Company may not receive an extension if it fails to apply within applicable deadlines, fails to apply prior to expiration of relevant patents or otherwise fails to satisfy applicable requirements. Moreover, the length of the extension could be less than the Company requests. If the Company is unable to obtain patent term extension or the term of any such extension is less than it requests, the period during which the Company can enforce its patent rights for that product will be shortened and the Company's competitors may obtain approval to market competing products sooner. As a result, the Company's revenue from applicable products could be reduced, possibly materially. Further, if this occurs, ESSA's competitors may take advantage of the Company's investment in development and trials by referencing the Company's clinical and preclinical data and launch their product earlier than might otherwise be the case.

***Confidentiality Agreements with employees and third parties may not prevent unauthorized disclosure of Company proprietary information, which would harm ESSA's competitive position.***

In addition to patents, ESSA relies on technical know-how and proprietary information concerning the Company's, business strategy and product candidates in order to protect its competitive position. ESSA's employees are required to sign agreements which protect the Company's proprietary information and intellectual property rights. In the course of ESSA's research and development activities and its business activities and operations, the Company relies on confidentiality and service agreements with its third-party service providers, consultants and contractors, to protect its proprietary information and intellectual property rights. Such assignment agreements may be breached, and the Company may be forced to bring claims against third parties, or defend claims that third parties may bring against the Company. In addition, the Company's employees, consultants, contractors, business partners or outside scientific collaborators may intentionally or inadvertently disclose the Company's proprietary information in breach of these agreements. Third parties working collaboratively with ESSA may have certain rights to publish data and may fail to notify ESSA of such publication and ESSA in turn may fail to apply for patent protection prior to such disclosure. It is possible that a competitor may make use of such information disclosure, and that ESSA's competitive position could be compromised. Enforcing a claim that a third party illegally obtained and is using any of ESSA's proprietary information is expensive and time consuming, and the outcome may be unpredictable. In addition, courts outside the U.S. sometimes may be less willing than U.S. courts to protect proprietary information and know-how. Moreover, the Company's competitors may independently develop equivalent knowledge, methods and know-how. If the Company cannot maintain the confidentiality of its proprietary technology and other confidential information, then the Company's ability to obtain patent protection could be jeopardized, which could adversely affect ESSA's competitive position.

***If ESSA's trademarks and trade names are not adequately protected, the Company may not be able to build name recognition in its markets of interest and its business, financial condition, results of operations and prospects could be significantly harmed.***

ESSA intends to use registered or unregistered trademarks or trade names to brand and market itself and its products. The Company's trademarks or trade names may be challenged, infringed, circumvented or declared generic or determined to be infringing on other marks. The Company may not be able to protect its rights to these trademarks and trade names, which it needs to build name recognition among potential partners or customers in its markets of interest. At times, competitors may adopt trade names or trademarks similar to ESSA's, thereby impeding its ability to build brand identity and possibly leading to market confusion. In addition, there could be potential trade name or trademark infringement claims brought by owners of other registered trademarks or trademarks that incorporate variations of the Company's registered or unregistered trademarks or trade names. Over the long term, if the Company is unable to establish name recognition based on its trademarks and trade names, then the Company may not be able to compete effectively, and its business, financial condition, results of operations and prospects may be significantly harmed. The Company's efforts to enforce or protect its proprietary rights related to trademarks, trade names, domain names, copyrights or other intellectual

49

property may be ineffective and could result in substantial costs and diversion of resources and could significantly harm its business, financial condition, results of operations and prospects.

***Intellectual property litigation may lead to unfavorable publicity that harms ESSA's reputation and causes the market price of its Common Shares to decline.***

During the course of any intellectual property litigation, there could be public announcements of the initiation of the litigation as well as results of hearings, rulings on motions, and other interim proceedings in such litigation. If securities analysts or investors regard these announcements as negative, the perceived value of the Company's existing products, programs or intellectual property could be diminished. Accordingly, the market price of shares of the Company's Common Shares may decline. Such announcements could also harm ESSA's reputation or the market for the Company's future products, which could significantly harm the Company's business, financial condition, results of operations and prospects.

***ESSA's intellectual property rights may not necessarily provide the Company with competitive advantages and its patent terms may be inadequate to protect the Company's competitive position on its product candidates for an adequate amount of time.***

The degree of future protection afforded by the Company's intellectual property rights is uncertain because intellectual property rights have limitations, and may not adequately protect the Company's business, or permit the Company to maintain its competitive advantage. The following examples are illustrative:

- others may be able to make compounds that are similar to the Company's product candidates but that are not covered by the claims of the patents that the Company or the Company's strategic partners own or have exclusively licensed;
- others may independently develop similar or alternative technologies without infringing the Company's intellectual property rights;
- issued patents that the Company owns or has exclusively licensed may not provide the Company's with any competitive advantages, or may be held invalid or unenforceable, as a result of legal challenges by the Company's competitors;
- the Company may obtain patents for certain compounds many years before it obtains marketing approval for products containing such compounds, and because patents have a limited term, the term may run close to the commercial sale of the related product, the commercial value of the Company's patents may be limited;
- the Company may fail to develop additional proprietary technologies that are patentable;
- the laws of certain countries may not protect the Company's intellectual property rights to the same extent as the laws of the United States, or the Company may fail to apply for or obtain adequate intellectual property protection in all the jurisdictions in which it operates; and
- third-party patents may have an adverse effect on the Company's business, for example by preventing the Company from marketing one or more of its product candidates for one or more indications.

Any of the aforementioned threats to the Company's competitive advantage could have a material adverse effect on its business.

In addition, patents have a limited lifespan. In the United States, if all maintenance fees are timely paid, the expiration of a patent is generally 20 years from its earliest U.S. non-provisional filing date. Various patent term extensions may be available, but the life of a patent, and the protection it affords, is limited. Even if patents covering the Company's product candidates are obtained, once the patent life has expired, the Company may be open to competition from competitive products. Given the amount of time required for the development, testing and regulatory review of new product candidates, patents protecting such candidates might expire before or shortly after such candidates are commercialized. As a result, the Company's owned and licensed patents may not provide the Company with sufficient rights to exclude others from commercializing products similar or identical to the Company's.

***Changes in patent laws or patent jurisprudence could diminish the value of patents in general, thereby impairing ESSA's ability to protect its products.***

The patent positions of pharmaceutical and biotechnology companies can be highly uncertain and involve complex legal and factual questions for which important legal principles remain unresolved. Changes in either the patent laws or in the interpretations of patent laws in the United States and other countries may diminish the value of the Company's intellectual property. The Company cannot predict the breadth of claims that may be allowed or found to be enforceable in its patents (including patents owned by or licensed to the Company), in the Company's strategic partners' patents or in third-party patents. Recent U.S. Supreme Court rulings have either narrowed the scope of patent protection available in certain circumstances or weakened the rights of patent owners in certain situations. In addition to increasing uncertainty with regard to the Company's ability to obtain patents in the future, this has created uncertainty with respect to the validity, scope and value of patents, once obtained.

In September 2011, the Leahy-Smith America Invents Act, also known as the America Invents Act ("AIA"), was signed into law. An important change introduced by the AIA is that, as of March 16, 2013, the United States transitioned to a first inventor to file system for deciding which party should be granted a patent when two or more patent applications are filed by different parties disclosing or claiming the same invention. A third party that has filed, or files a patent application in the USPTO after March 16, 2013, but before the Company's, could be awarded a patent covering a given invention, even if the Company had made the invention before it was made by the third party. This requires the Company to be cognizant of the time from invention to filing of a patent application.

Depending on decisions by the U.S. Congress, the U.S. federal courts, the USPTO or similar authorities in foreign jurisdictions, the laws and regulations governing patents could change in unpredictable ways that may weaken the Company's and the Company's licensors' ability to obtain new patents or to enforce existing patents the Company and the Company's licensors or partners may obtain in the future.

***Patent protection and patent prosecution for some of ESSA's product candidates may be dependent on, and the ability to assert patents and defend them against claims of invalidity may be maintained by, third parties.***

There may be times in the future when certain patents that relate to the Company's product candidates or any approved products are controlled by the Company's licensees or licensors. Although the Company may, under such arrangements, have rights to consult with the Company's strategic partners on actions taken as well as back-up rights of prosecution and enforcement, the Company may relinquish rights to prosecute and maintain patents and patent applications within the Company's portfolio as well as the ability to assert such patents against infringers.

If any current or future licensee or licensor with rights to prosecute, assert or defend patents related to the Company's product candidates fails to appropriately prosecute and maintain patent protection for patents covering any of the Company's product candidates, or if patents covering any of the Company's product candidates are asserted against infringers or defended against claims of invalidity or unenforceability in a manner that adversely affects such coverage, the Company's ability to develop and commercialize any such product candidate may be adversely affected and the Company may not be able to prevent competitors from making, using and selling competing products.

Case 1:25-cv-00124-WCG     Filed 10/10/25     Page 54 of 110     Document 29-1

**Risks Related to ESSA's Business and Industry**

***The Company's business and operations would suffer in the event of computer system failures or security breaches.***

In the ordinary course of ESSA's business, the Company collects, stores and transmits confidential information, including intellectual property, proprietary business information and personal information. Despite the implementation of security measures, ESSA's internal computer systems, and those of other third parties on which the Company relies, including, but not limited to, ESSA's CROs, collaborators, contractors or consultants, are vulnerable to damage from computer viruses, unauthorized access, cyberattacks, natural disasters, fire, terrorism, war and telecommunication and electrical failures. Cyberattacks are increasing in their frequency, sophistication and intensity. Cyberattacks could include the deployment of harmful malware, denial-of-service attacks, social engineering and other means to affect service reliability and threaten the confidentiality, integrity and availability of information. Significant disruptions of ESSA's information technology systems or security breaches could adversely affect ESSA's business operations and/or result in the loss, misappropriation, and/or unauthorized access, use or disclosure of, or the prevention of access to, confidential information (including trade secrets or other intellectual property, proprietary business information and personal information), and could result in financial, legal, business and reputational harm to the Company.

If ESSA fails to maintain or protect ESSA's information systems and data integrity effectively, ESSA could lose or have difficulty attracting customers, have difficulty preventing, detecting and controlling fraud, experience increases in operating expenses, incur expenses or lose revenues, or suffer other adverse consequences as a result of a data privacy breach. If such disruptions were to occur and cause interruptions in ESSA's operations or result in the unauthorized acquisition of ESSA's access to personally identifiable information or individually identifiable health information (violating certain privacy laws, as applicable, such as HIPAA, CCPA, HITECH and GDPR), it could result in a material disruption of ESSA's drug development program and ESSA could be subject to significant fines or penalties for any non-compliance with certain state and/or international privacy and security laws. Further, the loss of preclinical study or clinical trial data from completed, ongoing or planned preclinical studies or clinical trials could result in delays in ESSA's efforts to identify and develop product candidates and significantly increase its costs to recover or reproduce the data. To the extent that any disruption or security breach results in a loss of, or damage to, ESSA's data or applications, or inappropriate disclosure of confidential or proprietary information, the Company could incur liability and the further development of its product candidate and the Company's potential future product candidates could be delayed. ESSA's insurance policies may not be adequate to compensate ESSA for the potential loss arising from such disruptions, failure or security breach. In addition, such insurance may not be available to ESSA in the future on economically reasonable terms, or at all. Further ESSA's insurance may not cover all claims made against ESSA and could have high deductibles in any event, and defending a suit, regardless of its merit, could be costly and divert management attention. While ESSA has invested in the protection of data and information technology, there can be no assurance that ESSA's efforts, or those of ESSA's third-party collaborators, if any, to implement adequate security and quality control measures for data processing would be sufficient to protect against data deterioration or loss in the event of a system malfunction, or to prevent data from being stolen or corrupted in the event of a security breach.

***Business disruptions could seriously harm ESSA's future revenues and financial condition and increase costs and expenses.***

ESSA's operations and the operations of third parties whom ESSA depend upon, could be subject to earthquakes, power shortages, telecommunications failures, water shortages, floods, hurricanes, typhoons, fires, extreme weather conditions, medical epidemics and other natural or manmade disasters or business interruptions, for which ESSA is predominantly self-insured. Although ESSA carries insurance for earthquakes and other natural disasters, ESSA may not carry sufficient business interruption insurance to compensate the Company for all losses that may occur. The disaster recovery and business continuity plans ESSA has in place may not be adequate in the event of a serious disaster or similar event. ESSA does not carry insurance for all categories of risk that ESSA's business may encounter. The occurrence of any of these business disruptions could seriously harm ESSA's operations and financial condition and increase costs and expenses. Further, any significant uninsured liability may require ESSA to pay substantial amounts, which would adversely affect ESSA's business, results of operations, financial condition and cash flows from future prospects.

***If the Company is not successful in attracting and retaining highly qualified personnel, the Company may not be able to successfully implement its business strategy.***

The Company's ability to compete in the highly competitive biotechnology and pharmaceutical industries depends in large part upon its ability to attract and retain highly qualified managerial, scientific and medical personnel. Competition affects the Company's ability to hire and retain highly qualified personnel on acceptable terms. The Company is highly dependent on its management, scientific and medical personnel. The Company's management team has substantial knowledge in many different aspects of drug development and commercialization. Despite the Company's efforts to retain valuable employees, members of its management, scientific and medical teams may terminate their employment with the Company on short notice or, potentially, without any notice at all. The Company does not maintain "key person" insurance for any of its executives or employees. The loss of the services of any of the Company's executive officers or other key employees could potentially harm its business, operating results or financial condition. The Company's success may also depend on its ability to attract, retain and motivate highly skilled junior, mid-level, and senior managers and scientific personnel. Other pharmaceutical companies with which the Company competes for qualified personnel have greater financial and other resources, different risk profiles, and a longer history in the industry than the Company does. They also may provide more diverse opportunities and better chances for career advancement. Some of these characteristics may be more appealing to high-quality candidates than what the Company has to offer. The Company relies on consultants and advisors, including scientific and clinical advisors, to assist ESSA in its research and development strategy. The Company's consultants and advisors may be employed by employers other than ESSA and may have commitments under consulting or advisory contracts with other entities that may limit their availability to the Company. If the Company is unable to continue to attract and retain high-quality personnel, the rate and success at which the Company can develop and commercialize product candidates would be limited.

***Third-party coverage and reimbursement and health care cost containment initiatives and treatment guidelines may constrain the Company's future revenues.***

In many of the markets ESSA hopes to sell future products in, successful commercialization of any product candidate will depend, in part, on the extent to which coverage and reimbursement for such product candidates and related treatments will be available from government healthcare programs, private health insurers, managed care plans and other organizations. Government authorities and third-party payors, such as private health insurers and health maintenance organizations, decide which medications they will pay for and establish reimbursement levels. Third-party payors often rely upon Medicare coverage policy and payment limitations in setting their own reimbursement policies. However, no uniform policy for coverage and reimbursement for products exists among third -party payors in the United States.

Therefore, coverage and reimbursement for products can differ significantly from payor to payor. As a result, the coverage determination process is often a time-consuming and costly process that will require ESSA to provide scientific and clinical support for the use of ESSA's products to each payor separately, with no assurance that coverage and adequate reimbursement will be applied consistently or obtained in the first instance.

A primary trend in the U.S. healthcare industry is cost containment. Government authorities and third-party payors have attempted to control costs by limiting coverage and the amount of reimbursement for particular medications. Increasingly, third-party payors are requiring that drug companies provide them with predetermined discounts from list prices and are challenging the prices charged for medical products. ESSA cannot be sure that coverage and reimbursement will be available for any product candidates that it or any future collaborator commercialize and, if reimbursement is available, the level of reimbursement. In addition, coverage and reimbursement may impact the demand for, or the price of, any product candidate for which ESSA or a collaborator obtains marketing approval. If coverage and reimbursement are not available or reimbursement is available only to limited levels, ESSA or its collaborators may not be able to successfully commercialize any product candidate for which marketing approval is obtained.

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 56 of 110    Document 29-1

There may be significant delays in obtaining coverage and reimbursement for newly approved drugs, and coverage may be more limited than the purposes for which the drug is approved by the TPD, FDA or other regulatory authorities. Moreover, eligibility for coverage and reimbursement does not imply that a drug will be paid for in all cases or at a rate that covers ESSA's costs, including research, development, manufacture, sale and distribution expenses. Interim reimbursement levels for new drugs, if applicable, may also be insufficient to cover ESSA's and any collaborator's costs and may not be made permanent. Reimbursement rates may vary according to the use of the drug and the clinical setting in which it is used, may be based on reimbursement levels already set for lower cost drugs and may be incorporated into existing payments for other services. Net prices for drugs may be reduced by mandatory discounts or rebates required by government healthcare programs or private payers and by any future relaxation of laws that presently restrict imports of drugs from countries where they may be sold at lower prices than in the United States. ESSA's or any collaborator's inability to promptly obtain coverage and profitable payment rates from both government-funded and private payers for any approved products that ESSA or its collaborators develop could have a material adverse effect on ESSA's operating results, ability to raise capital needed to commercialize product candidates and overall financial condition.

***The directors and officers of ESSA may be subject to conflicts of interest.***

Some of the directors and officers are engaged and will continue to be engaged in the search for additional business opportunities on behalf of other corporations and situations may arise where these directors and officers will be in direct competition with the Company. Not all of the Company's directors or officers are subject to non-competition agreements. Some of the directors and officers of the Company are or may become directors or officers of the other companies engaged in other business ventures whose operations may, from time to time, be in direct competition with ESSA's operations. Conflicts, if any, will be dealt with in accordance with the relevant provisions of the Business Corporations Act (British Columbia) and under the Company's articles of incorporation.

***The Company faces intense competition from other biotechnology and pharmaceutical companies and its operating results will suffer if the Company fails to compete effectively.***

The biotechnology and pharmaceutical industries are intensely competitive and subject to rapid and significant technological change with a strong emphasis on proprietary and novel products and product candidates. ESSA's competitors may develop products, product candidates and processes competitive to ESSA's masofaniten (EPI-7386). The Company's potential competitors in the United States and globally include large, multi-national pharmaceutical companies, established biotechnology companies, specialty pharmaceutical sales and marketing companies, specialized cancer treatment companies, emerging and start-up companies, universities and other research institutions. Many companies, as well as research organizations, currently engage in, or have in the past engaged in, efforts related to the development of products in the same therapeutic areas as ESSA does. Due to the size of the prostate cancer treatment market and the large unmet medical need for products that treat CRPC, a number of the world's largest pharmaceutical companies are developing, or could potentially develop, products that could compete with the Company's future product candidates. Products ESSA may develop in the future are also likely to face competition from other product therapies, some of which ESSA may not be currently aware.

Many of the companies developing competing technologies and products in ESSA's field have significantly greater financial resources and expertise in discovery, R&D, manufacturing, preclinical studies and clinical testing, obtaining regulatory approvals and marketing than ESSA does. These companies may also have products that have been approved or are in late stages of development in our target markets. Other smaller companies may also prove to be significant competitors, particularly through collaborative arrangements with large and established companies. Academic institutions, government agencies and other public and private research organizations may also conduct research, seek patent protection and establish collaborative arrangements for discovery, research, clinical development and marketing of products similar to ESSA's. There is a risk that one or more of ESSA's competitors may develop more effective or more affordable products and that such competitors will commercialize products that will render its product candidates obsolete. ESSA faces competition with respect to product efficacy and safety, ease of use and adaptability to various modes of administration, acceptance by physicians, the timing and scope of regulatory approvals, availability of resources, reimbursement coverage, price and patent positions of others. In addition, these companies and institutions also compete with ESSA in recruiting and retaining qualified personnel, and in seeking and entering into new strategic partnerships. ESSA also competes with these companies and institutions in establishing clinical trial sites and enrolling subjects for clinical trials. If the Company

is not able to compete effectively against its current and future competitors, its business will not grow and its financial condition and operations will suffer materially adverse effects.

***The Company may face exposure to adverse movements in foreign currency exchange rates.***

ESSA's business may expand internationally and as a result, a significant portion of its revenues, expenses, current assets and current liabilities may be preliminary denominated in foreign currencies, while its financial statements are expressed in U.S. dollars. A decrease in the value of such foreign currencies relative to the U.S. dollar could result in losses in revenues from currency exchange rate fluctuations. To date, ESSA has not hedged against risks associated with foreign exchange rate exposure. ESSA cannot be sure that any hedging techniques it may implement in the future will be successful or that its business, financial condition, and results of operations will not be materially adversely affected by exchange rate fluctuations.

***If ESSA is not able to convince public payors and hospitals to include ESSA's products on their approved formulary lists, revenues may not meet expectations and ESSA's business, results of operations and financial condition may be adversely affected.***

Hospitals establish formularies, which are lists of drugs approved for use in the hospital. If a drug is not included on the hospital's formulary, the ability to promote and sell ESSA's products may be limited or denied. If ESSA fails to secure and maintain formulary inclusion for products on favorable terms or are significantly delayed in doing so, ESSA may have difficulty achieving market acceptance of products and ESSA's business, results of operations and financial condition could be materially adversely affected.

***The Company has never marketed a drug before, and if the Company is unable to establish an effective sales force and marketing infrastructure, or enter into acceptable third-party sales and marketing or licensing arrangements, the Company may be unable to generate any revenue.***

ESSA does not currently have, and has never had, an infrastructure for the sales, marketing and distribution of pharmaceutical drug products. The cost of establishing and maintaining such an infrastructure may exceed the cost-effectiveness of doing so. In order to market any products that may be approved by the FDA and comparable foreign regulatory authorities, ESSA must build its sales, marketing, managerial and other non-technical capabilities or make arrangements with third parties to perform these services. Establishing such an infrastructure will be expensive and time-consuming and will require significant attention of ESSA's executive officers to manage and could delay any product launch of ESSA's lead product candidate and potential future product candidates. If ESSA is unable to establish adequate sales, marketing and distribution capabilities, whether independently or with third parties, ESSA may not be able to generate product revenue and may not become profitable. If ESSA chooses to collaborate, either globally or on a territory-by territory basis, with third parties that have direct sales forces and established distribution systems, either to augment ESSA's own sales force and distribution systems or in lieu of ESSA's own sales force and distribution systems, ESSA will be required to negotiate and enter into arrangements with such third parties relating to the proposed collaboration. If ESSA is unable to enter into such arrangements when needed, on acceptable terms, or at all, ESSA may not be able to successfully commercialize its lead product candidate and potential future product candidates, or any such commercialization's may experience delays or limitations. ESSA will be competing with many companies that currently have extensive and well-funded sales and marketing operations. Without an internal commercial organization or the support of a third party to perform sales and marketing functions, ESSA may be unable to compete successfully against these more established companies.

***The Company will need to expand the size of its organization and the Company may experience difficulties in managing this growth.***

As the Company's development and commercialization plans and strategies develop, and if clinical trials are successful, the Company expects that it will need to expand the size of its employee base for managerial, operational, sales, marketing, financial and other resources.

Future growth would impose significant added responsibilities on members of management, including the need to identify, recruit, maintain, motivate and integrate additional employees. In addition, the Company's management may have to divert

Case 1:25-cv-00124-WCG     Filed 10/10/25     Page 58 of 110     Document 29-1

a disproportionate amount of its attention away from the Company's day-to-day activities and devote a substantial amount of time to managing these growth activities. The Company's future financial performance and its ability to commercialize its potential products and any other future product candidates and its ability to compete effectively will depend, in part, on the Company's ability to effectively manage any future growth.

***ESSA's product candidate and potential future products may, if approved for sale, not achieve or maintain expected levels of market acceptance, which could have a material adverse effect on its business, financial condition and results of operations and could cause the market value of its securities to decline.***

Even if ESSA is able to obtain regulatory approvals for its product candidates, the success of those products is dependent upon achieving and maintaining market acceptance. New product candidates that appear promising in development may fail to reach the market or may have only limited or no commercial success. Levels of market acceptance for ESSA's products could be impacted by several factors, many of which are not within ESSA's control, including but not limited to:

- demonstration of clinical safety and efficacy of ESSA's potential products and other possible AR-NTD inhibitors generally;
- safety, efficacy, convenience and cost-effectiveness of ESSA's products compared to products of its competitors;
- the prevalence and severity of any adverse side effects;
- scope of approved uses and marketing approval;
- limitations or warnings contained in FDA-approved labeling;
- timing of market approvals and market entry;
- the willingness of physicians to prescribe ESSA's potential products and of the target patient population to try new therapies;
- the inclusion of AR-NTD inhibitor products in applicable treatment guidelines;
- new procedures or methods of treatment that may reduce the incidences of any of the indications for which ESSA's potential products shows utility;
- difficulty in, or excessive costs to, manufacture;
- infringement or alleged infringement of the patents or intellectual property rights of others;
- the introduction of any new products, including generic AR-NTD inhibitor products, that may in the future become available to treat indications for which ESSA's potential product may be approved;
- availability of alternative products from ESSA's competitors;
- acceptance of the price of ESSA's products; and
- ability to market ESSA's products effectively at the retail level.

In addition, the success of any new product will depend on ESSA's ability to either successfully build its in-house sales capabilities or to secure new, or to realize the benefits of existing arrangements with third-party marketing or distribution partners. Seeking out, evaluating and negotiating marketing or distribution agreements may involve the commitment of substantial time and effort and may not ultimately result in an agreement. In addition, the third-party marketing or distribution partners may not be as successful in promoting ESSA's products as it had anticipated. If ESSA is unable to commercialize new products successfully, whether through a failure to achieve market acceptance, a failure to build its own in-house sales capabilities, a failure to secure new marketing partners or to realize the benefits of ESSA's arrangements with existing marketing partners, there may be a material adverse effect on ESSA's business, financial condition and results of operations and it could cause the market value of ESSA's securities to decline.

In addition, by the time any products are ready to be commercialized, what ESSA believes to be the market for these products may have changed. The Company's estimates of the number of patients who have received or might have been candidates to use a specific product may not accurately reflect the true market or market prices for such products or the extent to which such products, if successfully developed, will actually be used by patients. If ESSA's projections are inaccurate, the market opportunities for any of its product candidates could be significantly diminished. ESSA's failure to successfully introduce and market its products that are under development would have a material adverse effect on its business, financial condition and results of operations.

***The Company may acquire businesses or products or form strategic alliances in the future and the Company may not realize the benefits of such acquisitions.***

The Company may acquire additional businesses or products, form strategic alliances or create joint ventures with third parties that the Company believes will complement or augment its existing business.

If the Company acquires businesses in the future, it may not be able to realize the benefit of acquiring such businesses if the Company is unable to successfully integrate them with its existing operations and company culture. The Company may encounter numerous difficulties in developing, manufacturing and marketing any new products resulting from a strategic alliance or acquisition that delay or prevent the Company from realizing their expected benefits. The potential failure of the due diligence processes to identify significant problems, liabilities or other shortcomings or challenges with respect to intellectual property, product quality, revenue recognition or other accounting practices, taxes, corporate governance and internal controls, regulatory compliance, employee, customer or partner disputes or issues and other legal and financial contingencies could decrease or eliminate the anticipated benefits and synergies of any acquisition and could negatively affect ESSA's future business and financial results.

As part of ESSA's business strategy, it may also continue to acquire additional companies, products or technologies principally related to, or complementary to, ESSA's current operations. Any such acquisitions will be accompanied by certain risks including but not limited to:

- exposure to unknown liabilities of acquired companies and the unknown issues with any associated technologies or research;
- higher than anticipated acquisition costs and expenses;
- the difficulty and expense of integrating operations, systems and personnel of acquired companies;
- disruption of ESSA's ongoing business;
- inability to retain key customers, distributors, vendors and other business partners of the acquired company;
- diversion of management's time and attention; and
- possible dilution to shareholders.

Also, the anticipated benefit of any joint venture or acquisition may not materialize or such strategic alliance, joint venture or acquisition may be prohibited. Additionally, future acquisitions or dispositions could result in potentially dilutive issuances of ESSA's equity securities, the incurrence of debt, contingent liabilities or amortization expenses or write-offs of goodwill, any of which could harm ESSA's financial condition. ESSA cannot predict the number, timing or size of future joint ventures or acquisitions, or the effect that any such transactions might have on its operating results.

ESSA may not be able to successfully overcome these risks and other problems associated with acquisitions and this may adversely affect ESSA's business, financial condition or results of operations.

***ESSA has entered into collaborations with third parties for the development and commercialization of its lead product candidate. If those collaborations are not successful, ESSA may not be able to capitalize on the market potential of its lead product candidate.***

The Company has third-party collaborators for development and commercialization of its lead product candidate. ESSA's likely collaborators for any future collaboration arrangements include large and mid-size pharmaceutical companies, regional and national pharmaceutical and biotechnology companies. ESSA has and will likely continue to have limited control over the amount and timing of resources that its collaborators dedicate to the development or commercialization of its lead product candidate. The Company's ability to generate revenues from these arrangements will depend on its collaborators' abilities to successfully perform the functions assigned to them in these arrangements.

Collaborations involving ESSA's product candidates would pose numerous risks to ESSA including the following:

- collaborators have significant discretion in determining the efforts and resources that they will apply to these collaborations and may not perform their obligations as expected;
- collaborators may not pursue development and commercialization of ESSA's product candidates or may elect not to continue or renew development or commercialization programs based on clinical trial results, changes in the

- collaborators' strategic focus or available funding, or external factors such as an acquisition that diverts resources or creates competing priorities;
- collaborators may delay clinical trials, provide insufficient funding for a clinical trial program, stop a clinical trial or abandon a product candidate, repeat or conduct new clinical trials or require a new formulation of a product candidate for clinical testing;
- collaborators could independently develop, or develop with third parties, products that compete directly or indirectly with ESSA's products or product candidates if the collaborators believe that competitive products are more likely to be successfully developed or can be commercialized under terms that are more economically attractive than ESSA's;
- collaborators with marketing and distribution rights to multiple products may not commit sufficient resources to the marketing and distribution of ESSA's product relative to other products;
- collaborators may not properly maintain, defend or enforce ESSA's intellectual property rights or may use ESSA's proprietary information in such a way as to invite litigation or other intellectual property related proceedings that could jeopardize or invalidate ESSA's intellectual property or proprietary information or expose ESSA to potential litigation or other intellectual property related proceedings;
- collaborators may infringe the intellectual property rights of third parties, which may expose ESSA to litigation and potential liability;
- disputes may arise between the collaborators and ESSA that result in the delay or termination of the research, development or commercialization of ESSA's products or product candidates or that result in costly litigation or arbitration that diverts management attention and resources; and
- collaborations may be terminated and, if terminated, may result in a need for additional capital to pursue further development or commercialization of the applicable product candidates.

Collaboration agreements may not lead to development or commercialization of product candidates in the most efficient manner or at all. If a collaborator of ESSA's were to be involved in a business combination, the continued pursuit and emphasis on ESSA's product development or commercialization program could be delayed, diminished or terminated.

***ESSA's employees, independent contractors, consultants, commercial collaborators, principal investigators, CROs suppliers and vendors may engage in misconduct or other improper activities, including noncompliance with regulatory standards and requirements, which could cause significant liability for ESSA and harm ESSA's reputation.***

ESSA is exposed to the risk that its employees, independent contractors, consultants, commercial collaborators, principal investigators, CROs suppliers and vendors may engage in misconduct or other improper activities. Misconduct by these parties could include failures to comply with FDA regulations or similar regulations of comparable foreign regulatory authorities, provide accurate information to the FDA or comparable foreign regulatory authorities, comply with manufacturing standards ESSA has established, comply with federal and state healthcare fraud and abuse laws and regulations and similar laws and regulations established and enforced by comparable foreign regulatory authorities, report financial information or data accurately or disclose unauthorized activities to ESSA. Employee misconduct could also involve the improper use of information obtained in the course of clinical trials, which could result in regulatory sanctions and serious harm to ESSA's reputation. It is not always possible to identify and deter misconduct by these parties, and the precautions ESSA takes to detect and prevent these activities may not be effective in controlling unknown or unmanaged risks or losses in protecting ESSA from governmental investigations or other actions or lawsuits stemming from a failure to comply with these laws or regulations. If any such actions are instituted against ESSA and ESSA is not successful in defending itself or asserting ESSA's rights, those actions could have a significant impact on ESSA's business, including the imposition of significant penalties, including civil, criminal and administrative penalties, damages, fines, disgorgement, imprisonment, exclusion from government funded healthcare programs, integrity oversight and reporting obligations, contractual damages, reputational harm, diminished profits and future earnings and the curtailment and restructuring of the Company's operations.

***If product liability lawsuits are brought against the Company or its strategic partners, it may incur substantial liabilities and may be required to cease or limit the sale, marketing and distribution of its product candidate and potential future products.***

The Company or its strategic partners could face a potential risk of product liability as a result of its potential sales, marketing and distribution activities relating to any future commercialization of any future product. For example, the Company may be sued if any product it develops allegedly causes injury or is found to be otherwise unsuitable during product testing, manufacturing, marketing or sale. Any such product liability claims may include allegations of defects in manufacturing, defects in design, a failure to warn of dangers inherent in the product, negligence, strict liability and a breach of warranties. Claims could also be asserted under U.S. state or Canadian provincial or other foreign consumer protection legislation. If the Company cannot successfully defend itself against product liability claims, it may incur substantial liabilities or be required to cease or limit the sale, marketing and distribution of its products. Even successful defense against product liability claims would require significant financial and management resources. Regardless of the merits or eventual outcome, liability claims may result in:

- decreased demand for any future products that the Company may develop;
- injury to the Company's reputation;
- withdrawal of clinical trial participants;
- costs to defend the related litigation;
- a diversion of management's time and the Company's resources;
- substantial monetary awards to consumers, trial participants or patients;
- product recalls, withdrawals or labeling, marketing or promotional restrictions;
- loss of revenue;
- the inability to commercialize;
- the inability to continue the sale, marketing and distribution of ESSA's product candidate and potential future products; and
- a decline in the price of the Common Shares or other outstanding securities.

The Company currently maintains insurance that it believes has sufficient coverage to protect against the liability risks discussed above and the Company believes this coverage is consistent with industry norms for companies at a similar stage of development. However, if the Company is unable to obtain and retain sufficient product liability insurance in the future at an acceptable cost to protect against potential product liability claims, the commercialization of products it develops could be hindered or prevented.

***Compulsory licensing or generic competition may affect the Company's business in certain countries.***

In a number of countries, governmental authorities and other groups have suggested that companies which manufacture medical products (e.g., pharmaceuticals) should make products available at a low cost. In some cases, governmental authorities have held that where a pharmaceutical company does not do so, its patents might not be enforceable to prevent generic competition. Alternatively, some governmental authorities could require that ESSA grant compulsory licenses to allow competitors to manufacture and sell their own versions of ESSA's products, thereby reducing ESSA's sales or the sales of ESSA's licensee(s). In all of these situations, the results of future operations in these countries if any, could be adversely affected.

***ESSA incurs significantly increased costs and devotes substantial management time as a result of operating as a public company.***

As a public company, ESSA incurs significant legal, accounting and other expenses. For example, ESSA is subject to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act") the Sarbanes-Oxley Act of 2002, the Dodd-Frank Wall Street Reform and Consumer Protection Act and the listing requirements of the Nasdaq Stock Market LLC, as well as rules and regulations subsequently implemented by the SEC and including the establishment and maintenance of effective disclosure and financial controls and changes in corporate governance practices. ESSA's continued compliance with these requirements increase its legal and financial compliance costs and make some activities more time consuming and costly. In addition, ESSA's management and other personnel need to divert attention from

operational and other business matters to devote substantial time to these public company requirements. In particular, ESSA may or in the future incur significant expenses and devote substantial management effort toward ensuring compliance with the requirements of Section 404 of Sarbanes-Oxley, which involves annual assessments of a company's internal controls over financial reporting. ESSA may in the future need to hire additional accounting and financial staff with appropriate public company experience and technical accounting knowledge and may need to establish an internal audit function. ESSA cannot always predict or estimate the amount of additional costs incurred as a result of being a public company or the timing of such costs.

***ESSA is a smaller reporting company and a non-accelerated filer, and the reduced disclosure requirements available to ESSA may make ESSA's Common Shares less attractive to investors.***

Under the SEC rules, smaller reporting companies ("SRCs") may choose to comply with scaled financial and non-financial disclosure requirements in their annual and quarterly reports and registration statements relative to non-SRCs. In addition, companies that are not "accelerated filers" can take advantage of additional regulatory relief. Whether a company is an accelerated filer or a SRC is determined on an annual basis. For so long as ESSA qualifies as a non-accelerated filer and/or a SRC, ESSA will be permitted to and intends to rely on some or all of the accommodations available to such companies. These accommodations include:

- not being required to provide an auditor's attestation of management's assessment of internal control over financial reporting required by Section 404(b) of the Sarbanes-Oxley Act of 2002;
- reduced financial disclosure obligations, including that SRCs need only provide two years of financial statements rather than three years; a maximum of two years of acquiree financial statements are required rather than three years; fewer circumstances under which pro forma financial statements are required; and less stringent age of financial statements requirements;
- reduced non-financial disclosure obligations, including regarding the description of their business, management's discussion and analysis of financial condition and results of operations, market risk, executive compensation, transactions with related persons, and corporate governance; and
- later deadlines for the filing of annual and quarterly reports compared to accelerated filers.

ESSA will continue to qualify as a SRC and non-accelerated filer for so long as (a) ESSA's public float is less than $75 million as of the last day of its most recently completed second fiscal quarter or (b) ESSA's public float is $75 million or more but less than $700 million and it reported annual revenues of less than $100 million for its most recently completed fiscal year.

ESSA may choose to take advantage of some, but not all, of the available accommodations. ESSA cannot predict whether investors will find ESSA's Common Shares less attractive if ESSA relies on these accommodations. If some investors find ESSA's Common Shares less attractive as a result, there may be a less active trading market for ESSA's Common Shares and the price of ESSA's Common Shares may be more volatile.

**Risks Related to Additional Legal Compliance and Regulatory Matters**

***ESSA is subject to risks inherent in foreign operations.***

ESSA intends to pursue international market growth opportunities, such that international sales may account for a significant portion of its revenue. ESSA is subject to a number of risks associated with its potential international business operations, sales and marketing activities that may increase liability, costs, lengthen sales cycles and require significant management attention. These risks include:

- compliance with the laws of the United States, Canada, the European Union and other jurisdictions where ESSA may conduct business, including import and export legislation;
- increased reliance on third parties to establish and maintain foreign operations;
- the complexities and expenses of administering a business abroad;
- complications in compliance with, and unexpected changes in, foreign regulatory requirements;
- instability in economic or political conditions, including inflation, recession and actual or anticipated military conflicts, social upheaval or political uncertainty;

- foreign currency fluctuations;
- foreign exchange controls and cash repatriation restrictions;
- tariffs and other trade barriers;
- difficulties in collecting accounts receivable;
- differing tax structures and related potential adverse tax consequences;
- uncertainties of laws and enforcement relating to the protection of intellectual property or secured technology;
- litigation in foreign court systems;
- unauthorized copying or use of ESSA's intellectual property;
- cultural and language differences;
- difficulty in managing a geographically dispersed workforce in compliance with local laws and customs that vary from country to country; and
- other factors, depending upon the country involved.

There can be no assurance that the policies and procedures ESSA implements to address or mitigate these risks will be successful, that ESSA's personnel will comply with them or that ESSA will not experience these factors in the future or that they will not have a material adverse effect on ESSA's business, results of operations and financial condition.

***Laws and regulations governing international operations may preclude ESSA from developing, manufacturing and selling certain product candidates outside of the United States and Canada and require ESSA to develop and implement costly compliance programs.***

ESSA must comply with numerous laws and regulations in each jurisdiction in which ESSA plans to operate. ESSA must also comply with U.S. laws applicable to the foreign operations of U.S. individuals, such as the Foreign Corrupt Practices Act (the "FCPA"), and Canadian laws applicable to the foreign operations of Canadian businesses and individuals, such as the Corruption of Foreign Public Officials Act ("CFPOA"). The creation and implementation of international business practices compliance programs is costly and such programs are difficult to enforce, particularly where reliance on third parties is required.

The CFPOA prohibits Canadian businesses and individuals from giving or offering to give a benefit of any kind to a foreign public official, or any other person for the benefit of the foreign public official, where the ultimate purpose is to obtain or retain a business advantage. Furthermore, a company may be found liable for violations by not only its employees, but also by its third-party agents. Any failure to comply with the CFPOA, as well as applicable laws and regulations in foreign jurisdictions, could result in substantial penalties or restrictions on ESSA's ability to conduct business in certain foreign jurisdictions, which may have a material adverse impact on ESSA and its share price.

The FCPA prohibits any U.S. individual or business from paying, offering, authorizing payment or offering of anything of value, directly or indirectly, to any foreign official, political party or candidate for the purpose of influencing any act or decision of the foreign entity in order to assist the individual or business in obtaining or retaining business. The FCPA also obligates companies whose securities are listed in the United States to comply with certain accounting provisions requiring ESSA to maintain books and records that accurately and fairly reflect all transactions of the corporation, including international subsidiaries, and to devise and maintain an adequate system of internal accounting controls for international operations. The anti-bribery provisions of the FCPA are enforced primarily by the Department of Justice. The SEC is involved with enforcement of the books and records provisions of the FCPA.

Compliance with the FCPA is expensive and difficult, particularly in countries in which corruption is a recognized problem. In addition, the FCPA presents particular challenges in the pharmaceutical industry, because, in many countries, hospitals are operated by the government, and doctors and other hospital employees are considered foreign officials. Certain payments to hospitals in connection with clinical studies and other work have been deemed to be improper payments to government officials and have led to FCPA enforcement actions.

Violation of the FCPA can result in significant civil and criminal penalties. Indictment alone under the FCPA can lead to suspension of the right to do business with the U.S. government until the pending claims are resolved. Conviction of a violation of the FCPA can result in long-term disqualification as a government contractor. The termination of a government contract or relationship as a result of ESSA's failure to satisfy any of its obligations under laws governing international

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 64 of 110    Document 29-1

business practices would have a negative impact on its operations and harm its reputation and ability to procure government contracts. The SEC also may suspend or bar issuers from trading securities on U.S. exchanges for violations of the FCPA's accounting provisions.

ESSA's employees or other agents may, without the Company's knowledge and despite the Company's efforts, engage in prohibited conduct under its policies and procedures and the CFPOA, FCPA or other anti-bribery laws that ESSA may be subject to for which it may be held responsible. If ESSA's employees or other agents are found to have engaged in such practices, it could suffer severe penalties and other consequences that may have a material adverse effect on its business, financial condition and results of operations.

Various laws, regulations and executive orders also restrict the use and dissemination outside of the United States, or the sharing with certain non-U.S. nationals, of information classified for national security purposes, as well as certain products and technical data relating to those products. If ESSA expands its presence outside of the United States in the future, it will be required to dedicate additional resources to comply with these laws, and these laws may preclude ESSA from developing, manufacturing, or selling certain products and product candidates outside of the United States, which could limit ESSA's growth potential and increase development costs.

### *ESSA is subject to U.S. laws relating to fraud and abuse and patients' rights.*

As a pharmaceutical company, even though ESSA does not and will not control referrals of healthcare services or bill directly to Medicare, Medicaid or other third-party payors, federal and state healthcare laws and regulations pertaining to fraud and abuse and patients' rights are and will be applicable to ESSA's future arrangements with third-party payors and customers who are in a position to purchase, recommend and/or prescribe ESSA's product candidates for which the Company obtains marketing approval. These broadly applicable fraud and abuse and other healthcare laws and regulations may constrain ESSA's future business or financial arrangements and relationships with healthcare professionals, principal investigators, consultants, customers, and third-party payors and other entities, including ESSA's marketing practices, educational programs and pricing policies. Restrictions under applicable federal and state healthcare laws and regulations that may affect ESSA's ability to operate include, but are not limited to, the following:

- the U.S. Anti-Kickback Statute, among other things, prohibits persons from knowingly and willfully soliciting, offering, receiving or providing paying any remuneration (including any kickback, bribe, or rebate), directly or indirectly, overtly or covertly, in cash or in kind, to induce or reward, or in return for, either the referral of an individual for, or the purchase, lease, order or recommendation of, any good, facility, item or service, for which payment may be made, in whole or in part, under a federal healthcare program such as Medicare and Medicaid; and
- civil and criminal false claims laws and civil monetary penalty laws impose criminal and civil penalties, including through civil whistleblower or qui tam actions, among other things, prohibits individuals or entities from knowingly presenting, or causing to be presented, to the federal government, including the Medicare and Medicaid programs, claims for payment or approval that are false or fraudulent or from knowingly making a false statement to improperly avoid, decrease or conceal an obligation to pay money to the federal government;

Efforts to ensure that ESSA's business arrangements with third parties will comply with applicable healthcare laws and regulations will involve substantial costs. It is possible that governmental authorities will conclude that ESSA's business practices do not comply with current or future statutes, regulations, agency guidance, or case law involving applicable fraud and abuse or other healthcare laws and regulations. If ESSA's operations are found to be in violation of any of these laws or any other governmental regulations that may apply to ESSA, the Company may be subject to penalties, including, without limitation, significant civil, criminal and administrative penalties, damages, fines, disgorgement, exclusion from government funded healthcare programs, such as Medicare and Medicaid, contractual damages, reputational harm, administrative burdens and diminished profits and future earnings, and the curtailment or restructuring of ESSA's operations. If any physicians or other healthcare providers or entities with whom ESSA expects to do business are found to not be in compliance with applicable laws, they may be subject to criminal, civil or administrative sanctions, including exclusions from government funded healthcare programs. Moreover, ESSA expects there will continue to be federal and state laws and regulations, proposed and implemented, that could impact ESSA's operations and business. The extent to which future legislation or regulations, if any, relating to healthcare fraud abuse laws or enforcement, may be enacted or what effect such legislation or regulation would have on ESSA's business remains uncertain.

***If ESSA fails to comply with environmental, health and safety laws and regulations, ESSA could become subject to fines or penalties or incur costs that could have a material adverse effect on the success of ESSA's business.***

ESSA is subject to numerous environmental, health and safety laws and regulations in the United States and in Canada, and may in the future involve, the handling, use, storage, treatment and disposal of hazardous materials and wastes. ESSA's operations could involve the use of hazardous and flammable materials, including chemicals and biological materials. ESSA's operations could also produce hazardous waste products. The Company's general practice would be to contract with third parties for the disposal of such materials and wastes. ESSA cannot eliminate the risk of contamination or injury from these materials. In the event of contamination or injury resulting from ESSA's use of hazardous materials, it could be held liable for any resulting damages, and any liability could exceed its resources. ESSA also could incur significant costs associated with civil or criminal fines and penalties.

Although ESSA maintains workers' compensation insurance to cover for costs and expenses ESSA may incur due to injuries to employees resulting from the use of any hazardous materials, this insurance may not provide adequate coverage against potential liabilities. ESSA does not maintain insurance for environmental liability or toxic tort claims that may be asserted against it in connection with its storage or disposal of biological or hazardous materials.

In addition, ESSA may incur substantial costs in order to comply with current or future environmental, health and safety laws and regulations. These current or future laws and regulations may impair ESSA's research, development or production efforts. Failure to comply with these laws and regulations also may result in substantial fines, penalties or other sanctions.

***ESSA is and there is a risk that ESSA may continue to be a "passive foreign investment company" which would likely result in materially adverse U.S. federal income tax consequences for U.S. investors.***

ESSA believes it was classified as a passive foreign investment company ("PFIC") for the taxable year ending September 30, 2023 and believes it may be classified as a PFIC for the current taxable year and in future taxable years. However, the determination as to whether ESSA is a PFIC for any taxable year is based on the application of complex U.S. federal income tax rules that are subject to differing interpretations. If ESSA is a PFIC for any taxable year during which a U.S. Holder (as defined under "United States Income Tax Considerations") holds the Common Shares, it would likely result in adverse U.S. federal income tax consequences for such U.S. Holder. U.S. Holders should carefully read "United States Income Tax Considerations—Passive Foreign Investment Company Rules" for more information and consult their own tax advisors regarding the consequences of ESSA being treated as a PFIC for U.S. federal income tax purposes, including the advisability of making a qualified electing fund ("QEF") election (including a protective election), which may mitigate certain possible adverse U.S. federal income tax consequences but may result in an inclusion in gross income without receipt of such income.

***It may be difficult for United States investors to effect services of process or enforcement of actions against the Company or certain of its directors and officers under U.S. federal securities laws.***

The Company is incorporated under the laws of the Province of British Columbia, Canada. Its directors and officers reside in Canada or the United States. Because a number of these persons and a substantial portion of the assets of the Company are located outside the United States, it will be difficult for United States investors to effect service of process in the United States upon the Company and its directors and officers, or to enforce judgements obtained against the Company or such persons in United States courts, in any action, including actions predicated upon the civil liability provisions of the United States federal securities laws or any other United States laws. Additionally, rights predicated solely upon civil liability provisions of United States federal securities laws or any other laws of the United States may not be enforceable in original actions, or actions to enforce judgments obtained in United States courts, brought in a Canadian court including courts in the Province of British Columbia.

**Risks Relating to ESSA's Common Shares**

***The market price and trading volume of ESSA's Common Shares may be volatile, which could result in rapid and substantial losses for its shareholders or securities litigation.***

The market price of ESSA's Common Shares may be highly volatile and could be subject to wide fluctuations, in response to various factors, some of which ESSA cannot control. The stock market in general, and pharmaceutical and biotechnology companies in particular, have experienced extreme price and volume fluctuations that have been unrelated or disproportionate to the operating performance of these companies. Broad market and industry factors may negatively affect the market price of ESSA's common stock, regardless of ESSA's actual operating performance. In addition to the factors discussed in this "Risk Factors" section and elsewhere in this Annual report, these factors include:

- quarterly variations in operating results;
- operating results that vary from the expectations of securities analysts and investors;
- change in valuations;
- changes in ESSA's operations;
- expenses ESSA incurs related to future research;
- regulatory approvals;
- fluctuations in the demand for ESSA's product candidates;
- changes in the industry in which ESSA operates;
- announcements by ESSA or other companies of significant contracts, acquisitions, dispositions, strategic partnerships, joint ventures, capital commitments, plans, prospects, service offerings or operating results;
- results of clinical studies of our product candidates, including our combination studies, or those of our competitors;
- additions or departures of key personnel;
- future sales of ESSA's securities;
- trading of ESSA's securities by a large shareholder;
- other risk factors discussed herein; and
- other unforeseen events.

Stock markets in the United States and Canada have experienced extreme price and volume fluctuations. Market fluctuations, as well as general political and economic conditions, such as acts of terrorism, prolonged economic uncertainty, a recession or interest rate or currency rate fluctuations, could adversely affect the market price of ESSA's Common Shares resulting in substantial losses for shareholders. Also, in the past, companies that have experienced volatility in the market price of their Common Shares have been subject to securities litigation. ESSA may be the target of this type of litigation in the future. Securities litigation against ESSA could result in substantial costs and divert management's attention from other business concerns, which could materially harm ESSA's business.

***The Company has never declared dividends and may not do so in the future.***

ESSA has not declared or paid any cash dividends on Common Shares to date. The payment of dividends in the future will be dependent on ESSA's earnings and financial condition and on such other factors as ESSA's Board considers appropriate. Unless and until ESSA pays dividends, shareholders may not receive a return on their shares. There is no present intention by the Board to pay dividends on the Common Shares.

***The Company may experience future sales or issue additional securities.***

The market price of the Company's equity securities could decline as a result of issuances of securities by the Company or sales by the Company's existing shareholders of Common Shares in the market, or the perception that such sales could occur. Sales of Common Shares by shareholders might also make it more difficulty for the Company to sell equity securities at a time and price that the Company deems appropriate. Sales or issuances of substantial numbers of Common Shares, or the perception that such sales could occur, may adversely affect the prevailing market prices of the Common Shares. With any additional sale or issuance of Common Shares, investors will suffer dilution to their voting power and the Company may experience dilution in its earnings per share.

Additionally, as of September 30, 2023, there are 2,920,000 pre-funded warrants outstanding, which are exercisable into Common Shares at a nominal exercise price. If holders of these pre-funded warrants exercise these securities, existing shareholders will suffer dilution to their voting power and the Company may experience dilution in its earnings per share, as well as a negative impact on its share price.

*An active trading market for the Common Shares may not be sustained.*

Although ESSA has listed the Common Shares on the Nasdaq, an active trading market for the Common Shares may not be sustained. If an active trading market for the Common Shares is not maintained, the liquidity of the Common Shares and the prices that may be obtained for the Common Shares will be adversely affected. As of September 30, 2023, ESSA's public float, which is defined as Common Shares outstanding minus Common Shares held by officers, directors, or beneficial holders of greater than 10% of ESSA's outstanding Common Shares, represented approximately 60.17% of ESSA's outstanding Common Shares. In addition, the Company is aware of a number of significant shareholders, defined as a holding greater than 5%, who have participated in recent financings. The average number of shares traded in any given day over the past year has been relatively small compared to the public float. Thus, the actions of a few shareholders either buying or selling ESSA's Common Shares may adversely affect the price of the Common Shares. Historically, securities similar to ESSA's Common Shares have experienced extreme price and volume fluctuations that do not necessarily relate to operating performance and could result in rapid and substantial losses for shareholders.

**General Risk Factors**

*Widespread health concerns, pandemics or epidemics, and other outbreaks of illness may negatively affect the Company's ability to maintain operations and execute its business plan.*

Widespread health concerns, pandemics, and other outbreaks of illness, particularly in North America but also globally, can have evolving and uncertain impacts on our business. In March 2020, the Company made the decision to transition employees to primarily remote working arrangements. This continues to the present, but the Company has taken steps to maintain internal communication, and operations have thus far continued on schedule and with minimal interruption. Although COVID-19 has not yet had any material adverse impact on the Company's operations or financial condition, there can be no assurances that it, widespread health concerns, or other outbreaks of illness will not have an impact on the Company's business, operations or financial condition going forward. The Company has experienced significant delays in enrolling patients in its clinical trials, directly or indirectly related to COVID-19, resulting in resource constraints at clinical trial sites, as well as competition for patients with other studies being pursued by other entities. As a result of any widespread health concern, pandemic, or other outbreaks of illness, including the COVID-19 pandemic, the Company has and may continue to experience disruptions that severely impact our business, commercialization, third party vendor operations, including foreign and domestic supply chains, or delays in clinical trial activities, including:

- delays or difficulties in initiating clinical trial sites;
- delays or difficulties in enrolling patients in our current and potential future clinical trials of masofaniten (EPI-7386);
- disruption to and delays in preclinical research and analysis activities due to an extended temporary closure of contract lab facilities;
- disruptions in supply, logistics or other activities related to the procurement of materials, which could have a negative impact on the Company's ability to conduct preclinical studies, initiate or complete clinical trials or commercialize product candidates;
- diversion of healthcare resources away from conducting clinical trials;
- interruption of key preclinical studies and clinical trial activities, due to limitations on travel imposed or recommended by federal, state, provincial or municipal governments, employers and others;
- limitations in resources that would otherwise be focused on the conduct of the Company's business or current or planned preclinical studies or clinical trials, including due to sickness, restrictions on travel, prolonged stay-at-home or shelter-in-place orders and other COVID-19 related concerns;
- changes in regulations as part of a response to the COVID-19 outbreak which may require the Company to change the ways in which the preclinical studies and clinical trials are conducted and incur unexpected costs, or requires the Company to discontinue our preclinical research or clinical trials altogether;

- delays in receiving regulatory approvals;
- delays in necessary interactions with regulators, ethics committees and other important agencies and contractors due to limitations in employee resources or furlough of government or contractor personnel; and
- limitations on the Company's ability to recruit preclinical research, clinical, regulatory and other professional staff on the timeframe required to support research and development programs.

Government and health authority intervention in the face of a widespread health concern, pandemic, or other outbreak of illness may vary greatly in the various geographic regions in which we operate. The extent to which a widespread health concern may impact our business, commercialization, pre-clinical studies, and clinical trials will depend on future developments, which are highly uncertain and cannot be predicted with confidence.

***If ESSA is unable to implement and maintain effective internal control over financial reporting in the future, ESSA may not be able to report financial results accurately or prevent fraud. In that case, investors may lose confidence in the accuracy and completeness of ESSA's financial reports and the market price of ESSA's Common Shares may be negatively affected.***

Maintaining effective internal control over financial reporting is necessary for ESSA to produce reliable financial reports and is important in helping to prevent financial fraud. If ESSA is unable to maintain adequate internal controls, ESSA's business and operating results could be harmed.

Pursuant to Section 404(a) of the Sarbanes-Oxley Act and the related rules of the SEC, ESSA's management is required to, among other things, assess annually the effectiveness of its internal control over financial reporting and certify that it has established effective disclosure controls and procedures and internal controls over financial reporting for the period ended September 30, 2023.

Preparing ESSA's consolidated financial statements involves a number of complex manual and automated processes which are dependent on individual data input or review and require significant management judgment. One or more of these elements may result in errors that may not be detected and could result in a material misstatement of ESSA's consolidated financial statements. Management's significant estimates and judgements with respect to financial reporting are discussed and disclosed in the consolidated financial statements.

The process of designing and implementing effective internal controls and procedures, and expanding ESSA's internal accounting capabilities, is a continuous effort that requires ESSA to anticipate and react to changes in ESSA's business and the economic and regulatory environments and expend significant resources to establish and maintain a system of internal controls that is adequate to satisfy ESSA's reporting obligations as a public company. The standards that must be met for management to assess the internal control over financial reporting as effective are complex, and require significant documentation, testing and possible remediation to meet the detailed standards. ESSA cannot be certain at this time whether the Company will be able to successfully complete the continuing implementation of controls and procedures or the certification and attestation requirements of Section 404(a) of Sarbanes-Oxley on a continuous basis.

If a material misstatement occurs in the future, ESSA may fail to meet its future reporting obligations, it may need to restate its financial results and the price of its Common Shares may decline. Any failure of ESSA's internal controls could also adversely affect the results of the periodic management evaluations and any future annual independent registered public accounting firm attestation reports regarding the effectiveness of ESSA's internal control over financial reporting that may be required when Section 404 of Sarbanes-Oxley becomes fully applicable to ESSA. Effective internal controls are necessary for ESSA to produce reliable financial reports and are important to helping prevent financial fraud. If ESSA cannot provide reliable financial reports or prevent fraud, ESSA's business and results of operations could be harmed, investors could lose confidence in ESSA's reported financial information, and the trading price of ESSA's Common Shares could drop significantly.

66

*Provisions in ESSA's corporate charter documents and Canadian law could make an acquisition of the Company, which may be beneficial to ESSA's shareholders, more difficult and may prevent attempts by the shareholders to replace or remove ESSA's current management and/or limit the market price of the Common Shares.*

Provisions in ESSA's articles, as well as certain provisions under the Business Corporations Act (British Columbia) or applicable Canadian securities laws may discourage, delay or prevent a merger, acquisition or other change in control of ESSA that shareholders may consider favorable, including transactions in which they might otherwise receive a premium for their Common Shares. These provisions could also limit the price that investors might be willing to pay in the future for ESSA's Common Shares, thereby depressing the market price of ESSA's Common Shares. In addition, because the Board is responsible for appointing the members of the Company's management team, these provisions may frustrate or prevent any attempts by ESSA's shareholders to replace or remove current management by making it more difficult for shareholders to replace members of the Board. Among other things, these provisions include the following:

- shareholders cannot amend ESSA's articles unless such amendment is approved by shareholders holding at least two-thirds of the votes cast on the proposal;
- the Board may, without shareholder approval, issue preferred shares having any terms, conditions, rights, preferences and privileges as the Board may determine;
- shareholders must give advance notice to nominate directors; and
- applicable Canadian securities laws generally require, subject to certain exceptions, a tender offer to remain open for a minimum of 105 days and that more than 50% of the outstanding securities not owned by the offeror be tendered before the offeror may take up the securities subject to the tender offer.

*If securities or industry analysts do not publish research or publish inaccurate or unfavorable research about ESSA's business, its stock price and trading volume could decline.*

The trading market for ESSA's Common Shares depends in part on the research and reports that securities or industry analysts publish about it, or its business. If one or more of the securities or industry analysts who cover ESSA downgrade its Common Shares or publish inaccurate or unfavorable research about its business, its stock price would likely decline. If one or more of these analysts cease coverage of ESSA or fail to publish reports on it regularly, demand for ESSA's stock could decrease, which might cause its stock price and trading volume to decline.

**Item 1B.    Unresolved Staff Comments**

None.

**Item 1C. Cybersecurity**

Not applicable.

**Item 2.    Properties**

Our headquarters are located in Vancouver, British Columbia, where we rent office space on a short-term lease. Our U.S. offices are located in South San Francisco, California. In March 2018, we entered into a lease for the South San Francisco office that expired on March 31, 2021, and which we have extended to May 31, 2024.

We believe that our existing facilities are adequate for our immediate needs and can accommodate our anticipated growth. We believe that, should it be needed, additional space can be leased to accommodate any future growth.

**Item 3.    Legal Proceedings**

From time to time, we may become involved in legal proceedings or be subject to claims arising in the ordinary course of our business. As of September 30, 2023, we are not a party to any legal proceedings that, in the opinion of our management, would reasonably be expected to have a material adverse effect on our business, financial condition, operating results or cash flows if determined adversely to us. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

**Item 4.    Mine Safety Disclosures**

Not applicable.

**PART II**

**Item 5.    Market for Registrant's Common Equity, Related Shareholder Matters and Issuer Purchases of Equity Securities Market Information**

Our Common Shares began trading on the Nasdaq under the symbol "EPIX" on July 9, 2015.

| | Nasdaq | |
| --- | --- | --- |
| | High | Low |
| | US$ | |
| **Quarter Ended** | | |
| September 30, 2023 | 3.31 | 2.58 |
| June 30, 2023 | 3.48 | 2.56 |
| March 31, 2023 | 3.63 | 2.45 |
| December 31, 2022 | 5.16 | 1.40 |
| September 30, 2022 | 3.68 | 1.66 |
| June 30, 2022 | 8.03 | 3.13 |
| March 31, 2022 | 14.88 | 6.00 |
| December 31, 2021 | 14.78 | 7.54 |

On December 8, 2023, the last reported sale price of our Common Shares on the Nasdaq was $5.46 per share.

**Holders**

As at December 8, 2023, there were approximately 346 holders of record of ESSA's Common Shares. This number does not include beneficial owners whose shares are held in "street name" by banks, brokers, and other financial institutions.

**Dividends**

We have never paid any dividends on our Common Shares or any of our other securities. We currently intend to retain any future earnings to finance the growth and development of our business, and we do not anticipate that we will declare or pay any cash dividends in the foreseeable future. Any future determination to pay cash dividends will be at the discretion of our Board and will be dependent upon our financial condition, results of operations, capital requirements, restrictions under any future indebtedness and other factors the Board deems relevant.

**Certain Canadian Federal Income Tax Considerations for United States Holders**

The following generally summarizes certain Canadian federal income tax consequences generally applicable under the Income Tax Act (Canada) and the regulations enacted thereunder (collectively, the "Canadian Tax Act") and the Canada-United States Tax Convention (1980) (the "Convention") to the holding and disposition of Common Shares. Comment is restricted to holders of Common Shares each of whom, at all material times for the purposes of the Canadian Tax Act and the Convention, (i) is resident solely in the United States for tax purposes, (ii) is a "qualifying person" under, and entitled to the benefits of, the Convention, (iii) holds all Common Shares as capital property, (iv) holds no Common Shares that are "taxable Canadian property" (as defined in the Canadian Tax Act) of the holder, (v) deals at arm's length with and is not affiliated with ESSA, (vi) does not and is not deemed to use or hold any Common Shares in a business carried on in Canada, (vii) is not an insurer that carries on business in Canada and elsewhere, and (viii) is not an "authorized foreign bank" (as defined in the Canadian Tax Act) (each such holder, a "U.S. Resident Holder").

Certain U.S.-resident entities that are fiscally transparent for United States federal income tax purposes (including certain limited liability companies) may not in all circumstances be entitled to the benefits of the Convention. Members of or

68

holders of an interest in such an entity that holds Common Shares should consult their own tax advisers regarding the extent, if any, to which the benefits of the Convention will apply to the entity in respect of its Common Shares.

Generally, a U.S. Resident Holder's Common Shares will be considered to be capital property of such holder provided that the U.S. Resident Holder is not a trader or dealer in securities, did not acquire, hold, or dispose of the Common Shares in one or more transactions considered to be an adventure or concern in the nature of trade, and does not hold the Common Shares in the course of carrying on a business.

This summary is based on the information contained in this Form 10-K, the current provisions of the Canadian Tax Act and the Convention in effect on the date hereof, all specific proposals to amend the Canadian Tax Act and Convention publicly announced by or on behalf of the Minister of Finance (Canada) on or before the date hereof, and the current published administrative and assessing policies of the Canada Revenue Agency (the "CRA"). It is assumed that all such amendments will be enacted as currently proposed, and that there will be no other material change to any applicable law or administrative or assessing practice, whether by way of judicial, legislative or governmental decision or action, although no assurance can be given in these respects. Except as otherwise expressly provided, this summary does not take into account any provincial, territorial, or foreign tax considerations, which may differ materially from those set out herein.

This summary is of a general nature only, is not exhaustive of all possible Canadian federal income tax considerations, and is not intended to be and should not be construed as legal or tax advice to any particular U.S. Resident Holder. U.S. Resident Holders are urged to consult their own tax advisers for advice with respect to their particular circumstances. The discussion below is qualified accordingly.

Generally, a U.S. Resident Holder's Common Shares will not constitute "taxable Canadian property" of such holder at a particular time provided the Common Shares are listed on a "designated stock exchange" (which currently includes the TSX and Nasdaq) unless both of the following conditions are concurrently met:

    (i)  at any time during the 60-month period that ends at the particular time, 25% or more of the issued shares of any class of the capital stock of ESSA were owned by or belonged to one or any combination of:

        A.  the U.S. Resident Holder,

        B.  persons with whom the U.S. Resident Holder did not deal at arm's length, and

        C.  partnerships in which the U.S. Resident Holder or a person referred to in clause (B) above holds a membership interest directly or indirectly through one or more partnerships, and

    (ii)  at any time during the 60-month period that ends at the particular time, more than 50% of the fair market value of the Common Shares was derived, directly or indirectly, from one or any combination of (a) real or immovable property situated in Canada; (b) "Canadian resource properties" (as defined in the Canadian Tax Act); (c) "timber resource properties" (as defined in the Canadian Tax Act); or (d) options in respect of, interests in, or civil law rights in, such properties, whether or not the property exists.

Common Shares may also be deemed to be "taxable Canadian property" in certain circumstances set out in the Canadian Tax Act.

A U.S. Resident Holder who disposes or is deemed to dispose of one or more Common Shares generally should not thereby incur any liability for Canadian federal income tax in respect of any capital gain arising as a consequence of the disposition.

A U.S. Resident Holder to whom ESSA pays or credits or is deemed to pay or credit a dividend on such holder's Common Shares will generally be subject to Canadian withholding tax, and ESSA will be required to withhold the tax from the dividend and remit it to the CRA for the holder's account. The rate of withholding tax under the Canadian Tax Act is 25% of the gross amount of the dividend, but should generally be reduced under the Convention to 15% (or, if the U.S. Resident Holder is a company which is the beneficial owner of at least 10% of the voting stock of ESSA, 5%) of the gross amount of the dividend. For this purpose, a company that is a resident of the United States for purposes of the Convention and is

entitled to the benefits of the Convention shall be considered to own the voting stock of ESSA owned by an entity that is considered fiscally transparent under the laws of the United States and that is not a resident of Canada, in proportion to such company's ownership interest in that entity.

**United States Income Tax Considerations**

The following is a summary of the anticipated U.S. federal income tax consequences generally applicable to U.S. Holders (as defined below) of the ownership and disposition of the Company's Common Shares. This summary addresses only holders who acquire and hold the Common Shares as "capital assets" (generally, assets held for investment purposes).

The following summary does not purport to address all U.S. federal income tax consequences that may be relevant to a U.S. Holder (as defined below) as a result of the ownership and disposition of the Common Shares, nor does it take into account the specific circumstances of any particular holder, some of which may be subject to special tax rules (including, but not limited to, brokers, dealers in securities or currencies, traders in securities that elect to use a mark-to-market method of accounting for securities holdings, tax-exempt organizations, insurance companies, banks, thrifts and other financial institutions, persons liable for alternative minimum tax, persons that hold an interest in an entity that holds the Common Shares, persons that will own, or will have owned, directly, indirectly or constructively 10% or more (by vote or value) of our stock, persons that hold the Common Shares as part of a hedging, integration, conversion or constructive sale transaction or a straddle, former citizens or permanent residents of the United States, or persons whose functional currency is not the U.S. dollar).

This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "Code"), U.S. Treasury regulations, administrative pronouncements and rulings of the United States Internal Revenue Service (the "IRS"), judicial decisions and the Canada-United States Income Tax Convention (1980), as amended, all as in effect on the date hereof, and all of which are subject to change (possibly with retroactive effect) and to differing interpretations. Except as specifically set forth below, this summary does not discuss applicable income tax reporting requirements. This summary does not describe any state, local or foreign tax law considerations, or any aspect of U.S. federal tax law other than income taxation (e.g., estate or gift tax or the Medicare contribution tax). U.S. Holders (as defined below) should consult their own tax advisers regarding such matters.

No legal opinion from U.S. legal counsel or ruling from the IRS has been requested, or will be obtained, regarding the U.S. federal income tax consequences of the ownership or disposition of the Common Shares. This summary is not binding on the IRS, and the IRS is not precluded from taking a position that is different from, and contrary to, the positions taken in this summary. In addition, because the authorities on which this summary is based are subject to different interpretations, the IRS and U.S. courts could disagree with one or more of the positions taken in this summary.

As used in this summary, a "U.S. Holder" is a beneficial owner of the Common Shares who, for U.S. federal income tax purposes, is (i) a citizen or individual resident of the United States, (ii) a corporation (or other entity that is classified as a corporation for U.S. federal income tax purposes) that is created or organized in or under the laws of the United States, any State thereof or the District of Columbia, (iii) an estate whose income is subject to U.S. federal income tax regardless of its source, or (iv) a trust if (A) a U.S. court can exercise primary supervision over the trust's administration and one or more U.S. persons are authorized to control all substantial decisions of the trust, or (B) the trust has a valid election in effect to be treated as a U.S. person for U.S. federal income tax purposes.

The tax treatment of a partner in a partnership (or other entity or arrangement classified as a partnership for U.S. federal income tax purposes) that holds the Common Shares may depend on both the partnership's and the partner's status and the activities of the partnership. Partnerships (or other entities or arrangements classified as a partnership for U.S. federal income tax purposes) that are beneficial owners of the Common Shares, and their partners and other owners, should consult their own tax advisers regarding the tax consequences of the ownership and disposition of the Common Shares.

*Passive Foreign Investment Company Rules*

A foreign corporation will be considered a PFIC for any taxable year in which (1) 75% or more of its gross income is "passive income" under the PFIC rules or (2) 50% or more of the average quarterly value of its assets produce (or are held for the production of) "passive income." For this purpose, "passive income" generally includes interest, dividends, certain rents and royalties, and certain gains. Moreover, for purposes of determining if the foreign corporation is a PFIC, if the foreign corporation owns, directly or indirectly, at least 25%, by value, of the shares of another corporation, it will be treated as if it holds directly its proportionate share of the assets and receives directly its proportionate share of the income of such other corporation. If a corporation is treated as a PFIC with respect to a U.S. Holder for any taxable year, the corporation will continue to be treated as a PFIC with respect to that U.S. Holder in all succeeding taxable years, regardless of whether the corporation continues to meet the PFIC requirements in such years, unless certain elections are made.

The determination as to whether a foreign corporation is a PFIC is based on the application of complex U.S. federal income tax rules, which are subject to differing interpretations, and the determination will depend on the composition of the income, expenses and assets of the foreign corporation from time to time and the nature of the activities performed by its officers and employees. ESSA believes that it was classified as a PFIC for the taxable year ending September 30, 2023, and ESSA believes that it may be classified as a PFIC for the current taxable year and in future taxable years. However, our actual PFIC status for the current or any future taxable year is uncertain and cannot be determined until after the end of such taxable year.

If we are classified as a PFIC, a U.S. Holder that does not make any of the elections described below would be required to report any gain on the disposition of Common Shares as ordinary income, rather than as capital gain, and to compute the tax liability on the gain and any "Excess Distribution" (as defined below) received in respect of Common Shares as if such items had been earned ratably over each day in the U.S. Holder's holding period (or a portion thereof) for the Common Shares. The amounts allocated to the taxable year during which the gain is realized or distribution is made, and to any taxable years in such U.S. Holder's holding period that are before the first taxable year in which we are treated as a PFIC with respect to the U.S. Holder, would be included in the U.S. Holder's gross income as ordinary income for the taxable year of the gain or distribution. The amount allocated to each other taxable year would be taxed as ordinary income in the taxable year during which the gain is realized or distribution is made at the highest tax rate in effect for the U.S. Holder in that other taxable year and would be subject to an interest charge as if the income tax liabilities had been due with respect to each such prior year. For purposes of these rules, gifts, exchanges pursuant to corporate reorganizations and use of Common Shares as security for a loan may be treated as a taxable disposition of the Common Shares. An "Excess Distribution" is the amount by which distributions during a taxable year in respect of a Common Share exceed 125% of the average amount of distributions in respect thereof during the three preceding taxable years (or, if shorter, the U.S. Holder's holding period for the Common Shares).

Certain additional adverse tax rules will apply to a U.S. Holder for any taxable year in which we are treated as a PFIC with respect to such U.S. Holder and any of our subsidiaries is also treated as a PFIC (a "Subsidiary PFIC"). In such a case, the U.S. Holder will generally be deemed to own its proportionate interest (by value) in any Subsidiary PFIC and be subject to the PFIC rules described above with respect to the Subsidiary PFIC regardless of such U.S. Holder's percentage ownership in us.

The adverse tax consequences described above may be mitigated if a U.S. Holder makes a timely "qualified electing fund" election (a "QEF election") with respect to its interest in the PFIC. Consequently, if we are classified as a PFIC, it may be advantageous for a U.S. Holder to elect to treat us as a "qualified electing fund" with respect to such U.S. Holder in the first year in which it holds Common Shares. If a U.S. Holder makes a timely QEF election with respect to ESSA, the electing U.S. Holder would be required in each taxable year that we are considered a PFIC to include in gross income (i) as ordinary income, the U.S. Holder's pro rata share of the ordinary earnings of ESSA and (ii) as capital gain, the U.S. Holder's pro rata share of the net capital gain (if any) of ESSA, whether or not the ordinary earnings or net capital gain are distributed. An electing U.S. Holder's basis in Common Shares will be increased to reflect the amount of any taxed but undistributed income. Distributions of income that had previously been taxed will result in a corresponding reduction of basis in the Common Shares and will not be taxed again as distributions to the U.S. Holder.

A QEF election made with respect to ESSA will not apply to any Subsidiary PFIC; a QEF election must be made separately for each Subsidiary PFIC (in which case the treatment described above would apply to such Subsidiary PFIC). If a U.S. Holder makes a timely QEF election with respect to a Subsidiary PFIC, it would be required in each taxable year to include in gross income its pro rata share of the ordinary earnings and net capital gain of such Subsidiary PFIC, but may not receive a distribution of such income. Such a U.S. Holder may, subject to certain limitations, elect to defer payment of current U.S. federal income tax on such amounts, subject to an interest charge (which would not be deductible for U.S. federal income tax purposes if the U.S. Holder were an individual).

If we determine that we, and any subsidiary in which we own, directly or indirectly, more than 50% of such subsidiary's total aggregate voting power, is likely a PFIC in any taxable year, we intend to make available to U.S. Holders, upon request and in accordance with applicable procedures, a "PFIC Annual Information Statement" with respect to ESSA and any such subsidiary for such taxable year. The "PFIC Annual Information Statement" may be used by U.S. Holders for purposes of complying with the reporting requirements applicable to a QEF election with respect to ESSA and any Subsidiary PFIC. The U.S. federal income tax on any gain from the disposition of Common Shares or from the receipt of Excess Distributions may be greater than the tax if a timely QEF election is made.

Alternatively, if we were to be classified as a PFIC, a U.S. Holder could also avoid certain of the rules described above by making a mark-to-market election (instead of a QEF election), provided the Common Shares are treated as regularly traded on a qualified exchange or other market within the meaning of the applicable U.S. Treasury Regulations. However, a U.S. Holder will not be permitted to make a mark-to-market election with respect to a Subsidiary PFIC. U.S. Holders should consult their own tax advisers regarding the potential availability and consequences of a mark-to-market election, as well as the advisability of making a protective QEF election in case we are classified as a PFIC in any taxable year.

During any taxable year in which we or any Subsidiary PFIC is treated as a PFIC with respect to a U.S. Holder, that U.S. Holder generally must file IRS Form 8621. U.S. Holders should consult their own tax advisers concerning annual filing requirements.

***The Common Shares***

*Distributions on the Common Shares*

In general, subject to the passive foreign investment company rules discussed above, the gross amount of any distribution received by a U.S. Holder with respect to the Common Shares (including amounts withheld to pay Canadian withholding taxes) will be included in the gross income of the U.S. Holder as a dividend to the extent attributable to our current and accumulated earnings and profits, as determined under U.S. federal income tax principles. We may not calculate our earnings and profits for each year under U.S. federal income tax rules. Accordingly, U.S. Holders should expect that a distribution generally will be treated as a dividend for U.S. federal income tax purposes. Subject to the passive foreign investment company rules discussed above, distributions on the Common Shares to certain non-corporate U.S. Holders that are treated as dividends may be taxed at preferential rates provided we are not treated as a PFIC for the taxable year of the distribution or the preceding taxable year. Such dividends will not be eligible for the "dividends received" deduction ordinarily allowed to corporate shareholders with respect to dividends received from U.S. corporations.

The amount of any dividend paid in Canadian dollars (including amounts withheld to pay Canadian withholding taxes) will equal the U.S. dollar value of the Canadian dollars calculated by reference to the exchange rate in effect on the date the dividend is received by the U.S. Holder, regardless of whether the Canadian dollars are converted into U.S. dollars. A U.S. Holder will have a tax basis in the Canadian dollars equal to their U.S. dollar value on the date of receipt. If the Canadian dollars received are converted into U.S. dollars on the date of receipt, the U.S. Holder should generally not be required to recognize foreign currency gain or loss in respect of the distribution. If the Canadian dollars received are not converted into U.S. dollars on the date of receipt, a U.S. Holder may recognize foreign currency gain or loss on a subsequent conversion or other disposition of the Canadian dollars. Such gain or loss will be treated as U.S. source ordinary income or loss.

Distributions on the Common Shares that are treated as dividends generally will constitute income from sources outside the United States and generally will be categorized for U.S. foreign tax credit purposes as "passive category income." A

U.S. Holder may be eligible to elect to claim a U.S. foreign tax credit against its U.S. federal income tax liability, subject to applicable limitations and holding period requirements, for Canadian tax withheld, if any, from distributions received in respect of the Common Shares. A U.S. Holder that does not elect to claim a U.S. foreign tax credit may instead claim a deduction for Canadian tax withheld, but only for a taxable year in which the U.S. Holder elects to do so with respect to all foreign income taxes paid or accrued in such taxable year. The rules relating to U.S. foreign tax credits are complex, and each U.S. Holder should consult its own tax adviser regarding the application of such rules.

*Sale, Exchange or Other Taxable Disposition of the Common Shares*

A U.S. Holder generally will recognize gain or loss on the sale, exchange or other taxable disposition of Common Shares in an amount equal to the difference, if any, between the amount realized on the sale, exchange or other taxable disposition and the U.S. Holder's adjusted tax basis in the Common Shares exchanged therefor. Subject to the passive foreign investment company rules discussed above, such gain or loss will be capital gain or loss and will be long-term capital gain (currently taxable at a reduced rate for non-corporate U.S. Holders) or loss if, on the date of the sale, exchange or other taxable disposition, the Common Shares have been held by such U.S. Holder for more than one year. The deductibility of capital losses is subject to limitations. Such gain or loss generally will be sourced within the United States for U.S. foreign tax credit purposes.

**Required Disclosure with Respect to Foreign Financial Assets**

Certain U.S. Holders are required to report information relating to an interest in the Common Shares, subject to certain exceptions (including an exception for common shares held in accounts maintained by certain financial institutions), by attaching a completed IRS Form 8938, Statement of Specified Foreign Financial Assets, with their tax return for each year in which they hold an interest in Common Shares. U.S. Holders should consult their own tax advisers regarding information reporting requirements relating to their ownership of the Common Shares.

**Recent Sales of Unregistered Securities**

None.

**Issuer Repurchases of Equity Securities**

None.

**Item 6.     [Reserved.]**

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion should be read in conjunction with the attached financial statements and notes thereto. This Annual Report on Form 10-K, including the following sections, contains forward-looking statements within the meaning of the U.S. Private Securities Litigation Reform Act of 1995. These statements are subject to risks and uncertainties that could cause actual results and events to differ materially from those expressed or implied by such forward-looking statements. For a detailed discussion of these risks and uncertainties, see Item 1A, "Risk Factors" of this Annual Report on Form 10-K. We caution the reader not to place undue reliance on these forward -looking statements, which reflect management's analysis only as of the date of this Annual Report on Form 10-K. We undertake no obligation to update forward-looking statements to reflect events or circumstances occurring after the date of this Annual Report on Form 10-K. Throughout this discussion, unless the context specifies or implies otherwise, the terms "ESSA," "the Company," "we," "us," and "our" refer to ESSA Pharma Inc. and its subsidiaries. For a discussion regarding our financial condition and results of operations for fiscal 2022 as compared to fiscals 2021 and 2020 see Item 7 of our Annual Report on Form 10-K for the fiscal year ended September 30, 2022, filed with the SEC on December 13, 2022.*

**Overview**

ESSA is a clinical stage pharmaceutical company, focused on developing novel and proprietary therapies for the treatment of prostate cancer with an initial focus on patients whose disease is progressing despite treatment with current standard of care therapies, including second-generation antiandrogen drugs such as abiraterone, enzalutamide, apalutamide, and darolutamide. The Company believes its latest series of investigational compounds, including its product candidate masofaniten (EPI-7386), have the potential to significantly expand the interval of time in which patients with castration-resistant prostate cancer can benefit from anti-hormone-based therapies. Specifically, the compounds are designed to disrupt the androgen receptor signaling pathway, the primary pathway that drives prostate cancer growth and prevent AR activation through selective binding to the N-terminal domain of the AR. In this respect, the Company's compounds are designed to differ from classical non-steroid antiandrogens. These antiandrogens interfere either with androgen synthesis (i.e., abiraterone), or with the binding of androgens to the ligand-binding domain, located at the opposite end of the receptor from the NTD (i.e., lutamides). A functional NTD is essential for activation of the AR; blocking the NTD inhibits AR-driven transcription and therefore androgen-driven biology.

**General Development of the Business**

***Significant Business Developments for the Year Ended September 30, 2023***

On October 26-28, 2023, the Company presented updated dose escalation data from its Phase 1/2 study evaluating masofaniten (EPI-7386) in combination with enzalutamide at the 30th Annual Prostate Cancer Foundation Scientific Retreat.

The data presented were from the first four cohorts of patients in the Phase 1 dose escalation portion of the study. The data indicated that masofaniten (EPI-7386) had no effect on enzalutamide exposure, thus allowing the use of full dose per label (160mg) of enzalutamide in combination. It also indicated that enzalutamide reduces masofaniten (EPI-7386) exposure but twice daily dosing of masofaniten (EPI-7386) appears to mitigate the reduction and maintains clinically relevant drug exposures.

In patients evaluable for safety (n=18), masofaniten (EPI-7386) combined with enzalutamide, was well-tolerated at the doses tested through 21 cycles of dosing in some patients. The most frequent adverse events were Grade 1 and 2, related to either AR inhibition or gastrointestinal tract irritation. In Cohort 4, one patient experienced a Grade 3 rash, which was observed immediately following administration of masofaniten (EPI-7386) combined with enzalutamide and deemed probably related.

In the patients evaluable for efficacy (n=16), rapid, deep and durable reductions in PSA were observed, regardless of previous chemotherapy status, including in patients who received lower than the full dose of enzalutamide (120 mg). In the first three cohorts, 90% of patients (9 of 10) achieved PSA50 and PSA90, 80% of patients (8 of 10) achieved PSA90 in less than 90 days, and 70% of patients (7 of 10) achieved PSA <0.2ng/mL. Across all dose cohorts including patients in the recently enrolled Cohort 4, 88% of patients (14 of 16) achieved PSA50, 81% of patients (13 of 16) achieved PSA90,

69% of patients (11 of 16) achieved PSA90 in less than 90 days, and 56% of patients (9 of 16) achieved PSA <0.2ng/mL. The randomized Phase 2 dose expansion portion of the study was reported to be enrolling.

On October 20-24, 2023, the Company presented the same updated dose escalation data from its Phase 1/2 study evaluating masofaniten (EPI-7386) in combination with enzalutamide at the European Society of Medical Oncology (ESMO) 2023 Congress.

On October 3, 2023, the Company filed a prospectus supplement to its registration statement on Form S-3, including a base prospectus, with the SEC. Further to this, on November 6, 2023, the Company announced that it had entered into the ATM Sales Agreement with Jefferies LLC, effective as of November 3, 2023. Under the ATM Sales Agreement, ESSA may, within the period that the ATM Sales Agreement is in effect, sell its Common Shares from time to time for up to US$50.0 million in aggregate sales proceeds. No offers or sales of Common Shares will be made in Canada, to anyone known by Jefferies LLC to be a resident of Canada or on or through the facilities of any stock exchange or trading markets in Canada.

On September 18, 2023, the Company announced the initiation of the Phase 2 portion of its Phase 1/2 study evaluating its lead candidate, masofaniten (EPI-7386) in combination with Astellas and Pfizer's enzalutamide in patients with mCRPC naïve to second-generation antiandrogens

On August 31, 2023, the Company announced the establishment of Automatic Securities Disposition Plans for its President and Chief Executive Officer, David R. Parkinson and its Executive Vice President and Chief Operating Officer, Peter Virsik.

On June 6, 2023, the Company appointed Lauren Merendino to its Board.

On April 12, 2023, the Company announced it had entered into a clinical trial support agreement with Janssen. ESSA will sponsor and conduct a Phase 1 clinical trial evaluating the safety, pharmacokinetics, drug-drug interactions, and preliminary anti-tumor activity of masofaniten (EPI-7386) when administered in combination with either apalutamide or abiraterone acetate plus prednisone. Janssen will supply apalutamide and abiraterone acetate.

On February 16-19, 2023, the Company presented analyses of initial clinical data from two Phase 1 studies of masofaniten (EPI-7386) in patients with mCRPC at the American Society of Clinical Oncology Genitourinary Cancers Symposium. The Company presented an update to the Phase 1 monotherapy study demonstrating that masofaniten (EPI-7386) single agent showed a favorable safety profile and was well tolerated up to a daily dose of 1200 mg (600 mg BID), achieved target clinical exposures and showed preliminary signals of anti-tumor activity in heavily pretreated mCRPC patients. The second poster presented preliminary results to the Phase 1/2 trial of masofaniten (EPI-7386) in combination with Astellas and Pfizer's AR inhibitor, enzalutamide. Ten patients had been enrolled in the first three cohorts: three in cohort 1 (600 mg QD masofaniten (EPI-7386) and 120 mg QD enzalutamide), four in cohort 2 (800 mg QD masofaniten (EPI-7386) and 120 mg QD enzalutamide) and three in cohort 3 (600 mg BID masofaniten (EPI-7386) and 120 mg QD enzalutamide). At that time, the DLT period had not cleared for cohort 3. For the first 2 cohorts that cleared the DLT period, no DLTs were observed, and the safety profile was consistent with second-generation antiandrogens (e.g., Grade 1 or 2 AEs of fatigue and hot flushes). Pharmacokinetic results from cohorts 1 and 2 had demonstrated that enzalutamide exposure was minimally impacted by masofaniten (EPI-7386), while, as expected, masofaniten (EPI-7386) exposure was reduced by approximately 60% by enzalutamide (a well established CYP3A4 inducer). The observed masofaniten (EPI-7386) exposures remained in the clinically relevant range suggested by pre-clinical xenograph studies. Five out of six evaluable patients enrolled in the first two cohorts showed a PSA decrease >90% regardless of the patients previous chemotherapy status, and four out of six evaluable patients PSA levels reached < 0.2 ng/mL. All five patients that experienced biochemical responses showed stable disease by imaging.

*Financing and Capital*

On November 6, 2023, the Company announced that it had entered into the ATM Sales Agreement with Jefferies LLC, effective as of November 3, 2023. Under the ATM Sales Agreement, ESSA may, within the period that the ATM Sales Agreement is in effect, sell its Common Shares from time to time for up to US$50.0 million in aggregate sales proceeds.

No offers or sales of Common Shares will be made in Canada, to anyone known by Jefferies LLC to be a resident of Canada or on or through the facilities of any stock exchange or trading markets in Canada.

ESSA has never been profitable and has incurred net losses since inception. ESSA's net losses were $26,567,596 and $35,161,917 for the years ended September 30, 2023 and 2022, respectively. ESSA expects to incur losses for the foreseeable future, and it expects these losses to increase as it continues the development of, and seek regulatory approvals for, its product candidate. Because of the numerous risks and uncertainties associated with product development, ESSA is unable to predict the timing or amount of increased expenses or when, or if, it will be able to achieve or maintain profitability.

**Results of Operations**

The following table sets forth ESSA's consolidated statements of financial position and consolidated statements of loss and comprehensive loss as at and for the fiscal years ended September 30, 2023 and 2022:

| (US$)<br>Income Statement Data | Year Ended<br>September 30, 2023 | Year Ended<br>September 30, 2022 |
|---|---|---|
| Revenue | — | — |
| Research and development, net of recoveries | 21,322,530 | 24,415,246 |
| Financing costs | 6,942 | 13,746 |
| General and administration, net of recoveries | 10,811,574 | 12,544,760 |
| Total operating expenses | (32,141,046) | (36,973,752) |
| Net loss for the year | (26,582,343) | (35,103,251) |
| **Loss and comprehensive loss** | (26,567,596) | (35,161,917) |
| **Balance Sheet Data** | | |
| Cash | 33,701,912 | 57,076,475 |
| Prepaids and other current assets | 115,094,966 | 111,982,866 |
| Deposits | 257,245 | 259,455 |
| Right-of-use assets | 68,008 | 186,499 |
| **Total assets** | 149,122,131 | 169,505,295 |
| Accounts payable and accrued liabilities | 3,414,743 | 2,176,565 |
| Income tax payable | — | — |
| Lease liabilities | 80,328 | 210,252 |
| Shareholders' equity | 145,627,060 | 167,118,478 |
| **Total liabilities and shareholders' equity** | 149,122,131 | 169,505,295 |

**Results of Operations for the Fiscal Years Ended September 30, 2023 and 2022**

There was no revenue in any of the fiscal years as reported. The Company incurred a comprehensive loss of $26,567,596 for the year ended September 30, 2023 compared to a comprehensive loss of $35,161,917 for the year ended September 30, 2022. Variations in ESSA's expenses and net loss for the periods resulted primarily from the following factors described below.

*Research and Development Expenditures*

R&D expense included the following major expenses by nature:

| | | Year ended | | |
| --- | --- | --- | --- | --- |
| | | September 30, 2023 | | September 30, 2022 |
| Preclinical and data analysis | $ | 6,081,575 | $ | 8,134,161 |
| Clinical | | 5,780,660 | | 4,872,268 |
| Salaries and benefits | | 2,712,168 | | 2,073,188 |
| Share-based payments | | 2,627,505 | | 4,322,844 |
| Manufacturing | | 2,356,472 | | 2,946,412 |
| Legal patents and license fees | | 919,859 | | 1,123,319 |
| Consulting | | 430,260 | | 511,590 |
| Other | | 213,972 | | 204,334 |
| Travel and other | | 137,285 | | 144,645 |
| Royalties | | 62,774 | | 82,485 |
| Total | $ | 21,322,530 | $ | 24,415,246 |

The overall R&D expense for the year ended September 30, 2023 was $21,322,530 compared to $24,415,246 for the year ended September 30, 2022 and includes non-cash expense related to share-based payments expense of $2,627,505 (2022 - $4,322,844). R&D expense in 2023 reflects the ongoing clinical trial of masofaniten (EPI-7386).

Preclinical costs of $6,081,575 (2022 - $8,134,161) were generated in relation to expenditures for pharmacokinetic data analysis on data from the clinical trial related to the Phase 1 study and work on preclinical pipeline and Anitac compounds.

Clinical costs of $5,780,660 (2022 - $4,872,268) were generated in relation to expenditures associated with the Company's clinical research organizations conducting the Phase 1 clinical trial of masofaniten (EPI-7386).

Salaries and benefits, related to preclinical and clinical staff, have increased to $2,712,168 (2022 - $2,073,188) as a result of an increased number of preclinical and clinical staff.

The share-based payments expense of $2,627,505 (2022 - $4,322,844), which is a non-cash expense, relates to the value assigned to stock options and employee share purchase rights granted to key management personnel and consultants of the Company. The expense is recognized in relation to the grant and vesting of these equity instruments, net of expiries and forfeitures, and allocated to research and development, general and administration and financing expenditures relative to the activity of the underlying optionee.

Manufacturing costs of $2,356,472 (2022 - $2,946,412) for the year ended September 30, 2023 includes amount for cGMP manufacturing of masofaniten (EPI-7386) drug supply to support the ongoing clinical trial as well as costs incurred in formulation and chemistry work around the Company's pharmaceutical characteristics of masofaniten (EPI-7386).

Legal patents and license fees decreased to $919,859 (2022 - $1,123,319). The Company has adopted a tiered patent strategy to protect its intellectual property as the pharmaceutical industry places significant importance on patents for the protection of new technologies, products and processes. The costs reflect that ongoing investment and the timing of associated maintenance costs. The Company anticipates that there will be continued investment into patent applications.

Consulting costs decreased to $430,260 (2022 - $511,590) for the year ended September 30, 2023 primarily resulting from contract project management services.

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 80 of 110    Document 29-1

*General and Administration Expenditures*

General and administrative expenses include the following major expenses by nature:

| | Year ended | |
| --- | --- | --- |
| | September 30, 2023 | September 30, 2022 |
| Salaries and benefits | $ 4,303,570 | $ 3,710,999 |
| Share-based payments | 2,379,965 | 3,565,241 |
| Insurance | 1,724,746 | 2,088,637 |
| Professional fees | 1,019,989 | 901,282 |
| Investor relations | 602,645 | 577,350 |
| Office, insurance, IT and communications | 529,301 | 554,255 |
| Director fees | 392,667 | 343,083 |
| Regulatory fees and transfer agent | 202,525 | 197,877 |
| Travel and other | 179,302 | 146,603 |
| Rent | 22,567 | 9,443 |
| Consulting and subcontractor fees | 8,700 | 185,292 |
| Amortization/(Accretion) | (554,403) | 264,698 |
| Total | $ 10,811,574 | $ 12,544,760 |

General and administration expenses decreased to $10,811,574 for the year ended September 30, 2023 from $12,544,760 in the year ended September 30, 2022 and included non-cash expense related to share-based payments of $2,379,965 (2022 - $3,565,241). This non-cash expense relates to the value assigned to stock options and employee share purchase rights granted to key management and consultants of the Company. The expense is recognized in relation to the grant and vesting of these equity instruments, net of expiries and forfeitures, and allocated to research and development, general and administration and financing expenditures relative to the activity of the underlying optionee.

Salaries and benefits expense increased to $4,303,570 (2022 - $3,710,999) reflecting merit related salary adjustment and bonuses paid to employees and additional support staff costs.

Insurance expense of $1,724,746 (2022 - $2,088,637) decreased in the current year following lower insurance renewal premiums relative to the Company's activities, risk mitigation choices and insurance market pricing trends.

Professional fees of $1,019,989 (2022 - $901,282) were incurred for legal and accounting services in conjunction with ongoing corporate activities.

Consulting and subcontractor fees of $8,700 (2022 - $185,292) decreased following the termination of a support services contract in late fiscal 2022.

Amortization/(Accretion) recognized varies relative to the Company's investment holdings and market conditions for expected investment returns. Over the periods presented, the Company had a larger investment holding and had benefited from higher interest rates.

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 81 of 110    Document 29-1

**Liquidity and Capital Resources**

ESSA is a clinical stage company and does not currently generate revenue.

As at September 30, 2023, the Company had working capital of $145,301,807 (2022 - $166,748,942). Operational activities during the year ended September 30, 2023 were financed mainly by proceeds from financings in July 2020 and February 2021. At September 30, 2023, the Company had available cash reserves and short-term investments of $148,076,401 (2022 - $167,237,504) to settle current liabilities of $3,495,071 (2022 - $2,310,399). At September 30, 2023, the Company believed that it had sufficient capital to satisfy its obligations as they became due and execute its planned expenditures for more than twelve months. The Company expects its current cash runway to fund its operations and ESSA-sponsored clinical programs through 2025, including under Clinical Trial – EPI-7386-CS-001, the Part B Combination – Cohort 1 – Combination with abiraterone acetate/prednisone and the Part B Combination – Cohort 2 – Window of opportunity with clinical endpoints followed by combination with apalutamide study, also under Clinical Trial – EPI-7386-CS-010, the Phase 2 combination study with enzalutamide, and an investigator-sponsored study of masofaniten (EPI-7386) and darolutamide.

ESSA's future cash requirements may vary materially from those now expected due to a number of factors, including the costs associated with future preclinical work and to take advantage of strategic opportunities, such as partnering collaborations or mergers and acquisitions activities. In the future, it may be necessary to raise additional funds. These funds may come from sources such as entering into strategic collaboration arrangements, the issuance of shares from treasury, or alternative sources of financing. However, there can be no assurance that ESSA will successfully raise funds to continue its operational activities. See "Risk Factors" in Item 1A. elsewhere in this Annual Report.

**Critical Accounting Policies and Estimates**

The Company makes estimates and assumptions about the future that affect the reported amounts of assets and liabilities. Estimates and judgments are continually evaluated based on historical experience and other factors, including expectations of future events that are believed to be reasonable under the circumstances. In the future, actual experience may differ from these estimates and assumptions.

The effect of a change in an accounting estimate is recognized prospectively by including it in comprehensive income in the period of the change, if the change affects that period only, or in the period of the change and future periods, if the change affects both. Significant assumptions about the future and other sources of estimation uncertainty that management has made at the statement of financial position date, that could result in a material adjustment to the carrying amounts of assets and liabilities, in the event that actual results differ from assumptions that have been made that relate to the following key estimates:

*Income tax*

The determination of income tax is inherently complex and requires making certain estimates and assumptions about future events. Changes in facts and circumstances as a result of income tax audits, reassessments, changes to corporate structure and associated domiciling, jurisprudence and any new legislation may result in an increase or decrease the provision for income taxes. The value of deferred tax assets is evaluated based on the probability of realization; the Company has assessed that it is improbable that such assets will be realized and has accordingly not recognized a value for deferred taxes.

*Share-based payments and compensation*

The Company has applied estimates with respect to the valuation of shares issued for non-cash consideration. Shares are valued at the fair value of the equity instruments granted at the date of grant and the cost is recorded when the Company receives the goods or services.

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 82 of 110    Document 29-1

The Company measures the cost of equity-settled transactions with employees by reference to the fair value of the equity instruments at the date at which they are granted. Estimating fair value for share-based payment transactions requires determining the most appropriate valuation model, which is dependent on the terms and conditions of the grant. This estimate also requires determining the most appropriate inputs to the valuation model including the fair value of the underlying Common Shares, the expected life of the share option, volatility and dividend yield and making assumptions about them. The fair value of the underlying Common Shares is assessed as the most recent issuance price per common share for cash proceeds.

**Trend Information**

ESSA is a clinical stage pharmaceutical company and does not currently generate revenue. The Company is focused on the development of small molecule drugs for the treatment of prostate cancer. The Company has acquired a license to certain Licensed IP. As at the date of this Annual Report, no products are in commercial production or use. The Company's financial success will be dependent upon its ability to continue development of its compounds through preclinical and clinical stages to commercialization.

**Safe Harbor**

See "Cautionary Note Regarding Forward-Looking Statements" in the introduction to this Annual Report.

**Item 7A.     Quantitative and Qualitative Disclosures About Market Risk**

We are a smaller reporting company as defined by Rule 12b-2 of the Exchange Act and are not required to provide the information required under this item.

**Item 8.    Financial Statements and Supplementary Data**

**ESSA Pharma Inc.**



**CONSOLIDATED FINANCIAL STATEMENTS**
**(Expressed in United States dollars)**

**FOR THE YEARS ENDED SEPTEMBER 30, 2023 and 2022**

Case 1:25-cv-00124-WCG     Filed 10/10/25     Page 84 of 110     Document 29-1



# DAVIDSON & COMPANY LLP ——— Chartered Professional Accountants ———

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders and Directors of
ESSA Pharma Inc.

### *Opinion on the Consolidated Financial Statements*

We have audited the accompanying consolidated balance sheets of ESSA Pharma Inc. (the "Company") as of September 30, 2023 and 2022, and the related consolidated statements of operations and comprehensive loss, cash flows, and changes in shareholders' equity for the years ended September 30, 2023 and 2022, and the related notes (collectively referred to as the "financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of September 30, 2023 and 2022, and the results of its operations and its cash flows for the years ended September 30, 2023 and 2022 in conformity with accounting principles generally accepted in the United States of America.

### *Basis for Opinion*

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.



A member of
Nexia
International

1200 - 609 Granville Street, P.O. Box 10372, Pacific Centre, Vancouver, B.C., Canada V7Y 1G6
Telephone (604) 687-0947  Davidson-co.com

82

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 85 of 110    Document 29-1

*Critical Audit Matters*

The critical audit matters communicated below are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

We have not identified any critical audit matters for the years ended September 30, 2023 and 2022.

We have served as the Company's auditor since 2012.

**/s/ DAVIDSON & COMPANY LLP**

Vancouver, Canada                                      Chartered Professional Accountants

December 12, 2023

**ESSA PHARMA INC.**
CONSOLIDATED BALANCE SHEETS
(Expressed in United States dollars)
AS AT SEPTEMBER 30

|  | | 2023 | | 2022 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current** | | | | |
| Cash and cash equivalents | $ | 33,701,912 | $ | 57,076,475 |
| Short-term investments (Note 4) | | 114,374,489 | | 110,161,029 |
| Receivables | | 135,057 | | 6,211 |
| Prepaids (Note 5) | | 585,420 | | 1,815,626 |
| | | 148,796,878 | | 169,059,341 |
| **Deposits** | | 257,245 | | 259,455 |
| **Operating lease right-of-use assets (Note 7)** | | 68,008 | | 186,499 |
| **Total assets** | $ | 149,122,131 | $ | 169,505,295 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | |
| **Current** | | | | |
| Accounts payable and accrued liabilities (Note 6) | $ | 3,414,743 | $ | 2,176,565 |
| Current portion of operating lease liabilities (Note 7) | | 80,328 | | 133,834 |
| | | 3,495,071 | | 2,310,399 |
| **Operating lease liabilities (Note 7)** | | — | | 76,418 |
| **Total liabilities** | | 3,495,071 | | 2,386,817 |
| **Shareholders' equity** | | | | |
| Authorized | | | | |
| Unlimited common shares, without par value | | | | |
| Unlimited preferred shares, without par value | | | | |
| Common shares 44,100,838 issued and outstanding (September 30, 2022 – 44,073,076) (Note 9) | | 278,161,537 | | 278,089,136 |
| Additional paid-in capital (Note 9) | | 49,047,280 | | 44,043,503 |
| Accumulated other comprehensive loss | | (2,120,398) | | (2,135,145) |
| Accumulated deficit | | (179,461,359) | | (152,879,016) |
| | | 145,627,060 | | 167,118,478 |
| **Total liabilities and shareholders' equity** | $ | 149,122,131 | $ | 169,505,295 |

**Nature of operations (Note 1)**
**Commitments (Note 15)**
**Subsequent events (Note 16)**

The accompanying notes are an integral part of these consolidated financial statements.

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 87 of 110    Document 29-1

**ESSA PHARMA INC.**
CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS
(Expressed in United States dollars)
FOR THE YEARS ENDED SEPTEMBER 30

| | | 2023 | | 2022 |
|---|---|---|---|---|
| **OPERATING EXPENSES** | | | | |
| Research and development | $ | 21,322,530 | $ | 24,415,246 |
| Financing costs (Note 7) | | 6,942 | | 13,746 |
| General and administration | | 10,811,574 | | 12,544,760 |
| | | | | |
| Total operating expenses | | (32,141,046) | | (36,973,752) |
| | | | | |
| Foreign exchange | | 6,529 | | 1,687 |
| Interest and other income | | 5,553,774 | | 1,736,641 |
| Derivative liability gain (Note 8) | | — | | 20,352 |
| | | | | |
| Loss for the year before taxes | | (26,580,743) | | (35,215,072) |
| | | | | |
| Income tax recovery (expense) (Note 11) | | (1,600) | | 111,821 |
| | | | | |
| **Net loss for the year** | | (26,582,343) | | (35,103,251) |
| | | | | |
| **OTHER COMPREHENSIVE LOSS** | | | | |
| Unrealized gain (loss) on short-term investments (Note 4) | | 14,747 | | (58,666) |
| | | | | |
| **Loss and comprehensive loss for the year** | $ | (26,567,596) | $ | (35,161,917) |
| | | | | |
| **Basic and diluted loss per common share** | $ | (0.60) | $ | (0.80) |
| | | | | |
| **Weighted average number of common shares outstanding – basic and diluted** | | 44,089,557 | | 44,038,241 |

The accompanying notes are an integral part of these consolidated financial statements.

85

**ESSA PHARMA INC.**
CONSOLIDATED STATEMENTS OF CASH FLOWS
(Expressed in United States dollars)
FOR THE YEARS ENDED SEPTEMBER 30

| | | 2023 | | 2022 |
|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Net loss for the year | $ | (26,582,343) | $ | (35,103,251) |
| Items not affecting cash and cash equivalents: | | | | |
| Amortization of right-of-use asset | | 118,491 | | 121,787 |
| Amortization/(Accretion) of premiums/discounts on short-term investments, net | | (671,268) | | 69,653 |
| Accretion of lease liability | | 6,942 | | 13,305 |
| Derivative liability gain | | — | | (20,352) |
| Accrued Investment income | | 374 | | (189,213) |
| Unrealized foreign exchange | | (528) | | 845 |
| Share-based payments | | 5,007,469 | | 7,888,085 |
| | | | | |
| Changes in non-cash working capital items: | | | | |
| Receivables | | (128,846) | | 482,801 |
| Prepaids | | 1,232,416 | | 366,256 |
| Accounts payable and accrued liabilities | | 1,235,577 | | (1,629,065) |
| | | | | |
| Net cash used in operating activities | | (19,781,716) | | (27,999,149) |
| | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Purchase of short-term investments | | (365,203,691) | | (296,012,498) |
| Proceeds from short-term investments sold | | 361,676,542 | | 242,959,084 |
| | | | | |
| Net cash used in investing activities | | (3,527,149) | | (53,053,414) |
| | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Options exercised | | — | | 319,832 |
| Shares purchased through employee share purchase plan | | 68,709 | | 66,926 |
| Lease payments | | (136,866) | | (134,023) |
| | | | | |
| Net cash (used) provided by financing activities | | (68,157) | | 252,735 |
| | | | | |
| **Effect of foreign exchange on cash and cash equivalents** | | 2,459 | | 51,279 |
| **Change in cash and cash equivalents for the year** | | (23,374,563) | | (80,748,549) |
| **Cash and cash equivalents, beginning of year** | | 57,076,475 | | 137,825,024 |
| | | | | |
| **Cash and cash equivalents, end of year** | $ | 33,701,912 | $ | 57,076,475 |

**Supplemental Disclosure with respect to Cash Flows (Note 12)**

The accompanying notes are an integral part of these consolidated financial statements.

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 89 of 110    Document 29-1

**ESSA PHARMA INC.**
CONSOLIDATED STATEMENT OF CHANGES IN SHAREHOLDERS' EQUITY
(Expressed in United States dollars)

| | Number of shares | Common shares | Additional paid-in capital | Accumulated other comprehensive loss | Deficit | Total |
|---|---|---|---|---|---|---|
| **Balance, September 30, 2021** | 43,984,346 | $ 277,415,176 | $ 36,442,620 | $ (2,076,479) | $ (117,775,765) | $ 194,005,552 |
| Options exercised | 72,910 | 568,854 | (249,022) | — | — | 319,832 |
| Shares issued through employee share purchase plan | 15,820 | 105,106 | (38,180) | — | — | 66,926 |
| Share-based payments | — | — | 7,888,085 | — | — | 7,888,085 |
| Loss and comprehensive loss for the year | — | — | — | (58,666) | (35,103,251) | (35,161,917) |
| **Balance, September 30, 2022** | 44,073,076 | $ 278,089,136 | $ 44,043,503 | $ (2,135,145) | $ (152,879,016) | $ 167,118,478 |
| Shares issued through employee share purchase plan | 27,762 | 72,401 | (3,692) | — | — | 68,709 |
| Share-based payments | — | — | 5,007,469 | — | — | 5,007,469 |
| Loss and comprehensive loss for the year | — | — | — | 14,747 | (26,582,343) | (26,567,596) |
| **Balance, September 30, 2023** | 44,100,838 | $ 278,161,537 | $ 49,047,280 | $ (2,120,398) | $ (179,461,359) | $ 145,627,060 |

The accompanying notes are an integral part of these consolidated financial statements.

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 90 of 110    Document 29-1

## 1. NATURE OF OPERATIONS

**Nature of Operations**

ESSA Pharma Inc. (the "Company") was incorporated under the laws of the Province of British Columbia on January 6, 2009. The Company's head office address is Suite 720 – 999 West Broadway, Vancouver, British Columbia, Canada V5Z 1K5. The registered and records office address is Suite 3500, The Stack, 1133 Melville Street, Vancouver, British Columbia, V6E 4E5. The Company is listed on the Nasdaq Capital Market ("Nasdaq") under the symbol "EPIX".

The Company is focused on the development of small molecule drugs for the treatment of prostate cancer. The Company has a license to certain patents (the "NTD Technology") which were the joint property of the British Columbia Cancer Agency and the University of British Columbia. As at September 30, 2023, no products are in commercial production or use.

## 2. BASIS OF PRESENTATION

**Basis of Presentation**

These accompanying consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America ("U.S. GAAP") on a going concern basis.

The accompanying consolidated financial statements have been prepared on a historical cost basis except for certain financial assets measured at fair value using the accrual basis of accounting.

All amounts expressed in these accompanying consolidated financial statements and the accompanying notes are expressed in United States dollars, except per share data and where otherwise indicated. References to "$" are to United States dollars and references to "C$" are to Canadian dollars.

**Basis of Consolidation and Functional Currency**

*Consolidation*

The accounts of subsidiaries are prepared for the same reporting period as the parent company, using consistent accounting policies. Inter-company transactions, balances and unrealized gains or losses on transactions are eliminated upon consolidation. The consolidated financial statements comprise the accounts of ESSA Pharma Inc., the parent company, and its wholly owned subsidiary.

*Functional Currency*

The functional currency of an entity is the currency of the primary economic environment in which the entity operates.

The functional currency of the Company and its subsidiary have been determined as follows:

| | Country of Incorporation | Effective Interest | Functional Currency |
|---|---|---|---|
| ESSA Pharma Inc. | Canada | — | US Dollar |
| ESSA Pharmaceuticals Corp. | USA | 100 % | US Dollar |

The liquidation and dissolution process for Realm Therapeutics plc and Realm Therapeutics Inc. were completed as at September 30, 2022. The consolidated financial statements also include the operations of Realm Therapeutics plc and Realm Therapeutics Inc. to the date of dissolution.

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 91 of 110    Document 29-1

**Use of Estimates**

The preparation of the accompanying consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions about future events that affect the reported amounts of assets, liabilities, expenses, contingent assets and contingent liabilities as at the end of, or during, the reporting period. Actual results could significantly differ from those estimates. Significant areas requiring management to make estimates include the valuation of equity instruments issued for services and income taxes. Further details of the nature of these assumptions and conditions may be found in the relevant notes to these consolidated financial statements.

The effect of a change in an accounting estimate is recognized prospectively by including it in comprehensive income in the period of the change, if the change affects that period only, or in the period of the change and future periods, if the change affects both. Significant assumptions about the future and other sources of estimation uncertainty that management has made at the statement of financial position date, that could result in a material adjustment to the carrying amounts of assets and liabilities, in the event that actual results differ from assumptions that have been made, relate to the following key estimates:

*Income tax*

The determination of income tax is inherently complex and requires making certain estimates and assumptions about future events. Changes in facts and circumstances as a result of income tax audits, reassessments, changes to corporate structure and associated domiciling, jurisprudence and any new legislation may result in an increase or decrease the provision for income taxes. The value of deferred tax assets is evaluated based on the probability of realization; the Company has assessed that it is improbable that such assets will be realized and has accordingly not recognized a value for deferred taxes.

*Share-based payments and compensation*

The Company has applied estimates with respect to the valuation of shares issued for non-cash consideration. Shares are valued at the fair value of the equity instruments granted at the date the Company receives the goods or services.

The Company measures the cost of equity-settled transactions with employees by reference to the fair value of the equity instruments at the date at which they are granted. Estimating fair value for share-based payment transactions requires determining the most appropriate valuation model, which is dependent on the terms and conditions of the grant. This estimate also requires determining the most appropriate inputs to the valuation model including the fair value of the underlying Common Shares, the expected life of the share option, volatility and dividend yield and making assumptions about them. The assumptions and models used for estimating fair value for share-based payment transactions are discussed in Note 9.

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 92 of 110    Document 29-1

### 3. SIGNIFICANT ACCOUNTING POLICIES

**Cash and cash equivalents**

Cash and cash equivalents consist primarily of cash in banks and high-interest savings accounts and cash collateral which are recorded at cost, which approximates fair value.

**Short-term investments**

The Company's short-term investments consist of guaranteed investment certificates, U.S. treasury securities, corporate debt securities, commercial paper and term deposits with original maturities exceeding three months and less than one year. The investments are carried at fair value plus accrued interest.

**Foreign exchange**

Transactions in currencies other than the United States dollar are recorded at exchange rates prevailing on the dates of the transactions. At the end of each reporting period, monetary assets and liabilities of the Company that are denominated in foreign currencies are translated at the period end exchange rate while non-monetary assets and liabilities are translated at historical rates. Revenues and expenses are translated at the exchange rates approximating those in effect on the date of the transactions. Exchange gains and losses arising on translation are included in comprehensive loss.

On translation of the entities whose functional currency is other than the United States dollar, revenues and expenses are translated at the exchange rates approximating those in effect on the date of the transactions. Assets and liabilities are translated at the rate of exchange at the reporting date.

Translation gains and losses are recorded in other comprehensive income (loss) as the cumulative translation adjustment along with the historical effects of a change in the functional currency.

**Research and development costs**

Expenditures on research and development activities, undertaken with the prospect of gaining new scientific or technical knowledge and understanding, are recognized in profit or loss as incurred. Investment tax credits related to current expenditures are included in the determination of net income as the expenditures are incurred when there is reasonable assurance they will be realized.

**Fair value of financial instruments**

The Company's financial instruments consist of cash and cash equivalents, short-term investments, receivables, accounts payable and accrued liabilities and derivative liabilities.

The Company provides disclosures that enable users to evaluate (a) the significance of financial instruments for the entity's financial position and performance; and (b) the nature and extent of risks arising from financial instruments to which the entity is exposed during the period and at the date of the statement of financial position, and how the entity manages these risks.

The Company provides information about its financial instruments measured at fair value at one of three levels according to the relative reliability of the inputs used to estimate the fair value:

Level 1 – quoted prices (unadjusted) in active markets for identical assets or liabilities;

Level 2 – inputs other than quoted prices included in Level 1 that are observable for the asset or liability, either

directly (i.e., as prices) or indirectly (i.e., derived from prices); and

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 93 of 110    Document 29-1

Level 3 – inputs for the asset or liability that are not based on observable market data (unobservable inputs).

The fair value of cash and cash equivalents, GICs and term deposits included in short-term investments, receivables, accounts payable and accrued liabilities approximates their carrying values due to their short term to maturity. The fair value of U.S. treasury securities, corporate debt securities and commercial paper included in short-term investments are measured using Level 2 inputs based on standard observable inputs, including reported trades, broker/dealer quotes, and bids and/or offers (Note 4). The derivative liabilities are measured using level 3 inputs (Note 8).

**Share-based payments**

Share based payment arrangements in which the Company receives goods or services as consideration for its own equity instruments are accounted for as equity settled share-based payment transactions and measured at the fair value of at grant date.

*Share-based compensation*

The Company grants stock options to acquire Common Shares of the Company to directors, officers, employees and consultants.

The fair value of stock options is measured on the date of grant, using the Black-Scholes option pricing model, and is recognized over the requisite service or vesting period as applicable. Consideration paid for the shares on the exercise of stock options is credited to share capital. Such value is recognized as expense over the requisite service period, net of actual forfeitures, using the accelerated attribution method. The Company recognizes forfeitures as they occur. The estimation of stock awards that will ultimately vest requires judgment, and to the extent actual results, or updated estimates, differ from current estimates, such amounts are recorded as a cumulative adjustment in the period estimates are revised.

**Basic and diluted loss per share**

Basic loss per share is computed by dividing the loss available to common shareholders by the weighted average number of Common Shares outstanding during the year. The computation of diluted earnings per share assumes the conversion, exercise or contingent issuance of securities only when such conversion, exercise or issuance would have a dilutive effect on earnings per share. The dilutive effect of convertible securities is reflected in diluted earnings per share by application of the "if converted" method. The dilutive effect of outstanding options and warrants and their equivalents is reflected in diluted earnings per share by application of the weighted-average method. Since the Company has losses, the exercise of outstanding options and warrants has not been included in this calculation as it would be anti-dilutive.

**Leases**

At the inception of an arrangement, the Company determines whether the arrangement is or contains a lease based on the unique facts and circumstances present in the arrangement. Leases with a term greater than one year are recognized on the balance sheet as ROU assets and short-term and long-term lease liabilities, as applicable. ROU assets represent the Company's right to use an underlying asset for the lease term and lease liabilities represent its obligation to make lease payments arising from the lease. The Company typically only includes an initial lease term in its assessment of a lease arrangement. It also considers termination options and factors those into the determination of lease payments. Options to renew a lease are not included in the assessment unless there is reasonable certainty that the Company will renew.

Operating lease liabilities and their corresponding ROU assets are recorded based on the present value of lease payments over the expected remaining lease term. Certain adjustments to the ROU asset may be required for items such as incentives received. The interest rate implicit in lease contracts is typically not readily determinable. As a result, the Company utilizes its incremental borrowing rate, which reflects the fixed rate at which it could borrow on a collateralized basis the amount of the lease payments in the same currency, for a similar term, in a similar economic environment. In transition to ASC 842, the Company utilized the remaining lease term of its leases in determining the appropriate incremental borrowing rates. Lease expense for lease payments is recognized on a straight-line basis over the lease term.

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 94 of 110    Document 29-1

The Company elected the short-term lease exemption for all leases that qualify; as a result, we will not recognize right-of-use assets or lease liabilities for leases with a term of less than 12 months at inception.

**Income taxes**

Income tax is recognized in profit or loss except to the extent that it relates to items recognized directly in equity, in which case it is recognized in equity. Current tax expense is the expected tax payable on the taxable income for the year, using tax rates enacted at period end.

Deferred tax is recognized in respect of temporary differences, between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for taxation purposes. The following temporary differences are not provided for: goodwill not deductible for tax purposes and an excess of the amount for financial reporting over the tax basis of an investment in a foreign subsidiary that is essentially permanent in duration. The amount of deferred tax provided is based on the expected manner of realization or settlement of the carrying amount of assets and liabilities, using tax rates enacted at the financial position reporting date.

A valuation allowance is recognized for deferred tax assets if, based on the weight of available evidence, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets are reviewed at each reporting date and a valuation allowance is recorded to the extent that it is no longer more likely than not that the related tax benefit will be realized.

Deferred tax assets and liabilities are offset when there is a legally enforceable right to set off current tax assets against current tax liabilities and when they relate to income taxes levied by the same taxation authority and the Company intends to settle its current tax assets and liabilities on a net basis.

**Recently accounting pronouncements adopted**

During the year ended September 30, 2023, there have been no new, or existing, recently issued accounting pronouncements that are of significance, or potential significance, that impact the Company's consolidated financial statements.

**Recently accounting pronouncements not yet adopted**

Management does not believe that any recently issued, but not yet effective, accounting standards, if currently adopted, would have a material effect on the Company's consolidated financial statements.

Recent accounting pronouncements issued by the FASB, including its Emerging Issues Task Force, the American Institute of Certified Public Accountants, and the Securities and Exchange Commission did not or are not believed by management to have a material impact on the Company's present or future consolidated financial statement presentation or disclosures.

**Change in presentation**

During the year ended September 30, 2023, the Company identified a presentation item that required adjustments to be recorded in the historical consolidated statements of cash flows to conform to the presentation required under U.S. GAAP. Interest from short-term investments of $705,020 for the year ended September 30, 2022 has been reclassified from investing activities to operating activities. There were no changes to net loss of the Company or earnings per share in the periods presented.

The Company believes this reclassification and presentation change in the historical consolidated statement of cash flow for the year ended September 30, 2022 is not material and has reflected this reclassification and presentation change in the comparative period included within these consolidated financial statements.

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 95 of 110    Document 29-1

## 4. SHORT-TERM INVESTMENTS

Short-term investments consist of guaranteed investment certificates ("GICs") held at financial institutions purchased in accordance with the Company's treasury policy. These GICs and term deposits bear interest at 5.15%-5.40% per annum and have maturities of up to 12 months.

Short-term investments also consist of U.S. treasury securities, corporate debt securities and commercial paper. The Company has classified these investments as available-for-sale, as the sale of such investments may be required prior to maturity to implement management strategies, and therefore has classified all investment securities as current assets. Those investments with maturity dates of three months or less at the date of purchase are presented as cash equivalents in the accompanying balance sheets. Short-term investments are carried at fair value with the unrealized gains and losses included in accumulated other comprehensive loss as a component of shareholders' equity until realized. The Company records an allowance for credit losses when unrealized losses are due to credit-related factors. Realized gains and losses are calculated using the specific identification method and recorded as interest income.

| | Amortized Cost | Unrealized Gains | Unrealized Losses | Accrued Investment Income | Estimated Fair Value |
|---|---|---|---|---|---|
| | | **As of September 30, 2023** | | | |
| U.S. Treasury securities | $ 72,802,531 | $ — | $ (43,248) | $ 301,738 | $ 73,061,021 |
| GICs and Term deposits | 41,141,314 | — | — | 172,154 | 41,313,468 |
| Corporate debt securities | — | — | — | — | — |
| Balance, end of year | $ 113,943,845 | $ — | $ (43,248) | $ 473,892 | $ 114,374,489 |
| | | **As of September 30, 2022** | | | |
| GICs and Term deposits | $ 89,688,690 | $ — | $ — | $ 316,960 | $ 90,005,650 |
| U.S. Treasury securities | 11,149,053 | — | (39,590) | 39,720 | 11,149,183 |
| Corporate debt securities | 3,034,417 | — | (19,076) | 29,258 | 3,044,599 |
| Commercial paper | 5,961,597 | — | — | — | 5,961,597 |
| Balance, end of year | $ 109,833,757 | $ — | $ (58,666) | $ 385,938 | $ 110,161,029 |

As of September 30, 2023, short-term investments have an aggregate fair market value of $114.4 million (2022 – $110.2 million) were in an aggregate gross unrealized loss position of $43,248 (2022 - $58,666). The Company considers the decline in market value for the securities to be primarily attributable to current economic and market conditions. These particular investments have been in an unrealized loss position for less than 12 months and it is not more likely than not that the Company will be required to sell any of its securities prior to maturity. Accordingly, no allowance for credit losses has been recorded as of September 30, 2023, and no realized gains or losses on sales of short-term investments have been recorded through September 30, 2023.

93

## 5. PREPAIDS

| | September 30, 2023 | September 30, 2022 |
|---|---|---|
| Prepaid insurance | $ 24,839 | $ 1,611,516 |
| Prepaid CMC and clinical expenses and deposits | 181,835 | 181,835 |
| Other deposits and prepaid expenses | 378,746 | 22,275 |
| Balance, end of year | $ 585,420 | $ 1,815,626 |

## 6. ACCOUNTS PAYABLE AND ACCRUED LIABILITIES

| | September 30, 2023 | September 30, 2022 |
|---|---|---|
| Accounts payable | $ 2,028,265 | $ 954,598 |
| Accrued expenses | 845,730 | 807,484 |
| Accrued vacation | 540,748 | 414,483 |
| Balance, end of year | $ 3,414,743 | $ 2,176,565 |

## 7. OPERATING LEASE

The Company's operating leases included on the balance sheet are as follows:

| **Operating lease right-of-use assets** | | |
|---|---|---|
| Balance, September 30, 2021 | $ | 308,286 |
| Amortization | | (121,787) |
| Balance, September 30, 2022 | $ | 186,499 |
| Amortization | | (118,491) |
| Balance, September 30, 2023 | $ | 68,008 |
| **Operating lease liabilities** | | |
| Balance, September 30, 2021 | $ | 330,970 |
| Accretion | | 13,305 |
| Lease payments | | (134,023) |
| Balance, September 30, 2022 | $ | 210,252 |
| Accretion | | 6,942 |
| Lease payments | | (136,866) |
| Balance, September 30, 2023 | $ | 80,328 |
| Operating lease liabilities with expected life of less than one year | $ | 80,328 |
| Operating lease liabilities with expected life greater than one year | $ | — |

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 97 of 110    Document 29-1

The Company recognizes a right-of-use asset for the right to use the underlying asset for the lease term, and a lease liability, which represents the present value of the Company's obligation to make payments over the lease term. The present value of the lease payments is calculated using an incremental borrowing rate as the Company's leases do not provide an implicit interest rate. At September 30, 2023, the Company's incremental borrowing rate was 5.0% and the remaining lease term for the South Francisco office was 8 months.

Accretion expense of $6,942 (2022 - $13,305) have been recorded in "financing costs" in the statement of operations and comprehensive loss.

## 8. DERIVATIVE LIABILITIES

In January 2016, the Company issued, pursuant to a financing, 227,273 warrants ("Warrants") having an exercise price of $66.00 per common share. The holders of the Warrants had the ability to receive a variable number of shares pursuant to exercise terms or receive cash settlement under certain conditions. Pursuant to these conditions, the Warrants were treated as financial liabilities measured at fair value through profit or loss. The Warrants expired unexercised in the year ended September 30, 2023.

*Valuation*

The Company uses the Black-Scholes option pricing model to estimate fair value. The following weighted average assumptions were used to estimate the fair value of the derivative warrant liabilities on September 30, 2022:

|  | September 30, 2022 |
|---|---|
| Risk-free interest rate | 3.55 % |
| Expected life | 0.28 years |
| Expected annualized volatility | 73.3 % |
| Dividend | — |
| Liquidity discount | 20 % |

## 9. SHAREHOLDERS' EQUITY

*Authorized*

Unlimited common shares, without par value.

Unlimited preferred shares, without par value.

**Omnibus incentive plan**

On February 25, 2021, the Company adopted an omnibus incentive plan ("Omnibus Plan") consistent with the policies and rules of Nasdaq. Pursuant to the Omnibus Plan, the Company may issue stock options, share appreciation rights, restricted shares, restricted share units and other share-based awards. As of September 30, 2023, the Company has not issued any instruments other than stock options under the Omnibus Plan.

Prior to the adoption of the Omnibus Plan, the Company issued equity compensation pursuant to the Company's amended and restated stock option plan (the "Legacy Option Plan"), Amended and Restated Restricted Share Unit Plan (the "RSU Plan") and Employee Stock Purchase Plan. Since the adoption of the Omnibus Plan, no further grants have been made under the Legacy Option Plan or RSU Plan, though existing grants under the Legacy Option Plan will continue in effect in accordance with their terms.

As of September 30, 2023, the Omnibus Plan has a maximum of 8,410,907 Common Shares which may be reserved for issuance.

*Employee Share Purchase Plan*

The Company has adopted an Employee Share Purchase Plan ("ESPP") under which qualifying employees may be granted purchase rights ("Purchase Rights") to the Company's Common Shares at not less of 85% of the market price at the lesser of the date the Purchase Right is granted or exercisable. The Company currently holds offerings consisting of six-month periods commencing on January 1 and July 1 and ending on June 30 and December 31 of each calendar year. As at September 30, 2023, the ESPP has a maximum of 208,836 (2022 –236,598) Common Shares reserved for issuance.

Eligible employees are able to contribute up to 15% of their gross base earnings for purchases under the ESPP through regular payroll deductions. Purchase of shares under the ESPP are limited for each employee at $25,000 worth of the Company's Common Shares (determined using the lesser of (i) the market price of a common share on the first day of an applicable purchase period and (ii) the market price of a common share on the purchase date) for each calendar year in which a purchase right is outstanding.

During the year ended September 30, 2023, the Company issued a total of 27,762 (2022 –15,820) Common Shares upon the exercise of Purchase Rights. The Company recognizes compensation expense for purchase rights on a straight-line basis over the service period.

| | For the year ended September 30, | | |
| --- | --- | --- | --- |
| | 2023 | | 2022 |
| Research and development expense | $ 4,517 | $ | 16,381 |
| General and administrative | 7,031 | | 13,562 |
| | $ 11,548 | $ | 29,943 |

The Company measures the purchase rights based on their estimated grant date fair value using the Black-Scholes option pricing model and the estimated number of shares that can be purchased. The following weighted average assumptions were used for the valuation of purchase rights:

| | 2023 | 2022 |
| --- | --- | --- |
| Risk-free interest rate | 4.90 % | 0.94 % |
| Expected life of share purchase rights | 6 months | 6 months |
| Expected annualized volatility | 72.45 % | 89.42 % |
| Dividend | — | — |

**Stock options**

Pursuant to the Legacy Option Plan and Omnibus Plan, options were previously or may be granted, respectively, with expiry terms of up to 10 years, and vesting criteria and periods are approved by the Board at its discretion. The options issued under the Legacy Option Plan and Omnibus Plan are accounted for as equity-settled share-based payments.

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 99 of 110    Document 29-1

Stock option transactions are summarized as follows:

| | Number of Options | | Weighted Average Exercise Price* |
|---|---|---|---|
| Balance, September 30, 2021 | 6,803,230 | $ | 5.20 |
| Options granted | 1,347,500 | | 4.55 |
| Options exercised | (72,910) | | (4.41) |
| Options expired/forfeited | (175,759) | | (3.60) |
| | | | |
| Balance, September 30, 2022 | 7,902,061 | $ | 5.13 |
| Options granted | 300,000 | | 2.97 |
| Options expired/forfeited | (89,287) | | (12.27) |
| | | | |
| Balance outstanding, September 30, 2023 | 8,112,774 | $ | 4.97 |
| Balance exercisable, September 30, 2023 | 6,444,885 | $ | 4.79 |

\*    Options exercisable in Canadian dollars as at September 30, 2023 are translated at current rates to reflect the current weighted average exercise price in U.S. dollars for all outstanding options.

At September 30, 2023, options were outstanding enabling holders to acquire Common Shares as follows:

| Exercise price | | Number of options | Weighted average remaining contractual life (years) |
|---|---|---|---|
| $ | 2.39 | 50,000 | 8.96 |
| $ | 2.70 | 20,000 | 9.59 |
| $ | 2.71 | 20,000 | 9.57 |
| $ | 2.91 | 175,000 | 9.33 |
| $ | 2.97 | 15,000 | 9.65 |
| $ | 3.05 | 50,000 | 9.69 |
| $ | 3.23 | 3,629,400 | 6.02 * |
| $ | 3.59 | 26,667 | 6.05 |
| $ | 3.60 | 910,000 | 8.75 |
| $ | 3.75 | 20,000 | 9.18 |
| $ | 3.81 | 185,816 | 5.36 |
| $ | 4.00 | 539,518 | 4.22 |
| $ | 4.67 | 168,227 | 6.09 |
| $ | 5.99 | 190,000 | 8.56 |
| $ | 7.00 | 1,458,646 | 7.20 * |
| $ | 8.47 | 120,000 | 8.04 |
| $ | 9.76 | 50,000 | 8.39 |
| $ | 13.96 | 190,000 | 7.29 |
| $ | 29.63 | 100,000 | 7.58 |
| $ | 31.62 | 50,000 | 7.67 |
| C$ | 4.90 | 124,500 | 3.63 * |
| C$ | 5.06 | 20,000 | 5.36 * |
| | | 8,112,774 | 6.68 |

\* 3,500 options expired unexercised and 41,250 options exercised subsequent to September 30, 2023

97

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 100 of 110    Document 29-1

**Share-based compensation**

During the year ended September 30, 2023, the Company granted a total of 300,000 (2022 – 1,347,500) stock options with a weighted average fair value of $2.82 per option (2022 – $3.20).

The Company recognized share-based payments expense for options granted and vesting, net of recoveries on cancellations of unvested options, during the years ended September 30, 2023 and 2022 with allocations to its functional expense as follows:

| | For the year ended September 30, | |
| --- | --- | --- |
| | 2023 | 2022 |
| Research and development expense | $ 2,622,987 | $ 4,306,463 |
| General and administrative | 2,372,934 | 3,551,679 |
| | $ 4,995,921 | $ 7,858,142 |

The following weighted average assumptions were used for the Black-Scholes option-pricing model valuation of stock options granted:

| | 2023 | 2022 |
| --- | --- | --- |
| Risk-free interest rate | 3.78 % | 2.73 % |
| Expected life of options | 10.00 years | 10.00 years |
| Expected annualized volatility | 186.50 % | 79.11 % |
| Dividend | — | — |

**Warrants**

Warrant transactions are summarized as follows:

| | Number of Warrants | Weighted Average Exercise Price |
| --- | --- | --- |
| Balance, September 30, 2021 and September 30, 2022 | 3,234,750 | $ 4.84 |
| Warrants expired | (307,273) | (49.86) |
| | | |
| Balance outstanding and exercisable, September 30, 2023 | 2,927,477 | $ 0.11 |

At September 30, 2023, warrants were outstanding enabling holders to acquire Common Shares as follows:

| Number of Warrants | Exercise Price | Expiry Date |
| --- | --- | --- |
| 7,477 * | $ 42.80 | November 18, 2023 |
| 2,920,000 | $ 0.0001 | August 23, 2024 |
| 2,927,477 | | |

* 7,477 warrants expired unexercised subsequent to September 30, 2023

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 101 of 110    Document 29-1

## 10. RELATED PARTY TRANSACTIONS

Included in accounts payable and accrued liabilities at September 30, 2023, is $98,360 (2022 - $81,225) due to related parties with respect to key management personnel compensation and expense reimbursements. Amounts due to related parties are non-interest bearing, with no fixed terms of repayment.

## 11. INCOME TAXES

The following is a reconciliation of income taxes calculated at the combined Canadian federal and provincial income statutory corporate tax rate of 27.0% (2022 – 27.0%) to the tax expense:

| For the years ended September 30 | 2023 | 2022 |
|---|---|---|
| Loss for the year before income tax | $ (26,580,743) | $ (35,215,072) |
| Tax recovery at statutory income tax rates | $ (7,177,000) | $ (9,509,000) |
| Non-deductible share-based payments | 643,000 | 963,000 |
| Taxable capital gains | | |
| Other permanent differences including foreign exchange | (4,000) | (25,000) |
| Change in statutory, foreign tax, foreign exchange rates and other | 1,212,000 | 1,288,000 |
| Adjustment to prior years provision versus statutory tax returns and expiry of non-capital losses | 325,000 | 165,000 |
| Change in valuation allowance | 5,003,000 | 7,007,000 |
| Total income tax expense | $ 2,000 | $ (111,000) |

Tax attributes are subject to review, and potential adjustment, by tax authorities. The Company has recorded an income tax expense of $2,000 for the year ended September 30, 2023 (2022 recovery of $111,000) in relation to taxable income generated by its U.S. subsidiary.

For the years ended September 30, 2023 and 2022, the Company did not record a provision for income taxes due to a full valuation allowance against our deferred tax assets. The significant components of the Company's deferred tax assets that have not been included on the consolidated statement of financial position are as follows:

| Deferred tax assets | 2023 | 2022 |
|---|---|---|
| Operating losses carried forward | $ 43,726,000 | $ 37,710,000 |
| Equipment and intangible assets | 77,000 | 77,000 |
| Investment tax credits | 29,000 | 29,000 |
| Financing costs | 1,191,000 | 2,026,000 |
| Federal R&D credit | 210,000 | 210,000 |
| Other | (54,000) | 125,000 |
| | 45,179,000 | 40,177,000 |
| Valuation allowance | (45,179,000) | (40,177,000) |
| Net future tax assets | $ — | $ — |

As at September 30, 2023, the Company has non-capital loss carry-forwards of approximately $90,502,000 (2022 - $87,702,000) available to offset future taxable income in Canada and approximately $91,858,000 (2022 - $66,812,000) available to offset future taxable income in the US. These non-capital loss carryforwards begin to expire in 2031.

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 102 of 110    Document 29-1

**12. SUPPLEMENTAL DISCLOSURE WITH RESPECT TO CASH FLOWS**

There were no significant non-cash financing or investing activities during the year ended September 30, 2023 and 2022.

There were no amounts paid for taxes and interest in the year ended September 30, 2023 and 2022.

**13. SEGMENTED INFORMATION**

The Company works in one industry being the development of small molecule drugs for prostate cancer. The Company's right of use asset is located in the USA.

**14. FINANCIAL INSTRUMENTS AND RISK**

The Company's financial instruments consist of cash and cash equivalents, short-term investments, receivables, accounts payable and accrued liabilities and derivative liabilities. The fair value of cash and cash equivalents, GICs and term deposits included in short-term investments, receivables, accounts payable and accrued liabilities approximates their carrying values due to their short term to maturity. The fair value of U.S. treasury securities, corporate debt securities and commercial paper included in short-term investments are measured using Level 2 inputs based on standard observable inputs, including reported trades, broker/dealer quotes, and bids and/or offers (Note 4). The derivative liabilities are measured using Level 3 inputs (Note 8).

Fair value estimates of financial instruments are made at a specific point in time, based on relevant information about financial markets and specific financial instruments. As these estimates are subjective in nature, involving uncertainties and matters of judgement, they cannot be determined with precision. Changes in assumptions can significantly affect estimated fair values.

**Financial risk factors**

The Company's risk exposures and the impact on the Company's financial instruments are summarized below:

*Credit risk*

Financial instruments that potentially subject the Company to a significant concentration of credit risk consist primarily of cash and cash equivalents, short-term investments and receivables. The Company limits its exposure to credit loss by placing its cash with major financial institutions. The Company considers highly liquid investments with a maturity of up to twelve months when purchased to be short-term investments. Short-term investments includes investments that may have maturity dates exceeding one year at the date of purchase; however, the Company may liquidate investment positions prior to maturity to implement management strategies. The Company maintains an investment policy which requires certain minimum investment grades over its investment instruments.

As of September 30, 2023, cash and cash equivalents consisted of cash in Canada and the United States and term deposits in Canada and investments in certain instruments which have a maturity of less than three months at the date of purchase. Balances in cash accounts exceed amounts insured by the Canada Deposit Insurance Corporation for up to C$100,000 and by the Federal Deposit Insurance Corporation for up to $250,000. Amounts due from government agencies are considered to have minimal credit risk.

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 103 of 110    Document 29-1

*Liquidity risk*

As at September 30, 2023, the Company had working capital of $145,301,807 which will fund budgeted operations past the horizon of the coming year. The Company does not generate revenue and will use available financing options when required to pursue its business objectives.

*Market risk*

Market risk is the risk of loss that may arise from changes in market factors such as interest rates, and foreign exchange rates.

(a) Interest rate risk

Over the periods presented, the interest rate environment has changed considerably. The Company has elected to place its cash in instruments which provide a return on funds pending deployment to service business objectives (Note 4). The Company monitors its investments against internal investment criteria which prioritize security of principal. While all investments bear some degree of risk, the Company does not consider interest rate fluctuations to have a significant risk to its financial and operational objectives. The Company does not have any interest-bearing debt.

(b) Foreign currency risk

The Company's foreign currency risk exposure relates to net monetary assets denominated in Canadian dollars and Euro. The Company maintains its cash and cash equivalents in U.S. dollars and converts on an as needed basis to discharge Canadian and Euro denominated expenditures. A 10% change in the foreign exchange rate between the Canadian, Euro and U.S. dollar in relation to Canadian and Euro dollars held at September 30, 2023 would result in a fluctuation of $2,616 in the net loss recognized for the period. The Company does not currently engage in hedging activities.

## 15. COMMITMENTS

*License Agreement*

The NTD Technology is held under a license agreement signed in fiscal 2010 (the "License Agreement"). As consideration for the License Agreement, the Company issued Common Shares of the Company. The License Agreement contains an annual royalty as a percentage of annual net revenue and a percentage of any annual sublicensing revenue earned with respect to the NTD Technology. The License Agreement stipulates annual minimum advance royalty payments of C$85,000. In addition, there are certain milestone payments for the first compound, to be paid in stages as to C$20,000 upon filing an Investigational New Drug (IND) Application, C$50,000 at the start of a Phase 2 clinical trial, C$900,000 at the start of a Phase 3 clinical trial, C$1,450,000 at application for marketing approval, and with further milestone payments on the second and additional compounds. To date, the Company has paid C$20,000 for filing an IND application for masofaniten (EPI-7386). The next milestone of C$50,000 will be due upon initiation of the Phase 2 clinical trial for masofaniten (EPI-7386).

The Company has the following obligations over the next five years:

| Contractual obligations | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|
| Minimum annual royalty per License Agreement | C$ 85,000 | C$ 85,000 | C$ 85,000 | C$ 85,000 | C$ 85,000 |
| Lease on CDN office spaces | C$ 76,610 | C$ — | C$ — | C$ — | C$ — |
| Lease on U.S. office spaces | $ 81,509 | $ — | $ — | $ — | $ — |

*Collaborative agreements*

On January 13, 2021, the Company announced a clinical collaboration with Janssen to evaluate masofaniten (EPI-7386) with abiraterone acetate with prednisone as well as the combination of masofaniten (EPI-7386) with apalutamide in patients with mCRPC. Under the terms of the agreement, Janssen may sponsor and conduct up to two Phase 1/2 studies evaluating the safety, tolerability and preliminary efficacy of the combination of masofaniten (EPI-7386) and apalutamide as well as the combination of masofaniten (EPI-7386) with abiraterone acetate plus prednisone in patients with mCRPC who have failed a current second-generation antiandrogen therapy. Janssen will assume all costs associated with the studies, other than the manufacturing costs associated with the clinical drug supply of masofaniten (EPI-7386). The parties will form a joint oversight committee for the clinical studies. ESSA will retain all rights to masofaniten (EPI-7386).

The combination trial was initiated in March 2022. Enrollment was suspended by Janssen in October 2022 due to operational recruitment challenges. ESSA has announced its intention to revise the collaboration, with ESSA conducting a study of the combinations, potentially in an earlier patient population, and Janssen supplying apalutamide and abiraterone acetate.

On February 25, 2021, the Company announced a clinical collaboration with Astellas Pharma Inc. ("Astellas") to evaluate the combination of masofaniten (EPI-7386) and Astellas/Pfizer's androgen receptor inhibitor, enzalutamide, for patients with mCRPC. Under the terms of the agreement, ESSA will sponsor and conduct a Phase 1/2 study to evaluate the safety, tolerability and preliminary efficacy of the combination of masofaniten (EPI-7386) and enzalutamide in mCRPC patients who have not yet been treated with second-generation antiandrogen therapies. Astellas will supply enzalutamide for the trial. ESSA will retain all rights to masofaniten (EPI-7386).

On April 28, 2021, the Company announced that it had entered into a clinical trial collaboration and supply agreement with Bayer Consumer Care AG ("Bayer") to evaluate masofaniten (EPI-7386) in combination with Bayer's androgen receptor inhibitor, darolutamide, in patients with mCRPC. Under the terms of the agreement, following review of certain clinical data, Bayer may sponsor and conduct a Phase 1/2 study to evaluate the safety, tolerability, pharmacokinetics and preliminary efficacy of the combination of masofaniten (EPI-7386) and darolutamide in mCRPC patients. ESSA will supply masofaniten (EPI-7386) for the trial and will retain all rights to masofaniten (EPI-7386).

## 16.   SUBSEQUENT EVENTS

On November 2, 2023, the Company issued 30,000 common shares for stock options exercised for gross proceeds of $96,900.

On November 2, 2023, the Company issued 11,250 common shares for stock options exercised for gross proceeds of CDN$55,925.

**Item 9.    Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A.    Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

As of end of the period covered by this Annual Report on Form 10-K, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the design and operating effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act of 1934 as amended (the "Exchange Act"). Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports that the Company files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Any such information is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate, to allow timely decisions regarding required disclosure.

Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on our evaluation of our disclosure controls and procedures as of the end of the period covered by this report, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were, in design and operation, effective at the reasonable assurance level.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, is responsible for establishing and maintaining adequate internal control over our financial reporting, defined in Rule 13a-15(f) and Rule 15d-15(f) of the Exchange Act.

The effectiveness of any system of internal control over financial reporting, including ours, is subject to inherent limitations, including the exercise of judgment in designing, implementing, operating, and evaluating the controls and procedures, and the inability to eliminate misconduct completely. Accordingly, any system of internal control over financial reporting, including ours, no matter how well designed and operated, can only provide reasonable, not absolute, assurances. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate. Management has assessed the effectiveness of our internal control over financial reporting as at September 30, 2023. In making its assessment, management used the criteria set forth in the internal control – integrated framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 COSO framework) to evaluate the effectiveness of our internal control over financial reporting. Based on this evaluation, management has concluded that our internal control over financial reporting was effective as of September 30, 2023.

**Changes in Internal Control Over Financial Reporting**

There were no changes in our internal control over financial reporting during the quarter ended September 30, 2023 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B.    Other Information**

None.

**Item 9C.    Disclosure Regarding Foreign Jurisdictions that Prevent Inspections**

Not applicable.

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 106 of 110    Document 29-1

**Item 10. Directors, Executive Officers and Corporate Governance**

The information required by Item 10. of Form 10-K is incorporated by reference to our proxy statement for the 2024 annual meeting of shareholders (the "2024 Proxy Statement"), to be filed with the SEC within 120 days after the end of the fiscal year ended September 30, 2023.

**Item 11. Executive Compensation**

The information required by Item 11. of Form 10-K is incorporated by reference to our 2024 Proxy Statement (excluding the information under the subheading "Pay versus Performance"), to be filed with the SEC within 120 days after the end of the fiscal year ended September 30, 2023.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Shareholder Matters**

The information required by Item 12. of Form 10-K is incorporated by reference to our 2024 Proxy Statement, to be filed with the SEC within 120 days after the end of the fiscal year ended September 30, 2023.

**Item 13. Certain Relationships and Related Transactions, and Director Independence**

The information required by Item 13. of Form 10-K is incorporated by reference to our 2024 Proxy Statement, to be filed with the SEC within 120 days after the end of the fiscal year ended September 30, 2023.

**Item 14. Principal Accountant Fees and Services**

The information required by Item 14. of Form 10-K is incorporated by reference to our 2024 Proxy Statement, to be filed with the SEC within 120 days after the end of the fiscal year ended September 30, 2023.

**PART IV**

**Item 15. Exhibits and Financial Statement Schedules**

(a)(1) Financial Statements—The financial statements included in Item 8 are filed as part of this Annual Report on Form 10-K.

(a)(2) Financial Statement Schedules—All schedules have been omitted because they are not applicable or required, or the information required to be set forth therein is included in the consolidated Financial Statements or notes thereto included in Item 8 of this Annual Report on Form 10-K.

(a)(3) Exhibits—The exhibits required by Item 601 of Regulation S-K are listed in paragraph (b) below.

(b) Exhibits—The exhibits listed on the Exhibit Index below are filed herewith or are incorporated by reference to exhibits previously filed with the SEC.

Case 1:25-cv-00124-WCG    Filed 10/10/25    Page 107 of 110    Document 29-1

**EXHIBITS INDEX**

**Exhibit No.**

| | |
|---|---|
| 3.1 | Amended Articles of Incorporation of ESSA Pharma Inc. (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K (File No. 001-37410), originally filed with the SEC on September 18, 2023) |
| 4.1 | Specimen common share certificate (incorporated by reference to Exhibit 4.1 to the Company's Registration Statement on Form S-8 (File No. 333-225056), originally filed with the SEC on May 18, 2018) |
| 4.2 | Description of Capital Stock (incorporated by reference to Exhibit 4.2 to the Company's Annual Report on Form 10-K (File No. 001-37410), originally filed with the SEC on December 13, 2022) |
| 10.1 | Cancer Research Contract between CPRIT and the Company, dated July 9, 2014 (incorporated by reference to Exhibit 4.1 to the Company's Registration Statement on Form 20-F (File No. 377-00939), originally filed with the SEC on February 24, 2015) |
| 10.2 | License Agreement between the BC Cancer Agency, UBC and the Company, dated December 22, 2010, as amended on February 10, 2011 and May 27, 2014 (incorporated by reference to Exhibit 4.2 to the Company's Registration Statement on Form 20-F (File No. 377-00939), originally filed with the SEC on February 24, 2015) |
| 10.3 | Amendment to License Agreement between the BC Cancer Agency, UBC and the Company, dated May 25, 2021 (Schedules have been omitted pursuant to Item 601(b)(10) of Regulation S-K. The Company agrees to furnish supplementally to the SEC a copy of any omitted schedule upon request) |
| 10.4 | Employment Agreement for David Wood (incorporated by reference to Exhibit 4.9 to the Company's Registration Statement on Form 20-F (File No. 377-00939), originally filed with the SEC on April 7, 2015) |
| 10.5 | Employment Agreement for David Parkinson (incorporated by reference to Exhibit 4.9 to the Company's Annual Report on Form 20-F (File No. 001-37410), originally filed with the SEC on December 14, 2016) |
| 10.6 | Employment Agreement for Peter Virsik (incorporated by reference to Exhibit 4.10 to the Company's Annual Report on Form 20-F File (No. 001-37410), originally filed with the SEC on December 14, 2016) |
| 10.7 | Employment Agreement for Alessandra Cesano (incorporated by reference to Exhibit 4.7 to the Company's Annual Report on Form 20-F (File No. 001-37410), originally filed with the SEC on December 20, 2019) |
| 10.11 | Lease for 400 Oyster Point Boulevard, South San Francisco, California, United States dated March 5, 2018 (incorporated by reference to Exhibit 4.12 to the Company's Annual Report on Form 20-F (File No. 001-37410), originally filed with the SEC on December 13, 2018) |
| 10.12 | Essa Pharma Inc. 2022 Omnibus Incentive Plan (incorporated by reference to Exhibit 99.1 to the Company's Current Report on Form 8-K (File No. 001-37410), originally filed with the SEC on March 10, 2022) |
| 21.1 | List of Subsidiaries* |
| 23.1 | Consent of Davidson & Company LLP, an Independent Registered Public Accounting Firm* |
| 31.1 | Certification of the Chief Executive Officer pursuant to Rule 13a-14(a) of the Securities and Exchange Act of 1934, as amended* |
| 31.2 | Certification of the Chief Financial Officer pursuant to Rule 13a-14(a) of the Securities and Exchange Act of 1934, as amended* |
| 32.1 | Certification by the Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as added by Section 906 of the Sarbanes-Oxley Act of 2002** |
| 97 | The ESSA Pharma Inc. Clawback Policy |
| 101.INS | Inline XBRL Instance Document – The instance document does not appear in the interactive data file because its XBRL tags are embedded within the Inline XBRL document. * |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document * |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document * |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document * |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document * |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document * |
| 104 | Cover page from the Company's Annual Report on Form 10-K for the year ended September 30, 2023 formatted in Inline XBRL (included in Exhibit 101). |

---

\* Filed herewith.

\*\* Furnished herewith

Case 1:25-cv-00124-WCG     Filed 10/10/25     Page 108 of 110     Document 29-1

**Item 16.   Form 10-K Summary**

Not applicable.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Dated: December 12, 2023

*ESSA PHARMA INC.*
(Registrant)

Date: December 12, 2023

By:  /S/ DAVID PARKINSON

Name:David Parkinson

Title:  Chief Executive Officer

Pursuant to the requirements of the Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

| Signature | Title |
|---|---|
| /s/ *David Parkinson*<br>David Parkinson | President and Chief Executive Officer and Director (Principal Executive Officer) |
| /s/ *David Wood*<br>David Wood | Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer) |
| /s/ *Richard M. Glickman*<br>Richard M. Glickman | Chairman of the Board |
| /s/ *Marella Thorell*<br>Marella Thorell | Director |
| /s/ *Alex Martin*<br>Alex Martin | Director |
| /s/ *Sandy Zweifach*<br>Sandy Zweifach | Director |
| /s/ *Franklin Berger*<br>Franklin Berger | Director |
| /s/ *Scott Requadt*<br>Scott Requadt | Director |
| /s/ *Gary Sollis*<br>Gary Sollis | Director |
| /s/ *Philip Kantoff*<br>Philip Kantoff | Director |
| /s/ *Lauren Merendino*<br>Lauren Merendino | Director |