UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

| | |
|---|---|
| IN RE ESSA PHARMA, INC. SECURITIES LITIGATION | Case No. 1:25-cv-0124-WCG |
| THIS DOCUMENT RELATES TO:<br>ALL FILINGS | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT** |

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ............................................................................................................... i

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................................1

I.     STATEMENT OF RELEVANT FACTS ..................................................................3

    A.  ESSA's Core Focus on EPI-7386 (Masofaniten).........................................................3

    B.  The Importance of Generating Sufficient Exposure in Patients ...................................4

    C.  Defendants Admit that 300,000 AUC is the "Threshold" for Clinical Effectiveness ...4

    D.  Defendants Ignore FDA Guidance and Downplay Enzalutamide's Negative Impact on Masofaniten's AUC ...................................................................................................5

    E.  Masofaniten Fails as a Monotherapy ..........................................................................6

    F.  Defendants Mislead Investors by Falsely Claiming They Had Addressed Exposure Concerns ....................................................................................................................6

    G.  ESSA Terminates the Combination Trial and Investors Learn the Truth......................9

II.    ARGUMENT ...........................................................................................................10

    A.  The Complaint Adequately Alleges Violations of Section 10(b) ................................10

       1.  Plaintiff Plausibly Alleges Defendants made Material Misrepresentations and Omissions.................................................................................................................10

          a.  Defendants Made False and Misleading Statements About Masofaniten's Exposure Levels...................................................................................................11

          b.  Misrepresentations and Omissions Regarding M-E Combination Trial's Superiority Over the PREVAIL Study ..............................................................18

          c.  The PSLRA Safe Harbor Does Not Apply ......................................................20

       2.  Plaintiff Pleads a Strong Inference of Scienter ......................................................21

          a.  Defendants' Actual Knowledge and Access to Information Contradicting Their Public Statements Support a Strong Inference of Scienter ...................22

          b.  That the Misrepresentations Involved Defendants' Core Operations Supports a Strong Inference of Scienter ..........................................................................23

          c.  The Temporal Proximity Between Defendants' Statements and Their Decision to Terminate the Studies Supports a Strong Inference of Scienter .................25

i

       d.  Defendants' Evasive Response to Questions and Selective Reporting of Data Further Enhances the Inference of Scienter ....................................................25

       e.  Virsik's Insider Sales Bolster an Inference of Scienter ..................................26

       f.  Defendants were Motivated to Commit Fraud by Their Precarious Condition ..............................................................................27

       g.  Defendants Raise No Plausible Competing Inference ....................................28

    3.  The Complaint Alleges Loss Causation ................................................................29

  B.  Plaintiff Sufficiently Alleges Violations of Section 20(a) of the Exchange Act .........30

III.    CONCLUSION ........................................................................................................30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alaska Electrical Pension Fund v. Pharmacia Corp*,
554 F.3d 342 (3d Cir. 2009)..................................................................................................26

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)..................................................................................................28

*Alizadeh v. Tellabs, Inc.*,
No. 13 C 537, 2015 WL 557249 (N.D. Ill. Feb. 9, 2015)......................................................13

*Allison v. Oak St. Health, Inc.*,
No. 22 C 149, 2023 WL 1928119 (N.D. Ill. Feb. 10, 2023)............................................11, 25

*AnchorBank, FSB v. Hofer*,
649 F.3d 610 (7th Cir. 2011) ...............................................................................................10

*Asher v. Baxter Int'l, Inc.*,
No. 02 C 5608, 2005 WL 331572 (N.D. Ill. Feb. 3, 2005)....................................................22

*Azar v. Grubhub, Inc.*,
No. 1:19-CV-07665, 2021 WL 4077327 (N.D. Ill. Sept. 7, 2021).........................................10

*Blatt v. Corn Prods. Int'l*,
No. 05 C 3033, 2006 WL 1697013 (N.D. Ill. June 14, 2006) ...............................................17

*Busic v. Orphazyme A/S*,
No. 21 C 3640, 2022 WL 3299843 (N.D. Ill. Aug. 11, 2022)..........................................24, 25

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014)................................................................................................18

*City of Sterling Heights Gen. Emps. Ret. Sys. v. Hospira, Inc.*,
No. 11 C 8332, 2013 WL 566805 (N.D. Ill. Feb. 13, 2013)...........................................10, 12

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*,
8 F.4th 592 (7th Cir. 2021) .................................................................................................17

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023) ................................................................................................25

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021)....................................................................................................24

iii

*Desai v. Gen. Growth Props., Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009*)* ....................................................................................28

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005).................................................................................................................29

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015).....................................................................................................27

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011).................................................................................................................30

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) ...................................................................................................22

*Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*,
No. 09-CV-5641, 2012 WL 1068761 (N.D. Ill. Mar. 29, 2012)...............................................27

*Gimpel v. Hain Celestial Grp., Inc.*,
156 F.4th 121 (2d Cir. 2025) ...................................................................................................11

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) ...................................................................................................29

*Goucher v. Iterum Therapeutics plc*,
648 F. Supp. 3d 962 (N.D. Ill. 2022) .......................................................................................13

*Gregory v. ProNAi Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y. 2018)......................................................................................18

*Gregory v. ProNAi Therapeutics Inc.*,
757 F. App'x 35 (2d Cir. 2018) ...............................................................................................18

*Harden v. Raffensperger, Hughes & Co.*,
65 F.3d 1392 (7th Cir. 1995) ...................................................................................................20

*Hedick v. Kraft Heinz Co.*,
No. 19-cv-1339, 2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) .........................................16, 21

*Holwill v. AbbVie Inc.*,
1:18-CV-06790, 2020 WL 5235005 (N.D. Ill. Sept. 1, 2020)..................................................21

*Hughes v. Huron Consulting Grp., Inc.*,
733 F. Supp. 2d 943 (N.D. Ill. 2010) .......................................................................................10

iv

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
   45 F.4th 1236 (10th Cir. 2022) ......................................................................17, 18

*In re Akorn Sec. Litig.*,
   240 F. Supp. 3d 802 (N.D. Ill. 2017) ...............................................10, 21, 29, 30

*In re Amarin Corp. PLC Sec. Litig.*,
   13-cv-6663, 2016 WL 1644623 (D.N.J. Apr. 26, 2016).........................................20

*In re Amylin Pharm., Inc. Sec. Litig.*,
   No. 01CV1455, 2003 WL 21500525 (S.D. Cal. May 1, 2003) ...............................28

*In re APAC Teleservice, Inc. Sec. Litig.*,
   No. 97 CIV. 9145 (BSJ), 1999 WL 1052004 (S.D.N.Y. Nov. 19, 1999) ...............27

*In re Atossa Genetics Inc. Sec. Litig.*,
   868 F.3d 784 (9th Cir. 2017). .............................................................................21

*In re Baxter Int'l Inc*. Sec. Litig.,
   No. 19 C 7786, 2021 WL 100457 (N.D. Ill. Jan. 12, 2021) ...................................24

*In re Biomarin Pharm. Inc. Sec. Litig*.,
   No. 3:20-CV-06719-WHO, 2022 WL 164299 (N.D. Cal. Jan. 6, 2022)................24

*In re First Merchants Acceptance Corp. Sec. Litig*.,
   No. 97 C 2715, 1998 WL 781118 (N.D. Ill. Nov. 4, 1998)......................................11

*In re Gentiva Sec. Litig*.,
   971 F. Supp. 2d 305 (E.D.N.Y. 2013) .................................................................27

*In re GoHealth, Inc. Sec. Litig*.,
   No. 20-CV-5593, 2022 WL 1016389 (N.D. Ill. Apr. 5, 2022)...............................20

*In re Guidant Corp. Sec. Litig*.,
   536 F. Supp. 2d 913 (S.D. Ind. 2008)..................................................................28

*In re Inotiv, Inc. Sec. Litig*.,
   No. 4:22-CV-045-PPS-JEM, 2024 WL 1344784 (N.D. Ind. Mar. 29, 2024).........11

*In re Iso Ray Sec. Litig*.,
   189 F. Supp. 3d 1057 (E.D. Wash. 2016)............................................................24

*In re MannKind Sec. Actions*,
   835 F. Supp. 2d 797 (C.D. Cal. 2011) ................................................................23

v

*In re Motorola Sec. Litig.*,
   No. 03 C 287, 2004 WL 2032769 (N.D. Ill. Sept. 9, 2004)......................................................22

*In re Nektar Therapeutics Sec. Litig.*,
   34 F.4th 828 (9th Cir. 2022) .....................................................................................................30

*In re Nuvelo Inc. Sec. Litig.*,
   668 F. Supp. 2d 1217 (N.D. Cal. 2009) ....................................................................................28

*In re Oxford Health Plans, Inc.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ...............................................................................................27

*In Re Philip Morris Int'l Inc. Sec. Litig.*,
   89 F.4th 408 (2d Cir. 2023) ......................................................................................................16

*In re Synchrony Fin. Sec. Litig.*,
   988 F.3d 157 (2d Cir. 2021).......................................................................................................11

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
   504 F. Supp. 3d 224 (S.D.N.Y. 2020).......................................................................................27

*Institutional Invs. Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009).................................................................................................22, 25

*Jones v. Corus Bankshares, Inc.*,
   701 F. Supp. 2d 1014 (N.D. Ill. 2010) .................................................................17, 20, 22, 23

*Lewakowski v. Aquestive Therapeutics, Inc.*,
   No. CV213751ZNQDEA, 2023 WL 2496504 (D.N.J. Mar. 14, 2023)..................................16

*Macovski v. Groupon, Inc.*,
   553 F. Supp. 3d 460 (N.D. Ill. 2021) .......................................................................................10

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024).............................................................................................................14, 15

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ...............................................................................................20, 24

*Marwil v. Ent & Imler CPA Grp., PC*,
   No. 1:03-CV-00678-DFH-VS, 2004 WL 2750255 (S.D. Ind. Nov. 24, 2004) .......................23

*Norfolk Cnty. Ret. Sys. v. Ustian*,
   No. 07C7014, 2009 WL 2386156 (N.D. Ill. July 28, 2009) ....................................................21

*Pierrelouis v. Gogo, Inc.*,
No. 18 C 4473, 2021 WL 1608342 (N.D. Ill. Apr. 26, 2021)....................................................24

*Pizzuto v. Homology Medicines, Inc.*,
No. 1:23-CV-10858-AK, 2024 WL 1436025 (D. Mass. Mar. 31, 2024) ...............................30

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
No. 17 CV 5753 (JGK), 2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019)...................................27

*Premier Cap. Mgmt., L.L.C. v. Cohen*,
No. 02 C 5368, 2003 WL 21960357 (N.D. Ill. Aug. 15, 2003)................................................14

*Pugh v. Tribune Co.*,
521 F.3d 686 (7th Cir. 2008) ................................................................................................27

*Ross v. Career Educ. Corp.*,
No. 12 C 276, 2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) ....................................................11

*SEC v. Cook*,
1:13-CV-01312-SEB, 2015 WL 5022152 (S.D. Ind. Aug. 24, 2015) .....................................11

*SEC v. Kameli*,
No. 17 C 4686, 2020 WL 2542154 (N.D. Ill. May 19, 2020) .........................................11, 18

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ...........................................................................................23, 24

*Shah v. Zimmer Biomet Holdings, Inc.*,
348 F. Supp. 3d 821 (N.D. Ind. 2018) ..............................................................................21, 24

*Shapiro v. TG Therapeutics, Inc.*,
652 F. Supp. 3d 416 (S.D.N.Y. 2023)................................................................................13, 14

*Shash v. Biogen, Inc.*,
84 F.4th 1 (1st Cir. 2023)........................................................................................................26

*Skiadas v. Acer Therapeutics Inc.*,
No. 1:19-CV-6137-GHW, 2020 WL 3268495, (S.D.N.Y. June 16, 2020) .............................28

*Stransky v. Cummins Engine Co., Inc.*,
51 F.3d 1329 (7th Cir. 1995) ..................................................................................................11

*Takara Tr. v. Molex Inc.*,
429 F. Supp. 2d 960 (N.D. Ill. 2006) ......................................................................................26

*Teamsters Affiliates Pension Plan v. Walgreen Co.*,
No. 08 C 2162, 2010 WL 3894149 (N.D. Ill. Sept. 29, 2010)..................................................14

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)....................................................................................................21, 27

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)..................................................................................................16

*Vallabhaneni v. Endocyte, Inc.*,
No. 114CV01048TWPMJD, 2016 WL 51260 (S.D. Ind. Jan. 4, 2016)............................15, 19

*Van Noppen v. InnerWorkings, Inc.*,
136 F. Supp. 3d 922 (N.D. Ill. 2015) ..............................................................................15, 27

*Voulgaris v. Array Biopharma Inc.*,
No. 17-cv-02789-KLM, 2020 WL 8367829 (D. Colo. Nov. 24, 2020)..................................24

*Washtenaw Cnty. Employees' Ret. Sys. v. Walgreen Co.*,
No. 15-CV-3187, 2021 WL 5083756 (N.D. Ill. Nov. 2, 2021) ..............................................29

*Wu v. GSX Techedu Inc.*,
738 F. Supp. 3d 527 (D.N.J. 2024) .......................................................................................26

**Statutes and Regulations**

15 U.S.C. § 78t(a) .................................................................................................................30

17 C.F.R. § 240.10b-5......................................................................................................15, 27

Fed. R. Civ. P. 9(b) ...............................................................................................................10

Private Securities Litigation Reform Act of 1995 ...............................................................10, 20

Section 10(b) of the Exchange Act of 1934.........................................................................10, 30

Section 20(a) of the Exchange Act of 1934 ..............................................................................30

viii

Lead Plaintiff Todd Van Groll ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, hereby opposes the motion to dismiss filed by ESSA Pharma Inc. ("ESSA" or the "Company"), its Chief Executive Officer David R. Parkinson ("Parkinson"), and its Chief Operating Officer Peter Virsik ("Virsik").[1]

## PRELIMINARY STATEMENT

This is a straightforward securities fraud case in which Defendants touted the clinical trial results of the Company's only clinical candidate, Masofaniten, while concealing highly material adverse information concerning a key metric, the drug's exposure levels, thereby rendering their statements misleading. Specifically, during the Class Period, Defendants boasted that Masofaniten had achieved clinical levels of exposure in patients, and compared favorably to the studies of the standard of care treatment, Enzalutamide. Exposure levels, or the amount of the drug that reached the bloodstream after metabolization, were especially crucial with Masofaniten because much was lost to metabolization, especially when ingested in combination with Enzalutamide. ¶10.

But Defendants failed to disclose that in clinical trials, they observed exposure levels far below the threshold they previously admitted was "needed for anti-tumor activity." ¶¶96-97. Defendants knew that insufficient exposure levels were a problem for this family of molecule. ¶69. For instance, a previous drug candidate in this molecular family was terminated before the Class Period because it failed to maintain clinical levels of exposure. ¶¶70-72. Defendants understood and attempted to counteract their exposure problem with higher dosages, but the massive doses

---

[1] Parkinson, Virsik and the Company are referred to collectively herein as "Defendants." Paragraph citations ("¶" or "¶¶") refer to the numbered paragraphs of Amended Class Action Complaint ("Complaint") (ECF No. 20). "MTD" refers to the pages of the Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint (ECF No. 28). Unless otherwise noted, internal citations are omitted, and all emphasis is added. Capitalized terms not otherwise defined herein have the same meaning as defined in the Complaint.

1

imposed an unacceptable pill burden on patients, who were required to ingest up to 18 pills per day. ¶69. After failing multiple prior studies, Defendants pivoted to a combination trial, combining Masofaniten with Enzalutamide (the "M-E Combination Trial"). ¶¶80-84. However, this worsened the exposure problem because Enzalutamide is a known metabolizer of drugs such as Masofaniten, meaning that combining the two molecules would decrease Masofaniten exposure. ¶¶53-58. Despite knowing this fact, Defendants gave investors a false impression that they had accounted for the metabolization and "designed that into the study." ¶106. In truth, the exposure levels were well below the very levels they claimed were required to achieve therapeutic effect. ¶98. Rather than tell investors the truth, Defendants falsely stated that their exposure levels were "excellent" and that they had mitigated the drop in exposure. ¶¶110-11.

To make matters worse, Defendants misled investors by comparing their M-E Combination Trial PSA90 results with those of Enzalutamide's clinical trial results from a decade earlier ("PREVAIL"), which showed PSA90 rates of 47%. ¶¶116, 127. The PSA90 rate is a key metric in evaluating responsiveness to prostate cancer treatment—meaning the percentage of patients who received a 90% reduction in their PSA (Prostate-Specific Antigen) level. ¶¶37, 105. In touting their results, Defendants omitted that the M-E Combination Trial patients were not as sick as the patients in the PREVAIL study. ¶105. Hence, better outcomes would be expected whether or not Masofaniten had any effect. ¶105. Multiple studies completed by the start of the Class Period showed that standard of care treatments resulted in PSA90 response rates of 62% or above. ¶105. These more recent studies had lower baseline PSAs in the patient populations than the PREVAIL study (but still higher than in the M-E Combination Trial), further demonstrating why the patient population of PREVAIL would not reflect that of the M-E Combination Trial. ¶105. Defendants

2

nevertheless trumpeted the PREVAIL results as the "best metric" for comparison, omitting data that undermined their statements. ¶127.

Defendants' motion also mischaracterizes numerous well-pled statements as inactionable, claiming they were true when made, forward-looking, opinion or puffery. Their arguments lack merit. Defendants made omissions of material, known adverse information tethered to concrete statements about specific drugs and trial results. Defendants' scienter arguments fare no better. Considered holistically, as the Court must, Plaintiff sufficiently alleges strong circumstantial evidence that Defendants were, at the very least, severely reckless as to the truth or falsity of their statements. Finally, Plaintiff has satisfied the low threshold to plead loss causation by alleging that the revelation of the truth regarding the M-E Combination Trial led to the drop in ESSA's stock price. The motion shows no pleading deficiency and should be denied.

## I. STATEMENT OF RELEVANT FACTS

### A. ESSA's Core Focus on EPI-7386 (Masofaniten)

ESSA was a small company during the Class Period, solely focused on commercializing Aniten (EPI) molecules for the treatment of castration resistant prostate cancer ("mCRPC"). ¶¶66-67. Its first drug candidate for mCRPC treatment was EPI-506. *Id*. However, a Phase 1 clinical trial revealed that EPI-506 was clinically ineffective. ¶69. From the failure of EPI-506, Defendants learned the shortcomings of the EPI molecule, including that an "[e]xcessive high pill burden," requiring patients to swallow up to 18 pills per day to register a clinically active exposure, and that sustaining clinical levels of exposure within the body post-metabolization was an ongoing problem for the Antien drug compound. ¶¶69-71. On September 11, 2017, Defendants abandoned EPI-506 and initiated a corporate restructuring plan to keep ESSA alive. ¶71. A former technical consultant for the Company, CW1, confirmed that EPI-506 was terminated due to high pill burden, which

3

made administration extremely difficult, especially for the targeted cancer patients, many of whom had difficulty swallowing. ¶70. EPI-7386 ("Masofaniten") thereafter became the Company's new EPI molecule and sole drug candidate. Defendants touted Masofaniten as having overcome the shortcomings of EPI-506, claiming it "demonstrated 20 times higher potency" and exhibited "increased resistance to metabolism." ¶72.

**B.      The Importance of Generating Sufficient Exposure in Patients**

The FDA regulates pharmaceutical development and, as part of that process, launches initiatives to support these goals. ¶44. In the spring of 2021, the FDA launched Project Optimus to overhaul the way oncology drugs are dosed, providing drug sponsors with a new framework to generate more robust pharmacokinetic ("PK") information. ¶¶45-47. Pharmacokinetics assesses how a drug moves through a patient's body, and specifically its absorption, distribution, metabolism, and excretion. ¶47. One of the fundamental PK statistics is the area under the curve ("AUC"), which quantifies the drug exposure within the body and is considered a key measure when assessing safety, tolerability, and efficacy. *Id*.

**C.      Defendants Admit that 300,000 AUC is the "Threshold" for Clinical Effectiveness**

Even before the M-E Combination Trial began, Defendants confirmed that an *AUC of over 300,000 was "needed for anti-tumor activity*." ¶¶94-96. Virsik and Parkinson each had actual knowledge of the threshold and repeatedly spoke of the importance of achieving 300,000 AUC. ¶¶96, 114. On March 4, 2021, Virsik again confirmed the 300,000 AUC threshold for "anti-tumor activity." ¶96. On March 18, 2021, Virsik reiterated that ESSA's "ultimate goal, though, is to get exposures in patients of *roughly 300,000 AUC* … [a]nd the reason we are targeting that is because that's the exposure … where we saw very good anti-tumor effect across all models." ¶97. At an April 20, 2021 investor conference David Wood, CFO of ESSA, agreed with Virsik on the 300,000

4

AUC threshold. ¶135. After the M-E Combination Trial began, on June 27, 2022, Chief Medical Officer Alessandra Cesano ("Cesano") again confirmed ESSA's "*target threshold of 300,000 [AUC]* developed from extensive preclinical experience." ¶98.

### D. Defendants Ignore FDA Guidance and Downplay Enzalutamide's Negative Impact on Masofaniten's AUC

There can be no claim that Defendants were not acutely aware that Enzalutamide could increase metabolism (and thereby reduce AUC) of Masofaniten, because the FDA for years warned sponsors to consider this threat. ¶¶44-65. In January 2020, the FDA published two guidances (collectively, the "Enzyme Guidance") to "help drug developers plan and evaluate studies to determine the drug-drug interaction (DDI) potential between investigational drugs [*i.e.*, Masofaniten] with cytochrome p450 enzymes." ¶52. The Enzyme Guidance noted that the CYP3A4 enzyme metabolizes approximately half of all prescribed drugs, reducing the drug exposure and altering efficacy. ¶54. Enzalutamide, an FDA-approved standard of care treatment for mCRPC, is a known strong CYP3A4 inducer, meaning that it decreases the AUC of the victim drug by more than 80%. ¶¶56-59. Critically, Enzalutamide's label specifically warns that it is a "strong CYP3A4 inducer," that will "reduce the efficacy of these substrates." ¶64.

Before the Class Period, Defendants admitted understanding the drug-drug interaction issue presented by Enzalutamide. On March 9, 2021, Parkinson acknowledged that Defendants "don't want to see a drug that is a huge inducer of CYP3A[4] that would complicate … interactions with other drugs." ¶86. On June 27, 2022, Cesano admitted that Enzalutamide was "a strong inducer of the CYP3A4," that Masofaniten "was a [CYP3A4] substrate." ¶87. On November 17, 2022, Parkinson stated that "Enzalutamide is a notorious, what's called a CYP3A inducer" and that "it's a tough drug to combine with." ¶90. Even Defendants' own published data established that Enzalutamide metabolized Masofaniten to below the 300,000 AUC threshold. ¶103. Yet,

before and during the Class Period, Defendants misrepresented to investors that "*exposure of [Masofaniten] is still within the efficacy exposure range*" (¶104) and that they had designed the M-E Combination Trial to mitigate the drop in exposure (¶¶110-11).

### E. Masofaniten Fails as a Monotherapy

On March 30, 2020, ESSA submitted an Investigational New Drug Application to the FDA and began clinical testing on human patients in July 2020. ¶73. ESSA first tried to pursue Masofaniten as a single agent, evaluating doses ranging from 200 mg to 1000 mg once daily and a 600 mg dose taken twice daily. ¶¶76-77. Virsik initially said that the 300,000 AUC could be achieved via a single 600 or 800 mg daily dose, but after that dosing failed, ESSA amended its protocol to provide twice-daily 800 mg dosing. ¶78. Even with the increased dosing, the monotherapy failed to demonstrate clinical effectiveness, and Parkinson later admitted that Defendants "didn't see dramatic clinical activity" even at the highest dosing rate. ¶79.

### F. Defendants Mislead Investors by Falsely Claiming They Had Addressed Exposure Concerns

On February 24, 2021, ESSA announced that it would conduct the M-E Combination Trial, a two-phase, open-label clinical trial to evaluate Masofaniten in combination with Enzalutamide. ¶82. Defendants designed the M-E Combination Trial to ensure that they had full access to interim trial data, including AUC and PSA data. ¶¶82, 86-91, 99, 102-03, 111, 113. Phase 1 was a single-arm dose-escalation study to evaluate the safety and tolerability of the drug combination, assess drug-drug interactions, and identify the optimal dose for Phase 2. ¶83. Phase 2 was an open-label two-arm study, with one arm receiving the Masofaniten-Enzalutamide combination and the other receiving only Enzalutamide (the standard of care). ¶84.

Despite possessing data to the contrary, on March 15, 2023, Virsik misleadingly downplayed the known drug-drug interaction by assuring investors that although Enzalutamide

6

was increasing the metabolization of Masofaniten, Defendants had "*actually designed that into the study*" and were "*able to get to significant clinical exposures already* with current [once-daily dosing] and the [twice daily dosing] gets us again even higher dosing. *So we've been able to address the higher metabolism induced by Enzalutamide*." ¶106. Defendants claimed to have discovered a "trick" to reach clinical absorption levels by splitting doses over the day, and "did that very successfully in getting reproducibly high exposures. ¶¶108, 114.

In presentation materials, Defendants claimed that the 600 mg twice daily dosing "mitigates drop in exposure." ¶¶110-11, 140. It did not. By day 7, AUC dropped under the threshold even with the twice-daily dosing. *Id.* On September 18, 2023, Defendants began the Phase 2 portion of the trial, which compared the M-E combination results with those receiving only Enzalutamide. ¶113. On November 30, 2023, Parkinson, in response to pointed analyst questions, stated that Defendants got "excellent exposures, totally consistent with active levels of exposure from our preclinical data," referring to the 300,000 AUC threshold. ¶114. The data did not support this statement. The 300,000 AUC threshold was not met. ¶115.

Throughout the Class Period, Defendants stated that they monitored the M-E Combination Trial. ¶132. As an open-label study, Defendants had access to: (a) participant data, (b) safety and efficacy data, and (c) trial progress data. ¶¶82, 132. On June 6, 2024, Parkinson admitted that Defendants were then monitoring the patients every month, including their PSA levels, and that he received data from the safety review committee. ¶¶113, 132. Defendants initially reported this patient-level data to investors but ceased doing so after October 2022, reflecting their knowledge of problems that the data would expose. ¶¶133, 148.

On April 16, 2024, Parkinson continued to represent that even though Enzalutamide is "a nasty drug from [the combination] perspective," Defendants could "still get good exposures with

7

the 600 milligrams twice a day." ¶119. On July 15, 2024, Parkinson reiterated that Defendants "knew that Enzalutamide was a potent inducer of CYP3A4," but touted that Defendants could "give doses of Masofaniten which are therapeutic, together with full-dose of Enzalutamide" and still reach the 300,000 AUC "therapeutic efficacy" threshold derived from "preclinical studies." ¶121. As late as September 18, 2024, Virsik claimed that Defendants had resolved the metabolization issue by increasing the dose to 600 mg twice daily. ¶125

Defendants also misrepresented the PSA90 results of the M-E Combination Trial by claiming that their outcomes were better than those in another mCRPC study conducted nearly a decade earlier, PREVAIL, for Enzalutamide. ¶105. In fact, their own Phase 1 data showed that any comparison between the two would be factually and medically improper because the patients studied in the two trials were radically different. In touting their results, ESSA omitted that the M-E Combination Trial patients were not as sick as those in the PREVAIL study, so better outcomes would be expected regardless of whether Masofaniten had any effect. ¶105. For example, the median baseline (starting) PSA in the M-E Combination Trial was *approximately 1/18th* that in the PREVAIL trial, meaning that M-E Combination Trial patients came into treatment far less sick than those in the PREVAIL study. ¶105. Multiple studies completed by the start of the Class Period showed standard of care treatments resulted in PSA90 rates above 62%, demonstrating the PREVAIL study's irrelevance. ¶105. These more recent studies had lower baseline PSAs in the patient populations than in the PREVAIL study (but still higher than in the M-E Combination Trial), further demonstrating that the results of the PREVAIL patient population would not reflect those of the M-E Combination Trial. *Id.* Defendants nevertheless trumpeted the PREVAIL results as the "best metric" for comparison, omitting data that undermined their statements. ¶127.

8

Yet, when questioned about Masofaniten's impact on Enzalutamide, Virsik claimed that ESSA's results were better than the PREVAIL study, omitting that differences in response rate were due to ESSA's decision to study a healthier patient population and advances in detection and treatment over the last decade, not any superiority of its proposed drug combination. ¶¶40-43, 116. Then, on September 18, 2024, Virsik told investors that ESSA's results should be compared to PREVAIL because both involved "*the same patient population*" and that "there's nothing about them that stands out as being *particularly less* or harder to be able to treat than those patients we're talking about for PREVAIL." ¶127. Virsik then told investors that the "best metric of that is PREVAIL at 47%" despite knowing the huge differences in the populations. *Id*.

Defendants continued to make misleading statements about the drug's progress during Phase 2 testing. For example, on August 5, 2024, Parkinson said, "we are progressing towards a stream of significant milestones throughout the next nine to twelve months"—just two months before the Company abandoned all drug prospects. ¶123. On September 18, 2024, Virsik stated that the exposures were "very well," when the data Defendants had been actively monitoring showed the exact opposite. ¶¶125, 146.

### G. ESSA Terminates the Combination Trial and Investors Learn the Truth

On October 31, 2024, ESSA announced its decision to terminate Phase 2 of the Combination Trial and abandon Masofaniten development. ¶129. The Company admitted that Enzalutamide alone performed better than the proposed combination drug, and therefore that continued study would be futile. *Id*. On this news, ESSA's stock fell 73.08% on the next trading day. ¶130. ESSA's share price never recovered. *Id*. During the Class Period, Virsik sold over 81,000 shares, generating over $800,000. ¶150.

9

## II. ARGUMENT

### A. The Complaint Adequately Alleges Violations of Section 10(b)

The elements of a claim under Section 10(b) of the Exchange Act are (1) material misrepresentations or omissions, (2) scienter, (3) a connection between the misrepresentations or omissions and the purchase or sale of securities, (4) reliance, (5) economic loss and (6) loss causation. *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 813 (N.D. Ill. 2017). Defendants only challenge elements (1) (falsity), (2) (scienter) and (6) (loss causation). In considering a motion to dismiss, courts do not evaluate the merits, but merely test the sufficiency of the allegations. *Hughes v. Huron Consulting Grp., Inc.*, 733 F. Supp. 2d 943, 946 (N.D. Ill. 2010). At this stage, all reasonable inferences are drawn in Plaintiff's favor, and all well-pleaded allegations are assumed to be true. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). Under Section 10(b), a motion to dismiss may not be used to dispute the well-pleaded allegations of the complaint, assess credibility, or evaluate evidence. *See e.g.*, *City of Sterling Heights Gen. Emps. Ret. Sys. v. Hospira, Inc.*, No. 11 C 8332, 2013 WL 566805, at *11-12 (N.D. Ill. Feb. 13, 2013) (denying attempt to cobble together alternative theories and facts in seeking dismissal).

#### 1. Plaintiff Plausibly Alleges Defendants Made Material Misrepresentations and Omissions

To plead falsity under the PSLRA and Rule 9(b), Plaintiff is required only to specify each statement alleged to be misleading and explain the reasons why the statements are misleading. *Akorn*, 240 F. Supp. 3d at 813-14; *see also Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 473 (N.D. Ill. 2021) (same). On a motion to dismiss, courts "need not determine whether [Defendants'] statements were in fact misleading[.]" *Azar v. Grubhub, Inc.*, No. 1:19-CV-07665, 2021 WL 4077327, at *4 (N.D. Ill. Sept. 7, 2021). That is reserved for trial. Instead, at this stage, courts need only determine whether sufficient facts are alleged "to support a ***reasonable belief*** as to the

misleading nature of the statement or omission." *Ross v. Career Educ. Corp.*, No. 12 C 276, 2012 WL 5363431, at *3 (N.D. Ill. Oct. 30, 2012). Plaintiff need not plead "detailed evidentiary matter[.]" *In re First Merchants Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 WL 781118, at *9 (N.D. Ill. Nov. 4, 1998); *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021) ("even securities plaintiffs need not prove their entire case within the confines of the complaint.").

"The test for whether a statement is materially misleading" is "whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *SEC v. Kameli*, No. 17 C 4686, 2020 WL 2542154, at *25 (N.D. Ill. May 19, 2020); *SEC v. Cook,* 1:13-CV-01312-SEB, 2015 WL 5022152, at *17 (S.D. Ind. Aug. 24, 2015) (statement misleading if a "reasonable investor would have received a false impression"). Once a defendant chooses to speak, "he must speak the whole truth." *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995), *as amended* (Apr. 7, 1995); *Allison v. Oak St. Health, Inc.*, No. 22 C 149, 2023 WL 1928119, at *5 (N.D. Ill. Feb. 10, 2023). Half-truths are actionable under the Exchange Act. For example, "a child telling his parents that he ate dessert is misleading if he ate the entire cake." *Gimpel v. Hain Celestial Grp., Inc.*, 156 F.4th 121, 143 (2d Cir. 2025).

### a. Defendants Made False and Misleading Statements About Masofaniten's Exposure Levels

Defendants materially misrepresented the exposure levels of Masofaniten when combined with Enzalutamide, and Plaintiff plausibly alleges why the statements were misleading. Once Defendants chose to speak about Masofaniten exposure levels, they put the issue "in play" and undertook a duty to be truthful, accurate and complete. ¶¶106, 108, 110, 114, 119, 121, 125; *see also In re Inotiv, Inc. Sec. Litig.*, No. 4:22-CV-045-PPS-JEM, 2024 WL 1344784, at *19 (N.D. Ind. Mar. 29, 2024); *Kameli*, 2020 WL 2542154, at *26. Yet, instead of making statements fairly aligning with the devastating facts they knew internally, Defendants repeatedly claimed that they

11

had addressed the metabolic issues by implementing higher dosing and achieved sufficient exposure despite Enzalutamide's metabolizing effect on Masofaniten. For example, regarding metabolization, they said they "***actually designed that into the study***" and that they were "***able to address the higher metabolism induced by Enzalutamide***." ¶106. Defendants also claimed that the "trick" of twice-daily doses was "very successful[]" and provided "reproducibly high exposures." ¶¶108, 114. It did not. Parkinson also falsely said the exposure levels were "excellent." In fact, data showed that ESSA's own 300,000 AUC threshold was not met. ¶114.

Defendants' newfound argument that 300,000 AUC was not "a threshold for clinical significance," MTD at 5, 12, is the exact opposite of what they said prior to litigation. Then, Chief Medical Officer Cesano admitted that the "target ***threshold of 300,000***" was "developed from extensive preclinical experience." ¶98. Virsik repeatedly insisted that "the reason we're targeting 300,000 is because that is the exposure where we saw good consistent anti-tumor activity." ¶¶96, 97, 135. CFO David Wood made similar comments. ¶135. Finally, Defendants' presentation materials stated that the targeted AUC threshold was 300,000, and Defendants repeatedly stated that the 300,000 AUC threshold was the basis for dosage decisions. ¶¶94-95, 103.

Defendants' argument that twice-daily dosing mitigated the drug-drug interaction also contradicts well-pled facts admitted by Defendants prior to this litigation, when their own data showed that the 300,000 AUC threshold was not being sustained. *See*, *e.g.*, ¶¶110-11 (by Day 7, Masofaniten's AUC dropped to below 300,000, and by Day 28, it was less than 190,000). Because of the known problems Masofaniten was having in reaching clinical levels of exposure, the Company was likewise experiencing problems with pill burden as the Company kept needing to increase dosage to improve exposure. ¶¶5, 85. Defendants' dispute with well-pled facts must be resolved at trial, not on the pleadings. *See e.g.*, *Hospira, Inc.*, 2013 WL 566805, at *12.

12

Unable to directly address the 300,000 AUC threshold they claimed was necessary for clinical activity, Defendants now claim that 130,000 AUC might be "biologically active" or "biologically relevant." MTD at 12. That red herring does not undermine either the pleadings or the veracity of the Complaint's allegations.[2] And, the statements Defendants cite indicate that the 130-140,000 AUC figure pertained to the low starting doses abandoned as ineffective, while confirming that 300,000 AUC was needed for "good consistent activity." *See*, *e.g.*, MTD Ex. 15 at 5 (Virsik: "***200 milligram starting dose*** in our clinical study is projected to provide in overall area under the curve exposure AUC as we call it ... you can see the 137,000 would be in a range in xenografts that was biologically active …. And we are ***targeting in patients, an exposure of over 300,000 because that is the exposure where we saw good consistent activity...***"). At no point did Defendants indicate that 130,000 AUC was their threshold for the M-E Combination Trial.

Nor does Defendants' half-truth that Enzalutamide was a metabolizer of Masofaniten help. *See* MTD at 13. They consistently downplayed the effect and falsely claimed to discover a "trick" to offset the problem. ¶108. First, Defendants told investors that Enzalutamide reduced Masofaniten exposure by "50% to 60%," when, in fact, it reduced exposure by over 80%. ¶¶58, 137. Second, Defendants falsely said that the higher, twice-daily dosing "mitigates [the] drop in exposure." ¶110. This was also false.[3]

---

[2] Defendants' citation to *Alizadeh v. Tellabs, Inc.*, No. 13 C 537, 2015 WL 557249, at \*10 (N.D. Ill. Feb. 9, 2015) has no bearing here. MTD at 13. There, the misstatement was cleared up by other statements in the same call. But Defendants' statements here regarding the 300,000 AUC threshold were never cleared up.

[3] *Goucher v. Iterum Therapeutics plc*, 648 F. Supp. 3d 962, 972 (N.D. Ill. 2022) is irrelevant. In *Iterum*, the defendants fully disclosed that their drug failed to meet a primary endpoint and that their New Drug Application was based on a single phase 3 trial (when the FDA required two such trials). Here, Defendants never disclosed their inability to overcome the drug-drug interaction, or that they could not maintain Masofaniten exposure at clinical levels. *Shapiro v. TG Therapeutics, Inc.*, 652 F. Supp. 3d 416, 422 (S.D.N.Y. 2023) is likewise off point because that defendant

Defendants ignore the well-pleaded allegations and contend that their dosing statements were true. Plaintiff alleges all the reasons why twice daily dosing statements were false, including tying the statements to metabolization, saturation and pill burden. ¶¶109, 112. Defendants' citation to *Premier Cap. Mgmt., L.L.C. v. Cohen*, No. 02 C 5368, 2003 WL 21960357, at *3 (N.D. Ill. Aug. 15, 2003) misfires—in that case, the plaintiff simply did not include reasons why each statement was false or misleading other than making a conclusory statement that they were false. Here, the statements Defendants attack, *i.e.*, "we did that very successful[ly] in getting reproducibly high exposures" and "[twice daily] dosing mitigates drop in exposure," ¶¶109-112, are misleading because the M-E Combination Trial did not produce clinical levels of exposure (*i.e.*, 300,000 AUC). That Defendants still try to obfuscate and argue that there were "material increases in the AUC of Masofaniten," MTD at 14, does not address the fact that the drug failed to maintain clinical exposure levels and, in fact, was 40% below clinical exposure by Day 28. ¶¶110.[4]

Nor are these "pure omissions."[5] As alleged in the Complaint, each was tethered to misleading statements that Defendants chose to make, rendering them at best half-truths and at any

---

disclosed adverse events to the FDA in a public database. Here, by contrast, Defendants downplayed the impact of metabolization and misrepresented that they were still seeing good levels of exposure when they were not. And, unlike *Shapiro*, Defendants to this day have declined to submit results to the FDA. *See*, p. 26, *infra*.

[4] *Teamsters Affiliates Pension Plan v. Walgreen Co.*, No. 08 C 2162, 2010 WL 3894149, at *5 (N.D. Ill. Sept. 29, 2010) is also not relevant. There, the statement that rendered the misleading statement not misleading appeared in the same report, in the sentence preceding the alleged false statement. *Id*. The plaintiff alleged that no one knew about the change in price of a generic drug until Oct. 2007, but the same report stated that the price change had occurred prior to June 2007. *Id*. Here, Defendants create a new term, "material increase" in exposures, and provide an unsubstantiated explanation contesting the facts. MTD at 14. Plaintiff alleges that the "mitigation of exposure" chart is misleading because the chart fails to disclose that the exposure levels were below the 300,000 AUC threshold. ¶112.

[5] Defendants note that *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024) bars securities fraud claims based on the complete absence of a statement of so-called "pure omissions." But the question presented in that case was "whether the failure to disclose information

---

rate, highly misleading. ¶¶106, 108, 110, 114, 119, 121, 125. Defendants chose to speak about dosing levels, which directly dictate the number of pills needed to be taken by patients, and the resulting pill burden. ¶¶106, 108, 110, 114, 119, 121, 125. Pill burden was known to be a problem with EPI drugs, including both EPI-506 and Masofaniten. ¶¶70, 85-86. The challenged statement (¶106) is linked to pill burden because the dosing necessitates taking the high dose of pills. The Confidential Witness account is confirmed by the Company's own admission that EPI-506 was terminated because of lack of effectiveness and "[e]xcessive[ly] high pill burden." ¶69. Also, EPI-506 was the same class of molecule as Masofaniten, and Defendants admitted the same issues persisted with Masofaniten. *See* ¶106 ("They reach a limit of absorption and the trick is to split the dose over the day.").

Defendants' attacks on a former employee are also unfounded. First, such accounts are not properly discounted where, like here, "Plaintiff has described the witnesses with enough detail that this Court can determine that the confidential witnesses have a foundation for their allegations." *See Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 934-35 (N.D. Ill. 2015). Second, even Defendants' cited caselaw holds that "[w]hen the testimony of a confidential witness is supported by an adequate description of a witness' job title, duties, and duration, and when the testimony is also used to corroborate allegations established by other sources, the testimony is typically considered to be adequately supported." *Vallabhaneni v. Endocyte, Inc.*, No. 114CV01048TWPMJD, 2016 WL 51260, at *8 (S.D. Ind. Jan. 4, 2016). Here, the Confidential Witness's job title, duties, duration, and corroboration are all alleged, and CW1 (a former technical

---

required by Item 303 [under Regulation S-K] can support a private action under Rule 10b-5(b), even if the failure does not render any 'statements made' misleading." *Id*. at 260. Plaintiff here does not bring a Regulation S-K claim, but rather, alleges that statements in earnings calls were false and misleading when made for reasons clearly articulated in the Complaint. *See* ¶¶106-07.

15

consultant tasked with increasing Aniten potency) confirmed that EPI-506 was canceled due to high pill burden—requiring patients to take too many pills to sustain therapeutic exposure. ¶70. The Company admitted that was correct. *Id*.

The statements at issue were not mere opinions. First, the Defendants' misstatements involve a specific, measurable threshold: 300,000 AUC. Further, even if some might involve opinions, they are still actionable because they contain embedded false representations of fact. *See Hedick v. Kraft Heinz Co.*, No. 19-cv-1339, 2021 WL 3566602, at *9 (N.D. Ill. Aug. 11, 2021) (finding opinion statements that contained embedded or implicit statements of fact to be actionable). Either way, Defendants are liable for the misleading statements because they omitted highly material, but negative clinical results that failed to meet their threshold.

The statements do not represent a difference in interpretation of clinical data. Unlike in *Lewakowski v. Aquestive Therapeutics, Inc.*, here ESSA possessed concrete information plausibly showing that the clinical data failed ***its own threshold*** for consistent clinical activity. *Compare* No. CV213751ZNQDEA, 2023 WL 2496504, at *6 (D.N.J. Mar. 14, 2023) ("Nothing in the record suggests…that the topline results were not honestly believed and lacked a reasonable basis…") *with* ¶¶94, 97, 135. Nor is this like *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016), a case where the drug worked and was approved. Defendants' statements are still "misleading and actionable" under *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 423 (2d Cir. 2023), because the "omitted contrary facts substantially undermine the conclusion [that] a reasonable investor would reach from [the] statement." Here, the omission regarding Defendants' 300,000 AUC threshold substantially undermines the conclusion that M-E Combination Trial exposure levels were clinically effective.

16

Nor were Defendants' statements puffery. *See* MTD at 19 (stating that "many" statements were puffery without analysis). It is well-settled that statements are examined in their full context, and even loosely optimistic statements can mislead investors. *See e.g.*, *Blatt v. Corn Prods. Int'l*, No. 05 C 3033, 2006 WL 1697013, at \*4 (N.D. Ill. June 14, 2006). And even puffery is actionable when a defendant is aware of facts that undermine or contradict the statement, as Defendants were here. *See Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1028 (N.D. Ill. 2010) (considering the full context of the statements and declining to dismiss as puffery). Here, Defendants knew facts that undermined their statements. For example, Defendants said they had good exposures at Masofaniten's dosage levels, while omitting that Masofaniten fell below its threshold (*see*, *e.g.*, ¶¶121, 125), and made concrete comparisons of the M-E Combination Trial relative to PREVAIL while omitting the serious differences between the studies. (¶¶116, 127).[6]

Defendants also argue that the statements were not false because "there are no allegations that Defendants disclosed fake clinical results or that, when they made statements regarding the trial's next steps, ESSA did not in fact intend to move forward." MTD at 19. But that is not the theory of the case. At no point did Plaintiff allege that the clinical results were fake or that withdrawal from the study was imminent. The statements were false and misleading because, *inter alia*, they omitted that the drug failed to sustain clinical levels of exposure (*i.e.*, 300,000 AUC), and could not be effective at the dosage Defendants were testing. Nothing in the Complaint hinges on fake results or imminent termination. *See Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236,

---

[6] *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021) is not applicable. That case affirmed dismissal of a statement that a corporate integration was "progressing as planned," where there was no concrete assertion of fact. But here, Defendants' claim that their exposures were "excellent" in the context of other statements describing 300,000 AUC as a necessary condition for therapeutic efficacy necessarily implied that Defendants had satisfied that necessary condition, when they had not. ¶¶114, 119, 125. And, if exposure levels were truly "excellent," the drug would not have been abandoned as futile. ¶129.

17

1250-51 (10th Cir. 2022) (holding that courts "need not evaluate [d]efendants' hypotheticals" to analyze sufficiency).

Defendants' contention that they had no independent duty to disclose exposure data is beside the point. They repeatedly ***chose*** to discuss exposure levels to investors, and by doing so, undertook a duty not to mislead by omitting adverse information. ¶¶106, 108, 110, 114, 119, 121, 125; *Kameli*, 2020 WL 2542154, at *26. *Gregory v. ProNAi Therapeutics Inc*. supports Plaintiff here. 297 F. Supp. 3d 372, 410 (S.D.N.Y. 2010), *aff'd*, 757 F. App'x 35 (2d Cir. 2018). The issue in *Gregory* was whether protocol amendments had to be disclosed. *Id.* While the *Gregory* court found disclosure was made, it did note that hiding adverse information "***can make affirmative statements about the success of a drug materially misleading***." *Id*. Likewise, *City of Edinburgh Council v. Pfizer, Inc.*, is not relevant. 754 F.3d 159, 175 (3rd. Cir. 2014). There, plaintiffs claimed statements were misleading because they did not disclose adverse phase 2 results, but the defendants had not put that trial into play by discussing it. *Id.* Here, Defendants made several specific statements regarding Masofaniten exposure and were thus obligated to truthfully disclose their failure to achieve clinically significant exposure levels. ¶¶106, 108, 110, 114, 119, 121, 125.

### b. Misrepresentations and Omissions Regarding M-E Combination Trial's Superiority Over the PREVAIL Study

As recently as one month before ESSA terminated all operations, Defendants were still touting their Phase 1 results by comparing them to Enzalutamide's PREVAIL study from a decade earlier. ¶127. Virsik said that these should be compared to the much older PREVAIL study since it was "done for ***registration in the same patient population***" and that "there's nothing about them that stands out as being particularly less or harder to be able to treat than those patients we're talking about for PREVAIL." ¶127. This was misleading because PREVAIL involved much sicker patients, and detection and responsiveness to treatment had drastically changed. ¶¶37-43, 105.

18

Unable to dispute that Defendants misled investors by telling them that there was no difference in the patient populations of PREVAIL and the M-E Combination Trial when there was an enormous difference, Defendants now try to whitewash the prevarication by calling it is a mere disagreement about study design or statistical methodology. MTD at 17. The case Defendants cite, *In re Rigel Pharms*, was dismissed because it involved a dispute about whether defendants should have used another statistical methodology to assess significance. 697 F.3d 869, 877-78 (9th Cir. 2012). No matter how assessed, a baseline PSA in one study that is $1/18^{th}$ that of the other precludes any claim that the patient populations were the same. Similarly, in *Endocyte*, 2016 WL 51260, at \*14, plaintiffs alleged that defendants omitted that they used a different protocol but did "not explain the difference…, how the difference impacted the Phase 3 study results, or how such a disclosure would have been relevant to a reasonable investor's decision." Here, Plaintiff explains precisely why saying the patient population is the same when, in fact, the PREVAIL patients were 18 times sicker renders the statement misleading. ¶¶105, 117, 128.

Here, Defendants stated that the "best metric" in showing the efficacy of Masofaniten was that the M-E Combination Trial PSA90 rates were better than the PSA90 rates in PREVAIL. ¶¶116, 128. Defendants' brief does not defend the "best metric" misrepresentation. But, as Plaintiff alleges, (a) M-E Combination Trial Phase 1 data showed median baseline PSA was only 3 ng/ml, only ***approximately 1/18th the baseline PSA observed in the 2014 PREVAIL trial***; (b) Defendants consistently received reports measuring PSA levels in the trial; and (c) because published data on trials for Enzalutamide and other similar drugs showed a large reduction in baseline PSA since 2014, and corresponding increases in PSA90 response rates. *See* ¶105 (chart of multiple studies after the PREVAIL study measuring Enzalutamide and other standard of care treatments with PSA90 response rates in excess of 62%). But Defendants did not address these results when touting

19

the supposed comparisons to the outdated PREVAIL study with investors.[7] The PREVAIL study results did not suggest the efficacy of Masofaniten.[8] ¶128.

### c. The PSLRA Safe Harbor Does Not Apply

Defendants incorrectly aver that "many" of the statements are protected by the PSLRA safe harbor and the bespeaks caution doctrine. MTD at 21. Defendants solely cite to ¶¶121 and 123 of the Complaint. Even these statements are present-tense, not forward-looking. For example, in ¶121, Parkinson falsely said that the Company had already determined it could provide dosing that reached therapeutic efficacy. Defendants also highlight the statement that ESSA was then "progressing towards a stream of significant milestones" from ¶123, but ignore that the statement omitted that Masofaniten *had already failed to achieve clinical levels of exposure*. At best, when viewed in context, these are "mixed present/future statement[s]" whose non-forward-looking portions are unprotected and properly alleged to be misleading. *See Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008).

Similarly, the "bespeaks caution" doctrine does not apply to the omissions of then-existing and then-known facts alleged here. *See Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1405-06 (7th Cir. 1995); *In re GoHealth, Inc. Sec. Litig.*, No. 20-CV-5593, 2022 WL 1016389, at *5 (N.D. Ill. Apr. 5, 2022). Nor were the "warnings" Defendants cite, which are boilerplate and would apply equally to any drug candidate, relevant to the specific risk that had already

---

[7] Similarly, *In re Amarin Corp. PLC Sec. Litig.*, CV-13-6663, 2016 WL 1644623 (D.N.J. Apr. 26, 2016), has no bearing on Defendants' misleading statements regarding the PREVAIL study. The Japanese study in *Amarin* involved the same drug as Amarin's United States candidate, and the court noted that the FDA described the Japanese study's results as "encouraging," which "demonstrates that to some extent, the FDA considered [the Japanese study] indicative that Vascepa might eventually prove effective." *Id.* at *14. Here, the comparison involved Masofaniten's performance relative to a different study of a different drug tested a decade earlier.
[8] The "best metric" statement is also not puffery because the context was to give investors comfort about the supposed superiority of their data. *See Corus Bankshares*, 701 F. Supp. 2d at 1028.

20

materialized: that the drug had failed to sustain clinical levels of exposure. *Kraft Heinz Co.*, 2021 WL 3566602, at \*16 (generic risk disclosures insufficient when risk has already materialized). Moreover, Defendants fall far short of the "stringent" requirements to show that the truth was already known to investors. To obtain dismissal on that basis, a defendant must show that no reasonable person could disagree that the challenged statements were not misleading. *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017).

### 2. Plaintiff Pleads a Strong Inference of Scienter

Knowledge of an omission or the falsity of a statement or reckless disregard of a substantial omitted risk demonstrates scienter. *Akorn*, 240 F. Supp. 3d at 818. The inference must be cogent, but it "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). A tie of any inferences of scienter breaks in favor of the Plaintiff at the pleadings stage. *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 845 (N.D. Ind. 2018). To prevail on a motion to dismiss, a ***defendant*** must demonstrate a ***more*** compelling inference of innocence than the inference of fraud pled in the complaint. *Akorn*, 240 F. Supp. 3d at 821.

When evaluating scienter, "courts must consider the complaint in its entirety" and ask "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323 (emphasis in the original). Circumstantial facts, which tend to suggest "reckless disregard of a substantial risk that the statement is false," suffice. *See Holwill v. AbbVie Inc.*, 1:18-CV-06790, 2020 WL 5235005, at \*4 (N.D. Ill. Sept. 1, 2020). Defendants improperly isolate each scienter allegation (MTD at 21-27), but courts reject "'cherry picking' particular allegations that, standing alone, might not" suffice. *Norfolk Cnty. Ret. Sys. v. Ustian*, No. 07C7014, 2009 WL 2386156, at \*11 (N.D. Ill. July 28, 2009).

21

### a. Defendants' Actual Knowledge and Access to Information Contradicting Their Public Statements Support a Strong Inference of Scienter

A defendant's access to information contradicting their statements is classic evidence of scienter. *See Asher v. Baxter Int'l, Inc*., No. 02 C 5608, 2005 WL 331572, at \*6 (N.D. Ill. Feb. 3, 2005) (scienter pled as to senior executives with access to reports reflecting facts contradicting their statements); *Corus Bankshares*, 701 F. Supp. 2d at 1022; *In re Motorola Sec. Litig.*, No. 03 C 287, 2004 WL 2032769, at \*26 (N.D. Ill. Sept. 9, 2004); *see also Fla. State Bd. of Admin. v. Green Tree Fin. Corp*., 270 F.3d 645, 665 (8th Cir. 2001) ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate."). "[C]ontent and context" of a statement can be "the most powerful evidence of scienter." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009).

Defendants' own statements show that they were monitoring the progress of the M-E Combination Trial, an open-label study, including monthly changes in PSA levels. ¶¶9, 86-91, 102-03, 110-11, 113. Defendants had access to each cohort's patient AUC and PSA90 data and indeed referenced cherry-picked excerpts of this data in presentations. *See* ¶133. Parkinson specifically conceded that he monitored patient data in the study, and falsely assured investors that "if things emerge[]... we would certainly respond to that." ¶113, 132.

Defendants also made statements demonstrating actual knowledge of the underlying facts that made their statements about Masofaniten's AUC misleading, including the threshold Masofaniten AUC required for "consistent anti-tumor activity" and the detrimental impact Enzalutamide had on Masofaniten exposure. For example, Virsik and Parkinson repeatedly admitted before the Class Period that achieving 300,000 AUC was a necessary threshold, ¶¶135-

22

42, indicating they understood the significance of not having achieved it. Further, Virsik and Parkinson each spoke at length about other prostate cancer studies, including baseline PSA levels, and acknowledged the importance of establishing similar patient populations when comparing two trials. ¶¶116, 127, 141. Thus, they knew it would be misleading to compare the M-E Combination Trial to PREVAIL, which involved patients 18 times sicker at inception. ¶105.

Defendants wrongly dismiss these well-pled facts as conflating knowledge of clinical data with knowledge that the statements are false and misleading. *See* MTD at 23. But, Plaintiff alleges exactly why Defendants either knew or recklessly ignored each was false. *See*, *e.g.*, ¶¶107, 109, 112, 115, 117, 120, 122, 124, 126, 128. Courts "need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). Each ESSA senior executive knew about the 300,000 AUC threshold and the Company's failure to meet it. ¶¶132-42. That Defendants made statements touting the exposure levels as "excellent" was reckless, at a bare minimum.

Defendants' timing argument is equally specious. "Fraud is almost always detected after the fact." *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 809-10 (C.D. Cal. 2011); *Marwil v. Ent & Imler CPA Grp., PC*, No. 1:03-CV-00678-DFH-VS, 2004 WL 2750255, at *6 (S.D. Ind. Nov. 24, 2004) (rejecting fraud-by-hindsight argument where complaint alleged defendants knew statements were false based on "data that were available" at the time); *see also Corus Bankshares*, 701 F. Supp. 2d at 1020-21 (similar). That this normal course of events occurred here does not render Defendants' conduct fraud by hindsight. *Id.*

### b. That the Misrepresentations Involved Defendants' Core Operations Supports a Strong Inference of Scienter

All misrepresentations alleged in the Complaint involved ESSA's sole clinical drug candidate, Masofaniten. ¶5. Because they involved ESSA's core operations, scienter is properly

23

inferred. *Tellabs*, 513 F.3d at 710; *see also Killinger*, 542 F.3d at 786 (scienter is adequately pled where the facts are of such prominence that it would be "absurd to suggest that management" would not know about them); *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc*., 22 F.4th 1, 10-11 (1st Cir. 2021) (inferring scienter where the misrepresentations concerned the company's most important product); *Pierrelouis v. Gogo, Inc*., No. 18 C 4473, 2021 WL 1608342, at *7 (N.D. Ill. Apr. 26, 2021) (same).

Further, it "reasonably follows that the company's CEO would have been aware of a major issue" with the Company's sole drug candidate. *Busic v. Orphazyme A/S*, No. 21 C 3640, 2022 WL 3299843, at *22 (N.D. Ill. Aug. 11, 2022); *see also In re Biomarin Pharm. Inc. Sec. Litig*., No. 3:20-CV-06719-WHO, 2022 WL 164299, at *14 (N.D. Cal. Jan. 6, 2022) (inferring scienter where the drug was expected to be a significant source of the company's revenue); *Voulgaris v. Array Biopharma Inc.*, No. 17-cv-02789-KLM, 2020 WL 8367829, at *25 (D. Colo. Nov. 24, 2020) (inferring scienter where the subject of the fraud involved the most important clinical product); *Shanawaz v. Intellipharmaceutics Int'l Inc*., 348 F. Supp. 3d 313, 325-26 (S.D.N.Y. 2018) (imputing scienter when defendants made misrepresentations about a drug central to their business); *In re Iso Ray Sec. Litig*., 189 F. Supp. 3d 1057, 1079 (E.D. Wash. 2016) (same).

Defendants do not appear to contest that Masofaniten was a core operation of the Company, but state that "standing alone" it is insufficient. MTD at 26-27 (citing *In re Baxter Int'l Inc*. Sec. Litig., No. 19 C 7786, 2021 WL 100457, at *14 (N.D. Ill. Jan. 12, 2021). Defendants' argument is factually and legally wrong. As an initial matter, *Baxter* involved foreign currency transactions of a global drug powerhouse, not the single drug candidate of a company that rose or fell on its prospects. *Id*. at *2. By contrast, courts considering statements about crucial products have not hesitated to find scienter. *See*, *e.g.*, *Carbonite*, 22 F.4th at 9 (importance of an issue combined with

24

the fact that the defendants paid attention was alone sufficient to plead fraud.). Regardless, Plaintiff here alleges knowledge and access to information in addition to core operations. *See* pp. 22-23, *supra; Allison*, 2023 WL 1928119, at \*10 (applying core operations doctrine where plaintiffs "are not relying exclusively on the core operations inference that the defendants can be assumed to know of facts critical to [Oak Street]'s core operations or to an important transaction that would affect [Oak Street]'s performance, but also on the defendants' specific statements about Oak Street's marketing practices that indicate knowledge.").

### c. The Temporal Proximity Between Defendants' Statements and Their Decision to Terminate the Studies Supports a Strong Inference of Scienter

On September 18, 2024, just one month before the Company announced it was abandoning all clinical projects, Virsik stated that AUC exposures "worked very well" and misleadingly claimed that the trial data compared favorably to PREVAIL. ¶¶125, 127, 146. And on July 15, 2024, Parkinson said that they had reached therapeutic efficacy in clinical studies. ¶121. This temporal proximity between the misleading statements and contradictory adverse events further bolsters a strong inference of scienter. *See Avaya*, 564 F.3d at 271; *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 690-91 (3d Cir. 2023).

### d. Defendants' Evasive Response to Questions and Selective Reporting of Data Further Enhances the Inference of Scienter

That Defendants evaded questions about Masofaniten's progress and to this day have failed to report Phase 2 clinical data further supports an inference of scienter. On September 18, 2024, just *one month* before the Company terminated its studies, an analyst asked Virsik to review the findings to date, including Phase 2. ¶125. Defendants only responded with information from Phase 1, diverting the question away from the unfavorable Phase 2 data, ¶148, despite Phase 2 beginning a full year prior. *See Orphazyme A/S*, 2022 WL 3299843, at \*22 (evading a question about whether

a new clinical trial was necessary bolstered scienter). "[Q]uestions that challenge the company's position on important matters can strongly bear on scienter. Why? Because it stands to reason that such questions can ordinarily be expected to be a goad to further inquiry." *Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527, 561 (D.N.J. 2024).

Defendants also stopped reporting patient-level Masofaniten AUC after October 2022, which suggested Defendants were hiding the data after results showed the drug was metabolizing patients to below clinical levels of AUC.[9] *See Shash v. Biogen, Inc.*, 84 F.4th 1, 14 (1st Cir. 2023) (selective reporting of data when they knew they had inconsistent data suggested bad faith); *Alaska Electrical Pension Fund v. Pharmacia Corp*, 554 F.3d 342, 344, 352 (3d Cir. 2009) (same).

Defendants also failed to disclose clinical results to the FDA, despite being required. 42 C.F.R. §§11.42, 11.44. To this date, no results have been posted on the FDA website.[10] ¶148.

### e. Virsik's Insider Sales Bolster an Inference of Scienter

Plaintiff alleges Virsik's trades were out of line with his previous sales: specifically, he sold no shares before the Class Period, and then during the Class Period, and during the Phase 2 trial, he sold over eighty-one thousand shares netting over $819,000, which amounted to nearly double his salary. ¶150. These suspiciously timed trades generated a financial windfall for Virsik. *See Takara Tr. v. Molex Inc.*, 429 F. Supp. 2d 960, 981 (N.D. Ill. 2006).

---

[9] Defendants' MTD is silent as to this allegation.

[10] Plaintiff notes that in Defendants' response, in which they claimed they were still in compliance because a year had not yet passed, they only addressed the EPI-7386 study but ignored EPI-506 and the monotherapy studies. *See* https://www.clinicaltrials.gov/study/NCT04421222?spons=ESSA%20Pharmaceuticals&rank=2; https://www.clinicaltrials.gov/study/NCT02606123?spons=ESSA%20Pharmaceuticals&rank=3; https://www.clinicaltrials.gov/study/NCT05075577?spons=ESSA%20Pharmaceuticals&rank=1. In any event, now over a year has passed since the primary completion dates for each of their studies, yet no results have been posted.

26

That these trades were part of a trading plan does not defeat scienter because the plan was initiated ***during the Class Period*** while in the possession of material non-public information. *See* ¶150; *Van Noppen*, 136 F. Supp. 3d at 944; *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015); *Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, No. 17 CV 5753 (JGK), 2019 WL 2360942, at *6 (S.D.N.Y. Mar. 4, 2019). Defendants' cited cases do not hold to the contrary. *See Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641, 2012 WL 1068761, at *13 (N.D. Ill. Mar. 29, 2012) (court did not evaluate the timing of the trading plans); *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 931 (S.D. Ind. 2008) (same). Moreover, academic research documents that 10b5-1 plans are often used fraudulently, and at least one executive has been sentenced to prison for insider trading under a 10b5-1 plan. *See*, *e.g.*, *https://www.justice.gov/opa/pr/former-chairman-and-ceo-publicly-traded-health-care-company-sentenced-42-months-prison*.[11]

### f. Defendants were Motivated to Commit Fraud by Their Precarious Condition

While evidence of recklessness alone is sufficient to plead scienter, *Tellabs*, 551 U.S. at 325, motive, while not required, is alleged. For the entirety of its 15-year history, ESSA had never

---

[11] Defendants attack Plaintiff's allegations for not specifying the percentage of Virsik's holdings that were sold. While Plaintiff was not required to do so, Plaintiff notes that Defendants' Exhibit 20 states that Virsik owned 86,110 shares as of February 6, 2024, meaning that he sold almost all his holdings during the Class Period. *See In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (sale of 11% of an insider's stock sufficient to establish suspicious insider trading). That Virsik, but not Parkinson, sold does not diminish scienter. *See In re APAC Teleservice, Inc. Sec. Litig.*, No. 97 CIV 9145 (BSJ), 1999 WL 1052004, at *7 (S.D.N.Y. Nov. 19, 1999) ("The fact that not every one of the defendants may have sold stock does not defeat an inference of scienter at this stage of the litigation"); *In re Gentiva Sec. Litig.*, 971 F. Supp. 2d 305, 327 (E.D.N.Y. 2013), *on reconsideration in part* (Dec. 10, 2013) (scienter satisfied where two of the three defendants sold shares). Likewise, that Virsik exercised options and immediately sold the stock does not negate an inference of scienter. *See In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 257-58 (S.D.N.Y. 2020); *see also Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008) (suggesting exercising options and selling shares would contribute to scienter).

launched a product. ¶¶66-69. Its previous candidate, EPI-506, failed to show efficacy, as did Masofaniten as a monotherapy. ¶¶69-71, 79. Janssen terminated its collaboration with ESSA early. ¶151. When Masofaniten failed the very threshold ESSA claimed was most critical before Phase 2, the Company faced an existential crisis. ESSA had two choices: admit the M-E Combination Trial was failing and risk shutting down, or delay disclosing the truth in hopes of a miracle. "Defendants either had to know about [company's precarious situation], or, if they did not, such lack of knowledge would amount to reckless disregard." *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 860 (N.D. Ill. 2009); *Skiadas v. Acer Therapeutics Inc.*, No. 1:19-CV-6137-GHW, 2020 WL 3268495, at \*11 (S.D.N.Y. June 16, 2020) (where "executiv[es] ha[ve] a stronger incentive to bet the farm in a reckless gamble because the alternative is certain failure ... supports ... scienter"); s*ee also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002).

### g. Defendants Raise No Plausible Competing Inference

Defendants' claim that they were genuinely optimistic, MTD at 27, is not a competing inference and does not affect their scienter. Whether or not they thought proceeding despite failing to meet clinical exposure thresholds was wise, they were obligated to be truthful about the risks of their gamble. "There is nothing wrong with taking a calculated risk. However, if … Defendants misled Plaintiffs about such risk by making assurances … Defendants may be held liable." *In re Nuvelo Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1231 (N.D. Cal. 2009) (quoting *In re Amylin Pharm., Inc. Sec. Litig.*, No. 01CV1455, 2003 WL 21500525, at \*5 (S.D. Cal. May 1, 2003)).

Moreover, Plaintiff alleges numerous facts from which a reasonable jury could determine that Defendants did not genuinely believe that the M-E Combination Trial was succeeding when they made their misleading statements. The inference that Defendants were at least reckless as to telling investors the whole truth is far more compelling than any competing inference.

### 3. The Complaint Alleges Loss Causation

The Supreme Court makes clear that alleging loss causation "should not prove burdensome" as a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). "Because pleading loss causation is 'not meant to impose a great burden upon a plaintiff,' loss causation allegations need only 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Akorn*, 240 F. Supp. 3d at 821 (quoting *Dura*, 544 U.S. at 347). The Complaint easily meets this test.[12] Plaintiff does not need to "plead loss causation at such a granular level as to link each explanation" for Defendants' misrepresentations "to an immediate stock price drop." *Akorn*, 240 F. Supp. 3d at 822.

Each of the misrepresentations and omissions that Plaintiff alleges concerns a facet of the M-E Combination Trial. Plaintiff alleges that Defendants, throughout the M-E Combination Trial, misrepresented (i) Masofaniten's AUC (¶¶106, 110, 114, 121), (ii) the degree Enzalutamide metabolized Masofaniten (¶¶106, 119, 125), (iii) that the twice per day dosing regimen cured the Enzalutamide metabolization issue (¶¶106, 108, 110, 119, 121, 125), and (iv) the comparability of PSA90 rates of the M-E Combination Trial to that of the PREVAIL Trial (¶¶116, 127). The October 31, 2024, press release solely addresses the M-E Combination Trial, so there is no question as to whether there are any other reasons to consider for the Company's stock price dropping that day. ¶129. *Akorn* is instructive where the court found plaintiffs had sufficiently pled

---

[12] Defendants cite to the wrong standard. *Glickenhaus & Co. v. Household Int'l, Inc.* dealt with loss causation evidence presented at trial, a wholly different standard than at the pleading stage. 787 F.3d 408, 417 (7th Cir. 2015). *Washtenaw Cnty. Employees' Ret. Sys. v. Walgreen Co.* dealt with the summary judgment standard, where defendants contested the issue, the court found that the issue was for the jury to decide. No. 15-CV-3187, 2021 WL 5083756, at *5-6 (N.D. Ill. Nov. 2, 2021).

29

loss causation because they "alleged a stock drop following" a disclosure "which revealed errors" that touched on the alleged misrepresentations, "which is all that is required at this stage." *Akorn.* 240 F. Supp. 3d at 822.

Defendants' cases are inapposite. In *In re Nektar Therapeutics Sec. Litig.*, the alleged misrepresentations were solely about a Phase 1 trial, while the alleged disclosure was only about the results of a Phase 2 trial, so there was no connection since each trial relied on different patient data. 34 F.4th 828, 839 (9th Cir. 2022). In *Pizzuto v. Homology Medicines, Inc.*, the court found that plaintiffs failed to plead scienter, so the court held that there was no information that was concealed that could have been revealed, so there could be no loss causation. No. 1:23-CV-10858-AK, 2024 WL 1436025, at *19 (D. Mass. Mar. 31, 2024). To the extent that Defendants are factually disputing loss causation, that is improper at this stage. *Akorn*, 240 F. Supp. 3d at 8221; *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011) (holding that loss causation need not be proven until after the class certification stage).

**B.      Plaintiff Sufficiently Alleges Violations of Section 20(a) of the Exchange Act**

Because the Complaint adequately pleads a primary violation under Section 10(b), Plaintiff's claim for control person liability under Section 20(a) of the Exchange Act should be sustained. *See* 15 U.S.C. § 78t(a).

**III.      CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety. Should the Court grant the motion in whole or in part, Plaintiff respectfully requests leave to replead.

Dated:  November 25, 2025                                 Respectfully submitted,

                                                                                    */s/ Brian P. O'Connell*

30

Brian P. O'Connell
(WIED Bar Number 6313628)
Joshua B. Silverman
(WIED Bar Number 6238108)
Genc Arifi
(WIED Bar Number 6323579)
**POMERANTZ LLP**
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile:  (312) 377-1184
Email: boconnell@pomlaw.com
        jbsilverman@pomlaw.com
        garifi@pomlaw.com

*Counsel for Lead Plaintiff Todd Van Groll and the Proposed Class*

31