**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

| | |
|---|---|
| IN RE ESSA PHARMA INC., SECURITIES LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Case No.: 1:25-cv-00124-WCG<br><br><u>CLASS ACTION</u><br><br>REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT |

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................................1

ARGUMENT ..................................................................................................................................2

I. None of the Challenged Statements Are False or Misleading ..........................................2

    A. Plaintiff Cannot Claim Securities Fraud by Fabricating an AUC Requirement ........................................................................................................2

        1. ESSA Disclosed 300,000 AUC As an "Upper Target Threshold," Not a "Necessary Condition" ....................................................................2

        2. Twice-Daily Dosing of Masofaniten Mitigated the Drop in Exposure ............................................................................................4

        3. ESSA Disclosed Actual AUC Data Revealing the Impact of Enzalutamide on Masofaniten ..........................................................5

        4. Plaintiff's Manufactured 300,000 AUC Requirement Does Not Render the PSLRA Safe Harbor and Bespeaks Caution Doctrine Inapplicable ....................................................................................6

    B. Plaintiff Fails to Allege That Patients Struggled with Pill Burden ..........................7

    C. Defendants' References to the PREVAIL Study Were Not Misleading ................8

II. Plaintiff ALSO Fails To Plead Scienter ........................................................................10

    A. Plaintiff Does Not Plead Facts to Show Knowledge or Reckless Indifference to Falsity ....................................................................................10

    B. Core Operations Alone Cannot Establish Scienter ................................................11

    C. Alleged Temporal Proximity Does Not Support Scienter ....................................11

    D. Plaintiff's Arguments Regarding Purported "Evasive" Answers and "Selective" Data Reporting Do Not Establish Scienter ........................................11

    E. Plaintiff's Stock Sales Allegations Do Not Support a Strong Inference of Scienter ....................................................................................................13

    F. Plaintiff Has Not Adequately Articulated Motive ................................................13

    G. More Plausible Competing Inferences Cannot Be Overcome ..............................14

Case 1:25-cv-00124-WCG     Filed 01/05/26     Page 2 of 21     Document 31

III.    Plaintiff Cannot Allege Loss Causation..................................................................................14

IV.    Plaintiff fails to state a claim under Section 20(a)............................................................15

CONCLUSION....................................................................................................................................15

Case 1:25-cv-00124-WCG    Filed 01/05/26    Page 3 of 21    Document 31

<u>Page(s)</u>

**CASES**

*In re Akorn, Inc. Securities Litigation*,
    240 F. Supp. 3d 802 (N.D. Ill. 2017) ...............................................................................15

*Alizadeh v. Tellabs*,
    No. 13 C 537, 2015 WL 557249 (N.D. Ill. Feb. 9, 2015) ...................................................6

*California Public Employees' Retirement System v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004) ...............................................................................................8

*City of Warren Police & Fire Retirement System v. Prudential Financial, Inc.*,
    70 F.4th 668 (3d Cir. 2023) ...............................................................................................11

*In re Cloudera, Inc.*,
    121 F.4th 1180 (9th Cir. 2024) ...........................................................................................4

*Friedman v. Rayovac Corp.*,
    291 F. Supp. 2d 845 (W.D. Wis. 2003) ............................................................................15

*Goucher v. Iterum Therapeutics plc*,
    648 F. Supp. 3d 962 (N.D. Ill. 2022) .................................................................................6

*Higginbotham v. Baxter International, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ......................................................................................10, 13

*Institutional Investors Group v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ..............................................................................................11

*Kuebler v. Vectren Corp.*,
    13 F.4th 631 (7th Cir. 2021) ...............................................................................................6

*Lewakowski v. Aquestive Therapeutics, Inc.*,
    No. 21-3751 (ZNQ) (DEA), 2023 WL 2496504 (D.N.J. Mar. 14, 2023) ...........................4

*In re MannKind Securities Actions*,
    835 F. Supp. 2d 797 (C.D. Cal. 2011) ........................................................................10, 11

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ..............................................................................................................6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..........................................................................................................14

Case 1:25-cv-00124-WCG    Filed 01/05/26    Page 4 of 21    Document 31

*Tongue v. Sanofi*,
 816 F.3d 199 (2d Cir. 2016)..................................................................................................4

*Tricontinental Industries, Ltd. v. PricewaterhouseCoopers, LLP*,
 475 F.3d 824 (7th Cir. 2007) ..............................................................................................15

*Vallabhaneni v. Endocyte, Inc.*,
 No. 1:14-CV-01048-TWP-MJD, 2016 WL 51260 (S.D. Ind. Jan. 4, 2016)........................8

*Wu v. GSX Techedu Inc.*,
 738 F. Supp. 3d 527 (D.N.J. 2024) ....................................................................................12

## OTHER AUTHORITIES

*Mitigate*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/mitigate................4

## PRELIMINARY STATEMENT

Plaintiff's Opposition confirms that the Complaint must be dismissed for multiple independent reasons.[1] Plaintiff repeatedly cherry-picks and distorts portions of ESSA's disclosures, including disclosures related to *other* trials, to manufacture alleged facts that support his narrative. But when ESSA's statements are read in full and in their proper context, rather than through the lens of Plaintiff's selective quotation, it is clear that none of the challenged statements are false or misleading. ESSA never expressed that Masofaniten must reach an exposure of 300,000 AUC during the M-E Combination Trial, and—far from concealing material information about the drug's exposure levels—ESSA repeatedly disclosed exact AUC measurements and offered its truthful opinion as to the levels achieved. It also correctly informed investors that Enzalutamide would reduce Masofaniten exposure when the drugs were combined, even with twice-daily dosing. And it provided accurate information about the interim results of the M-E Combination Trial, including by comparing it to other studies, all while providing appropriate cautionary language and risk disclosures.

Put simply, Plaintiff's case boils down to an investor disappointed by a failed clinical trial. But the fact that the M-E Combination Trial ultimately failed to achieve its desired results does not mean that ESSA and the Individual Defendants misled investors about its prospects or otherwise committed securities fraud. For the reasons stated herein and in the MTD Brief, Plaintiff fails to adequately plead any element of a claim for securities fraud, and the Complaint should be dismissed with prejudice.

---

[1] "Def. Br." and "MTD Brief" refer to the Memorandum of Law in Support of Defendants' Motion to Dismiss, Dkt. 28; "Pl. Opp." and "Opposition" refer to Plaintiff's Opposition, Dkt. 30; "CAC ¶__." refers to Amended Class Action Complaint, Dkt. 20. Capitalized terms have the same meanings defined in the MTD Brief.

## I. NONE OF THE CHALLENGED STATEMENTS ARE FALSE OR MISLEADING

### A. Plaintiff Cannot Claim Securities Fraud by Fabricating an AUC Requirement

The linchpin of Plaintiff's case is his allegation that Defendants knew that an AUC of 300,000 was the *minimum* exposure of Masofaniten necessary for clinical effectiveness. (*See* Opp. at 12-18.)[2] In support of this critical premise—without which Plaintiff's claims collapse—Plaintiff relies on carefully selected excerpts from statements made by ESSA prior to the Class Period, and during the time that it was testing Masofaniten as a single drug agent, while ignoring the broader context of ESSA's statements and its contemporaneous disclosures. As explained below, however, Plaintiff's attempt to anchor his claims to a fabricated 300,000 AUC "requirement" is unsupported and inadequate to plead a claim for securities fraud.

#### 1. ESSA Disclosed 300,000 AUC As an "Upper Target Threshold," Not a "Necessary Condition"

Plaintiff repeatedly asserts that ESSA's clinical trial updates were misleading because the company failed to disclose that "the clinical data failed ***its own threshold***" of 300,000 AUC. (Pl. Opp. at 16.) But Plaintiff cannot point to any statement made by ESSA that 300,000 AUC was required for a successful M-E Combination Trial. Instead, ESSA disclosed that 300,000 AUC was an "upper target" or "goal" during the Monotherapy Trial (CAC ¶¶ 96-98; Def. Br. Ex. 6 at 6), but even then, it was never a "minimum" or "necessary condition" for clinical activity. For example, in the materials Plaintiff cites, incorporated by reference in the Complaint, ESSA clarified that exposures in the range of 130,000 to 140,000 AUC "would indicate a biologically

---

2   Plaintiff describes his "theory of the case" as follows: "The statements were false and misleading because, *inter alia*, they omitted that the drug failed to sustain clinical levels of exposure (*i.e.*, 300,000 AUC), and could not be effective at the dosage Defendants were testing." (Pl. Opp. at 17.)

active dose" (Def. Br. Ex. 2 at 6), and that patients taking the 200 mg dose and achieving an AUC between 130,00 and 140,000 reached "a meaningful [exposure] in terms of biological effects, albeit at the low end range." (Def. Br. Ex. 2 at 6.) ESSA also disclosed that "an exposure in patients of roughly 130,000, 140,000 . . . maybe [*sic*] in a range where we could start to see some biological activity in patients" (Def. Br. Ex. 5 at 6), and that "137,000 [AUC] would be in a range in xenografts that was biologically active but perhaps not the highest exposure and certainly not our highest target exposure." (Def. Br. Ex. 15 at 3).[3] Thus, ESSA never stated that 300,000 AUC was a requirement for any of Masofaniten's clinical trials, and certainly not its M-E Combination Trial. Instead, ESSA explicitly and repeatedly indicated that even significantly lower exposures were biologically active, meaningful, and relevant to patient treatment.

Plaintiff's Opposition does not meaningfully challenge the veracity of ESSA's statements indicating that exposures under 300,000 AUC were clinically meaningful. And even if it did, courts have consistently held that statements regarding what constitutes a significant, clinical, therapeutic, or high drug exposure are statements of opinion, and such opinions are only actionable under the securities laws if the speaker did not actually hold the professed belief, provided untrue supporting facts, or omitted information that would render the opinion misleading to a reasonable investor. (Def. Br. at 16-17.) Plaintiff fails to engage with this well-established standard and does not adequately allege that Defendants disbelieved or provided untrue facts in support of their statements that lower exposures were biologically active.

Instead, Plaintiff attempts only to distinguish the case law cited by ESSA, but that effort falls flat. For example, in *Lewakowski v. Aquestive Therapeutics, Inc.*, the court dismissed the

---

[3]     ESSA further stated that "the 200-milligram once-a-day dosing . . . is projected to be at the low end of the biologically active dose" (Def. Br. Ex. 5 at 7), and that this dose would yield exposures "quite relevant to patient treatment." (Def. Br. Ex. 15 at 3).

complaint because the plaintiffs failed to challenge the defendants' basis for their opinion that a specific plasma concentration was sufficient to be therapeutic or to allege that the defendants did not honestly believe that opinion. No. 21-3751 (ZNQ) (DEA), 2023 WL 2496504, at *7 (D.N.J. Mar. 14, 2023). Plaintiff argues that *Lewakowski* is inapposite because ESSA "possessed concrete information" showing that the clinical data failed "***its own threshold***." (Pl. Opp. at 16.) But this argument simply restates Plaintiff's manufactured baseline exposure for clinical activity, rather than challenging the basis for ESSA's honestly held belief that exposures below 300,000 AUC could still be clinically significant.[4] Ultimately, Plaintiff's selective reliance on isolated language and post hoc recharacterization of ESSA's parameters for clinical significance cannot transform non-actionable statements of opinion into actionable misrepresentations.

### 2. Twice-Daily Dosing of Masofaniten Mitigated the Drop in Exposure

Plaintiff next attempts to graft his fabricated 300,000 AUC minimum onto ESSA's statements regarding twice-daily dosing, but this effort fares no better. Plaintiff contends that twice-daily dosing did not "mitigate[] [the] drop in exposure" because "AUC dropped under the [300,000] threshold even with the twice-daily dosing." (Pl. Opp. at 7.) In doing so, Plaintiff invents a new definition for the word "mitigate," ignoring its actual meaning: "to make (something) less severe, painful, or intense."[5] *See In re Cloudera, Inc.*, 121 F.4th 1180, 1188-89

---

[4] Plaintiff's attempt to distinguish *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016), is equally unpersuasive. Plaintiff asserts that *Tongue* is factually inapposite because "the drug worked and was approved," but offers no explanation as to why the ultimate success or failure of the drug should alter the legal standard for when an opinion is actionable. (Pl. Opp. at 16.) The holding in *Tongue* is clear: statements of opinion are only actionable if the speaker does not actually hold the belief, provides untrue supporting facts, or omits information that would make the opinion misleading. 816 F.3d at 210. Plaintiff's focus on the outcome of the clinical trial is a classic example of impermissible fraud-by-hindsight—suggesting that if a drug fails, any prior optimistic opinion must have been fraudulent, but if it succeeds, there is no fraud.

[5] *Mitigate*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/mitigate (last visited Jan. 5, 2026).

4

(9th Cir. 2024) (affirming dismissal where plaintiff failed to plead detailed facts supporting his definitions of terms as purportedly understood by reasonable investors). And the very evidence Plaintiff cites demonstrates that twice-daily dosing did, in fact, lessen the drop in exposure compared to once-daily dosing. As shown in the referenced poster, when 600 milligrams of Masofaniten was administered only *once* daily in conjunction with 120 milligrams of Enzalutamide, patients' average AUC was 111,000 after twenty-eight days. (CAC ¶ 110; Def. Br. Ex. 10.) But when the same dose of Masofaniten was administered *twice* daily, the average AUC more than *doubled*, reaching 233,000 after twenty-eight days. (CAC ¶ 110; Def. Br. Ex. 10.) The summary section of the poster, which Plaintiff cropped out of the Complaint (*see* CAC ¶ 99), states that "Masofaniten 600 mg [twice-daily] dosing can *partially compensate* the drop in exposure caused by [Enzalutamide]" and "[d]espite a reduced AUC, masofaniten levels are still in an active range." (Def. Br. Ex. 10 (emphasis added).) No reasonable investor could interpret ESSA's statements to mean that twice-daily dosing would eradicate the drop in exposure entirely. Plaintiff's attempt to state a claim by stripping ESSA's statements of their context and plain meaning is unavailing.

### 3. ESSA Disclosed Actual AUC Data Revealing the Impact of Enzalutamide on Masofaniten

Similarly, Plaintiff fails to plausibly allege that a reasonable investor would have been misled by ESSA's disclosures regarding exposure levels given that ESSA transparently disclosed relevant AUC data. Plaintiff alleges, for example, "that the 'mitigation of exposure' chart is misleading because the chart fails to disclose that the exposure levels were below the 300,000 AUC threshold." (Pl. Opp. at 14 n.4.) This argument is meritless. The chart in question explicitly lists the actual AUC values for patients receiving various doses of Masofaniten in combination with Enzalutamide, providing investors with the underlying data. (CAC ¶ 110.) Thus, a

superfluous statement that the numbers listed were below 300,000 AUC—which again, is a baseline of Plaintiff's own making—would not have altered the "total mix" of information available to investors, rendering any alleged omission immaterial. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011); *see also Kuebler v. Vectren Corp.*, 13 F.4th 631, 642 (7th Cir. 2021) (affirming dismissal where plaintiff failed to "offer[] a plausible theory for treating the [omitted data] as material in light of all the other information provided to shareholders").[6]

Plaintiff's attempts to distinguish the case law cited in the MTD Brief suffer from similarly flawed logic. For example, Plaintiff argues that *Alizadeh v. Tellabs, Inc.*, No. 13 C 537, 2015 WL 557249 (N.D. Ill. Feb. 9, 2015), is inapposite because the misstatement was "cleared up" by other statements in the same call. (Pl. Opp. at 13 n.2.) But Plaintiff ignores that ESSA repeatedly disclosed actual AUC data throughout the relevant period, thus leaving nothing to "clear up." Similarly, Plaintiff's assertion that *Goucher v. Iterum Therapeutics plc*, 648 F. Supp. 3d 962 (N.D. Ill. 2022), is "irrelevant" because ESSA never disclosed its inability to maintain exposure at "clinical levels" is unpersuasive (Pl. Opp. at 13 n.3) because the "clinical level" Plaintiff references is a requirement of his own invention.

### 4. Plaintiff's Manufactured 300,000 AUC Requirement Does Not Render the PSLRA Safe Harbor and Bespeaks Caution Doctrine Inapplicable

Plaintiff's arguments against the applicability of the PSLRA safe harbor and bespeaks caution doctrine also hinge on the fabricated 300,000 AUC requirement and must be rejected. These doctrines protect forward-looking statements, including opinions and projections, when accompanied by meaningful cautionary language. (Def. Br. at 20-21.) Plaintiff argues that they

---

[6] Plaintiff additionally argues that ESSA misled investors by claiming that "Enzalutamide reduced Masofaniten exposure by 50% to 60%, when, in fact, it reduced exposure by over 80%." (Pl. Opp. at 13 (internal quotation marks omitted).) But Plaintiff ignores that this statement was made on November 17, 2022, almost four months prior to the start of the Class Period.

do not apply to Defendants' statements here because Masofaniten had already failed to achieve "clinical levels of exposure." But this assertion again rests entirely on his baseless premise that 300,000 AUC was a minimum threshold for clinical activity. (*See* Pl. Opp. at 20.) Moreover, Plaintiff offers no evidence beyond mere speculation that exposures below 300,000 AUC rendered the clinical trial unsuccessful or that ESSA knew the trials would fail on this basis.

**B.        Plaintiff Fails to Allege That Patients Struggled with Pill Burden**

Plaintiff likewise cannot salvage his defective claims regarding pill burden. The Opposition argues that ESSA fraudulently omitted that patients were "experiencing problems with pill burden." (Pl. Opp. at 12.) Yet Plaintiff fails to cite any evidence from the M-E Combination Trial indicating that patients struggled with pill burden. Instead, Plaintiff resorts to the unsupported assertion that, because patients in the EPI-506 study suffered from pill burden, and "EPI-506 was the same class of molecule as Masofaniten . . . the same issues persisted with Masofaniten." (Pl. Opp. at 15.)

But Plaintiff does not provide any factual basis for imputing challenges faced during the EPI-506 trial to the M-E Combination Trial. In fact, the conference materials Plaintiff cites foreclose such a comparison. There, ESSA repeatedly stated that Masofaniten, which was developed to account for EPI-506's shortcomings, was *twenty times* more potent than its predecessor. (Def. Br. Ex. 2 at 5; Def. Br. Ex. 15 at 2-3.) As explained during the 2021 Bloom Burton Investor Conference, ESSA spent a year and a half developing this more potent EPI molecule in order to "overcome[e] the liabilities of [EPI-506]," including the fact that the drug was "difficult to take," because patients had to take "so many softgel capsules." (Def. Br. Ex. 15 at 2-3.) In light of these statements, Plaintiff's assertion that the same pill burden issues necessarily affected both EPI-506 and Masofaniten is not only unsupported, but is directly contradicted by the contemporaneous statements of ESSA's management. Such baseless

speculation cannot substitute for well-pleaded facts and should not be credited. *See Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004) ("Generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of 15 U.S.C. § 78u–4(b)(1).").

Moreover, Plaintiff's reliance on the confidential witness to support allegations regarding pill burden is misplaced. Courts discount confidential witness testimony where the plaintiff fails to establish how the witness would be in a position to know the information alleged. (Def. Br. at 15); *Vallabhaneni v. Endocyte, Inc.*, No. 1:14-CV-01048-TWP-MJD, 2016 WL 51260, at *10 (S.D. Ind. Jan. 4, 2016). Here, Plaintiff offers no explanation of how this witness could credibly speak to the details of the EPI-506 Trial, which ended *before* the witness is alleged to have been a consultant at ESSA, or the M-E Combination Trial, which began *after* the witness's time consulting at ESSA. (CAC ¶¶ 67, 70, 82.)

**C.      Defendants' References to the PREVAIL Study Were Not Misleading**

Plaintiff's claims based on the PREVAIL study fare no better. Plaintiff argues that Defendants' statements were materially misleading because they failed to disclose that patients enrolled in Phase 1 of the M-E Combination Trial had lower baseline PSAs than those in the PREVAIL study. (*See* Pl. Opp. at 19.) But once again, this argument ignores that Defendants explicitly disclosed the relevant data in the very materials cited in the Complaint.

ESSA never obscured patients' baseline PSA levels when presenting its clinical trial data. To the contrary, ESSA included detailed information about Phase 1 patients' baseline characteristics—including PSA levels—in its October 2023 poster for the European Society of Medical Oncology:

## Patient Baseline Characteristics

| Parameter N=18 | Cohort 1 Masofaniten 600mg QD + Enz 120mg QD n=3[1] | Cohort 2 Masofaniten 800mg QD + Enz 120mg QD n=4[1] | Cohort 3 Masofaniten 600mg BID + Enz 120mg QD n=4 | Cohort 4 Masofaniten 600mg BID + Enz 160mg QD n=7 |
|---|---|---|---|---|
| Median age (range), yrs. | 70.0 (68-73) | 73.5 (61-86) | 72.0 (60-75) | 75.0 (65-89) |
| ECOG performance status, n (%) | | | | |
| 0 | 0 (0%) | 2 (50.0%) | 2 (50.0%) | 5 (71.4%) |
| 1 | 3 (100.0%) | 2 (50.0%) | 2 (50.0%) | 2 (28.6%) |
| Bone Only Disease | 1 (33.3%) | 4 (100.0%) | 3 (75.0%) | 1 (14.3%) |
| Prior Chemotherapy, n (%) | 2 (66.6%) | 3 (75.0%) | 1 (25.0%) | 2 (28.6%) |
| Median Baseline PSA (range), ng/mL | 24.9 (2.6-26.4) | 2.54 (1.84-1209) | 2.13 (1.35- 20.6)[2] | 13.5 (1.18-565) [3] |

[1] 2 of the 3 subjects from the masofaniten 600mg QD cohort dose escalated to the masofaniten 800mg QD cohort after 9 cycles. 2 of the 3 subjects from the masofaniten 800mg QD cohort dose escalated to the masofaniten 600mg BID cohort after 8-10 cycles
[2] Masofaniten 600mg BID + Enza 120mg QD, 1/4 baseline PSA result was obtained with local lab
[3] Masofaniten 600mg BID + Enza 160mg QD , 1/7 baseline PSA result was obtained with local lab

(Def. Br. Ex. 10.) This disclosure informed investors that the 18 patients enrolled in Phase 1 had Median Baseline PSAs ranging from 2.13 (Cohort 3) to 24.9 ng/mL (Cohort 1).

ESSA also expressly informed investors how these median baseline PSA levels compared to other studies, including the PREVAIL study, during the Piper Sandler 35th Annual Healthcare Conference. There, Virsik stated, "[W]e have a low PSA coming into our study," and he also provided specific comparative data: PREVAIL had a median PSA of 54 ng/mL, ACIS had a median PSA of 32 ng/mL, and PROPEL had a median PSA of 18 ng/mL. (Def. Br. Ex. 11 at 6.) Moreover, Parkinson accurately disclosed that while "the first couple of cohorts" had "fairly low" baseline PSA levels, patients in the following cohort had "some pretty high PSAs." (*Id.*)

In short, Plaintiff's assertions that ESSA fraudulently omitted both the M-E Combination Trial patients' relatively low baseline PSAs and the existence of more recent studies with lower baseline PSAs are factually incorrect. (Pl. Opp. at 19-20.) ESSA provided investors with access to patient-level PSA data from the M-E Combination Trial and, when drawing comparisons to other trials, clearly disclosed the differences in baseline PSA levels. Moreover, Defendants repeatedly cautioned that, regardless of any initially favorable comparison to PREVAIL, the results of the clinical trial were uncertain. (*See* Def. Br. at 18.) Accordingly, Plaintiff fails to allege any adequate basis to support that Defendants' statements regarding the PREVAIL study

9

were false or misleading.

## II.     PLAINTIFF ALSO FAILS TO PLEAD SCIENTER

### A.     Plaintiff Does Not Plead Facts to Show Knowledge or Reckless Indifference to Falsity

Even if Plaintiff could plead that Defendants made a false or misleading statement (which he cannot), his securities fraud claims would nonetheless fail for lack of scienter. Plaintiff argues that scienter can be inferred because Defendants had access to information about the M-E Combination Trial that allegedly contradicted their public statements. (Pl. Opp. at 22-23.) But this bare allegation does not satisfy the PSLRA. To adequately allege scienter, a plaintiff must plead with particularity that the defendant had "knowledge of the *statement's* falsity or reckless disregard of a substantial risk that the *statement* [wa]s false." *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756 (7th Cir. 2007) (emphasis added). Here, Plaintiff fails to plead any facts to support that any Defendant knew or had reason to know that any statement made was false or misleading. Instead, Plaintiff again lays bare that his entire case is conditioned on the false premise "that achieving 300,000 AUC was a necessary threshold," arguing that "[e]ach ESSA senior executive knew about the 300,000 AUC threshold and the Company's failure to meet it." (Pl. Opp. at 22-23.) Defendants' purported knowledge of a standard that never existed does not support a strong inference of scienter.

Plaintiff's reliance on *In re MannKind Securities Actions* is also misplaced. There, the court cautioned that it must "distinguish between forward-looking statements later deemed to be unduly optimistic, and statements of historical fact later shown to be *false* when made." *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 809 (C.D. Cal. 2011). Here, Plaintiff has alleged no factual statements later revealed to be false like the statements in *MannKind*, i.e., "that the FDA had accepted, or blessed, or agreed to the Defendants' [ ] methodology" when in fact the

FDA had not. *See id.* Instead, Plaintiffs' allegations are exactly the type of later-revealed "undu[e] optimis[m]" that does not support securities fraud. *Id.*

## B. Core Operations Alone Cannot Establish Scienter

Although the development of Masofaniten was central to ESSA's operations, Plaintiff cannot establish scienter on this basis *alone*. (*See* Pl. Opp. at 24-25 (citing cases that discussed "not relying exclusively on the core operations inference" and core operations "combined with" other factors).) Thus, because Plaintiff's allegations otherwise fail to give rise to a strong inference of scienter, the core operations inference cannot salvage his allegations of scienter. (Def. Br. at 26-27.)

## C. Alleged Temporal Proximity Does Not Support Scienter

Plaintiff's temporal proximity argument (Pl. Opp. at 25) also fails because Plaintiff conveniently ignores that ESSA received the results of the protocol-specified interim review and futility analysis *after* Virsik's positive statements on September 18, 2024. And it was this interim review and futility analysis that ultimately led to ESSA's decision to terminate the M-E Combination Trial. (*See* CAC ¶ 129.) The cases Plaintiff relies upon are thus inapposite as they did not involve an intervening event, but instead held that the omitted information was known at the time of the misstatements. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 271 (3d Cir. 2009); *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 690 (3d Cir. 2023).

## D. Plaintiff's Arguments Regarding Purported "Evasive" Answers and "Selective" Data Reporting Do Not Establish Scienter

Plaintiff's attempt to claim that Defendants "evaded questions about Masofaniten's progress" also lacks merit. (Pl. Opp. at 25.) The only support for this contention is a mischaracterization of a response to a single question in a Q&A: "And maybe we can review

11

some of the Phase 1 and 2 findings thus far? And what is giving you the confidence that masofaniten is adding benefit to [*sic*]?" (*See id.*; CAC ¶¶ 148-49.) But as explained in the MTD Brief, the transcript is clear that Defendants answered the first part of the multi-part question, and then the moderator asked a follow-up question before the Defendants could address the second part. (Def. Br. at 24-25.) There was no evasion.

Further, even if the Court credits Plaintiff's allegation that Defendants deliberately avoided answering this one Q&A question, it would not support an inference of scienter. Plaintiff relies on *Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527 (D.N.J. 2024), for the proposition that "questions that challenge the company's position on important matters can strongly bear on scienter." (Pl. Opp. at 26 (quoting *Wu*, 738 F. Supp. 3d at 561).) But Plaintiff misleadingly crops the quotation, which actually begins with "sharp, detailed, and recurring questions." *Wu*, 738 F. Supp. 3d at 561. The question that Plaintiff alleges Defendants evaded was neither sharp, detailed, nor recurring, and thus cannot support an inference of scienter.

Plaintiff's attempt to plead scienter by conflating a requirement to submit clinical trial results to the FDA—which was not triggered during the Class Period—with a supposed obligation to report "patient-level Masofaniten AUC" data should also be rejected. (Pl. Opp. at 26.) The deadline to submit clinical trial results is "no later than 1 year after the primary completion date of the applicable clinical trial." (Def. Br. at 24 (quoting 42 C.F.R. § 11.44).) As shown in the webpages Plaintiff cites in the Opposition, the primary completion date for both Phase 1 and Phase 2 of the M-E Combination Trial was October 31, 2024. (*See* Pl. Opp. at 26 n.10.)[7] Plaintiff's claim that Defendants "stopped reporting patient-level Masofaniten AUC after

---

[7]  Plaintiff seemingly concedes this requirement was not triggered for the Phase 1 and Phase 2 studies, but states in a footnote, "In any event, now over a year has passed since the primary completion dates for each of their studies, yet no results have been posted." (*See* Pl. Opp. at
*(cont'd)*

October 2022" (Pl. Opp. at 26) is similarly untethered to any requirement to do so. In sum, Plaintiff asks the Court to find a strong inference of scienter based on Defendants' purported failure to do things they were never required to do during the Class Period.

**E.      Plaintiff's Stock Sales Allegations Do Not Support a Strong Inference of Scienter**

Plaintiff's allegations related to certain stock sales by Virsik pursuant to a 10b5-1 trading plan are likewise insufficient to support an inference of scienter. (Def. Br. at 25-26.) The Opposition focuses on the rare instances in which courts held that 10b5-1 plans entered into during the class period did not defeat scienter. But Plaintiff makes little effort to respond to the fact that the lack of stock sales by any other ESSA executive is fatal to finding a strong inference of scienter here. The Seventh Circuit has made clear that "the *absence* of sales by other managers who would have been in the know . . . implies that nothing was thought to be out of the ordinary." *Higginbotham*, 495 F.3d at 759. In the face of this controlling law, Plaintiff points to only two out-of-Circuit district court cases in which the court held scienter allegations to be sufficient when fewer than all executives (but not just one) sold stock. (Pl. Opp. at 27 n.11.)

**F.      Plaintiff Has Not Adequately Articulated Motive**

Plaintiff's motive argument is again based on the false premise that a 300,000 AUC threshold was required for the M-E Combination Trial. Plaintiff argues that "[w]hen Masofaniten failed the very threshold ESSA claimed was most critical before Phase 2, the Company faced an existential crisis." (Pl. Opp. at 28.) When his fabricated threshold requirement is removed, Plaintiff's motive theory falls apart. This is especially so given that Defendants specifically disclosed patient AUC levels during the Class Period. (*Supra* § I.A.3.)

---

26 n.10.) But he makes no effort to explain how a purported failure to post results *after the Class Period* could support an inference of scienter *at the time* the alleged misstatements were made.

### G. More Plausible Competing Inferences Cannot Be Overcome

Plaintiff's argument that he "alleges numerous facts from which a reasonable jury could determine that Defendants did not genuinely believe that the M-E Combination Trial was succeeding when they made their misleading statements" is likewise insufficient. (Pl. Opp. at 28.) To establish a "strong" inference of scienter, as required, Plaintiff's theory "must be more than merely plausible or reasonable—it must be cogent and *at least as compelling as any opposing inference of nonfraudulent intent*." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007) (emphasis added). It is not. Considering all of the facts pled and incorporated by reference in the Complaint, a far more compelling inference is that ESSA developed a product that showed promising pre-clinical results, tested the product in clinical trials, made candid and fulsome disclosures, and acted decisively to end the trial when confronted with data indicating the drug would not succeed.

### III. PLAINTIFF CANNOT ALLEGE LOSS CAUSATION

Plaintiff's argument in support of loss causation also fails because it is premised on an unsupported inferential leap. (Def. Br. at 28-30.) Plaintiff alleges that Defendants made false and misleading statements regarding AUC levels, Enzalutamide interaction, the effect of twice-daily dosing on the interaction, and comparisons to the PREVAIL study. (Pl. Opp. at 29.) But the press release announcing the termination of the M-E Combination Trial relates to none of these topics. Instead, it revealed that the decision to terminate the Trial was based on a protocol-specified interim review and futility analysis that showed (1) "a much higher rate of PSA90 response in patients treated with enzalutamide monotherapy . . . than were expected based upon historical data" and (2) "no clear efficacy benefit seen with the combination of masofaniten plus enzalutamide compared to enzalutamide single agent." (CAC ¶ 129.) ESSA thus concluded that there was "a low likelihood of meeting the prespecified primary endpoint of the study." (*Id.*)

14

These were all new facts, not the correction of prior misstatements.

Once again, Plaintiff's case law cannot save his claim. The Opposition asserts that "*Akorn* is instructive" and supports a finding that Plaintiff adequately pled loss causation despite there being no connection between the disclosure and alleged misstatements. (Pl. Opp. at 29-30 (citing *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 822 (N.D. Ill. 2017).) Not so. *Akorn* is distinguishable because, in that case, plaintiffs "alleged a stock price drop following the April 24 disclosure that revealed errors in the same financial statements that had been restated the previous month due to the discovery of an error in [an acquired company's] balance sheet." 240 F. Supp. 3d at 822. Here, no error was revealed or corrected. ESSA's press release announced accurate information based on a newly conducted interim review and futility analysis. Accordingly, Plaintiff fails to allege any "causal connection between the material misrepresentation and the loss." *Tricontinental Indus. Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843 (7th Cir. 2007) (citation omitted). For this independent reason, the Complaint should be dismissed.

## IV.     PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 20(A)

Plaintiff does not dispute that, without an underlying violation, Plaintiff's control person claim fails as a matter of law. (*See* Pl. Opp. at 30.)

## **CONCLUSION**

For these reasons and those stated in the MTD Brief, the Court should dismiss the Complaint in full, and with prejudice. Where, as here, "[p]laintiffs have not suggested that they have access to additional facts that could strengthen their allegations" a request for permission to replead should be denied. *Friedman v. Rayovac Corp.*, 291 F. Supp. 2d 845, 858 (W.D. Wis. 2003).

Dated: January 5, 2026

Respectfully submitted,

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

_s/ Marcella L. Lape_
Marcella L. Lape
(WIED Bar No. 77803)
320 South Canal Street
Chicago, Illinois 60606
Telephone: (312) 407-0954
Fax: (312) 827-9327
marcie.lape@skadden.com

Lara A. Flath
(WIED Bar No. 5723481)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3717
Fax: (917) 777-3717
lara.flath@skadden.com

_Counsel for Defendants ESSA Pharma Inc.,_
_David R. Parkinson, and Peter Virsik_

16