TODD VAN GROLL, *individually and
on behalf of all others similarly situated*,

        Plaintiff,

        v.                          Case No. 25-C-124

ESSA PHARMA INC.,
DAVID R. PARKINSON, and
PETER VIRSIK,

        Defendants.

## DECISION AND ORDER GRANTING MOTION TO DISMISS

On October 31, 2024, Defendant ESSA Pharma Inc., a pharmaceutical company, issued a press release announcing its decision to terminate its trial and development of a drug called "Masofaniten." The next day, when the market opened, ESSA's stock price fell 73.08%, closing at $1.40 per share, causing investors to suffer tens of millions of dollars in losses. Less than a year later, ESSA announced it was being acquired by another company.

Plaintiff Todd Van Groll filed this federal securities fraud class action against ESSA, as well as two of its top officials, Defendants David R. Parkinson, Chief Executive Officer, and David S. Wood, Chief Financial Officer. Plaintiff alleges that Defendants knew early on that Masofaniten was ineffective but nonetheless represented otherwise to shareholders and at medical conferences during the Class period between March 14, 2023, and October 31, 2024. On motion of the Plaintiff, the court appointed Van Groll as lead plaintiff and approved of lead counsel pursuant to the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(a)(3). Dkt. No. 16. Plaintiff filed an amended class action complaint (CAC) on August 11, 2025, removing Defendant

David S. Wood and adding Defendant Peter Virsik, ESSA's Chief Operating Officer. Dkt. No. 20.

The CAC advances two theories of liability. First, Plaintiff alleges against all Defendants violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. Second, Plaintiff alleges against Parkinson and Virsik (the Individual Defendants) violations of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

This matter is currently before the court on Defendants' motion to dismiss the CAC pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), as well as the PSLRA, 15 U.S.C. § 78u-4(b). Dkt. No. 27. The court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa(a). For the reasons set forth below, the motion to dismiss will be granted.

## ALLEGATIONS OF THE AMENDED CLASS ACTION COMPLAINT

ESSA was a clinical-stage pharmaceutical company focused on developing therapies for the treatment of prostate cancer. CAC ¶ 1. More specifically, during the class period, ESSA was working to develop and commercialize products based on Aniten molecules, which target androgen receptors (AR). *Id.* ¶¶ 3, 66–67. Targeting androgens, male sex hormones that impact cancer growth, is a way to treat prostate cancer, including metastatic, castration-resistant prostate cancer. *Id.* ¶¶ 31–35. ESSA focused on developing treatments for disease cases caused by activated androgen receptors, which are composed of three "domains": the ligand-binding domain (LBD), the DNA-binding domain, and the N-terminal domain (NTD). *Id.* ¶ 34. Androgen deprivation theory, the standard of care in prostate cancer, works by stopping testosterone from being made or from reaching prostate cancer cells. *Id.* ¶ 35. ESSA's treatments focus on inhibiting the N-terminal domain of the androgen receptor. *Id.* ¶ 36.

2

Prior to the class period, the FDA provided industry guidance on dosing and label requirements of drug-on-drug interactions, as well as processes for developers to assess maximum efficacy and safety for various doses early in clinical trials. *Id.* ¶¶ 44–46. Exploring different doses is important because it provides better information regarding drug absorption, distribution, metabolism, and excretion (pharmacokinetic, or PK, information). The specific measure of total systemic exposure to a drug over a period of time is called the "area under the curve" (AUC). *Id.* ¶¶ 10, 47. The AUC of a drug is an important benchmark for researchers to use in assessing efficacy, safety, and tolerability of a drug at different dose ranges. *Id.* ¶ 47. The Prostate-Specific Antigen (PSA) level is also a relevant indicator; a PSA level over a certain threshold can lead to a recommendation for a biopsy, and PSA level changes, either up or down, can inform whether a treatment is effective. *Id.* ¶¶ 37–40, 79, 82. ESSA's trials and publications sometimes cited the PSA90 rates—the percentage of patients who received a 90% reduction in PSA level—of ESSA's trial and other similar trials as a metric of success. *Id.* ¶ 105.

Drugs can interact differently with an enzyme called "cytochrome P450," and more specifically, the "3A4" subtype of that enzyme (CYP3A4). *Id*. ¶¶ 52–54. CYP3A4 metabolizes approximately half of all prescribed drugs and is therefore a major site for drug-drug interactions. *Id*. ¶ 54. Drugs that inhibit CYP3A4 activity (inhibitors), for instance, can have a significant impact on drugs being metabolized by CYP3A4 (a "substrate" drug) by increasing the substrate's concentration in the body. *Id.* ¶ 55. Drugs that induce CYP3A4 activity (inducers), by contrast, increase the enzyme's activity and the breakdown of the substrate drug, which reduces the substrate's concentration in the body and thereby reduces the AUC. *Id.* ¶ 56. The FDA classifies different CYP3A4 inducers into three categories: strong, moderate, and weak.

3

Enzalutamide, a standard of care prostate cancer drug, is a strong CYP3A4 inducer that decreases the AUC of CYP3A4 substrates by more than 80%. *Id.* ¶¶ 56–58. So, if a patient takes Enzalutamide, it can have a dramatic impact on CYP3A4 substrates like Masofaniten. *Id.* ¶¶ 11, 63–64. Federal regulations require precise labeling information regarding drug-drug interactions, including PK effects, which Enzalutamide included regarding its effect on CYP3A4 substrates. *Id.* ¶¶ 60–65. At all relevant times, ESSA was aware of Enzalutamide's predicted and actual impact on Masofaniten. *Id.* ¶ 86.

## A. ESSA's Drug Development

Masofaniten was not ESSA's first Aniten molecule treatment for castration-resistant prostate cancer. ESSA first developed a drug candidate called EPI-506, but a Phase 1 clinical trial revealed it was clinically ineffective and had an "excessive high pill burden" to reach a clinically relevant response. *Id.* ¶¶ 66–71. After canceling EPI-506 and undergoing corporate restructuring, ESSA focused on EPI-7386 (Masofaniten). ESSA issued a press release in March 2019, announcing Masofaniten as its lead clinical candidate. *Id.* ¶¶ 70–72. ESSA reported Masofaniten "demonstrated 20 times higher potency than EPI-506" and exhibited "increased resistance to metabolism." *Id.* ¶ 71. ESSA's first Masofaniten study was a "monotherapy trial," where the drug was tested as a single agent. *Id.* ¶¶ 75–76. During the monotherapy trial, ESSA assessed various dose ranges from 200 mg to 1000 mg taken once daily, and a 600 mg dose taken twice daily. *Id.* In September 2021, ESSA amended its protocol to allow for twice-daily dosing of 800 mg due to saturation issues. *Id.* ¶ 78. Even with higher doses, however, the use of Masofaniten by itself failed to demonstrate clinical effectiveness. *Id.* ¶ 79.

Faced with Masofaniten's ineffectiveness as a monotherapy, ESSA sought to try combining Masofaniten with approved LBD-targeting drugs that had become standard of care. *Id.*

4

¶ 80.  On February 24, 2021, ESSA announced a collaboration with Astellas Pharma Inc. to evaluate Masofaniten in combination with the Astellas' AR inhibitor, Enzalutamide (the M-E combination trial).  *Id.* ¶¶ 80–82.  The M-E combination trial was designed to have two phases, both of which were open label and had no masking of the drug for participants.  *Id.* ¶ 82.  The study design ensured ESSA, as the study's sponsoring and responsible party, had full access to interim trial data such as PSA reduction and AUC.  *Id.*  Phase 1 was a single-arm, dose-escalation study to evaluate the safety and tolerability of the drug combination, assess drug-drug interactions, and identify the optimal dose for Phase 2.  *Id.* ¶ 83.  Phase 2 was an open-label, two-arm study, with one arm receiving the Masofaniten-Enzalutamide combination and the other receiving only Enzalutamide.  *Id.* ¶ 84.

**B.  ESSA's Statements as the M-E Combination Trial Progressed**

ESSA's target exposure for Masofaniten during the monotherapy trial was at or above 300,000 AUC.  *Id.* ¶¶ 95–98; Dkt. No. 29-2 at 7 (Cowen 41st Annual Health Care Conference, March 4, 2021); Dkt. No. 29-5 at 6–7 (Oppenheimer 31st Annual Healthcare Conference, March 18, 2021).  ESSA explained that the reason for targeting 300,000 "is because that is the exposure where we saw good consistent anti-tumor activity across all of our Xenograft models with the molecule."  CAC ¶ 96.  ESSA knew that pairing Masofaniten with Enzalutamide would make reaching that threshold more difficult than Masofaniten's monotherapy trial.  For instance, ESSA informed its investors on several occasions of both predictions of effects and the actual results: that Masofaniten's exposure would be reduced by roughly 60% when taken with Enzalutamide, but exposure was still in the clinically relevant range.  *Id.* ¶¶ 87–91; Dkt. No. 29-6 at 10 (ESSA Special Call, June 27, 2022); Dkt. No. 29-7 at 8 (Jefferies London Healthcare Conference, Nov. 17, 2022); Dkt. No. 29-8 at 3 (Oct. 26, 2022 Press Release); Dkt. No. 29-1 at 18 (Form 10-K for

5

the fiscal year ended September 30, 2023). Plaintiff further alleges that, on October 27 to 29, 2022, ESSA participated in the 2022 Prostate Cancer Foundation Retreat and presented findings regarding the drug-drug interaction between Enzalutamide and Masofaniten, although the study involved lower doses of Enzalutamide than was usual. CAC ¶¶ 99–104.

Plaintiff cites remarks made by ESSA executives at several conferences, which will be included where relevant in the court's analysis, as evidence that ESSA misleadingly downplayed Enzalutamide's negative impact on Masofaniten as evidenced in Phase 1 of the M-E combination trial. *Id.* ¶¶ 106–12. Phase 2 of the M-E combination trial began in September 2023 and was scheduled for "primary completion" in August 2025 and full "study completion" in January 2026. *Id.* ¶ 113. Plaintiff cites statements made at various conferences and in press releases regarding the findings of Phase 2, arguing that ESSA executives improperly compared the M-E results to the earlier conducted "PREVAIL" study, and that ESSA ignored Masofaniten's deficiencies and misleadingly exaggerated clinical findings. *Id.* ¶¶ 114–28.

Finally, on October 31, 2024, ESSA issued a press release announcing its decision to terminate Phase 2 of the M-E combination trial and abandon Masofaniten development. *Id.* ¶ 129. ESSA stated it did not identify any clear benefit from combining Masofaniten and Enzalutamide versus Enzalutamide on its own, and that a futility analysis showed a low likelihood of meeting the prespecified primary endpoint of the study. *Id.* ESSA's stock plummeted 73.08% the next day, closing at $1.40 per share on November 1, 2024. *Id.* ¶ 130. ESSA share prices never recovered, and ESSA announced on July 14, 2025 that it was being acquired by Xeno Therapeutics. *Id.*

6

## C. Additional Evidence of Scienter

Plaintiff alleges several sources of evidence that support a finding of scienter on Defendants' part. First, Defendants had access to concealed information regarding the open-label M-E combination trial. Defendants knew the PSA90 and AUC data for each cohort patient at each stage when it made representations about Masofaniten's efficacy. *Id.* ¶¶ 132–33.

Second, Defendants knew of the 300,000 AUC threshold requirement, knew that Enzalutamide would interfere with reaching that threshold, and still made its misleading representations about Masofaniten's efficacy. *Id.* ¶¶ 134–42. Defendants either misrepresented or ignored the significance of Enzalutamide.

Third, the CAC alleges Defendants' scienter is supported by the fact that the alleged misstatements and omissions concerned core operations of ESSA. *Id.* ¶ 143. Developing Masofaniten was a core operation of ESSA during the class period, and the M-E combination trial was ESSA's only active study that had reached Phase 2. *Id.* Further, the Individual Defendants were active in all aspects of the business and certainly knew about the problems with exposure level and the combination drug trial's issues. *Id.* ¶ 144.

Fourth, the temporal proximity between the misleading statements and ESSA's decision to cancel the Masofaniten project entirely support an inference of scienter. For example, within six weeks of Virsik's statement that Masofaniten exposures were "very well," the company had completed a futility analysis and made the decisions to cancel the project as explained above. *Id.* ¶¶ 145–47.

Fifth, contrary to FDA requirements that clinical trial results be posted on the FDA website, ESSA did not submit any clinical trial results for its failed studies to the FDA. *Id.* ¶ 148. Nor did ESSA report patient AUC data after October 2022. *Id.*

7

Sixth, Virsik sold stock during the class period in 2024 and obtained $819,303.41 of proceeds. Virsik had not sold any shares in the 18 months before the class period, and his sales during the class period were out of line with his prior trading history. His disproportionate trading enhances an inference of fraud. *Id.* ¶ 150.

Seventh, and finally, ESSA's position as a company supports an inference of fraud, since ESSA had never developed a successful product. EPI-506 failed, and Masofaniten was suffering the same fate—Plaintiff contends Defendants had two choices: admit the M-E combination trial was failing, or delay the bad news and hope for a miracle. They did the latter, and investors suffered. *Id.* ¶ 151.

## LEGAL STANDARD

A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint to state a claim upon which relief can be granted. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990); *see* Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss under Rule 12(b)(6), the court must accept all well-pleaded factual allegations as true and draw all inferences in the light most favorable to the non-moving party. *Gutierrez v. Peters*, 111 F.3d 1364, 1368–69 (7th Cir. 1997); *Mosley v. Klincar*, 947 F.2d 1338, 1339 (7th Cir. 1991). Rule 8 mandates that a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The plaintiff's short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While a plaintiff is not required to plead detailed factual allegations, it must plead "more than labels and conclusions." *Id.* Stated differently, a "formulaic recitation of the elements of a cause of action will not do." *Id.* A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to

8

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff's claims sound in fraud and are therefore subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b). *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 266 F. Supp. 3d 1154, 1157 (E.D. Wis. 2017), *aff'd*, 895 F.3d 933 (7th Cir. 2018); *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 982 (E.D. Wis. 2009). "In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This heightened pleading standard requires plaintiffs to "provide the who, what, when, where, and how" of the alleged fraud. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (internal quotations marks omitted).

"[I]n addition to the heightened pleading standard imposed by Rule 9, the [PSLRA], enacted by Congress as a check against abusive litigation in private securities fraud actions, heightens even further the pleading standards in actions such as this one." *Kohl's*, 266 F. Supp. 3d at 1157–58 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320–22 (2007)). In charging misrepresentations or omissions of material fact, the PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Further, in alleging scienter, the "complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u–4(b)(2). Scienter is a mental state that, for these purposes, means "knowledge of the statement's falsity or reckless

9

disregard of a substantial risk that the statement is false." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (internal quotation marks omitted).

**ANALYSIS**

Plaintiff brings two claims in this lawsuit. First, Plaintiff alleges against all defendants violations of Section 10(b) of the Exchange Act and Rule 10b-5. Second, Plaintiff alleges the Individual Defendants violated Section 20(a) of the Exchange Act. This claim is dependent upon Plaintiff's success on the first claim, since a claim under Section 20(a) requires adequately pleading a primary violation of securities laws. *Pugh v. Trib. Co.*, 521 F.3d 686, 693 (7th Cir. 2008). Because Plaintiff's Section 20(a) claim is dependent on his Section 10(b) claim, the court will first examine whether Plaintiff has sufficiently pled a primary violation of the securities laws and then examine Plaintiff's claim under Section 20(a).

**A. Violation of Section 10(b) and Rule 10b-5**

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 makes it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" 17 C.F.R. § 240.10b–5(b). The elements of a claim based on violations of § 10(b) and Rule 10b–5 are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810

10

(2011) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011)); *Pugh*, 521 F.3d at 693.

Defendants argue that the CAC fails to allege actionable misstatements, fails to plead facts giving rise to a strong inference of scienter, and fails to allege loss causation. Importantly, pure omissions, absent circumstances that would require assertions to prevent other statements from being misleading, are not actionable. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264–66 (2024). Further, the Seventh Circuit has said there is no "fraud by hindsight," meaning, a plaintiff cannot get by with allegations that post-hoc failures prove actionable pre-failure knowledge. *Pugh*, 521 F.3d at 694 (citing *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007)).

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 & n.12 (1976)). It can be "demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham*, 495 F.3d at 756 (citing *Ernst & Ernst*, 425 U.S. at 193). "Recklessness" is defined as "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *City of Livonia Emps.' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*, 711 F.3d 754, 756 (7th Cir. 2013) (citations omitted). To adequately allege scienter, a plaintiff must meet the "exacting pleading requirements" of the PSLRA—requirements that rise above the threshold set by Federal Rule of Civil Procedure 8(a) and even Rule 9(b), as explained above. *Tellabs*, 551 U.S. at 313; *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*, 99 F.4th 928, 951 (7th Cir. 2024) (qualifying the scienter element as a "difficult hurdle"). A plaintiff must "state with particularity facts giving rise to a strong inference that the

11

defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "To qualify as 'strong' . . . , an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. "The strength of an inference cannot be decided in a vacuum" because "[t]he inquiry is inherently comparative." *Id.* at 323.

So, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically," with the ultimate question being: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326. If the former inference is not at least as compelling as the latter, the court should dismiss. *Id.* at 328; *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 937 (7th Cir. 2018).

Here, there are two inferences. Plaintiff's version paints the picture of Defendants touting their primary drug project as overcoming all odds, despite clear and ongoing evidence that the exposure obtained in trials was insufficient across the board. Every conference and presentation afforded Defendants new opportunities to exaggerate the benefits and downplay the issues, and all the while, executives made money selling inflated stock. Defendants, on the other hand, explain that pharmaceutical companies conducting clinical trials on novel drugs oftentimes face hurdles, and when things go wrong, "[i]t would be a great disservice to stifle biopharmaceutical companies' pursuit of medical advancements by failing to safeguard against inundation of lawsuits alleging securities-law violations." Dkt. No. 28 at 8 (quoting *Emps.' Ret. Sys. v. MacroGenics, Inc.*, 61 F.4th 369, 388 (4th Cir. 2023)). ESSA spent years developing drugs to treat prostate cancer, eventually choosing Masofaniten as its lead candidate in 2019. ESSA presented ongoing findings at conferences and in public filings and promptly cancelled the trial once it became clear that the

M-E therapy did not demonstrate a clear efficacy benefit over Enzalutamide alone.  On balance, the court cannot say that Plaintiff has shown its inference is "at least as strong" as Defendants'. *Tellabs*, 551 U.S. at 326.

### 1. ESSA's Allegedly False and Misleading Statements

Plaintiff alleges that ESSA's statements were actionable misstatements or omissions regarding (1) patients' exposure to Masofaniten, (2) comparisons between Masofaniten and past clinical trials of Enzalutamide (the "PREVAIL" study), and (3) the benefits of the M-E combined treatment.  Defendants contend that the CAC fails to plead facts that show any of ESSA's statements were false or misleading at the time they were made.

The CAC alleges that ESSA's statements about Masofaniten exposure levels were false and misleading because Masofaniten exposure levels were "below the necessary threshold for anti-tumor activity of 300,000 AUC" (CAC ¶¶ 107, 109, 112, 115, 120, 122, 124); Enzalutamide significantly reduced Masofaniten exposure (*id.* ¶¶ 107, 109, 115); bi-daily dosing was not successful in producing clinical exposures (*id.* ¶¶ 109, 112, 126); and pill burden remained a significant problem (*id.* ¶¶ 107, 109, 115).

Defendants point out, however, that while Plaintiff characterizes the 300,000 AUC figure as a mandatory threshold, it was instead a target far above the base level required for bioactivity and clinic relevance. Dkt. No. 28 at 19.  The full context of each statement highlighted by Plaintiff in the CAC shows that, on several occasions, ESSA stated that 130,000 AUC indicated a "biologically active" or "biologically relevant" dose, and the 300,000 AUC figure was a target for maximum efficacy.  *See* Dkt. No. 29-2 at 7 (41st Annual Cowen Healthcare Conference) ("[A] very favorable starting dose in our view . . . would achieve an exposure in AUC in patients of roughly 130,000 or 140,000 [AUC] . . . . Our target here, though, is to be able to get to exposures

of over 300,000 AUC . . . . And the reason we're targeting 300,000 is because that is the exposure where we saw good, consistent antitumor activity across all of our xenograft models with the molecule."); Dkt. No. 29-5 at 6 (Oppenheimer 31st Annual Healthcare Conference) (same); Dkt. No. 29-15 at 4 (Bloom Burton & Co. Healthcare Investor Conference) ("[T]he 137,000 [AUC] would be in a range in xenografts that was biologically active but perhaps not the highest exposure and certainly not our highest target exposure. And we are targeting in patients, an exposure of over 300,000 . . . .").

The court concludes that Plaintiff's characterization of 300,000 AUC as a floor for significance is inconsistent with ESSA's full representations. And it follows that Plaintiff's assertions of material falsehood or misleading statements based solely on trial results with sub-300,000 AUC numbers cannot bear the weight the relevant pleading standard places upon them— Defendants' statements that Masofaniten's exposure levels during testing were clinically significant (CAC ¶ 106), "therapeutic" (*id.* ¶ 121), "high" (*id.* ¶ 108); "excellent" (*id.* ¶ 114), or "good" (*id.* ¶ 116), in light of its findings, were not actionable misstatements.

Plaintiff also takes issue with Defendants' statements regarding Masofaniten's interaction with Enzalutamide. Specifically, Plaintiff asserts that Defendants failed to communicate how devastating Enzalutamide was on Masofaniten's exposure. CAC ¶¶ 107, 109, 115. But, as Defendants observe, many of ESSA's quotations included in the CAC acknowledge the difficulties that Enzalutamide posed and explained that ESSA was working specifically to address those concerns. Defendants stated they expected Enzalutamide to cause an increase in the metabolism of Masofaniten and had increased the dose to address the effect. *Id.* ¶ 106. ESSA disclosed that Enzalutamide did end up causing a reduction of Masofaniten's overall AUC, but that dosing

decisions attempted to address the issue. *id.* ¶¶ 110, 114, 119, 125. In context, Defendants' statements were not misleading or in contradiction with the trial data.

Plaintiff also highlights the bi-daily dosing modification, arguing that Defendants' optimistic statements about Masofaniten's exposure were flat-out wrong. *Id.* ¶¶ 102, 112. But the court must view the statements in context and with the relevant background in mind. *Teamsters Affiliates Pension Plan v. Walgreen Co.*, No. 08 C 2162, 2010 WL 3894149, at \*5 (N.D. Ill. Sept. 29, 2010) ("Plaintiffs would like the court to view the statement in a vacuum, but the court must consider the statement in the context of the report."). One example from the CAC is ESSA's presentation at ESMO 2023, which included clinical results showing an increase in the AUC of Masofaniten when the switch was made from a once-daily dose (QD dosing) to a twice-daily dose (BID dosing). CAC ¶ 110. The fact that even a twice-daily dose did not result in an AUC in excess of 300,000 does not mean that there was not significant improvement. The very evidence Plaintiff cites shows that switching to a twice-daily dose significantly improved Masofaniten's AUC from what it was under a once-daily dose regiment. Dkt. No. 30 at 21.

The CAC also alleges that ESSA's statements regarding exposure were materially misleading because they failed to disclose that "patients were having issues with pill burden." CAC ¶ 107. But the CAC does not identify any statement Defendants offered concerning pill burden of Masofaniten, other than a report from a confidential witness who previously worked for ESSA on a predecessor drug. If Defendants themselves made no statement about the pill burden of Masofaniten, then the allegation is at most one of omission, which is not actionable under *Macquarie*, which held that "Rule 10b–5(b) does not proscribe pure omissions." 601 U.S. at 264. Aside from this problem, the CAC doesn't even allege facts that support its assertion that Masofaniten presented a substantial pill burden on users since a confidential witness statement

15

about his previous experience with a predecessor drug does not raise any inference concerning Masofaniten.

Next, Plaintiff cites to ESSA's comparison of the M-E combination trial with the 2014 clinical trial, PREVAIL, evaluating Enzalutamide as a monotherapy. CAC ¶¶ 105, 127. The CAC alleges that Defendants "touted the M-E Combination Trial early Phase I results by comparing the PSA90 rates (meaning the percent of patients who received a 90% reduction in PSA level) to patients in earlier studies." *Id.* ¶ 105. Plaintiff argues that each of the previous studies and, in particular, the PREVAIL study, were materially different in that participants started with a baseline PSA 18 times higher than the baseline PSA in the M-E combination trial, making Defendants' comparisons misleading. *Id.* ¶ 128. In its presentations, however, Defendants acknowledged that the PSA levels were different between the two studies but nevertheless thought that the PREVAIL study still had some relevance. Dkt. No. 29-11 at 6–7 (Piper Sandler 35th Annual Healthcare Conference).

Plaintiff also alleges that several statements made by Defendants beginning in November 2023 were false and misleading because, after Phase 1 of the M-E combination trial, ESSA already knew the M-E trial was no more effective than Enzalutamide as a monotherapy. CAC ¶¶ 117, 122, 124, 126, 128. But the fact that Masofaniten alone was not more effective than Enzalutamide alone does not mean that combining the two would not be more effective than Enzalutamide by itself. That is precisely the question the M-E trial was intended to answer. None of the statements cited by Plaintiff show any representation of certainty or guarantees regarding the M-E trial during Phase 2, and Plaintiff does not allege any false data was presented or information arose that would necessitate additional disclaimers. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) ("[Section] 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and

all material information. Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" (quoting 17 CFR § 240.10b–5(b)). Overall, the court cannot conclude that Plaintiff has borne his burden of alleging Defendants' representations were materially false or misleading.

### 2. Scienter

Even if the court was to assume that some of Defendants' statements were inaccurate, Plaintiff also fails to satisfy the element of scienter. Plaintiff alleges that the record is replete with evidence of Defendants' knowledge that their statements regarding Masofaniten's efficacy were false or misleading, including confidential or otherwise undisclosed information relating to the M-E combination trial's progress. And Plaintiff says additional factors push the inference over the edge from innocent to actionable, including Masofaniten's development as the core operations of ESSA's business, the temporal proximity between disclosures and project cancellation, evasive responses and selective reporting of data, Virsik's stock sales, ESSA's precarious condition, and Defendants' failure to argue a competing inference.

As stated above, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "To qualify as 'strong' . . . , an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. "The strength of an inference cannot be decided in a vacuum" because "[t]he inquiry is inherently comparative." *Id.* at 323.

Much of Plaintiff's argument here hinges on the relevance of 300,000 AUC; Plaintiff argues that Defendants knew or should have known their statements about Masofaniten's AUC were misleading since exposure in patients did not achieve the 300,000 AUC threshold. But, as

17

explained above, Defendants' representations do not support Plaintiff's contention that Defendants believed an AUC of Masofaniten below 300,000 would have no effect, especially when combined with Enzalutamide.

Plaintiff also flags Masofaniten's development as the core operations of ESSA's business, ESSA's precarious condition, the temporal proximity between disclosures and project cancellation, and evasive responses and selective reporting of data. When executives make statements about core or critical aspects of their own companies, an inference of scienter may be bolstered. *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 661 (N.D. Ill. 2020). But the so-called "core operations" theory cannot establish scienter on its own. *In re Baxter Int'l Inc. Sec. Litig.*, No. 19 C 7786, 2021 WL 100457, at *13 (N.D. Ill. Jan. 12, 2021). And here, because the court concludes Plaintiff has not borne his burden otherwise, "core operations" cannot change the outcome. The "precarious condition" of a core operation failing go hand in hand, but it is insufficient here in light of all the circumstances. Nor can temporal proximity change the outcome on its own, lest the court improperly depend upon "fraud by hindsight." *See Arazie v. Mullane*, 2 F.3d 1456, 1467–68 (7th Cir. 1993) ("[T]emporal proximity between positive statements stressing a firm's strengths and announcements of poor economic performance do not create an inference that the earlier statements were fraudulent."). Lastly, upon review of the full context for each statement cited in the CAC, the court concludes that Plaintiff's characterizations of "evasive responses" and "selecting reporting of data" cannot sufficiently support scienter.

Stock sales can create a strong inference of scienter, but the sale(s) must be unusual or suspicious—and a failure to provide context showing that the applicable time period is unusual undercuts a "strong" demonstration of scienter. *Pugh*, 521 F.3d at 695. Here, Plaintiff contends

18

Virsik's suspicious stock sales during the class period—totaling $819,303.41—enhance an inference of fraud. CAC ¶ 150. And Plaintiff does include allegations regarding Virsik's total lack of stock-selling activity in the 18 months preceding the class period, and that the trading was "out of line with his prior trading history over a comparable period in the past." *Id.* Further, Plaintiff alleges that the trading plans were entered into six months after the class period began, and after Virsik "began misleading investors." *Id.* But the CAC lacks other relevant information, such as whether Virsik's sales represented a significant percentage of his total holdings, whether they were offset by later purchases of shares, whether his stock was restricted in any way, the terms of the supposed trading plans entered into six months after the class period began, what exactly a "comparable period [of time]" means in the context of a fifteen-year-old company with very few major projects, etc. *See Kohl's*, 266 F. Supp. 3d at 1169 (listing potential context of sales lacking in the complaint and concluding that "[a]lleging an absence of sales for one year preceding a class period that runs two-and-a-half years does not provide enough information to demonstrate a pattern, let alone an unusual one"). And the absence of stock sales by other parties who would have been "in the know" and incentivized to sell at the same time as Virsik "implies that nothing was thought to be out of the ordinary." *Higginbotham*, 495 F.3d at 759. Plaintiff's allegations are not enough to suggest Virsik's trades were unusual.

Finally, regarding competing inferences, the court must "weigh the strength of the plaintiffs' inferences in comparison to plausible nonculpable explanations for the defendants' conduct," and assess whether a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Pugh*, 521 F.3d at 693 (quoting and citing *Tellabs*, 551 U.S. at 324). On balance, the court concludes that Plaintiff's inference is not at least as compelling as Defendants, as summarized at the start of

19

the court's analysis. ESSA was developing a drug after years of research, explained the pitfalls and difficulties related to drug concentration, expressed optimism as Phase 1 concluded and Phase 2 began, and eventually decided to end the trial once it was clear the trial was "futile."

Overall, the above circumstances are insufficient to make the inference of scienter "at least as strong as any opposing inference[.]" *Tellabs*, 551 U.S. at 326. Plaintiff's inference is possible, and circumstantially, may appear probable, if one focuses too closely on individual statements and actions. But the court's inquiry must be holistic, *id.*, and the court concludes the inference of scienter is not as strong as the opposing inference that each representation made corresponded with reasonable optimism over the course of a drug's trial.

### 3. Loss Causation

Plaintiff's last argument is that he sufficiently pled loss causation from Defendants' statements to support his allegations of securities fraud. However, because the court concludes the representations were not materially false or misleading, nor is there a plausible inference of scienter, the court need not address whether loss causation is shown here.

### B. Violation of Section 20(a)

Section 20(a) states that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person[.]" 15 U.S.C. § 78t(a). Plaintiff alleges that the Individual Defendants, Parkinson and Virsik, are "controlling persons" of ESSA by virtue of their positions as CEO and COO of ESSA, respectively, during the relevant times. As explained above, to state a claim under Section 20(a), Plaintiff must adequately plead a primary violation of securities laws. *Pugh*, 521 F.3d at 693. Because Plaintiff fails to state a claim

20

under Section 10(b) or Rule 10b-5 as discussed above, it follows that his claim under Section 20(a) must also be dismissed.

**CONCLUSION**

For the reasons set forth above, Defendants' motion to dismiss (Dkt. No. 27) is granted. The question remains whether dismissal should be with prejudice. Plaintiff requested that the court grant leave to amend if it granted Defendants' motion. Dkt. No. 30 at 30. But Plaintiff has already amended once and could have easily sought leave to do so again in response to Defendants' motion pointing out the deficiencies in the CAC. Even while requesting leave to amend, Plaintiff fails to state what new facts he can allege that would change the result. *Id.* Still, the Seventh Circuit has repeatedly said that "a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015). Moreover, "[t]his admonition carries special weight in securities fraud cases because '[i]n this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error.'" *Kohl's*, 895 F.3d at 941 (quoting *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)).

Given these admonitions, the dismissal will be without prejudice. Plaintiff will be given thirty (30) days from the date of this order to file a second amended class action complaint if he wishes to proceed in this case. If Plaintiff does not file a second amended class action complaint by the deadline, the case will be dismissed, and final judgment entered.

**SO ORDERED** at Green Bay, Wisconsin this 15th day of July, 2026.

William C. Griesbach
United States District Judge

21